IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT

OF FLORIDA JACKSONVILLE DIVISION


ROBERT TRAMMELL,                          :
              Plaintiff,                   :
                                           :
              vs.                          :
                                           : Case No.
BRUCE A. THOMASON, in his                  : 3:06-CV-984-J-16TEM
official capacity as Chief of              :
Police of the Jacksonville Beach           :
Police Department, Jacksonville            :
Beach, Florida; RICHARD KEITH              :
DOROUGH, individually, and CITY            :
OF JACKSONVILLE BEACH, FLORIDA,

              Defendants.

_____

DEPOSITION UPON ORAL EXAMINATION OF

KENNETH WALLENTINE

_____


TAKEN AT:        333 South Rio Grande
                 Salt Lake City, Utah 84101

DATE:            March 24, 2008

REPORTED BY:     AMBER PARK, RPR, CSR

A P P E A R A N C E S

For the Plaintiff:
        CHRISTOPHER SHAKIB
        TERRELL HOGAN ELLIS YEGELWEL
        233 East Bay Street
        8th Floor
        Jacksonville, Florida 32202

For the Defendants:
        L. JOHNSON SARBER, III
        MARKS GRAY, P.A.
        1200 Riverplace Boulevard
        Suite 800
        Jacksonville, Florida 32201

-oOo-

I N D E X

EXAMINATION                                              PAGE

Examination by Mr. Sarber                                  3
Examination by Mr. Shakib                                154
Further Examination by Mr. Sarber                        198
Further Examination by Mr. Shakib                        209

```
 1              Monday, March 24, 2008:  1:50 p.m.

 2                   P R O C E E D I N G S

 3                   KENNETH WALLENTINE,

 4        called as a witness, having been duly sworn,
                was examined and testified as follows:
 5
                             EXAMINATION
 6

 7     BY MR. SARBER:

 8         Q      Mr. Wallentine, would you please introduce

 9     yourself for the record.

10         A      Yes, sir.  My name is Ken Wallentine and

11     I'm here as the deponent.

12         Q      Mr. Wallentine, good afternoon.  As you

13     know my name is Johnny Sarber, I'm an attorney in

14     Jacksonville.  I'm defending the City of Jacksonville

15     Beach, its Chief of Police, Chief Thomason and one of

16     its former officers Keith Dorough in this matter, and

17     those are all of the remaining defendants in this

18     case.  And as you also know I'm here to take your

19     deposition.  I appreciate you making time for us this

20     afternoon.  And as I understand it perhaps you

21     traveled a little bit to get up here into downtown

22     Salt Lake so I appreciate it.

23         A      Not near as much as you did, sir.

24         Q      Well, I appreciate you making it a little

25     bit more convenient for us.  I presume that you've
```

1  been deposed many times in the past?

2      A    Yes, sir, I've been deposed before.

3      Q    Well then you know the rules and the ways

4  in which this goes easier.  Please -- I do every once

5  in a while ask a question that won't make any sense to

6  you and perhaps not even to me, so feel free to

7  interrupt me or ask me to repeat it, I would be happy

8  to do so.  I have here a report that Mr. Shakib

9  forwarded to me that appears to be authored by you and

10 it was dated -- if I can find a date -- January 4 of

11 2008.  Have you revised in written form your report in

12 this case?

13     A    No, sir.

14     Q    Okay.  Have some of your opinions changed

15 from what was in here?

16     A    Yes, sir.

17     Q    Okay.  I figured that and we will go

18 through that.  Let's -- tell me about -- what do you

19 do right now?  How are you presently employed?

20     A    My primary employment, my day job if you

21 will, is as the Chief of Law Enforcement for the Utah

22 Attorney General.

23     Q    And as the Chief of Law Enforcement for

24 the Utah Attorney General what do you do on a daily

25 basis?

1          A     I provide direct oversight and command for

2     four different investigative bureaus that are

3     contained within the Utah Attorney General's Office.

4     I have other duties within the Attorney General's

5     office as part of the management group there, but they

6     may or may not impact my daily work.

7          Q     Is that a full-time job?

8          A     Yes, sir.

9          Q     How long have you been employed in that

10    position?

11         A     Since June of 2005 I believe.

12         Q     Are you gainfully employed in any other

13    respect other than providing expert witness services

14    occasionally?  We'll get to that in a moment.

15         A     Yes, sir.

16         Q     And explain how.

17         A     I teach almost every semester.  By

18    employed I assume you mean any source of income

19    part-time of any kind?

20         Q     Yes, sir.

21         A     I teach every semester, I provide

22    Administrative Law Judge services for a few small

23    cities and counties within the State of Utah, I'm

24    presently being paid to write a book.

25         Q     What's the topic of the book?

1      A     Use of force in search and seizure by
2   police service dogs.
3      Q     I interrupted you.  Do you have any other
4   forms of gainful employment, again, other than expert
5   witness?
6      A     I do some infrequent lecturing, but most
7   of my fees are given to charity so I don't really
8   count that as income.  And I do on very rare occasions
9   practice law, although again, my fees are generally
10  given over to a charity rather than being paid
11  directly to me.
12     Q     When you do practice law what do you do?
13     A     Almost exclusively for the last several
14  years adoption -- for cases that I charge a fee?
15     Q     Yes.
16     A     Adoption.  I also participate in some
17  poverty law clinics where I do a variety of consumer
18  landlord tenant sort of things but there are no fees
19  charged.
20     Q     Okay.  In which states are you licensed to
21  practice law?
22     A     The only state court in which I am
23  licensed to practice law is the courts of Utah.  I'm
24  licensed in Federal Courts in other areas but only in
25  the State of Utah.

Q     Which other Federal Circuits are you
authorized to practice in?

        A     10th Circuit, the 5th circuit and the
United States Supreme Court.

        Q     The book that you're writing, you said it
did pertain to police service dogs?

        A     Yes.

        Q     What stage is the book in right now as far
as completion is concerned?

        A     It is in its infancy.  I have just barely
in fact this week agreed to the contract and we have
finalized the outline for the book.

        Q     Okay.  How many other books have you
written?

        A     I have written as the sole author and
published by recognized publishers two other books.  I
have been a contributing author to one other book that
was published by a major publisher, and then written
one book that was published by a trade association.

        Q     And what other subject matters are those?
I think you've listed four other books now in addition
to the one you've just begun, but what are the subject
matters of those others?

        A     In reverse chronological order the most
recent book was published by the American Bar

Association and the title of that book is Street
Legal; A Guide to Pretrial Criminal Procedure for
Prosecutors, Defenders and Police.  And the subject
matter of that book is pretrial criminal procedure,
including some investigative chapters on various
crimes.  Is that sufficient detail?

     Q     Yes.  Thank you so much.  How about the
next one?

     A     The next one would be a book called
Criminal Procedure.  That book generally addressed
pretrial criminal procedure but was written for a
police audience.  It was published by Aspen Press in I
believe 2005.

          The next book prior to that is called Life
in the Law:  Answering God's Interrogatories.  It was
a book co-written by a number -- with a number of
ecclesiastical leaders, and I wrote a section on --
well, probably the best way to sum it up is I wrote a
section on racial and ethnic bias as being contrary to
fundamental moral law and natural law.

          And then the last of the list that was
published by the Utah Peace Officer's Association,
which is a trade association, it's called Drafting and
Executing Search Warrants.  And it addressed
warrantable search and seizure, how to properly

1 prepare a search warrant for swearing before a judge

2 and how to properly execute a search warrant once

3 granted by a court.

4 Q Okay. That last book you mentioned, did

5 that pertain specifically to canine police service

6 dogs?

7 A I don't recall that there was anything in

8 that book about dogs other than a brief exposition on

9 how to write a warrant that established the

10 reliability of a police service dog in so far as the

11 dog's behavior contributed to probable cause to

12 search.

13 Q The book Life of Law I presume did not

14 pertain to canines?

15 A Absolutely not. It pertained to the Old

16 Testament.

17 Q The criminal procedure book, the one

18 geared for a police audience, did that have anything

19 involving police service dogs?

20 A Yes, sir. There were two chapters that

21 specifically dealt with police service dogs. One

22 being on the unique rules of search and seizure for

23 police dogs, and the other being a chapter on the

24 application of force and the use of police service

25 dogs as law enforcement tools.

1      Q      And then when was the most recent one
2  published, Street Legal?
3      A      2007.
4      Q      And did it include anything on canines?
5      A      It did.  There was again a chapter on the
6  rules of search and seizure and police service dogs
7  and a use of force chapter that included discussion of
8  police service dogs.
9      Q      Is there some crossover between the
10 opinions that you have reached in this case and some
11 of the things you've talked about in both of those two
12 most recent books as far as search and seizure and the
13 use of police service dogs?  Some of the principles
14 applied?
15     A      Some of the principles apply, right.
16     Q      Going back to your occasional practice in
17 law.  In the last ten years have you ever practiced
18 law in the area of canine involvement, police service
19 dog involvement, whether it's criminal or civil cases?
20     A      Ten years would be -- in the past 9 to
21 10 years, yes.  If you are asking for a real rigid cut
22 off at ten years from this date I'm not sure I can
23 tell you accurate, but I believe the answer is yes.
24     Q      And what would you have done assuming some
25 work fell into that time period?

A     Ten years ago -- in 1998 I would have been

serving as the Chief Deputy County Attorney in Uintah

County, Utah and had responsibility for risk

management of the county, which included -- oversight

of risk management in the county, which would have

included oversight of any litigation or settlement

compromise of claims against the county's canine

program or the County Sheriff's Office involving the

use of one of the sheriff's canines.

          Q     And other than oversight of that program

have you represented parties involved in litigation

involving police service dogs in the last ten years?

          A     Only the county.

          Q     Okay.  So you have actually been counsel

of record for the county?

          A     Yes.

          Q     Have you tried any cases, whether they be

criminal or civil, in the role as an attorney

involving police service dogs?

          A     Period or in the last ten years?

          Q     In the last ten years?

          A     I believe so.

          Q     Okay.  And you did longer than that?

          A     Yes.

          Q     For a broader period of time?

1      A      Yes.

2      Q      In your capacity as a ALJ, as an

3   Administrative Law Judge, does that ever involve cases

4   involving police service dogs?

5      A      No, sir.  That work is almost exclusive --

6   strike the qualifier.  That work is exclusively

7   employment related.  Sitting in judgment of cause for

8   discipline or termination.

9      Q      Any kind of employee?  A particular kind

10  of employee?  State employees?

11     A      Public employees.  So state, county or

12  municipal.

13     Q      And I'm kind of working back to the

14  present time.  Now in your position as Chief of Law

15  Enforcement for Utah, does that involve oversight of

16  any canine police service dogs?

17     A      It does not.

18     Q      Okay.  As the Chief of Law Enforcement

19  what's the interaction there with police officers?

20  What is it that you're doing, if anything, with police

21  officers?  Would there be any kind of connection

22  between your job and any kind of daily contact with

23  what they do, policy making, defending them,

24  criticizing them?  Kind of describe that.

25     A      It would be helpful if I broke that into

two branchs of answers.

Q    Okay.

A    I'm going to start with the first.  I have
daily interaction with the four bureau chiefs who
report directly to me.  They are law enforcement
officers.  And for the most part the majority of their
employees are law enforcement officers.  My agency has
no uniformed patrol officers.  They are all either
investigators or forensic technicians or specialists
such as accountants, economists, nurses, forensic
accountant.  And ultimately I'm responsible for the
command of all the sworn law enforcement officers.
There are -- I believe I put 35 in my report, I think
the actual number is closer to 39 or maybe -- 38 or
maybe 40.  So I have direct oversight responsibility
for every law enforcement officer and for many people
who support law enforcement officers that are employed
by the Attorney General's Office.

My position also entails being a
representative of the Utah Attorney General, who under
our state constitutional scheme is the supreme law
enforcement official in the state, and as such often
find myself representing the Attorney General either
on an ad hoc basis or on a permanent assignment with
groups such as the Utah Chiefs of Police Association,

individual Chiefs of Police from a variety of Utah
cities, Sheriffs of the 29 counties in a variety of
capacities.

And then I have -- let's see, you also
asked about policy making.  Naturally I have policy
making responsibility for the law enforcement entities
within the Attorney General's Office and have policy
making involvement with a number of law enforcement
agencies, both state, municipal and county throughout
the State of Utah.

Q    Okay.  You mentioned teaching and some
lecturing.  Are you currently doing any teaching or
lecturing on issues related directly to the use of
canine patrol service dogs?

A    Only tangentially.  This semester I'm
teaching Criminal Justice 101, which is a broad
overview survey.  It was my turn to take that class.
And there may be -- of an 800 page textbook there may
be four or five pages -- and that's probably a
stretch, two to three pages on police service dogs.

Q    Okay.  Where are you teaching that?

A    Excelsior College at Albany, New York.

Q    Do you go there to teach that or is
that --

A    I teach online to students.  I have

students in Iraq, Afghanistan, Japan.  They're
primarily overseas -- well, that's not fair.  The
majority -- a number of my students are overseas.

    Q    Okay.  At some point a while back if I
read in here, I thought I did, you were actually a law
enforcement officer at some point?

    A    I still am.

    Q    You still are.  When did you first become
a law enforcement officer?

    A    I became certified in the State of Utah as
a law enforcement officer in 1982.

    Q    And you served as basic street patrol for
lack of a better term?

    A    Yes, sir.  That's a good term.

    Q    And how long did you do that?

    A    I served in the municipal police
department through 1987 when I went to law school.
And most of that time I was a patrol officer.  I had
investigative assignments for periods of time but held
the rank of patrol officer.

    Q    And then law school in 1987?

    A    Correct.

    Q    After law school did you ever serve as a
law enforce -- as a patrol officer?

    A    Yes.  Although not on a full-time basis.

1      Q    Where did you do that and how much of your
2  time was spent in that fashion?
3      A    For the Uintah County Sheriff's Office and
4  beginning in 1994 -- it would depend.  I was a reserve
5  officer.  The requirement I believe was to work eight
6  hours a month.  I certainly exceeded that on many,
7  many months.
8      Q    Okay.
9      A    I don't know if you were done with the --
10  whether you meant me to give you a history from then
11  to now?
12      Q    No.
13      A    I've been continuously certified since
14  then as a law enforcement officer.
15      Q    When was the last time you did any basic
16  patrol type of work?
17      A    That would be around 1999, 2000.
18      Q    At it would have been part-time work?
19      A    Yes, sir.  On a regular basis.  I mean, I
20  still every once in a while will go out more in a --
21  more to show support for line troops, and we have DUI
22  blitzes to show our office has an interest and so
23  forth.  But I don't fool myself.  I know they have a
24  young patrol officer to make sure I don't get hurt.
25      Q    What does it take to maintain the

certification in Utah now days?

   A      40 hours of in-service training per year
in a variety of subjects, some mandated, some not.

   Q      Let's talk about your specific experience
with canine or patrol service dogs.  When did you
first have experience with dealing with canines?  I
imagine as I read at one point you were a handler
yourself?

   A      Yes, sir.

   Q      When did you start that?

   A      When did I start my experience or when did
I start being a handler?

   Q      When did you start your experience and
then get me into when did you start being a handler.

   A      My first municipal law enforcement agency
was the Provo Police Department.  Now I'd actually
worked in a cadet capacity before that, before 1982.
The Provo Police Department and the County Sheriff's
there had dogs, and so I had some very minor
experience acting as a not well educated decoy --
that's the fella who takes the bites -- just out of an
interest in police service dogs.  Never became a
handler for the Provo Police Department.  In 1984 when
I worked part-time for the Uintah County Sheriff's
Office I again became involved as a decoy.  In the

capacity of reserve officer would have the opportunity

to patrol both independently as well as with a

partner, and when I patrolled with a partner

invariably -- well, the majority of time was with a

police service dog unit and gravitated to becoming I

think a slightly better educated decoy, which was the

path, if you will, to acquire one's own dog.  I

acquired my own dog in '97 or early '98, I don't

recall specifically, and worked that dog until I left

Uintah County in 2001 and the dog went on to another

handler.

     Q    So when you had your first dog and became

a handler in either '97 or '98 you were with the

Uintah County Sheriff's Office?

     A    Yes, sir.

     Q    And you remained a handler until

approximately 2001?

     A    Yes, sir.  Got the dog back but not in a

working capacity.

     Q    Any direct handling, canine handling,

experience since 2001?

     A    Again, you will commonly find me at state

training events and certification trials, and it would

be -- I'm usually the master of ceremonies at our

state canine competition, and it would be uncommon for

1    me not to be out there and take a bite or three or

2    four or five.  But again....

3          Q    Put the suit on for old times sake?

4          A    That and to maintain some feeling that I'm

5    not over the hill yet.

6          Q    Have you ever done any law enforcement

7    work in any capacity at all in the State of Florida?

8          A    Well, the way you ask that question is

9    pretty broad.

10         Q    I meant to be broad at first.

11         A    Not really.  I mean, I've been in Florida

12   for two weeks in a law enforcement capacity being paid

13   by my primary employer, but was simply there once in

14   Lake County, and then I believe -- is Orange County

15   where Disneyworld and all that is?

16         Q    Yes.

17         A    And then once in Orange County with Bill

18   Manther.  Both times -- and I don't remember the

19   fellow from Lake County who brought me there -- but

20   both times I would have been there in the capacity of

21   presenting training as part of a conference relating

22   to the police service dogs.  And so, you know, I mean,

23   yeah, I got up and rode around in a helicopter a few

24   times, but I didn't consider myself really doing law

25   enforcement.  But law enforcement related, yeah.

Q     All right.  So you weren't actually doing

law enforcement but you were doing some training in

the field of police service dogs?

         A     Right.  I don't purport to have any

authority as a law enforcement officer in Florida.

         Q     Approximately what years were those two

occasions?  You knew I was going to ask that.

         A     I suppose I should have anticipated that

and briefed myself.  I traveled the country quite a

bit between '96 and maybe '03, '04 doing -- I mean, I

would do two to three weeks a year.  I believe the

last time I was in Florida was 2002.  I believe that I

took -- I believe that was the week when I was at Lake

County because I associate that with a wedding

anniversary and a cruise that I flew my wife down for.

         Q     Okay.

         A     So I believe it's been at least six years,

and in fact my wife might tell you it's been longer.

         Q     All right.  You mentioned in connection I

think with the Orange County visit a man's name, it

sounded like Bill something?

         A     Bill Manther.

         Q     Who is Bill Manther?

         A     If you remember Gilligan's Island or

McKale's Navy and -- he was a Tim Conway look alike by

darn, identical.  He was a Sergeant and I'm sure

he's -- I'm not sure, I suspect he's retired.  He was

a Sergeant at the Orange County Sheriff's Office who

oversaw the canine program for the Orange County

Sheriff's Office.

     Q    Okay.  Have you ever had any -- to your

knowledge have you ever had any direct contact or

dealings with anyone at the Jacksonville Sheriff's

Office or with my client, the Jacksonville Beach

Police Department?

     A    I truly don't believe so but it is

possible just because there's -- they may have shown

up at a conference, and my employee -- I have a former

employee who has done work I believe for your client.

     Q    Okay.

     A    I believe I recall signing permission

slips for him to work for your client.

     Q    Who is that employee?

     A    Wendall Nope.

     Q    Spell that.

     A    N-O-P-E.

     Q    Wendall Nope?

     A    Right.  His name shows up in some of the

documents here.

     Q    And in what capacity did he work for my

client?

A    I believe that he has gone there to provide training or judging services. I believe that he's provided expert witness services, but, you know, I might be confusing your client with the Jacksonville County Police or sheriff.

Q    Sheriff's office?

A    His name showed up in the documents and it jogged my memory that at one point I had signed approval for him to do outside employment for I think your agency.

Q    And you say he was a former employee of yours?

A    Yes, sir.

Q    Where?

A    Here in Utah. At the Department of Public Safety.

Q    That's what I'm asking.

A    He still works there, I don't.

Q    And so approximately when was that do you think that Mr. Nope was in Florida?

A    2003, 2004.

Q    Okay. Beyond searching your memory and telling me what you've told me here today have you talked to Mr. Nope, confirmed with him or sought any

information from him directly, with regard to his
dealings with Jacksonville or one of its agencies over
there in connection with this case?

     A    No, I haven't spoken with him -- we've
spoken but not about this case.  We still are friends
and we maintain contact.

     Q    Okay.

     A    In fact, tables have turned, I work for
him on occasion now.

     Q    That's the way it goes, huh?  Let's talk
about your experience as an expert in the field of
patrol service dogs, use of patrol service dogs and
your capacity as an expert witness.  How often are you
serving as a witness like you are in this case to one
party in a civil lawsuit?

     A    In the last four years or broader than
that?

     Q    Let's say the last ten years.

     A    I prepared my memory to answer the last
four years.

     Q    Let's start with that then.

     A    I'll do my best.

     Q    That's fine.

     A    I am presently serving as an expert
witness in a dog bite case for the City of Phoenix.  I

1    have previously served as an expert witness for a dog

 2    bite case for the City of Phoenix -- and I'm giving

 3    you cases in which I've provided either trial

 4    testimony or deposition testimony.

 5          Q     Sounds good.

 6          A     I previously served as a witness expert in

 7    a canine case in Mesa, Arizona.  I previously served

 8    as an expert witness in a case in Ada County, Idaho

 9    that's the capitol county, Boise.  I consulted on a

10    case in Simi Valley, California.  I don't recall that

11    I ended up giving a deposition.  Those are the cases

12    that come to my memory right now pertaining to police

13    service dog use.

14          Q     And do all those pertain to the last four

15    years?

16          A     No, sir.  The cases in the last four years

17    I would have provided in my report excepting that I

18    don't believe -- I don't recall whether I mentioned

19    the case of Gonzales v. Morton in the City of Phoenix

20    because at the time I prepared that report I had not

21    given a deposition in that case yet.  In fact, I still

22    haven't, however, I am scheduled to give trial

23    testimony in Federal Court there in a couple of weeks.

24    Strange case.  It's going to trial without any depos.

25          Q     Okay.

1        A    It's very interesting to me.

2        Q    And let me refer -- I'm going to look on

3   Page 6 of your report, this is under Paragraph 7.  And

4   you mentioned here these are the cases in the last

5   four years.  Harmon and Overton v. Utah Department of

6   Public Safety.  Deposition testimony on behalf of the

7   defendant, which I assume is the State of Utah or the

8   Department of Public Safety?

9        A    It was the defendant's -- lawyers for the

10  defendants who retained me in that case.  Just was

11  dismissed by the 10th Circuit of Appeals about two

12  days ago.

13       Q    And you have in your report that subject

14  matter of that case was the wrongful execution of a

15  search warrant, negligent investigation.  Did that

16  case have anything to do with police service dogs?

17       A    There were dogs present but the dog's

18  actions had nothing to do with the litigation.  The

19  officers kicked the -- allegedly kicked the wrong

20  door.

21       Q    Allegedly.  And then you list the case of

22  Herring, H-E-R-R-I-N-G, v. City of Colorado Springs

23  down in Colorado in 2005.  Deposition testimony given

24  on behalf of the defendants.  Was that a canine case?

25       A    There was nothing -- no, that was a

wrongful death.  There was nothing connected with the
dogs in that case at all.

        Q    But it did have to do with law enforcement
issues?

        A    It had to do with the allegation that
officers wrongfully caused the death of Mr. Herring.

        Q    Walker v. Orem Department of Public Safety
Utah Central Division 2004.  Deposition testimony
given on behalf of the defendants.  Again, was that a
canine case?

        A    No, sir.  A shooting case.

        Q    Okay.  And the Koliboski,
K-O-L-I-B-O-S-K-I, v. City of Mesa.  Is that the one
you were mentioning down in Mesa?

        A    Yes, sir.

        Q    Subject matter was FLSA compensation for
canine care.  Did that have to do with the use and/or
deployment of a patrol service dog?

        A    It had to do with the use of a dog in so
far as litigation between a police officer and the
city over what the city owed -- reasonably owed the
officer for taking care of a police service dog in his
off-duty hours at his home.

        Q    Okay.  That one would not --

        A    No use of force, no, sir.

Q    And then the ones you listed for me a
while ago, the one you've got now for the City of
Phoenix you said was a dog bite case.  Just generally
you were retained on behalf of the City of Phoenix?

 A    I believe in that case I'm retained on
behalf of the officers.  But I believe the city is
paying for their defense.

 Q    You're for the defendants in a civil
action?

 A    An individual dog handler defendant, yes,
sir.

 Q    And in your view -- I don't want to sit
here and ask you all the details of that case, I don't
care, but is that case similar to ours in any respect?
I mean, did it involve biting the wrong person or was
it an issue of whether the dog should be deployed or
whether it was excessive use to use the dog or
anything like that?

 A    The plaintiff's claim is the force was
excessive.  Beyond that -- the man committed a crime,
he's pursued in a vehicular pursuit, lights and siren.
He enters a residential neighborhood, jumps out,
starts running in the dark and the officers don't --
they lose sight because it's pitch black.  He goes
into a residential -- the officers believe he's gone

into a fenced backyard because they're doing a house
to house sniff, a track.  The dog gives some
indication that someone may be behind a fence.  So in
that respect one could allege it's similar.  However,
as the -- in Arizona -- and maybe the same is true in
Florida -- sometimes water heaters are outside of the
home because of the heat.  The officer is walking
through a narrow passageway that's even more narrow
because the water heater is enclosed and is outside in
the carport and there's a car parked and a very narrow
space, perhaps 18 inches, between the car and the
water heater.  As the officer goes toward the back
fence where he intends to find a gate and intends to
look into the backyard his dog suddenly drops its head
and at the same time a hand comes out from underneath
the car.

          At contention is whether the hand was
attempting to grab the dog or attempting to wave at
the officer.  The man says nothing, so if he's waving
he's doing so in the dark silently in greeting.  The
dog is presented with a hand inches from his face, is
startled, quickly bites, quickly releases.  There's a
very minor bite.  That forms the entire basis.
There's some other claims that the officers used
racial epithets, but that forms the entire basis of

the use of force claim against the police service dog
handler.  So I don't find that particularly similar,
but there is a fenced yard and they are -- they do
intend to enter the fenced yard.  They never get
there.  Turns out this man is waving.  He is in fact
the man who bailed out of the car and fled.

    Q    Okay.  Now the one that you said just got
dismissed was this Harmon and Overton case; is that
right?

    A    Yes, sir.

    Q    So this one down in Phoenix is ongoing.
That's the one you expect to give deposition testimony
shortly?

    A    That's the one I just described to you.
There was a different case for Phoenix.  Is that what
you were asking me about?

    Q    Yeah, because there was another case.

    A    Is that what you intended that I answer
about this time?

    Q    No, you answered what I was asking.
Thanks.  But I wanted to ask about the previous one in
the City of Phoenix.  A dog bite case?

    A    Yes, sir.

    Q    Any resemblance to our case here?

    A    I don't believe so.  The man stole a car

and was armed with a firearm.  He threatened officers,
was on methamphetamine, he bailed out of the car
following a lengthy pursuit with helicopters and cars,
was running into a school playground.  The officer was
concerned about the neighborhood and so forth, sent
the dog and the dog bit the man in the heel and
allegedly impacted the achilles tendon and the man's
ability to walk once he's released from his like
25-year prison term.  So I don't find any similarity,
but if you do then I'll be happy to discuss it.

    Q    No need to discuss further.  You've talked
about -- we've already talked about a lot of these
cases, and I appreciate you going through them.  Have
I missed something or have you been retained by the
law enforcement agency or officers or for that side of
the case in each one of these?

    A    In the last four years, yes.

    Q    Okay.  What about -- are there any other
cases where you have been retained and have not given
testimony but you've just been consulted?  Do you do a
lot of work like that?

    A    I've done some.  I don't really advertise.
I've had a couple cases I've consulted and perhaps
given some guidance to attorneys that then were able
to settle.

1     Q    Okay.  We've talked about the one you have

2   now for the City of Phoenix and it's a dog bite.  Some

3   of the ones that you had previously, City of Phoenix,

4   Mesa, Ada County, Idaho, how long ago has it been

5   since those cases were active?

6     A    The Mesa case is the Koliboski case -- was

7   that Mesa?

8     Q    Right.  Koliboski v. City of Mesa, 2002.

9     A    The Mesa case -- it will drop off the list

10  here pretty quickly.  It's been four years since

11  there's been anything in that case.  And I believe

12  that ultimately that was no cause.  Ada County I think

13  it's been off the list for about a year.  I think the

14  last time I did anything in that case -- I believe it

15  was resolved in '02, maybe '03.  And then I don't

16  think I named any other cases that were -- I mean,

17  I've done other cases before four years.

18    Q    Okay.  You're obviously on the side of the

19  plaintiff, been retained by the plaintiff in this

20  case.  When was the last time you were obtained by a

21  plaintiff in a civil case involving a canine case?

22    A    A canine case?

23    Q    Yes, sir.

24    A    I've never been retained by the plaintiff.

25    Q    So this is your first time in a civil

canine case?

     A     In a canine case.

     Q     Now going beyond canine cases, when was
the last time you were retained by a plaintiff?

     A     Well, I'm not sure that I was.  Let me
explain why I have to say that.

     Q     Okay.

     A     There was a shooting that occurred not far
from here -- I believe it was 2000.  The shooting has
a very, very convoluted litigation history that
continues today.  An officer shot a man on a traffic
stop, the city police department -- the city being
Salt Lake City Police Department -- disciplined the
officer for the shooting.  The county attorney
criminally charged the officer for the shooting.  At
the same time I had been retained in a criminal case
on another shooting in Salt Lake City, and so because
of that involvement, because of a number of factors, I
was retained by the -- I was retained by the officer's
civil defense attorney to be his expert in a civil
service commission hearing.  Now is that the
plaintiff?  I'm not sure --

     Q     I'm not sure either.

     A     -- whether that is or not.  But in that
case I testified against the City and was retained in

the criminal case as a defense witness against the
City.  Although, there were a couple of officers
charged in shootings, the District Attorney for
whatever reason, political pressure, public outcry,
reversed his decision and dismissed charges against
both before I ever gave deposition testimony in the
criminal case.  I did however give trial testimony in
the civil employment case.  And that case -- and then
ended up as a defendant many years later when the
fellow was unhappy with what happened to him.  So I
don't know if that's plaintiff or not, but I always
looked at that as a plaintiff's case from my
perspective.  It didn't win me any friends in the law
enforcement community.

        Q    Did you bring your file today pertaining
to this case?

        A    No.  I just brought my bottle of water.

        Q    Do you have a file?

        A    I have some binders, yes.

        Q    You were supposed to bring your file
today.  Well, why don't you -- I had intended and
asked that you bring your file.

        A    All I got was an e-mail to show up here.
I didn't seen a subpoena, so I apologize if I missed
something I should have had.

MR. SHAKIB:  What's in the duces tecum?
We'll see if we can unofficially produce this.  I have
a bunch of stuff, I'm not sure.

THE WITNESS:  I can answer the question if
the question is what's in my file.

MR. SARBER:  Let me see if I can find it
because I know I have it.  I think it was just my
standard language, I asked you to bring all --
everything that's been provided you on behalf of the
plaintiff, everything that has been provided you from
any other source other than the plaintiff -- related
to this case obviously -- anything that you've
generated or prepared and then any report.  I have an
old report, you've already told me you haven't revised
it in writing.  So there's no magic to that, it simply
was a matter of tell me everything -- I just wanted to
see or you can tell me everything you've gotten in
this case and everything you've generated in the case?

THE WITNESS:  Man, I've got a lot of
paper.  You all have killed a lot of trees.  My report
lists in the first paragraph all of the documents that
I'd relied on up to that point.  Since that point I
have received some additional training records that
you provided following a -- I believe it was you.
Someone provided to Mr. Shakib which his assistant

then sent on to me after someone's deposition, I don't

recall whose.  I listened to by way of the telephone

or the internet, I don't recall how it was set up, the

deposition of Mr. Dorough, and I have also received a

written transcript recently of his deposition, which I

recently reviewed.  There were some exhibits to his

deposition that I received and reviewed since the

report.  Also last Thursday or Friday received

depositions of Commander Corbitt and Sergeant Young

and the exhibits that are associated with that

deposition.  I have since then had the opportunity to

review some DVDs of -- commercially produced KNPV

trials in Holland.

     Q   (BY MR. SARBER)  Where did you get those

from?

     A   Mr. Shakib had them.  They are produced by

Leerberg, a guy by the name of Ed Frawley,

F-R-A-W-L-E-Y.

     Q   What's Leerberg?

     A   Leerberg, L-E-E-R-B -- I think it's

B-E-R-G.

     Q   That's the -- that's who produced the DVD?

     A   Yeah.  Ed runs a place called Leerberg

Kennels and he does the videos on the side.

     MR. SHAKIB:  And just for your sake, if

you want copies -- I actually have them with me but
when I get back I can have copies made if you want.

THE WITNESS:  If you do that I want you to
buy my DVD on copyright.

MR. SHAKIB:  You're right.  I can't make
copies for you.

MR. SARBER:  Maybe you can just make them
available to me.

THE WITNESS:  And Mr. Sarber, I made a
mistake on an earlier answer.  You can let me know
when you want me to correct it.

MR. SARBER:  You can go ahead.

THE WITNESS:  Let me finish this one.
I've had conversations with a friend of mine who was
more familiar with KNPV training and certification
protocols and had actually attended KNPV trials.  And
so I believe that's all that I've received since the
report.  And obviously I didn't rely on any of that
material for this report because I received it after
the report.

Earlier when you were asking about books
I'm assuming that you're meaning only printed
material; is that correct?

Q    Yes.

A    Then I didn't make a mistake.  I have done

other publications but not....

Q    I know you've got a lot of articles and stuff out there.  I wasn't asking about that.

A    I've also done a video of which I'm very ashamed.

Q    Okay.

A    Not because of the content but because I watch it and I think I'm wooden.

Q    Just because your presentation?

A    I think my voice sounds terrible.  But I've done a video that's actually sold fairly well on copyright law.

Q    All right.  That's what the video was about, copyright law?

A    Yes, sir.  I can get you a disc out on it. My brother's company owns the distribution.

Q    I appreciate your offer, but I have absolutely no interest in copyright law.  So the stuff you had before generating your January 2008 report, the original and supplemental reports of the officers on scene July 11, 2003, medical reports from Shands Hospital, deposition transcripts of Officers Hartley, Golleher and Howell.  You say here the report of plaintiff's expert.  I assume you meant report of defendant's expert?  You're the plaintiff's --

1        A     Did I say plaintiff?

2        Q     You said plaintiffs.  Habit?

3        A     I am sorry.

4        Q     I figured that was us.

5        A     I was thinking Charlie and we're -- we

6 would both be surprised to find ourself on the

7 plaintiff's side.  I apologize for that, sir.

8        Q     That's quite all right.  Training and

9 deployment records of Officers Dorough and Ingle and

10 patrol service dogs Yacco, Aswin, Kimbo and Biko.

11 Complaint history of Officer Dorough, Jacksonville

12 Beach Police Department policies relating to police

13 service dog use, photographs of the fence and yard at

14 Henry Cooper's residence, consultation with James

15 Kunz, K-U-N-Z, and then statements of Robert Trammell

16 describing events.

17       A     Yes, sir.

18       Q     That's what you had before.  Off the top

19 of your head can you think of anything else that you

20 had in your possession that you relied on that was

21 sent to you?

22       A     At the time I did the report?

23       Q     At the time you did the report.

24       A     No, sir, I believe that's a complete list.

25       Q     So since then you've listened to

Mr. Dorough's deposition and have since received the transcript and the exhibits attached to that deposition.  You've got the depositions of Corbitt and Young, the DVDs on the KNPV trials and you had a conversation with this person -- and what's the friend's name you had a conversation with?

A     Kenny Lichtlider, L-I-C-H-T-L-I-D-E-R.

Q     Where is Mr. Lichtlider?

A     He owns and operates Vonne, V-O-N-N-E, space, Liche, L-I-C-H-E, Kennels and -- what's the name of his town?  It's in Indiana.

Q     Okay.  Is Mr. Lichtlider somebody you were acquainted with or knew of before this case?

A     Yes.

Q     Have you -- when you spoke with him was any of the substance of your conversation reduced to writing?  Did you take any notes of that, any letters exchanged, e-mails?

A     No.  We just spoke over dinner.

Q     So this was actually a personal meeting?

A     It was.  Kenny and Charlie and I are all on the same Homeland Security Committee.

Q     All right.  When did that conversation take place?

A     Do you mind if I check my calendar?  Is

that all right?

    Q      Whatever you need to do to give me an
approximate time frame.

    A      It would have been the 12th or 13th of
March of this year in Dallas.

    Q      Did you go to Dallas for the purpose of
meeting with Mr. Lichtlider to discuss this case?

    A      No.

    Q      What was the purpose of going to Dallas?

    A      It was a SWGDOG, S-W-G-D-O-G, working
meeting.

    Q      And what does SWGDOG stand for?  I presume
that's an acronym?

    A      It is.  Scientific Working Group on Dog
and Orthogonal, O-R-T-H-O-G-O-N-A-L, Guidelines.

    Q      And what did you learn from talking with
Mr. Lichtlider that has a bearing on your opinions in
this case?

    A      I discussed with Kenny the reason that
KNPV titled dogs tend to bite higher on the physical
body, the subject's body, than do dogs either trained
through Schutzhünd, S-C-H-U-T-Z-H-Ü-N-D, or trained
solely in American police working dog disciplines.

    Q      Any other primary topics of your
conversation?

1          A     We talked dogs for five days, sir.  But

2    with respect to -- 5 days 12 hours a day -- 4 days

3    12 hours a day -- but with respect to this case, no,

4    sir.

5          Q     That's what I meant by my question.  Thank

6    you for following along.

7          A     We talked generally about whether he

8    bought KNPV dogs versus Schutzhünd, whether he was

9    doing more work in Holland or the Czech Republic or

10   Germany, those sort of things.  But specific to this

11   case the specific question I sought his expertise on

12   was the question I related to you.

13         Q     Before seeking his expertise did you have

14   an impression one way or the other as to whether KNPV

15   titled dogs did intend to bite higher than dogs

16   trained through other disciplines?

17         A     I did.

18         Q     And what was the source of your impression

19   in that regard?  I'm talking about before you spoke to

20   Mr. Lichtlider where was it that you gained that

21   impression?

22         A     I had seen other videos of KNPV dogs.  I

23   had talked to Mr. Kunz, I had heard generally from

24   other trainers and handlers that this was something

25   that was distinguished -- or distinguishable about

KNPV dogs.  I don't have any personal experience and I
don't recall any dog in Utah being a KNPV dog.  We
don't see them in the west that much.  So in fact I
think all the people I've ever talked to about those
dogs have been east coasters.

     Q     And what did Mr. Lichtlider add to your
knowledge or to your impressions with regard to that
issue?

     A     Well, he more than add, he confirmed my
thought that the judges in KNPV trials -- and those
trials are done I believe exclusively in Holland --
but the judges looked for an athletic jump immediately
prior to the bite.  Part of the KNPV trial involves an
exercise where there's a stimulus, it's usually a
gunshot -- and -- do you want me to describe this?
Have you ever seen one?

     Q     Please do.  I was going to at some point
today so you might as well right now.

     A     Okay.  Part of the trial is there's a
gunshot.  The decoy is wearing a full bite suit.
You've called it or you've called it in your
deposition a Michelin man suit.  I'll tell you
something, that's a 70, 80-pound suit.  It's hefty.
So the decoy will fire a gunshot into the air, will
run a predetermined distance -- I don't recall what it

is, maybe 20, 30 yards -- and the dog who's being
judged will be some distance away from the decoy.  So
the decoy will already have a 50 yard or so head start
on the dog.  And during this 20 to 30 yard run,
however long it is -- and please don't hold me on
those distances.  I've been to Holland, I've seen dogs
there, but I've never seen a KNPV trial in person.
The dog's task is to apprehend the decoy.  The decoy
fires another shot as he is running -- or she, it
could be a woman -- drops the handgun and now slows to
a fast walk.  And that's at about the point the dog
will engage the decoy as the decoy's back is to the
dog.  And I have been told, and Kenny Lichtlider
confirmed this for me, and I relied on him as an
expert in -- he's clearly one of the world's experts
in dogs, period -- that the Dutch judges prefer to see
an athletic leap -- that is a through the air leap
onto the body of the decoy.  The dogs that do that
tend to score higher in the KNPV trial.  And so some
KNPV sport enthusiasts will work the dog, train the
dog, condition the dog to bite in the upper body
regions.

        Q     And what are those upper body regions
that -- or did Mr. Lichtlider talk about what those
upper body regions are?

A    We didn't have that specific discussion,
but I've seen them on video.  I've never seen these
dogs in person, but I've seen on video bites that will
be shoulder bites, underarm bites, high bicep --
remember the dog is moving -- the decoy is moving away
from the dog, so invariably you'll see these bites to
the rear -- even high rib cage, high rib cage bites.
On occasion I have seen dogs, KNPV dogs, in trial that
will jump and they will twist their body somewhat and
so it's almost as if they were -- in fact, I actually
have seen this happen once -- they are knocking the
decoy to the ground so that they can acquire a bite or
will acquire the bite as the decoy is going to the
ground.
         Q    And you saw it happen once or something
you saw happen regularly?
         A    I've seen it happen on a couple dogs.  But
again, I want to emphasize I've only seen perhaps in
my whole life a dozen, certainly less than two dozen
films of -- and by films I mean dogs being filmed, not
different movies -- of KNPV dog trials in Holland.
         Q    One to two dozen dogs on film is what
you're saying?
         A    Yeah, maybe even only one dozen dogs.  And
out of that I think I've seen the body check or the

body impact once that I recall specifically because it
was so athletic. It was such a beautiful dog. And
another -- I think there was one other time.

Q    Okay. Now the DVDs of the KNPV trials
that you've seen recently, the commercially produced
ones, is that part of the dozen or so?

A    I've seen some today that would move it
beyond the dozen. And I don't remember how many we
watched.

Q    So when you've listed for me things you've
seen since preparing this report, these DVDs, you're
talking about something you saw today, something
Mr. Shakib brought and you all looked at together?

A    Right. I've seen other films, but today I
saw some that were high quality commercially produced.

Q    And I trust that Mr. Shakib will give me
some opportunity to look at those when we get back
home. That's perfectly fine. That's all right. But
can you tell me, do you know what the source of those
DVDs were or where they came from?

A    Those are Ed Frawley's videos. And I
believe I've seen others of his videos. This is a guy
who videos a lot of his training and then he sells it.
I believe that those videos are produced to do one of
two things. I think that he produces those to say

either I bought this dog -- because see what happens
is you'll have the trial there in Holland.  The dog
does well.  When the hobbyist -- these are amateur,
they're sport people, housewives and mailmen, they
walk off the field there will often be American and
other countries' vendors there.  Like Ed Frawley will
say, I'll give you $2,500 or 3,000 Euros for that dog.
I believe these are dogs that he has purchased and is
trying to sell here in the United States, or that he
uses these videos as representative to the dogs he
buys.  I'm not sure.

      MR. SARBER:  Okay.  I'm not one for
sitting here getting uncomfortable.  Can we take a
couple minutes of a break.

      (Whereupon, a recess was taken.)

      THE WITNESS:  I am reminded of another
issue to correct for you and I apologize.  Mr. Shakib
did remind me I actually did prepare one other
document.  I prepared an outline of a few questions
for him to ask Officer Dorough in his deposition and I
provided to that Mr. Shakib.

    Q  (BY MR. SARBER)  All right.  You don't
have that with you?

    A  No.  I sent it by e-mail and I never did
make a hard copy of it.

Q    We'll come back to the KNPV issues.  I've
got some more issues on that about the details and how
it may play into your opinions.  Let me go first kind
of in order here.  I want to figure out how your
opinions and conclusions might have changed in light
of the information that you've received since this,
and then maybe we'll come back and kind of figure out
how that plays in.  So what have you revised?  How are
your conclusions different than what I've read in your
January report?

A    Well, there have been some additional
facts that have either bolstered or altered my
opinions.  One of those -- and generally speaking they
have to do with the level of expertise in providing
training and supervision that appears to have been
present at the Jacksonville Beach Police Department at
the time of July 2003.  My opinion as to whether the
dog -- whether Yacco was actually on a leash
physically attached to Officer Dorough is changed.  My
opinion as to the reasonableness of Yacco not calling
off the bite or the shorthand that we typically use,
sir, would be outing from the bite has been impacted
by learning that Yacco on this night was wearing an
electronic collar.  Those are the general areas in
which my opinions have been impacted by after

1   learned -- or information learned after I wrote this

2   in January.

3        Q     Okay.  Let me ask this, of the opinions

4   and conclusions that are in your written report from

5   January 2008, have any of them changed not due to new

6   information learned but just re-analysis or new

7   analysis or whatever that may be?  Maybe change your

8   mind --

9        A     Just reexamination on what I knew then?

10       Q     Right.

11       A     No.

12       Q     So if I heard you then, based on

13  information recently received there are three general

14  areas where your opinions have changed.  The first one

15  you listed was -- I think as you said the level of

16  expertise -- excuse me, of training and supervision

17  within the department?

18       A     Correct.

19       Q     Tell me specifically what are your

20  opinions now in that regard?

21       A     I don't see any evidence that as good a

22  supervisor and Sergeant that Sergeant Young may have

23  been -- or Commander -- that Commander or Lieutenant

24  I'm not sure, Corbitt may be or may have been.  It

25  does not appear to me that either of those individuals

who are in the chain of command who were responsible

for supervising Officer Dorough and Officer Ingle

possessed enough knowledge about canine operations,

canine policies, particularly canine deployment

policies to insure to a reasonable degree of certainty

that the Jacksonville Beach Police Department canine

department was being operated in a reasonable fashion.

Q    Can you give me some details or specifics

as to why it is you reached that conclusion?

A    Sure.  Let me give you one example.  I've

learned just in the last 72 hours looking through

Commander Corbitt's deposition and Sergeant Young's

deposition, reading through them over the weekend,

that there was -- or maybe still is -- appears to

still be the case -- written policy of the

Jacksonville Police Department, and then something

that Sergeant Young refers to the spirit of unwritten

policy.  That there was unwritten policy and unwritten

training protocols that one would expect Officer

Dorough to follow in using his police service dog for

the benefit of the Jacksonville Beach -- can we just

say Jax Beach PD?

Q    Yes, you can.

A    Jax Beach PD.  Specifically the issue that

one handler should give a minimum of two warnings,

which would be consistent with what I believe to be
the national standard when it comes to the number of
warnings that should be given prior to deploying a dog
or placing a dog in a position that the dog could
reasonably bite a suspect, coupled with the unwritten
requirement that the warnings being given prior to
deploying the dog in something other than a building.
The written policy as I recall talks about a warning,
a single warning, prior to deploying the dog in the
building.

There also appears to me to be an
inconsistency in policy between a waiting period.
That is that interstitial period between when the
warning is given and the dog is released and/or given
the command to act, to search and apprehend.  And in
fact based on the single reading of Sergeant Young's
deposition I'm still not clear that Jacksonville Beach
Police Department is clear within its internal
operations what their policy is or is not and whether
there is a waiting period required and whether there
are warnings required for deployment in something
other than an enclosed building.  The evidence that I
have seen to date, again, particularly citing the two
depositions that I read over the weekend, Commander
Corbitt and Sergeant Young, suggest to me that a

number of these policy issues which I believe are key
to proper operation of a reasonable police service dog
unit, these gentlemen simply -- they don't have the
skill set to know whether their handlers are acquiring
the training and executing the operations in a
reasonable manner.

     Q    So sticking with that, the first of your
different opinions, are there any other details or
aspects of that?

     A    And I don't want to quibble, but I would
say supplemental.

     Q    Doesn't matter to me.

     A    I don't know that I really hit that issue.

     Q    Doesn't matter to me.  We'll call it what
you want to call it.  Supplemental.  Any other aspects
of that?

     A    Those are certainly the strong indicators
that I've seen from the evidence that I've been
provided after the date of my report that caused me
concern about the level of supervision and the skill
level of those who were identified as directly
overseeing the canine unit.

     Q    Okay.  What is your recollection, your
understanding of what it is that Sergeant Young and/or
Commander Corbitt indeed testified to that causes you

1    to have this opinion that perhaps the Jax Beach Police

2    Department is not clear on what their policy is?

3         A    The strongest indicator of that for me is

4    this dichotomy between written policy and unwritten

5    policy, between what's expected -- what compliance is

6    expected according to policy and what compliance is

7    expected according to training, tradition and I

8    believe the term that I saw used several times was the

9    spirit of the policy.  That is -- which I interpreted

10   when I saw that referenced to mean something that was

11   unwritten, but there was an expectation that the

12   respective handlers would know and would comply with.

13             Continuing on, there did not seem to be --

14   and I wouldn't expect to see this frankly at the

15   Commander level or Lieutenant level consistently, but

16   there did not seem to be active participation in

17   insuring by the -- by some responsible supervisor --

18   and my sense is that the responsible supervisor in Jax

19   Beach PD was Sergeant Young -- that he didn't

20   participate in the training, that he didn't insure to

21   a reasonable certainty that proper training was being

22   done, that maintenance was being done, that the dogs

23   were being used properly, that they were being trained

24   according to proper protocols and policies.

25        Q    Okay.

1     A     It was -- to be fair to him, it was more

2  what I didn't see in the evidence than what I did see.

3     Q     Okay.  Now what's your understanding of --

4  well let me ask you this in general terms.  Do you

5  believe it's improper or inappropriate for a police

6  department -- let me ask the question a different way.

7  Are you -- is it your belief, Mr. Wallentine, that a

8  police department should have written policies that

9  cover every possible contingency and occurrence that a

10  police officer or canine handler might encounter?

11     A     No, sir.

12     Q     There are countless numbers of possible

13  situations, circumstances, facts that may arise in the

14  working life of a canine handler and his dog; correct?

15     A     That is correct.

16     Q     Out in the field, on the street, as we

17  say?

18     A     Yes, sir.

19     Q     Would you also agree with me that because

20  of that it's important for a canine handler to be

21  given some latitude of discretion in what he does with

22  regard to handling his dog?

23     A     A canine officer should be charged with

24  and empowered with a measure of discretion in police

25  operations, including police operations involving a

1  police service dog.

2      Q      So based on what you've just told me here

3  in the last moment or so, you're not -- you don't

4  object to the fact that in general terms that there

5  are some aspects of a police department's policy and

6  practices, customs, that are actually written down and

7  that there are some that are not.  In general -- you

8  don't disagree with that in general terms?

9      A      In -- no, not in general terms.

10     Q      In other words, generally speaking, it's

11  okay that some of those policies are written and

12  others are not, right?

13     A      True.

14     Q      Because you can't write down everything?

15     A      No.

16     Q      What is your understanding of Jax Beach's

17  written policy of what's actually written down with

18  regard to giving announcements?

19     A      My understanding is that the policy that

20  was in effect at the time of this incident was that an

21  announcement, a single announcement, needed to be made

22  prior to sending the dog to search a building.  And

23  that answer assumes that other criteria for even

24  deploying the dog that they have written elsewhere in

25  the policy are there.

Q    Right.  We're just focussing on the announcement policy for now.  We'll talk about the other stuff in a moment.  Did you -- as you read Sergeant Young's testimony did you understand him to testify under oath as a spokesman not defendant in this case, that Jax Beach canine handlers are taught in their initial certification course, the initial 400-hour certification course, that they are taught to give two canine warnings, two canine announcements followed by a waiting period prior to deploying a dog?

A    Though I don't recall that his answer was consistent on that point, I believe that at one point in his deposition he did say that he thought that the training for the handler included providing two warnings and then providing some unspecified waiting period before sending the dog.

Q    Okay.  The waiting period, again, you would not expect the waiting period to be specified in writing, would you -- excuse me, the exact amount of time?  You wouldn't expect the exact amount of time to be specified in writing, would you?

A    I would not.  It's a little bit like the struggle that the Supreme Court has had in the last four -- last three terms to define the appropriate waiting period between knocking and announcing a

search warrant and the actual breaching of the plains

of 4th Amendment interest of the home.  If your

question is would I expect to see a number of seconds

or number of minutes?  I would not expect to see that.

Q       Did you understand in reviewing Sergeant

Young's deposition that he testified that in addition

to being trained initially in the initial

certification to give two canine warnings followed by

a waiting period prior to deploying a dog, that in the

annual recertification process that Jax Beach canine

handlers participate in that they would be again

taught that process, to give two warnings and a

waiting period prior to deploying a dog?

A       Again, I don't recall that he was

consistent on that, but I don't contest that he said

something along the lines of they did that in their

annual recertification.  Whether they were trained to

do that or whether that was part of the rote for that

certification test I don't recall.  But I do recall he

said something about it.

Q       And likewise, do you recall Sergeant Young

testifying that in the Jax Beach -- in their own

monthly training, their daily and monthly kind of

through the year type of training that they would do

on a regular basis, whether that be by themselves or

1   with Jacksonville Sheriff's officers with their canine

2   department, that again in that context, in those

3   settings, that they were trained and in fact did give

4   two canine announcements followed by a waiting period

5   before deploying a dog?

6        A    I believe that he said that they would do

7   that on occasion.  I don't believe that I recall that

8   he testified that he was present at very many of those

9   regular training sessions.

10       Q    You recall his testimony was something

11  along the lines that he would try to be present once

12  or twice a month for those training sessions?

13       A    I recall he said he tried to be there

14  occasionally, yes, sir, and that he felt that on some

15  of those occasions he had heard training where

16  multiple warnings were given in training.

17       Q    So it's your recollection that it was his

18  testimony that only on occasion were two warnings

19  given in training?

20       A    I don't believe that was his term.  I

21  don't recall a specificity with which he said he heard

22  warnings given during training deployment.  But I do

23  recall that he said on occasions he was at training

24  and that he heard officers -- and I believe he may

25  have even testified that he heard Officer Dorough say

at a training deployment -- or give multiple warnings
at a training deployment.

        Q      Okay.  As an example let me refer you to
Sergeant Young's deposition testimony and for
purposes -- since you didn't -- you don't have it,
I've got testimony here and I'm sure Mr. Shakib does.
On the bottom of Page 152 --

            MR. SHAKIB:  Give me one second to get it
for him.

            (Whereupon, an off-the-record discussion
was held.)

        Q      (BY MR. SARBER)   Look at the bottom of
152 starting there.  Bottom question on Line 22, and
obviously there's no exact amount of -- this is a
question by Mr. Shakib -- there's no exact amount
of -- is there some way that you use as a rule of
thumb to determine how much time between the canine
warning and deployment is enough?

            Top of 153.  Answer, we give two
announcements.  We give two announcements, and back
then we gave two announcements and you waited.  We can
argue all the time and hope that we've won as to what
a perfect time is.  That's up to the handler.

            Question, right.

            Answer, but I can tell you that we don't

give the warning and release the dog.  We give the
warning, we wait.  Now defining the wait is subject to
interpretation, but the only person that can answer
that is the handler themselves.  But we give two
warnings, we wait and then we send the dog in.

And further down on line 17, a standard
has always been that you give two canine
announcements.  It's an unwritten rule.

And then looking at the top of 154,
question, how did a police officer or canine officers
know about the fact they've got to give two canine
warnings and they have to wait, you know, some time
between the canine warning and the deployment?

Going on to the answer, number one, it's
in the policy where they'll give the announcement.
And number two, through training we consistently give
two announcements.

And then again on Page 156, Line 16, and
in training when we do that, they consistently -- they
know that prior to sending somebody into the building
you give the commands and they know that we give two
commands.

And as you mentioned a little while ago,
sir, you understand that at another point in the
deposition Sergeant Young said he specifically

1  recalled being present when Officer Dorough trained by

2  giving two canine announcements.  So I guess I'm

3  trying to get some context here.  You're referring to

4  Sergeant Young's testimony and attributing to his

5  testimony some inconsistency or he's saying only

6  occasionally we give two announcements.  I've just

7  read to you excerpts from his deposition where he says

8  it was consistently trained that they give two canine

9  warnings and then a waiting period, that undefined

10  number which we've agreed is acceptable, before

11  deploying a dog.  Can you point me to testimony by

12  Sergeant Young that -- where something different is

13  said?

14        A     Okay, here we go.

15        Q     Where are you?

16        A     I'm on Page 233 at the top and that's not

17  the only -- there were two places I wanted to cite you

18  to.  On Page 221 and 222 there is a discussion between

19  Mr. Shakib and Sergeant Young concerning whether a

20  warning, the warning or multiple warnings were given

21  and Sergeant Young suggests -- I don't think he

22  suggests, he states that on Line 6 on Page 222 he

23  evaluated whether or not Officer Dorough complied with

24  the warning policy by looking and informing himself as

25  to what was written in the policy, not what had been

trained or tradition or the spirit of the policy.
That coupled with the discussion as to whether the
announcement and the actual deployment of the dog and
the biting of Mr. Trammell had any period between the
finishing of the announcement or whether it was given
contemporaneously or even after the dog -- after Yacco
had already started moving through the fence and
indeed perhaps as Yacco was engaging Mr. Trammell.

So when I say that he's been inconsistent
in his testimony, I'm referring to saying that there's
a tradition or a spirit or a practice that's trained
and followed with the evaluation of the conduct, as
opposed to the written policy which appears to me to
require only one warning and appears to me to require
only a warning when going into a building not into
some other area such as open field or enclosed
backyard and so forth.

Q    And we'll talk about the building in a
minute because that's an issue as well.  I'll grant
you that and I want to talk with you about that in a
moment the way the written policy's worded.  And I
think I'm following what you're saying with regard to
Page 222 and the conversation Mr. Shakib and Sergeant
Young had about how Sergeant Young went about
evaluating in the departmental incident review as to

whether the policy had been followed.  I'm with you
there.

          But can you point me to anywhere where
Sergeant Young has testified that the training that
Officer Dorough and other handlers at Jax Beach
received and followed was anything less than or
different than the standard is you give two warnings
followed by a waiting period?

     A     No.  If my memory's correct I believe that
he said that that which was practiced was two
warnings.  I believe he was consistent that that was
the tradition or practice.

     Q     All right.  And we can agree that -- I'll
agree with you is my point, that the written policy
does not specify the number.  It says give an
announcement or give a warning.

     A     Among other things it does not specify a
number.

     Q     The policy is what it is and I have no
gripe with you there.  Let me ask you this, if indeed
what happened here in this incident was that Officer
Dorough gave two warnings followed by a waiting period
of some kind, then would you agree with me that your
concerns, about Sergeant Young and Commander Corbitt
as you've described here and your concern about the

1   fact that the written policy doesn't specify to the

2   degree that you would like, are really irrelevant as

3   far as how this case happened?

4        A    Irrelevant begs I think a legal

5   conclusion, and here is where we find the disadvantage

6   of a police officer who is also a lawyer.  I think

7   certainly -- I think I would have to agree that if the

8   behavior in this case and the facts if this case

9   comported with national standards that were not

10   reduced to writing and not incorporated in policy, I

11   think the significance of the policy is far, far less.

12        Q    That's fair.  I appreciate that answer.

13        A    I think that's what you wanted.  But I

14   think that's true.  I think absolutely.

15        Q    So in other words, if the policy was bad,

16   fell short, but Dorough said -- let's assume an

17   extreme case.  How about this.  Let's assume the

18   policy is, guys, don't ever give a canine

19   announcement.  We don't want anybody getting an idea

20   we're coming.  That would be a terrible policy and

21   woefully inadequate with regard to standards in the

22   industry; correct?

23        A    And woefully unconstitutional.

24        Q    Absolutely.

25        A    Sure.

1          Q     But if, despite a policy that was that

2     bad, Officer Dorough said, you know what, I've always

3     heard that what you're supposed to do is give two

4     announcements, I'm going to give two announcements

5     tonight, then the significance of the woefully

6     inadequate and unconstitutional policy would be much

7     less?

8          A     Much, much less.

9          Q     Wouldn't have much effect because Dorough

10    wouldn't have done that?

11         A     Right.

12         Q     I think we can agree on that.  I think

13    that's a fair statement on your part.  The building

14    issue.  Is it your belief that the Jax Beach policy

15    should be that a canine announcement is given not only

16    when deploying a dog into a building but also into an

17    enclosed or confined or defined area, even if it's an

18    exterior area?  Is that a fair statement?  Or how

19    would you change it?

20         A     It is with the qualification that there

21    are circumstances in which an officer should even have

22    the discretion not to give the warning when a dog's

23    going into a building.

24         Q     Absolutely.

25         A     But with that additional piece of

discretion there I believe that a reasonable police

service dog deployment policy should call for

providing multiple warnings and a waiting period

sufficient to allow the suspect to surrender.

Depending on the character of the building or the area

to be searched, whether it's a residence or a

Wal-Mart, whether it's a law office or a warehouse,

that a warning followed by another warning should be

delivered as loudly as possible.  Again, I'm going to

tell you, Mr. Sarber, that tactically that's not

sensible.  If that's the only thing that indicates --

well, there may be a number of factors where

tactically it's not reasonable to require that of the

officer.

     Q    Because of officer safety?

     A    Well, because of officer safety and

because of public safety.  There may be times when the

public safety interest in apprehending someone is so

overwhelming that one wants to balance all the cards

on the side of stealth and speed against risk of

injury to that person we're trying to apprehend.

     Q    Okay.  And again let me follow that and

conclude this particular part here by saying that

given -- in light of your opinion the policy should

have been worded in a different way, perhaps adding

1    areas or circumstances in which an announcement ought

2    to be given, Officer Dorough was not about to go into

3    a building on the night July 11, 2003; correct?

4         A    He was not.  Well, I don't believe he was.

5    Not immediately.  That may have been in the chain of

6    events because there was a building nearby, but I

7    don't believe that --

8         Q    But we hadn't gotten to that point?

9         A    No, I don't believe that was the logical

10   conclusion.

11        Q    But again, if Officer Dorough gave the two

12   announcements and the waiting period where he was on

13   the outside of the fence prior to going into the

14   fenced area, then any supposed shortcoming of the

15   policy the way it is worded would be to a large extent

16   nullified because of the fact that Officer Dorough

17   gave the announcement anyway?

18        A    The two announcements at a level of volume

19   that they could be heard followed --

20        Q    If done properly?

21        A    If done properly, followed by a reasonable

22   period for whomever to make themselves known in the

23   backyard, yes, then the written policy becomes much

24   less relevant.

25        Q    Let me ask you this -- canine

announcement -- we've thrown the term deployment

around in this case.  And as I've read through the

depositions and heard the witnesses testify it's come

to my attention that perhaps there are two -- at least

two definitions of deployment.  One being you actually

take the leash off the dog, release the dog and let

him go to do his work, versus not letting the dog --

not releasing the dog but keeping the dog on a leash

but moving into an area doing some work.  How do you

define the term deployment as it -- and as it relates

to when you need to give an announcement?

          A     The context of deployment arises -- the

term of deployment arises in a couple of contexts.  In

one sense it would be -- the term in the industry

would be to deploy if I'm getting the dog out of the

car intending the dog to perform an act of service.  I

wouldn't use this usage but I've heard officers say, I

deployed my dog to a school demonstration.  But the

common term deployment -- the term deployment is

commonly understood to be, I'm getting my dog out of

the car to do some act of service, whether it's to

find narcotics, whether it's to find explosives,

whether it's to find -- some dogs at the border are

used to find parrots that are illegally imported,

plants that are illegally imported.  And as you point

out another usage of that word, sloppy vernacular on
the part of the canine people means I'm going to put
the dog in position to -- with the intent that that
person -- the dog apprehend a person, and apprehend
usually means bite -- or usually includes a bite --

Q    So the more common use --

A    -- depending on the dog's training.

Q    So the more common usage is that general
term of getting the dog out of the car to do police
work?

A    Right.  That's part of -- it's kind of a
footnote, but that's part of what some groups, some
subcommittees in SWGDOG are doing is trying to clean
up the situation that you just brought up where we use
one word to mean two different things.  So we're not
always -- because what -- KNPV dogs are a great
example.  I'm telling you, if I go to Northern
California -- if I talk to many of my handlers -- I
just saw a police canine unit go by a few minutes ago.
If I were to pull that officer in here and say tell me
about a KNPV dog he's going to look at me like what
are you talking about?  And yet if I go to the
Carolinas I'm told I'm going to hear that a lot more.
So it's not unusual for a term like deployment to have
different meanings to different people.

1    Q    Now let's talk about specific context when
2 in your opinion a canine warning needs to be given.
3    A    Is appropriate?
4         (Whereupon, a recess was taken.)
5    Q    (BY MR. SARBER)   I think at the time we
6 took a break we were talking about this term
7 employment.
8    A    Deployment.
9    Q    Deployment, excuse me.  The term
10 deployment, and that the common use of that term is
11 really anytime you get the dog out of the car, send
12 them to do police work of any kind, drug search,
13 person search, whatever you're doing, but that when
14 you're actually sending the dog off the leash to
15 apprehend, which very often involves a bite, can we
16 use the term release instead?  What would you say?
17 You're the expert.
18    A    In some regions of the country they use
19 the word release, and they use that even if the dog is
20 kept on the leash, which happens.
21    Q    So release to apprehend can take place
22 while on a leash?
23    A    Yeah.  And one term that you'll hear
24 commonly used, and I don't know frankly, sir, whether
25 it's used in Florida or not, but in the western part

of the country, send the dog, I'm sending the dog.

Deploying, I'm getting the dog out, preparing and

undertaking activity, but when I have target in mind

I'm sending the dog.

Q    Okay.  What in your opinion are the

circumstances in which it is incumbent upon a canine

handler to give the two canine -- the minimum canine

warnings or announcements followed by a waiting period

before doing something with the dog?

A    Let me start off with my belief that the

general premise is that whenever an officer intends to

place the dog into service in a position to

apprehend -- and this is particularly true -- there

are two major philosophies of dog training -- I hate

it when a witness is not grammatically correct.  If

I'm going to be using a find and bite dog, which this

dog -- is that a term that I can use comfortably with

you guys?

Q    We can go find and bite, bite and hold.

A    If I'm using a find and bite -- and

clearly the world's leading authority on this issue

frankly is Charlie Meslow -- if I'm using a find and

bite dog I think it's incumbent on me to provide

multiple canine warnings in any situation where I

intend that dog or reasonably believe that dog is

1    going to apprehend and then likely bite a person,

2    unless there are tactical considerations that mitigate

3    against giving the warnings.

4         Q    A while back we got into the three

5    supplemental opinions that you have generated since

6    receiving more recent information after generating

7    your initial report.  We for a while now have talked

8    about your first one and as we get a little bit later

9    on we'll probably pop back into that one and talk some

10   more details about how this happened and some of your

11   originally generated opinions.  But let me move now to

12   the second of your supplemental opinions, which

13   according to my notes had something to do with whether

14   Yacco, Y-A-C-C-O, was on the leash physically attached

15   to Dorough or something along those lines.  What is

16   your supplemental opinion in that regard?

17        A    I initially believed based on the

18   testimony of Golleher and the other officer who was --

19        Q    Howell?

20        A    Howell.  Prior to hearing Dorough's

21   deposition and prior to reading Sergeant Young's

22   deposition I believed that it was likely that Yacco

23   had slipped the leash or had -- the leash had been

24   dropped or had been jerked off Dorough's hand and that

25   the leash was not actually held by or attached to

Officer Dorough at the moment of impact and bite.  I
now -- and after having seen the pictures as well and
heard Sergeant Young's testimony and Officer Dorough's
deposition I'm now less resolved.  I'm not quite
certain, but I believe that this actually could have
happened with Officer Dorough extending his body and
arm at full length, which one would expect if the
leash were affixed to Dorough rather than by Dorough
having his hand through the loop or around the loop
and just gripping.  If Dorough had the leash looped
over the wrist so the loop at the end of the leash
actually encircled his wrist and then had a grip --
which is not at all uncommon, I used to do that all
the time with my dog -- and the dog suddenly leapt
forward with great power it's possible that that
six-foot leash then becomes a 9, 10, maybe even 11 or
could be longer, 12-foot distance between the majority
of the body of the handler and the teeth of the dog.
Even the -- you know, even longer possibly.  It
appears to me now after hearing Dorough that the
dog -- that Yacco suddenly jumped, suddenly sprang --
that's a better word, suddenly sprang toward
Mr. Trammell.  And I believe I heard Officer Dorough
talk about his wrist and I did hear Sergeant Young
talk about how he thought the distance could be

greater than six feet because of the jerking of the

leash.  So I don't know.  Initially the testimony, the

deposition of Howell and Golleher suggested to me that

that dog was not on the -- that he dropped the leash.

Now I'm not certain.

     Q    What was it about the testimony of

Golleher and Howell that gave you the impression that

perhaps the leash was not physically connected to

Officer Dorough at the time of the bite?

     A    It appeared to me that they perceived that

Yacco had gone through a smaller aperture and was

through the fence and actually engaging at the moment

that we've -- there's been reference to a gate.  I

don't think that was a gate.  All I can say is that

looking at the pictures it looked like an old grave

stake fence that I had in my backyard.  I think it

actually was an entire fencing panel that had come

loose and been nailed up and that Officer Dorough

physically had to rip it from the post.

     Q    Yes.

     A    My sense was in reading their testimony

that Yacco had gone through, was acting independently

as Dorough was yelling giving a warning telling

Mr. Trammell show your hands and he was trying to pull

open enough of an opening for a -- I don't know how

big the guy is, but a full size adult to get through

that fence panel.  And he also indicates that he had

to like bend down.  And as I looked at the fence,

pictures of the fence -- and I don't know -- have you

seen the same pictures I'm referring to?

Q     I believe so, yes, sir.

A     As I've looked at the fence it appeared to

me that that crossbeam or crossbar in the fence was

two and a half, three feet off the ground.  Which if

it's a six-foot fence, which it appeared to me to be

just a standard six-foot homemade fence --

Q     Yes.

A     -- one would expect that cross to be even

at three feet.  So I now think that it's possible --

and I'm making a motion now where I'm bending down

extending my arm -- I think it's possible to see that

there was some additional distance now that I could

account for that I wasn't certain about before.  I'm

still not certain.  I'm still not certain.

Q     But would you agree with me that if the

leash remained connected to Officer Dorough at the

time of the bite and thereafter, then you agree with

me that that would be inconsistent with the

description given by Mr. Trammell and his friend

Mr. Cooper?

1      A      Inconsistent?

2      Q      Yes.

3      A      Yes.  I would agree with that.

4      Q      And I believe it's fair to say
5  Mr. Trammell was not sure whether the leash was
6  connected to Officer Dorough or not.  Mr. Cooper's
7  testimony was that the leash was connected to Yacco,
8  the handler end was not connected to the handler and
9  someone picked it up.  Generally that's what they
10 said?

11     A      Generally.  Although my understanding,
12 based in part on my conversation with Mr. Trammell, is
13 that Mr. Cooper came out after this had started to
14 unfold.

15     Q      Right.

16     A      I don't think he can shed light for me on
17 that issue of what happened as the dog's moving
18 through the fence itself.

19     Q      Sure.  Let's go now just to finish up
20 these supplemental opinions.  Your third one, the
21 reasonableness of calling off the bite or outing and
22 the impact of the electronic collar -- and as you
23 probably read in Sergeant Young's testimony might be
24 called a shock collar.  What's your opinion in that
25 regard?

A     My opinion about the shock collar itself

or my opinion about the reasonableness about the dog

not coming off the bite and outing instantly when

given the command?

          Q     The latter.  That's what I understood the

substance of your third supplemental opinion.

          A     My third supplemental opinion bolsters my

earlier opinion that that dog did not behave

reasonably and that it did not come right off the

bite.  It did not out on the first command as it

should have.

          Q     Okay.

          A     It is -- my opinion is strengthened

knowing now that Dorough -- or believing now because

I'm getting it from somebody who wasn't there -- I'm

not getting it from Dorough, I'm getting it from

Sergeant Young -- that that dog was equipped that

evening with an electronic collar or sometimes called

a shock collar, an E collar.  Sergeant Young testified

in his deposition, he described for Mr. Shakib and

you -- because I had the sense that at least one of

you wasn't familiar with an electronic collar -- he

described how they work.  In fact, if you choose you

can get on You Tube and you can see people who have

put them on.  They are a pain compliance device very

much. I agree with Sergeant Young's description of a

taser for dogs. I've had both taser darts shot into

me and fired, and I've felt the prongs of an activated

electronic collar. They generally get the dog to

comply with the command just instantly. So if that

dog had an electronic collar and was not, as I believe

the facts are pretty clear, outing on the first

command from Officer Dorough, that the shock collar

could have been used to gain expected immediate

compliance with the verbal command to release from the

bite.

     Q    So do you still -- is it still your belief

that Yacco did not immediately comply with a verbal

command to out or as Officer Dorough as you saw used

the command stand still?

     A    Stand still, yes.

     Q    What's the basis for your opinion, factual

basis?

     A    The testimony of the other two officers

who were both consistent, as well as my discussion

with Mr. Trammell, that Officer Dorough had to

physically remove, had to pull back on the collar of

the dog, physically remove him off the bite, all the

while giving him commands to release.

     Q    So you're relying on the testimony of

1    Officer Golleher and Howell --

2         A    And Howell.

3         Q    -- in describing Officer Dorough pulling

4    the leash?

5         A    Removing -- I'd have to look at their

6    depositions to get the exact words.  And I believe

7    that the -- there's some citations in my report but I

8    believe that they refer to him actually pulling the

9    dog off by the collar or by the neck.  As well as

10   Mr. Trammell's statement to me as I interviewed him.

11        Q    When did you interview Mr. Trammell?

12        A    It was shortly after Christmas of 2007.

13        Q    Was that interview reduced to writing or

14   recorded in any way?

15        A    I took some handwritten notes.  I didn't

16   record.

17             MR. SARBER:  Let me get those notes,

18   Chris.  Is your understanding that -- well, you've

19   read -- you've heard and read Officer Dorough's

20   testimony?

21             THE WITNESS:  Yes, sir.

22        Q    (BY MR. SARBER)  Do you understand that --

23   let me ask you this, is it your understanding based

24   solely on Officer Dorough's testimony that -- let me

25   ask it a different way.  Can you conclude or can you

form an opinion based solely on Officer Dorough's
testimony that Yacco failed to comply with a verbal
command?

         A     I don't believe so.

         Q     Okay.  Would you agree with me that
neither Mr. Trammell or Mr. Cooper state that Yacco
failed to comply with a verbal command?

         A     Mr. Sarber, I'm having a hard time -- I
did not talk to Mr. Cooper.  I'm having a hard time
remembering where I saw his statement, but I believe
that's true.  And I can tell you that in my
discussions with Mr. Trammell that statement is true.
He did not tell me that Yacco failed to comply with a
single verbal command from Officer Dorough.

         Q     Okay.  And is your understanding based
upon the totality of the testimony from the officers
that it was Officer Dorough who went into the backyard
first?

         A     Yes.

         Q     Before Officers Golleher and Howell?

         A     Yes, sir.

         Q     And that Officer Golleher was -- I don't
know if we ever quantified this -- several steps
behind, came in afterwards, perhaps on the run?

         A     I believe he was within a few steps

behind, yes, sir, and I believe he came in and then
Howell.

Q    Okay.  But it's your understanding that
Officer Golleher and Howell suggest that Yacco failed
to comply with the command to release his bite or are
you simply concluding that based on their description
of Officer Dorough picking up the dog by the collar?

A    Again, I'd have to refer to their -- I'd
have to refer to their depositions to recall the exact
discussion about what they heard him say, but I am
concluding that largely on the basis of their
testimony about Dorough's actions in having to
physically remove Yacco from the bite.

Q    You're familiar with Officer Dorough's
description that he gave the stand still command
simultaneously with performing what Officer Dorough
called the lift off maneuver where he grabs the dog by
the back, the collar, the scruff, and lifts.  Do you
recall his testimony that he did those two things
simultaneously?

A    I do.  I think he said the collar.

Q    All right.  Fine.  I don't have any reason
to quibble with you.  But somehow grabbed the
collar --

A    I believe that's what he said.

Q    -- area of the dog, picked the dog up
physically with his hands?

         A    I believe that's what he said.

         Q    So if neither the plaintiff nor his
companion attribute a failure to comply with the
verbal command to the dog, and Officer Dorough does
not, and Officer Golleher and Howell got to the scene
moments after Officer Dorough did, then is it still
your opinion that the dog failed to obey a command to
release?

         A    It is.  I don't believe that I would agree
that Golleher and Howell got there moments after.  I
think based on what they said and based on the
distance that they testified they were behind I think
that their arrival was substantially contemporaneous.
And I also want to clarify, Mr. Trammell did not
recall the exact words but remembered Golleher -- or
excuse me, remembered Dorough yelling at Yacco as he
was trying to get him to come off the bite.

         Q    You say Mr. Trammell testified to that?

         A    No, I'm saying that's what he told me in
our discussions.  He didn't remember the words.  He
just remembered that there was yelling.  In fact, I
believe that Dorough either in his report or his
deposition also talked about yelling at Mr. Trammell.

1    So I don't want to suggest that Mr. Trammell recalled

2    clearly the discussion or recalled the shouting by

3    Officer Dorough.

4        Q    Okay.  But you're telling me that in your

5    interview of Mr. Trammell, Mr. Trammell recounted for

6    you hearing Officer Dorough yell something?

7        A    He was yelling something.  He may have

8    been --

9        Q    While the dog was on him?

10       A    Right.  As Officer Dorough was pulling the

11   dog, doing the lift off as Officer Dorough called it.

12       Q    Have you read Mr. Trammell's deposition

13   transcript?  You didn't list that.

14       A    I was not aware Mr. Trammell had been

15   deposed until you just said that.

16       Q    So I assume you also haven't read

17   Mr. Cooper's deposition transcript?

18       A    I was not aware he had been deposed.

19       Q    Okay.

20            MR. SHAKIB:  If that's something you don't

21   have, you were supposed to have that.

22       Q    (BY MR. SARBER)  One thing I'm not sure

23   I'm clear on on this last opinion here -- I guess

24   there are two things.  First of all, you're basing

25   your opinion on the description of Golleher and Howell

and specifically their testimony that Officer Dorough
picked the dog up by the collar to remove him from
Mr. Trammell.  Do I have that right?

     A    Yes, sir.

     Q    And based on that description you conclude
that Yacco did not release the bite immediately.

     A    Yes, sir.

     Q    Did Officer Golleher and Officer Howell to
your recollection testify in any way that release
command was given before the action of picking the dog
up and that the dog failed to comply with the release
command?

     A    I don't recall whether they did or not.

     Q    Okay.  Now let me ask you about -- on that
same line Officer Dorough, as you know, testified and
we just covered this, that he intentionally gave the
release command simultaneously with the lift off --
and I'm paraphrasing his testimony -- in order to just
make sure.  Because at that moment he knew he had the
wrong guy.  And he just wanted to make sure there
wasn't a re-engagement or any problem at all.  Is that
a fair summary?

     A    I think a pretty close summary of what he
said.

     Q    In light of Officer Dorough's description

1  in that regard, of doing the two simultaneously, and

2  Officer Dorough saying yes, I did the lift off but not

3  because he failed to release.  In fact, he did release

4  immediately.  And your failure to recollect Officers

5  Golleher and/or Howell identifying a specific command

6  that the dog failed to obey I'm not understanding how

7  you then reach the conclusion that Yacco failed to

8  release immediately upon a command.

9      A      Based -- I am making an assumption here

10  that the minute that -- the second that Dorough

11  recognized that he had the wrong guy -- he had a

12  shorter, older white guy in a white shirt as opposed

13  to a big tall, young bulky black man that was half the

14  age of Mr. Trammell -- I'm making the assumption that

15  he did what would be reasonable and that is give a

16  release command.  Officers Golleher and Howell

17  testified that there's some shouting going on and they

18  both testify -- and I don't remember whether they used

19  the word had to -- I believe one of them said that

20  Dorough had to pull the dog off Mr. Trammell.  Now it

21  is -- and that's a factual issue that I'm not able to

22  resolve in my mind, just like I'm not able to resolve

23  with a high measure of certainty whether the leash was

24  being held at that time or not.

25      Q      Okay.

1              A     I'm not certain.  That's my best

2      conclusion based on what I read.  And again, it was

3      before Dorough's deposition, which I realize wasn't

4      much after -- too many months after Howell and

5      Golleher's, but that's my best conclusion based on the

6      totality of the facts known to me or that I believe

7      based on Golleher, Trammell, Howell and Dorough.

8              Q     Okay.  And then one other question on the

9      same line, you began in your explanation of this third

10     supplemental opinion by describing something about

11     Sergeant Young and discussion of the shock collar.

12     How does that relate to this opinion that we now

13     talked about for the last few minutes?  I'm not

14     connecting those two.

15             A     I don't know whether -- see a shock collar

16     has to have two components.  You've got to have both

17     the collar on the dog and the transmitter.  And I

18     understand now that it's the policy of Jax Beach to

19     keep those on the dogs all the time they're in

20     service.  That's not a real common policy, but it's

21     not rare.  It's not unheard of.

22             Q     It's okay to do that?  In other words, you

23     don't quibble with that being a policy?

24             A     No, I don't.  I think there's something --

25     that tells you something about the dogs.

1          Q     Okay.

2          A     But if -- but I've seen handlers who have

3    the collar on the dog and then they leave the

4    transmitter in their drink cup holder in their car.

5    That doesn't do you any good.  It's like a gun without

6    a trigger.  It's like a baseball game without a

7    baseball.  You've got to have that device.  When I --

8    and I was surprised, frankly, to hear this late in the

9    game that there was an electronic collar on that dog.

10   To me that's something I would have expected to have

11   been mentioned earlier.  But typically when an agency

12   requires a shock collar, an electric collar, to be on

13   a dog, they required the handler to have -- you also

14   have to charge the batteries up.

15         Q     Right.

16         A     Precisely for circumstances like this

17   where you need the most instant, the most

18   contemporaneous, the most urgent release from a bite.

19         Q     Putting one's self in Officer Dorough's

20   shoes and his description of the incident, first of

21   all you recognize the fact that he doesn't make any

22   mention of Yacco wearing one of these collars at the

23   time?

24         A     I do, which -- yeah, I do.  And that

25   certainly raised an issue in my mind.

1    Q    So I mean, perhaps it's fair to say right

2    now what we have is Officer Dorough's lack of any

3    mention of it and Sergeant Young reflecting back and

4    saying yes, I think we did have them.  So perhaps we

5    don't know whether Yacco had one or not?

6    A    That suggests a couple of things.  That's

7    certainly one of the reasonable suggestions from that

8    night.  And it may well -- I mean, I had one -- when I

9    had a dog I owned one.  I don't believe in them,

10   didn't use it.  Sheriff's office says here, goes to

11   the dog.  So yeah, I had one but did I ever have it on

12   the dog?  No.

13   Q    And the other thing is in light of Dorough

14   not mentioning it, he certainly makes no mention of

15   utilizing the collar if Yacco had one on.

16   A    Right.

17   Q    But let me ask you this, just putting --

18   reading Dorough's description and looking at it from

19   his point of view and his description of the event,

20   Dorough is a mere step or two away from the suspect

21   who he thought was the suspect, this person who turned

22   out to be Mr. Trammell.

23   A    Right.

24   Q    He has the moment as we just mentioned

25   where he sees, uh-oh, we've got the wrong guy and he

has, as you've described, he does what was reasonably
expected, immediately does what he can as quick as
possible to get the dog off.  And I believe based on
what you said you believe he did that?

A    I think -- I don't want to project myself
into Dorough's, but I think every dog handler or
anybody who's been a dog handler recognizes that for a
handler this is a moment of gut wrenching, and all
kinds of questions go through your mind.  Not the
least of which is the humanity question.  I don't want
anybody to be bitten by my dog that doesn't -- and it
may well be -- I don't know Dorough, but I'm willing
to do what I shouldn't do and speculate that he's
concerned about taking care of this 50 some odd year
old man as quickly as he can.  And the first thing
he's got to do to take care of that man is get the dog
off his bite.

Q    And he actually says that in his
deposition, doesn't he?

A    I don't remember that, but I wouldn't be
surprised if he says that.

Q    If indeed we're going to look at it in
that way, that Dorough would want to get the dog off
as quickly as possible and he's right there almost on
top of the situation, a step or two away, wouldn't you

1    agree with me, doesn't it make sense that even if he

2    had -- even if the dog had the shock collar and

3    Dorough had a transmitter that it would be a quicker

4    maneuver to remove the dog from Mr. Trammell to reach

5    down and grab the dog?

6         A    I believe that that's fair.

7         Q    Instead of hitting a transmitter button

8    and hoping the dog releases?

9         A    And that kind of depends on his experience

10   with the transmitter --

11        Q    Absolutely.

12        A    -- his experience with the dog, his

13   comfort level with that equipment that was mandated

14   for him to have.  I don't know.  But I certainly think

15   that in the universe of reasonable alternatives, if

16   I'm this distance to you, doing a lift off is an

17   option that he may well have taken.

18        Q    That procedure, by the way, that Officer

19   Dorough describes as you called it the lift off, is

20   that something you've heard of, are familiar with?

21        A    I've heard it called a lift off, a take

22   off, a pull off.  Lift off's probably the more common.

23        Q    Handlers are taught that technique in case

24   they need it?  That's a commonly taught technique?

25   It's in the arsenal, so to speak?

A      It would be unreasonable not to be taught
that technique.

         Q      I appreciate that.  I want to try and keep
this rolling forward.  I want to look now into your
report to the extent we haven't already covered some
things and walk through and see what still is and
still perhaps may not be your opinion.  So I'm going
to start -- and perhaps we ought to do this but I'll
just make this Defense Exhibit A to the deposition,
your report dated January 4, 2008.  And if you'll
forgive some pauses I want to read through some things
but there will be stuff that has no point in me asking
you.  It may just take me a moment to get there.

                (Whereupon, an off-the-record discussion
was held.)

         Q      (BY MR. SARBER)   Let's go to the point
where Dorough has been called out to the scene -- I'm
just tracking through some of your summary of known
facts here.  Dorough is called out to the scene, they
begin the track.  You make a comment here after
tracking to neighborhood backyards and in and out of
those yards and finding no one, it appeared that Yacco
may have lost whatever track he may have found.
Shortly thereafter Yacco apparently acquired some
scent along the fence line and reacted to that scent.

1   I just want to ask you about those couple of sentences

2   there.  What's the basis for your summarizing

3   factually that Yacco may have lost whatever track he

4   found?  Is it your understanding he had a track and

5   lost it?

6          A    I'm relying on the reports and I'm relying

7   on deposition from Golleher and Howell, admittedly two

8   people who probably are not in good position to make a

9   decision about whether Yacco had lost an actual -- if

10  he had a track, whether he lost the actual track or

11  not.  That's a pretty hard thing to call, and the

12  person that's really in the best position to tell us

13  that is going to be Dorough.

14         Q    That's what I was about to ask you.

15  Everything else being equal you would probably rely on

16  his description of whether the dog had a scent or lost

17  it or whatever because he knows the dog?

18         A    Right.

19         Q    And I think Dorough talked about that and

20  we'll leave his testimony for whatever it was on that.

21  In going on at this point I'm on Page 8, this is your

22  paragraph number 3 under your summary of facts and you

23  go on to say that -- and I'm skipping over some parts

24  I don't need to ask you about at this point in time.

25  You said this was a very small backyard, described as

1   ten feet or less by Officer Golleher.  At some point

 2   Dorough made an announcement near the fence.  Whether

 3   by direction -- let me stop there.  At some point

 4   Dorough made an announcement near the fence.  You

 5   understand that Mr. Trammell disputes hearing an

 6   announcement?

 7        A    I do understand that, but I believe he

 8   made an announcement.

 9        Q    You do believe he made an announcement?

10        A    I do.

11        Q    Do you believe he made one or two

12   announcements?

13        A    I'm not able to resolve that.

14        Q    Let me ask you why then do you believe he

15   did make the one announcement?  Trammell said he

16   didn't, Dorough says he did.  Why do you feel

17   comfortable that he did?

18        A    Dorough says he did, the other two

19   officers say he did.  I believe that the person -- I

20   believe that Mr. Trammell's behavior would have been

21   different if he heard an announcement.  You know,

22   Mr. Trammell, he can't prove the negative here.  He

23   says he didn't make the announcement, he says he would

24   have been in position to hear it, but I just -- my

25   best conclusion is that an announcement was made at

some point.

Q    Okay.  And based on what you've looked at
so far from the factual evidentiary standpoint have
you reached any conclusions about why Mr. Trammell did
not hear the announcement?

A    I can only guess.

Q    It wouldn't help me to ask you if you have
any opinions on his testimony that he may have had
three beers or may have had a mild hearing loss in the
left ear?  That's outside of your bailiwick.  Is that
a factor for you or bearing here?

A    I certainly recall there were some
discussions he had had some beer.  I don't recall
hearing loss.  But there could be other things.  There
could have been ambient noise, the helicopter, he told
me that he was looking -- he was looking at something
on his phone.  And, you know, I can tell you there are
times when I look at messages or -- give you an
example, my brother called me on the break and has now
sent me a text message and there are times when I can
be so focused on that I may not hear my wife or
whatever.  I just don't know, sir.  I just don't know.

Q    All right.  Did Mr. Trammell tell you
whether he had -- let me ask you a different way.
Mr. Trammell testified something close along the lines

1   of that he had no idea that there was a police officer

2   or a police canine dog on the other side of the fence

3   from which he was only a few feet away until -- he had

4   no idea they were there until, as he said, he put his

5   hand in front of his face, the dog is about to go to

6   his throat.  Did he tell you generally the same thing

7   during your interview?

8        A    Yes, he did.

9        Q    Okay.  You made reference a while ago to

10  the fact that Dorough ripped apart -- pulled apart

11  that fence in order to get the dog and himself into

12  the backyard?

13       A    Yes, sir.

14       Q    And I think we all know now in hindsight

15  and 20/20 vision that Mr. Trammell was just a few feet

16  away from Dorough and Yacco on the other side of the

17  fence as Dorough and Yacco came through the fence.  We

18  all know that; right?

19       A    I believe he could have been within 9 to

20  10 feet at that point.

21       Q    So whether Officer Dorough -- I mean,

22  you've said he gave an announcement and I appreciate

23  the fact that you're not in a position to give an

24  opinion within your expertise of why Trammell didn't

25  hear the announcement.  Is it unusual to you that

Mr. Trammell would have testified that he didn't even
hear the fence coming down, he didn't hear a dog
alerting, he didn't hear anything that gave him an
indication it was a police officer right there other
than, you know, he heard ambient noise perhaps.  Is
that surprising to you in this case?

     A    No.

     Q    It's not surprising?

     A    I'll leave it at that.  You can follow-up
if you want.  It just depends on the sequence of
events.

     Q    Okay.  How would it depend then?

     A    I don't know how much of the fence is
already down but I believe -- I think we all -- all
the evidence is there's some gap in that fence.  And
it didn't look like it was a real rock solid fence
from the pictures.

     Q    All right.

     A    And so it may well be -- it may well be --
I can reconcile in my mind that the dog's able to get
through, Dorough's able to get his arm through and the
dog is able to get up as you indicated by showing the
dog right in his face, and at that point there may
have been auditory gating.  For example, you probably
have a wallet in your back pocket.  You probably don't

1   feel it, you probably haven't felt it all day, but now

2   that I've mentioned it you're aware that the wallet's

3   there.  You shut things out all the time.  I was shot

4   once.  I can remember very clearly, very clearly

5   seeing the gun and I remember what I said.  I never

6   heard -- and we were -- the guy was this far.  I never

7   heard the gunshot.

8        Q     Sure.

9        A     I saw the blood, I felt it.

10       Q     That's very common.  You hear a lot of

11  people say that that have been shot.

12       A     I never -- and people told me later how

13  loud -- I never heard it.  So yeah, I think it's

14  possible that Mr. Trammell didn't hear the fence being

15  ripped off and he didn't hear other things.  I don't

16  know why he wouldn't have heard the warning.  Because

17  if indeed we have this very common psychological

18  phenomenon going on, it would have happened after

19  the -- after some verbal statement.  It's possible too

20  that the warning is being given contemporaneously with

21  the dog being that close.  And most people,

22  particularly people who weren't used to a Malimois or

23  a German Shepard coming at them, for many people

24  that's a very intimidating experience.

25       Q     Absolutely.  And that fright is going to

have an effect. Neither one of us is a psychologist but I imagine it's logical to conclude that it's likely for a fright like that to have an effect on what you might recall afterwards and how you might see things?

A    That's absolutely well documented. Absolutely.

Q    Okay. Mr. Trammell told you he didn't have any idea the dog and the officer were out there before the dog came through?

A    Correct.

Q    And I think he said that in his testimony so I think we agree on that. That being the case then we can't -- I guess the question I'm trying to ask is is that being the case isn't it true that Officer Dorough and Officer Golleher and Officer Howell then become the only credible sources of information as to what happened up to the point of Yacco and Dorough coming through the fence?

A    The only credible sources that I'm aware of up to the point -- yeah, sure, that's --

Q    Meaning Mr. Cooper and Mr. Trammell don't have anything to add to you as an expert as you're looking at all these facts as far as what happened before Yacco and Dorough came through the fence,

right?

     A     They do not.

     Q     So we must rely on Dorough and Golleher and Howell and whoever else may have been on the other side of that fence for events that happened before that event?

     A     Correct.

     Q     I think that's fair.  What did Mr. Trammell tell you, if anything, with regard to what happened -- let me start over again.  What did Mr. Trammell tell you about any struggle or fight he may have had with the dog before the dog was removed off of him?

     A     He told me that the dog knocked him to his rear end.  Knocked him to a seated position and that he reached up and grabbed onto the dog and tried to get the dog off of him.

     Q     Did he tell you whether he was successful on getting the dog off of himself?

     A     I don't believe that I asked him that.  I don't believe that he said that he was.

     Q     Let me represent to you that in his deposition testimony -- and I can point to the place where it is but if I could summarize it he said the dog knocked him on his back or behind.  Somehow he got

in the seated position and that the dog had him by the
neck.  And then he then testified that he was able
with his hands and arms to remove the dog's bite and
hold from his neck, hold the dog out at arm's length.
Okay?  I'm just telling you that's what he says or
something close to that.  You understand from Officer
Dorough that Yacco was an 85-pound Belgian Malimois;
correct?

          A     Yes, sir.

          Q     And that he was a very strong trained
police canine; correct?

          A     Yes, sir.

          Q     In your experience in this field is it --
would you expect a gentleman of Mr. Trammell's stature
and state and condition on that night to have been
able to remove a dog's bite from his neck by his own
strength and hold that dog at arm's length?

          A     I don't know what his condition was that
night so let me tell you that right off.

          Q     Sure.

          A     I don't know what condition his condition
was.  I'm maybe a little bit younger than
Mr. Trammell, not much, I'm over 50.  I am a big
fella, played ball, gone to cede, but I can still
punch and still lift a fair bit, and I have fought

dogs and been a decoy.  I think I would have
difficulty with a dog that's engaged in a soft tissue
bite in pulling the dog away.  But I can't discount
that there may not have been some -- I've been in
situations -- I once broke an man's arm in two, which
is a remarkably difficult thing to do, because the man
was trying to reach a revolver to shoot me.  And I
didn't know until after that I had actually broken his
arm and it was hanging there limp because I continued
to take that man to the ground and I continued to -- I
was very -- I had been shot by then and the last thing
I ever wanted in my whole life again was to be shot at
close range.  And I had another situation where a man
pulled a gun on me and I was able to overcome him
physically without drawing my weapon.  So is it
possible?  Yeah, it's possible.  Would I have expected
it?  I would be surprised.

    Q    Okay.

    (Whereupon, a recess was taken.)

    Q    (BY MR. SARBER)   Mr. Wallentine, I want
to ask you, have you developed an opinion or
impression one way or the other as to whether Officer
Dorough intended for the dog to apprehend by biting
someone when the dog did?

    A    Someone?

Q    Someone.  Thinking it was a suspect but
obviously ended up being something different.  Do you
believe Dorough anticipated the dog would be biting?

A    I have not formed an opinion on that and
I'm not certain from the facts.

Q    Is it fair to say or would you or would
you not agree with me that based on Officer Dorough's
description of the events leading up to this that he
had a -- an indication, perhaps a strong indication
based on the dog's behavior, that the suspect was in
that backyard or very close to it?

A    I believe based on the dog's behavior that
Officer Dorough believed that he was about to
apprehend Mr. Dillard.

Q    Mr. Dillard, the suspect?

A    Correct.

Q    In fact, that's why at least he says, and
you say you believe he did, why he gave the
announcement thinking hey, I'm about to apprehend the
suspect, it's the right time to give the announcement?

A    Correct.

Q    I think you would agree, you don't have
reason to conclude confidently, that Officer Dorough
released the dog from the leash.  He did not do that,
did he?

1      A      I don't know that he did.

2      Q      Intentionally is what I'm talking about.

3      A      Oh.  I don't believe -- if it happened I'm

4  not -- I can't conclude that he did it intentionally.

5      Q      Okay.  Based on his testimony would you

6  agree with me that his -- from his perspective he

7  was -- he intended to go into the backyard with the

8  dog still under control on the leash?  That was at

9  least his intention?

10      A      I'm not certain of that but I believe

11  that -- that's a fair interpretation of what he

12  intended.

13      Q      Okay.  Would you agree with me that

14  Officer Dorough did not know that Mr. -- did not know

15  that the person he suspected was in the backyard was

16  not Mr. Dillard until after the dog bit Mr. Trammell?

17      A      I think I understand what you meant by

18  that question.

19      Q      And it may have been inartfully asked.

20      A      I believe that Officer Dorough did not

21  know that Yacco was biting someone other than

22  Mr. Dillard until he saw Yacco on the bite.

23      Q      Okay.  You don't believe that Officer

24  Dorough intended, knowingly intended, for the dog to

25  bite someone other than Mr. Dillard?

A     I don't believe that.

          Q     There's been some discussion in the
depositions and even with the initial reports about
the presence of a helicopter air unit in the general
vicinity?

          A     Yes, sir.

          Q     Does any of that discussion or existence
of the air unit, does that have a role, does that play
a role or have a bearing in the opinions in this case?

          A     I find it curious on two fronts.  I don't
know enough about the timing of the helicopter to know
why this is the case, but I find having been in a
helicopter following a dog chase I find it curious
that Mr. Trammell wasn't identified by the helicopter,
or illuminated and identified by the helicopter.

          Q     Right.

          A     You know, I can see how it could happen.
I also find it curious that Mr. Trammell and other
people weren't out in their yards looking up to see
the helicopter.  To me that seems to be human nature.
When we put one of our helicopters -- I say one, we
only have one -- we put a helicopter in the air and
it's lighting up somebody's backyard, people come out
and they look and they say, oh, the police are in my
neighborhood, what's that big spotlight doing?  What's

going on?  But I'm not sure that I know enough about
the timing of the helicopter or the flight to have it
be a real factor in my opinions.

        Q        Okay.  Did Mr. Trammell tell you in your
interview that as he was struggling with the dog that
he was aware of the fact that officers were just
standing around doing nothing until Mr. Cooper
arrived?

        A        We didn't discuss that.

        Q        One of your -- included in your opinions
here in your written report was a discussion about the
Graham v. Connor factors --

        A        Yes, sir.

        Q        -- for using excessive force.  Let me ask
you about those.  And I'm not sure to what extent, if
any, your expertise in this case is going to include
any kind of legal interpretations.  I presume that's
not what you intend to do?

        A        I don't believe I've been hired to provide
legal counsel or interpretation of the law here.

        Q        Sounds good.  Let's -- we'll gear our
conversation then to facts as they might apply here to
these three factors.  The first being the severity of
the crime.  Mr. Dillard was suspected of burglary to a
residence; correct?

A     Yes, sir.

          Q     And you understand that Officer Dorough
knew that burglary would be the charge when and if
Mr. Dillard was apprehended?

          A     I believe that's what he was told by other
officers.

          Q     Okay.  Do you believe that the city's
policy to not release a dog to apprehend a suspect
unless the charge is a felony is an appropriate
policy?

          A     No.

          Q     Why not?

          A     It doesn't go far enough.

          Q     Tell me what it should say in your
opinion.

          A     Well, you gentlemen in other depositions
I've read I've seen you talk about bad check cases.

          Q     Right.

          A     Which apparently in Florida a $150 check
would be a felony.

          Q     I haven't been talking about bad check
cases by the way, but one of us has.

               MR. SHAKIB:  Off the record.

               (Whereupon, an off-the-record discussion
was held.)

THE WITNESS:  I have similarly used

another example in the past.  My grandmother, God rest

her soul, before she passed on she was defrauded out

of over $1,000 in soap sales by some telemarketer.  If

I had found the person that did that -- and that would

be a felony in this state -- I would want to release

my dog and then some.  I love my grandma a lot.  Under

the Jax Beach PD policy and some other circumstances

being present, I think I would have been able to

release my dog.  My quibble with that part of the

policy, sir, is that it doesn't go far enough in

talking about what type of felony.

        Q    (BY MR. SARBER)  Okay.  Because it could

include a felony that's a nonviolent type of felony?

        A    Correct.  And I also will say in the

interest of fairness here there are policies that

allow -- that don't discuss felony versus misdemeanor

and allow for release of a dog in certain misdemeanors

and courts have upheld that.  We look -- in the dog

world, sir -- I'm not trying to reach a legal issue

here, but in the dog world Graham v. Connor is

something that's taught to handlers as almost a

talismanic formula.  Get this case down and these

three factors.  So if your question to me is, is the

felony alone enough to deploy, if that's an

appropriate policy, I have to say no.

Q    And that actually was not my question at all.  You've said you reviewed Sergeant Young's testimony, then I trust that you read that he testified that it's the practice and custom of the Jax Beach Police Department that in addition to there needing to be a felony for the release of a dog to apprehend that there's got to be some type of threat, risk of immediate threat to the officer, and resistance, a lack of compliance of some sort?

A    Yes, sir.

Q    And you would agree that that is an appropriate practice?

A    Yes, sir, that practice supplementing the policy is a much more reasonable situation than the policy standing alone.

Q    And in fact you probably also read that Sergeant Young testified that in his experience with the department that canines had never been released on someone suspected of comitting one of those nonviolent felonies, the worthless checks, the Medicaid fraud and all that?  You read that?

A    Yes, sir.

Q    And you would applaud that?

A    I think that's appropriate use of -- or

1  appropriate restraint from use of a dog.

2      Q    Absolutely.  Okay.  So looking at the

3  Graham v. Connor factors.  First we look at severity

4  of the crime.  Certainly burglary qualifies as

5  sufficient severity to at least meet that prong, does

6  it not?

7      A    I would prefer to say that burglary in a

8  residence.  And maybe you don't break it up in

9  Florida, but here we have -- if somebody breaks into

10  my shed where I keep my garden tools and my potting

11  stuff, that's a felony.

12      Q    All right.

13      A    That's a burglary.  I wouldn't equate that

14  the same as Dillard kicking in the door to a

15  residence.  To me that's a higher grade burglary.  And

16  I don't know -- if you would make that distinction I

17  would feel more comfortable.  Because that's what

18  Dillard did.

19      Q    That's what he did.  So what Dillard did

20  qualifies for that prong of the test?

21      A    I believe it does, sir.

22      Q    And then the second prong is did the

23  suspect present an immediate threat -- I'm reading

24  your report -- subject presented an immediate threat

25  to the safety of officers or the public.  Let me ask

1  you about that.  In this situation, again looking at

2  it from Officer Dorough's point of view, he's chasing

3  a burglary suspect, it's dark, he can't see the

4  suspect, the dog has alerted and given Officer Dorough

5  a reasonable belief that the suspect is close at hand

6  in that backyard.  Do those -- and Officer Dorough

7  doesn't -- because he can't see him he can't confirm

8  one way or the other whether the suspect is armed.  He

9  may not have heard anything about that one way or the

10 other, but can't confirm that he's not armed.  Do

11 those facts present in your opinion the type of

12 immediate threat that qualifies to meet the second

13 prong of Graham v. Connor?

14      A     They could.  It's not as clear cut as the

15 first and there's some other things I would like to

16 discuss in the analysis, but I think as the facts are

17 presented as you just presented them I would have to

18 resolve that factor in favor of deployment of a police

19 service dog.

20      Q     All right.  And then the third Graham v.

21 Connor factor is was the suspect actively resisting

22 arrest or attempting to escape?  Again, at least from

23 Officer Dorough's perspective he's chasing a suspect

24 who's trying to escape; correct?

25      A     Correct.

Q     And from his perspective he's given an

announcement and gotten no response; correct?

          A     Correct.

          Q     And those facts will qualify for the third

prong in Graham v. Connor?

          A     Again, that's an even closer issue because

for me there are some -- and I think I've specified

these in my report -- there's some steps I would want

to see the officers taking to verify that at the time

or at the moment we're about to send that dog, deploy

that dog, that our suspect is actively resisting or

attempting to escape.

          Q     Okay.  Let me ask you that because now

we've come back around to that term deployment.

          A     I figured we would.

          Q     Officer Dorough -- and again, just going

on his description and from his perspective of what

he's intending to do, he wasn't -- as we've defined it

earlier he wasn't sending the dog; correct?

          A     That's my understanding of what happened.

          Q     He was not releasing the dog off of the

leash; correct?

          A     Correct.

          Q     And --

          A     At least not intentionally so.

1      Q    And from his perspective what Officer

2   Dorough was doing was moving into the backyard with

3   his dog on a leash?

4      A    I believe that was his perspective.

5      Q    Okay.  So is it fair to say -- and I

6   really am trying to get your opinion based on the

7   facts.  I'm not looking for that legal analysis

8   obviously.  I'm trying to stay with you on this.  I'm

9   trying to stay on the same playing field with you.

10  From a factual standpoint is it your opinion that

11  Officer Dorough was not at the moment of entering the

12  fence intending to employ force on the subject, force

13  being dog go get him, bite him, apprehend him?

14     A    That I'm not certain.

15     Q    Okay.

16     A    I'm not certain.

17     Q    All right.  Would you agree with me that

18  Officer Dorough did not know that there was a person

19  in the spot where Mr. Trammell ended up being before

20  Officer Dorough went in the fence?

21     A    I believe he was not certain of that.

22     Q    Okay.  He didn't know with 100 percent

23  certainty whether there was a person in the backyard

24  at all; correct?

25     A    I don't think so.

1      Q    And if he suspected there was a person in

2    the backyard, he didn't know if the person was two

3    feet away or 20 feet away.  Fair?

4      A    He may have had a suspicion based on the

5    behavior of the dog, but I don't think he knew.

6      Q    Okay.  One thing you state in your report

7    is about the flashlight.  And you acknowledge that

8    overusing a flashlight in a situation which Officer

9    Dorough found himself in the night of is a valid

10   tactical concern for officer safety?

11     A    Yes, sir.

12     Q    He didn't want to have that flashlight on

13   too much, because then he's easy to spot in case

14   somebody does have a gun; right?

15     A    Yes, sir.

16     Q    Officer Dorough describes in his

17   deposition using a flashlight intermittently -- and

18   that may be my word, not his, but briefly shining it

19   and getting a quick glimpse.  Is that a fair

20   characterization of what you believe he described?

21     A    I believe he said intermittent.

22     Q    Maybe that's where I got it.  Do you agree

23   that that type of use of a flashlight in this type of

24   situation is appropriate?

25     A    Yes, sir.

Q    I got a sense you're itching to add
something to that statement.  I don't want to cut you
off.

     A    It's appropriate but there's more to it.
But in terms of what I think you were asking
intermittent versus long flash or long illumination,
clearly intermittent was the far more tactically
sensible choice to make.

     Q    And you acknowledge Officer Dorough's
testimony that he, after creating the opening in the
fence, did a quick shine of the light inside the
backyard to see if he could see the suspect?

     A    I believe that's what he said.

     Q    Do you fault him for doing that?

     A    No, sir.

     Q    Do you believe that was done improperly?

     A    No, sir.

     Q    Do you believe there's anything else
different he should have done with regard to the use
of the flashlight?

     A    Well, his testimony in the reports don't
give me enough clarity.  Ideally, in the luxury of the
20/20 hindsight here today, I'd like to see him -- I
would like to have seen a -- ideally I wish the
helicopter had, you know, lit up this white man in a

white shirt, but that didn't happen.

     Q     Right.

     A     It appears to me, given the distance that the evidence suggests and all the testimony suggests that Mr. Trammell was from the fence, that he should have been able to be seen through proper use of a sneak and peak or a flash move maneuver. And I don't know if I described that adequately and I suspect that officers have tried to describe that for you. But that's typically -- depending on the circumstances, where there's a fence typically one would look over the fence momentarily to try and get a vision in the ambient light and then illuminate -- usually the hand will be held high above the head and as far away from the head as you can. For a couple reasons. People, like moths, turn to the light and they typically on a flashlight will focus right at that light. You may have an officer who has the flashlight extended three feet away from his head and people won't see the officer they'll see the light. If that had been done a couple of times along that fence line over that fence and if Mr. Trammell were standing where he says -- where he told me that he was and where the evidence suggests, I find it intriguing that he was not seen.

Q   Did you read that Officer Dorough was asked about -- it may have even been me that asked him this, about whether he kind of looked up and over the fence. The fence is about six-foot high, he's about six-foot high. And did you read that his response was I didn't want to put my head up and shine a light where it could get shot off. Again, that's my paraphrasing. Do you fault him for making that decision and not looking up over the fence and instead trying to look in the opening he created? I mean, is that a valid concern that he gave?

A   It's a valid concern. It wouldn't be what I would have done or wanted one of my employees to do, but it is a valid concern. And if that was the limit of his training and ability, then that's the choice he made.

Q   Okay. But again, in light of his training and ability it was an appropriate decision to make?

A   I don't know what low light illumination tactics he had been trained in. I don't think it's preferable, but that may be how it's done.

Q   Let me ask you -- and as you know he says they've got part of the fence out, he was in a kneeling position trying to keep his body and his profile low.

A     Right.

         Q     Again, that's an appropriate tactic in
some situations?

         A     It is.

         Q     And then he from the kneeling position
shined his light in very quickly to -- you had the
term for it, I don't know what it was --

         A     Some people call it sneak and peak or
flash move.

         Q     And he didn't see anything.  If
Mr. Trammell had indeed been standing up as he's
described for both you and for me literally just a few
feet away -- which we know he was, his body was,
whether he was standing up or on the ground but he was
a few feet away -- you would have expected the sneak
and peak to have illuminated his white shirt; right?

         A     Yes, sir.

         Q     Does it make sense to you that Officer
Dorough did not illuminate his white shirt in the
standing position on the sneak and peak because
Mr. Trammell was lying on the ground and not standing
up?

         A     No, sir.

         Q     That's not logical to you?

         A     If that were the fact -- yeah, there's

some logic to that hypothetical.  But I still believe
that as big as Mr. Trammell appears to me to be -- he
looks like a pretty corpulent, stalky fellow in the
pictures.  Even if he's down low he's wearing a white
shirt and a flashlight's flashed on it, I think he
should have been seen.

    Q    Either way, whether he's lying down or
standing up you think he could have been seen?

    A    Yeah.  Certainly I would have to say that
if he's standing up, kneeling, that it's more than
likely -- that it's more likely that the flashlight
would illuminate him.

    Q    But you remain cognizant as you state -- I
imagine you would maintain your position as you state
in your report that as you say, a hiding suspect
almost always has the visual advantage over a
searching officer.  That's the case?

    A    That's almost always the case.

    Q    And for that reason and not withstanding
what you've told me in the last few minutes, you don't
fault Officer Dorough for exercising caution with
regard to the use of the flashlight?

    A    I would have exercised caution.  Any
reasonable officer would have exercised caution.

    Q    Okay.  You state in your report on Page 17

that there was no evidence provided to me or

discernable in any of the documents that Yacco was

ever tested and certified by the Florida Department of

Law Enforcement, and/or by any of the nationally or

locally recognized training and certification

organizations.  Are you prepared to withdraw that

statement today?

A     I am.  I saw documents in this deposition

exhibit that suggested to me that's not true.

Q     So you now understand that Dorough and

Yacco were certified annually and passed their

certifications each year up until the time of this

incident?

A     I didn't pay a lot of attention until the

year that was applicable here, but I believe that

Sergeant Young brought some records.  But there's an

exhibit here that -- and there were some additional

documents provided to me after one of the depositions.

But I believe I've seen something that convinces me

that that team of Dorough and Yacco were certified at

the time this happened.

Q     You don't have any reason to take position

now that they were not properly certified?

A     I do not.

Q     Okay.  And are you familiar with the

1    certification requirements by the Florida Department

2    of Law Enforcement?

3         A    Only vaguely.  I haven't researched them

4    in this case, but I have had occasion -- when I

5    supervised the police service dog training program at

6    the state police academy we looked at -- from time to

7    time one of my employees would say, you know, Chief,

8    here's what other states are doing and here's

9    something they're doing, I think we should change it.

10   And I remember having seen a bunch of different states

11   once and FDLE was included in that group.

12        Q    And given the fact that Officer Dorough

13   and Yacco were certified by the state annually as

14   required in each of the several years before this

15   incident as they were supposed to be, what does that

16   tell you as an expert in this field with regard to

17   their abilities and their -- whether they were

18   permitted to be on the street?

19        A    It means that they met the standards of

20   the State of Florida that its department of law

21   enforcement feel are necessary to show, you know,

22   street working competence at one point in the year.

23        Q    Okay.  And if I represent to you that they

24   were certified at the end of 2002, six or seven months

25   before this incident, and that they were again

certified at the end of 2003, five months after this

incident, you wouldn't have any reason to dispute

that, would you?

     A    I do not.

     Q    Along those lines -- I have to thank

Mr. Shakib for educating me to some extent on the

different other national, international police work

dog associations.  Is it your opinion that it is

necessary for Officer Dorough and Yacco to have been

certified or accredited or members of any of these

other national or international organizations, the

national -- what are they, National Work Dog,

International Police Dog, the American -- whatever

they are.  Is that necessary?

     A    Necessary under Florida law?  I'm not sure

I follow -- they're not mandatory certifications, no.

     Q    All right.

     A    In most states they're not mandatory.

     Q    And I don't believe they are in Florida.

Do you?

     A    I don't believe they are.

     Q    So it's not mandatory.  Do you believe

that -- and let's assume for the moment, because I

think this is accurate that Dorough and Yacco were not

members of any other organizations -- do you believe

1    that is inappropriate in any way or causes them to

2    fall short in any way for their ability to do their

3    job?

4         A    I think it's -- well, I don't want to

5    quibble with your word inappropriate.  But it's the

6    best practice to belong to the major organization in

7    your particular area and it facilitates a collegiality

8    and exchange of information.  But does it mean that

9    the dog and the handler are less able to perform on

10   the street if that's what you're after?  No, I don't

11   think it necessarily does.

12        Q    Are you prepared at this point and have

13   knowledge of whether the -- I don't know if the right

14   term is the qualification or membership or

15   certification standards of these organizations is less

16   stringent, equally stringent, more stringent than the

17   Florida Department of Law Enforcement standards?

18        A    I could offer you an opinion on that.

19   There are different areas.  So I can offer an opinion

20   on that with respect to particular areas, but not as

21   we sit here now.  I would have to be sitting in my

22   office and pull out my NAPWADA, N-A-P-W-A-D-A, my

23   North American Police Working Dog Association

24   standards, my United States Police Canine Association

25   Standards.  Those are the two major groups for patrol

dogs.  I would have to pull those standards out and
lay them side by side the Florida standards.

        Q     All right.  But you didn't have any --
that I could tell any opinions along those lines in
your written report, nor are they part of your
supplemental -- I guess I'm just trying to confirm
that's not part of your opinions?

        A     No.  That's correct.  They are not.  The
principle reason for that, sir, is that it is my
opinion that where states undertake to offer
certification standards in that state that's the best
representation of the local standard.  But not every
state does.  Utah does, Florida does, a few others do.
Others rely on these organizations that we talked
about.

        Q     All right.  We're making progress here
through your report so we're getting there.  Page 18
you say that in only 8 out of the 12 previous months
of training records was there any indication that
Yacco received maintenance training in releasing.  It
is notable that the training records, which contain
very sparse performance comments do reflect concerns
that Yacco does not properly release from bites.  Can
you identify for me any of the particular training
records that in your mind reflect concerns that Yacco

does not properly release from bites?

     A     Not as we sit here, but there were written
comments in some of those training records that said
that Yacco needed to work on or there were -- there
was a numerical scale and I believe that Jack Speech
used a 1 to 5 scale.  3 being the threshold -- 5 being
an A, if you will, 2 being a B, 3 being a C, and 4
being -- excuse me, it may be the other way around.
1, A; 2 -- in any event, that Yacco received what we
considered to be the equivalent of a D grade.

     Q     Okay.  I want to come back around to this
issue of the KNPV.  In your mind is the mere fact that
the dog has KNPV training, does that alone render the
dog inappropriate for American police canine work?

     A     No.

     Q     Does the fact that Yacco was a KNPV
trained dog have a bearing on any of your opinions?

     A     Yes.

     Q     What are they?

     A     If -- I don't know with familiarity
Officer Dorough or the fellow from Jax Sheriff's
office who provided the majority of the initial
training.  I don't know what familiarity they have
with KNPV, so I don't know what inconsistencies there
would be between KNPV sporting trials -- that is the

performance standards for these sport dogs -- KNPV is
a sport, not a law enforcement thing -- and American
police service.  A better person to talk to about that
would be a trainer.  I do have some concerns that --
my general sense has been prior to this case and has
been reinforced in my discussion in this case, again
most recently with my friend Kenny Lichtlider -- that
KNPV dogs tend to be dogs that will seek the higher
bites, which generally are not desirable.

     Q    Why not?

     A    Well, this case is a case in point.  The
only undisputed and known fatality from a police
service dog bite in the last three decades in this
country stems from a neck bite.  And this is -- these
are -- you know, you can have -- and I believe I would
have to look at my own documents, but I believe that
was because a carotid artery was punctured.

     Q    Was that dog a KNPV dog?

     A    I do not know that.  And given the
circumstances I don't know that it would have
mattered.

     Q    Was it the Robinette case?

     A    It was Robinette, and the guy's hiding
under a car.

     Q    Lying on the ground?

A    Yeah, lying on the ground.  So that may
have been the first area presented, but it's an
example of why we don't seek those.  You can also have
tears of the cartilage.  I've been involved in a head
bite case many years ago.  You can have ocular
injuries, you can have maxillofacial damage.  Those
are -- so there's a higher risk of damage
associated -- and our goal is not to damage the
person, it's to gain compliance, which leads me to my
second point.  And that is that we find that people
are less -- the dog is more able to control the
individual and people are less able to fight the dog
off when we see the typical -- and maybe even
stereotypical is a better term -- American police
service dog bites.  And those dogs are trained -- I'm
sure you've heard this -- to engage the area first
presented.  That's the desirable target zone for a
couple of reasons.  One, it's easier to train that.
And two, typically suspects that are bitten by dogs
more often than not they're running away from the
dogs.  So typically we see people pumping arms, they
hear the dogs -- it's very common to see a bite -- and
I am gesturing now turning, one arm lower at waist
level -- to see someone turn, look over the shoulder,
and because that hand has been dropped in the act

of -- it's a natural physiological movement, the dog
will engage on the arm.  That is often very effective
at stopping people.  Another very effective way of
stopping people when they're running away is a thigh
or a calf bite.  It just -- major muscle groups, the
dog latches on.  In upper body bites sometimes we'll
see many people have a fleshy area under here and
that -- there may not be much muscle and bone there
for the dog to grab onto so you may see either
repetitive biting or maybe not a good bite.  So
generally we would prefer the dog not to be biting in
the face, head and shoulders area.

    Q    Okay.  Now does the fact that Yacco was a
KNPV dog or trained dog, does that -- and you've used
the word they tend to bite higher.  Does that
necessarily mean Yacco had a tendency to bite higher?

    A    No, it does not.

    Q    And if he's a KNPV trained dog and you
know that Officer Dorough's testified that regardless
of what training they had before they put them through
their own 400-hour course, the initial certification
training course, that that can be trained out of a dog
if the dog has a tendency to do something they don't
like?

    A    It can be.

Q     And if I couple that with presenting you

with testimony by Officer Dorough that Yacco did

not -- and Sergeant Young as well -- that Yacco did

not have a history of biting suspects in the head or

neck area, can you necessarily then draw a connection

between his KNPV training many years before this

incident and the mere fact that Mr. Trammell was

bitten on the neck?  Are those two necessarily

related?

         A     They're not necessarily related.  Again,

you've got a couple factors here that are a little

different.  First off, you've got a frontal bite.

Most dog bites are not frontal bites.

         Q     You're saying there's a frontal bite here?

         A     Frontal bite in this case.  Frontal bites

usually come when we've got an aggressive, charging,

out of control, defensive person.  They usually are a

defensive bite.  That is the dog coming in -- if I'm

charging someone, the dog's coming in and gaining me

frontally.  And even then frankly we tend to see them

in the thigh or lower extremities.  So I don't know

how often this dog had been presented with frontal

bite areas.  He may be reverting to some KNPV

training, but sir, I don't know that.  And I don't

think Dorough knew that.  I don't think any of us can

say that.  Is it a factor?  Could be.  Do I know?
Absolutely not.

        Q     There's no trick here.  Obviously there's
been a lot of questions as you've seen the depositions
about KNPV.  And I just want to know are you going to
present an opinion here, hey, this is a KNPV dog, that
means he's bad, that means he's a problem?

        A     Sir, I started off by saying earlier today
you don't see KNPV dogs in the west.  I'm interested
in dogs, I continue to be.  I had a dog that passed
away a few months ago and I'm not going to go through
that again, but I've had dogs my whole life and worked
sporting dogs and hunting dogs.  And to me the
KNPV has always been something like, okay, I know they
do that over there.  But, sir, I've never seen a KNPV
dog work to my knowledge.

        Q     Okay.

        A     I do not profess any expertise in that
sport.

        Q     Okay.

        A     They're beautiful dogs to watch though.

        Q     I imagine.

        A     It's really quite a sport.

        Q     If it's okay with you let's keep going.
Is that right all right with you?  Just tell me if you

feel uncomfortable.

     A    I don't.

     Q    On the same lines, forgetting everything else, the mere fact -- the fact alone that Mr. Trammell was bitten in the neck, does that mean necessarily that there was a training failure, a training deficiency with regard to Yacco?

     A    It's something that would cause me to inquire further into training, but no, sir, it does not.  I have seen -- sir, I participate in what most people consider to be the world's leading think tank on canine activities.  And one of my dear friends there is one of the great trainers in this country.  And I recall very vividly being asked to look at one of his bites seven or eight years ago that was a neck bite.  Highly trained dog, titled dog, had won a national championship.  It happens.

     Q    Okay.

     A    So it's something we look at but does it in and of itself say bad training, bad dog, bad handler?  No way.

     Q    And if you had a dog where if somebody says, Wow, he's never bitten in the head or neck before, and this is a dog that bites the first thing he comes to, something you said a little while ago is

1    what's been echoed by Sergeant Young and Officer

2    Dorough, trained to bite the first thing, then while

3    the neck bite may be a question, it doesn't by itself

4    tell you, okay, we've got a problem here?

5         A    No.

6         Q    I appreciate that.

7         A    You know, it doesn't tell me that we've

8    got a problem.  It just says there's something to take

9    a look at.  That's it.

10        Q    Okay.  Along those same lines -- on the

11   issue of the neck bites, the Jacksonville Beach Police

12   Department Canine Unit had experienced at least two

13   prior neck bites in the decade prior to this incident.

14   Can you identify what those prior neck bites were or

15   what the circumstances were?

16        A    I believe one was actually a rear, back

17   here, and that may have been Yacco.  And that was the

18   one that I recall -- one was Yacco and then one was a

19   different dog and I have forgotten who it was.  I

20   would have to look at the training records.  But in

21   Yacco, the suspect was down.  So that's a far more

22   explainable -- that's where Yacco found the suspect

23   and the suspect -- I am assuming by reading the

24   incident reports -- I assume what you're asking me to

25   do is talk about an incident --

Q    Yes, sir.

        A    -- that happened years before and all I
had was the police incident reports -- but I'm
assuming the suspect had the opportunity to extend his
hands out and surrender and chose not to.  And
unfortunately there was a head bite.  We don't like
those.  I told you why we don't like those.  And the
other one was another dog and I don't recall the
circumstances, but it was not Dorough and it was not
Yacco.  Aswin I think.

        Q    You talked to James Kunz?

        A    Yes, sir.

        Q    Tell me about the substance of y'all's
conversation that's relevant to your opinions.  I'm
sure you talked about a lot of things.

        A    Have you talked to him?

        Q    We have not taken his deposition, no, sir.

        A    He's a talker.

        Q    Is there anything that you used that you
are going to rely on here?

        A    No, sir.  No, sir.  He -- I have told
people all along I'm not a trainer and I don't know
the regional training standards in that area and how
regional training's done, so I suggested to Mr. Shakib
that he talk to somebody.  Mr. Kunz came recommended.

1     Q     All right.  Did Mr. Kunz give you any kind

2  of documentation that you're going to use?

3     A     He did not.  He pointed me to some areas

4  in the training that were of concern.  I actually felt

5  that I'd identified those areas already.

6     Q     Those are the release --

7     A     Yeah.  He also talked to me a great deal

8  about KNPV dogs and he talked to me about Orchard

9  Knoll Kennels.  I already had a pretty strong opinion

10  about Orchard Knoll Kennels before I talked to him or

11  anybody in this case.

12     Q     All right.  And that was somewhere in my

13  notes to ask you if you're familiar with Orchard Knoll

14  Kennels.  You were?

15     A     Yes, I am.

16     Q     And what are your opinions about that

17  facility?

18     A     Ken Mathias, who is the fellow that runs

19  Orchard Knoll Kennels, and I have -- I don't know that

20  we've ever served on a national committee together,

21  we've met.  I believe his title is Major.  Major

22  Mathias has an outstanding representation in the world

23  as being an honest dog seller, and I know that he's a

24  highly respected police officer in the State of North

25  Carolina.

Q   Okay.

 A   I've heard -- I've never bought a dog from him but I've heard from people who did said, you know, you buy green dogs but they're good, they're healthy, he's honest.  If you have a problem he takes them back.  He's got a great reputation.

 Q   And just to make sure the record's clear, you're aware that's where Yacco came from?  You know that's why that name came up?

 A   I figured that out afterwards, yeah.  At some point somebody showed me the documents about Yacco's purchase and that's when I figured that out.

 Q   What -- what else are you planning to do in this case?  Have you got any work left that you know of at this point in time?

 A   Yeah.  Go through files and find that one single page of notes with Mr. Trammell.  I don't believe so.  That depends on what you folks do.

 Q   Sure.  I understand.  I realize that.  I realize there may be further testimony.

 A   I don't know.

 Q   Do you have any workup to develop opinions that you know you need to do and haven't done yet?

 A   I don't believe so.  I am going to ask Ms. Buchanan, Mr. Shakib's assistant, to see

1  Mr. Trammell and Mr. Cooper's depositions because I

2  want to make sure that they're not -- that

3  Mr. Trammell didn't tell me something that's

4  inconsistent to his deposition and then I'll alert

5  Mr. Shakib.  I do want to revisit Sergeant Young's

6  depo because I got that Easter weekend, all my adult

7  children were in town and so I will admit I spent a

8  lot more time with my kids than I did that deposition.

9       Q     I'm with you.  Generally speaking based on

10 articles I've read that you've authored, excerpts and

11 books and things of that nature, my sense is that

12 you're a believer, for lack of a more accurate term,

13 of the use of dogs in law enforcement?

14      A     I am --

15      Q     That they have an important place?

16      A     I'm a believer that dogs have an important

17 place, that they can augment the mission of public

18 safety, they can serve communities, and I am a strong

19 believer and have been a participant in efforts to

20 increase the professionalism in the police canine

21 world and donated hundreds of hours to that purpose.

22 I do believe that police service dogs are a great

23 adjunct to American law enforcement.

24      Q     Do you agree that the Belgian Malimois is

25 an appropriate breed to use for this work?

1          A     Yes, sir.

2          Q     A good breed?

3          A     It's a very fine breed.  I've authorized

4     many purchases of those.

5          Q     This will save me a little time.

6     Generally speaking do you have any complaints or

7     criticism of my clients and the way in which my client

8     acquired Yacco?

9          A     No, sir.  It appears that they use -- in

10    fact, let me just tell you that selection criteria you

11    use, I believe that came from my agency.

12         Q     Is that right?

13         A     I believe that came from Sergeant Nope

14    which was my employee.

15         Q     Okay.

16         A     That's the same kind of -- those are the

17    same kind of issues that any reasonable agency would

18    look at, and certainly the same kind of issues that I

19    would look at if I were in the position to buy a dog.

20         Q     Okay.  Any reason to dispute Officer

21    Dorough's description of Yacco's demeanor from the

22    time that he was acquired up until the day of this

23    incident, just generally that Yacco was easy to get

24    along with, played with kids, et cetera?

25         A     I have no reason to dispute that.

1      Q    Okay.  You're not taking a position here

2  that Yacco was a mean dog, not suited for police work,

3  should never have been put on the street, anything

4  along those lines?

5      A    If that's the case I haven't been shown

6  the evidence.

7      Q    Okay.  Related to this KNPV, what does

8  PH-1 mean?  Is that some other type of European

9  certification standard or something?  That term got

10  batted around a couple of times, PH-1.

11      A    I would be happy to e-mail you the term.

12  I have it on my computer, I can't pronounce it.  It's

13  a word that's -- my gosh, it's got to be 20 letters

14  long.  But it's like the top certification -- like you

15  have Schutzhünd -- I'm not even going to try the

16  German either.  The Europeans put all those words

17  together in one big long word.  But it's a KNPV 1 dog

18  or KNPV P-1 dog is a higher level.  And again, I don't

19  follow the sport, I admire the people that do.  It

20  just means that dog's scored a certain number of

21  points in a trial in front of neutral independent

22  judges.

23      Q    That's what the PH-1 means?

24      A    I believe so.  I've got a little chart

25  that shows the different German and Dutch titles in my

office.  I would have to look at them but I believe
that's what that means.

Q    And I don't care to know a whole lot about
it unless that has a bearing on your opinions in this
case --

A    It doesn't.

Q    -- as far as Yacco's suitability and
things of that nature?

A    No.  I believe somebody told me this dog
was in the 370 range.  That's not a bad -- I had a
Schutzhünd dog that was in the same range.

Q    Along the same lines, at one point
somebody talked about a METLOF, M-E-T-L-O-F, I think
METLOF rating.  Does that have any significance to you
in this case?

A    It does not.  I've heard the term, I
really don't know what it means.

Q    The use of Dutch versus English commands,
does that have any bearing in your opinion in this
case?  The sense I get is they are kind of used
interchangeably or some are used in some situations
others not.  Does it matter in this case?

A    No, not really.  I mean, dogs -- most --
no, it doesn't really matter.  If the training's
consistent.  You can actually transition dogs from one

language to another.  It doesn't work real well to have bilingual dogs.  You can mix terms.  For example, as I believe with Sergeant Young's testimony there was a point that Jax Beach PD decided to go to stand still as the out command.

Q     Yes, sir.

A     There was some discussion nationwide about that several years ago and the agency that I was with at the time -- the Utah Department of Public Safety, we had 14 dogs at the time -- we made that decision as well.  So our dogs here all of their commands are in German except one English term, and I think you understand why that is.  It has a dual meaning.  It's a command to the suspects, it's a command to the dog as well.

Q     Which is what Officer Dorough described -- or maybe Sergeant Young, I can't remember which one.

A     The problem with languages comes when you have a dog that you've made a transition from Dutch to German or German to English or English to Dutch.  I mean, some language transition and the dog hasn't been fully conditioned to the new language or the handler's not consistent and goes back and forth and the dog -- because the dog has to say now what the heck is that?

Q     Do you have any information that the

city -- that my client trained its dogs specifically

to bite in the neck or the head?

          A     I have no information.

          Q     Do you have any information that my client

trained its dogs intentionally specifically to jump

and bite?

          A     I haven't seen that.

          Q     Officer Dorough -- does his employment

file, his disciplinary record have any bearing on your

opinions in this case with regard to whether he

conducted himself properly on July 11, 2003?

          A     I've seen things in his file that make me

question the decision to appoint him to the position

of a canine handler.

          Q     Like what?

          A     I'd have to go back and look at his file,

but generally his suitability to be supervised and use

independent judgment.  That's pretty critical as a

canine handler.  You're giving a canine handler a

particular tool that has the ability to inflict great

damage if used improperly or even when used properly.

          Q     Specifics, can you give me specifics on

what caused you to have concern?

          A     Just -- it was something I had seen in a

personnel evaluation.

1      Q     Don't know what it was?

2      A     It had to do with the ability to be

3  supervised and the ability to act independently.

4  There was also some discussion in his file about prior

5  excessive force complaints.  I don't recall the dates.

6  But I do know that Jax Beach had a policy of not

7  appointing someone to be a handler if they had had

8  prior substantiated complaints within a two-year

9  period.

10     Q     Correct.

11     A     And I think that standing alone is a

12 pretty valid criteria in terms of an officer's

13 temperament.  It's not to say there are patterns that

14 we can now look at and say I question this decision

15 based on the other things I've seen.

16     Q     I'm sorry, you said that is a valid

17 policy?

18     A     I do think that's a valid policy.  You're

19 giving a -- you know, you're giving somebody a force

20 tool, an additional force tool.

21     Q     Sure.  And Officer Dorough met that

22 qualification, didn't he?

23     A     I believe.  That's my understanding.

24     Q     The report you gave that you generated and

25 then your supplemental opinions today, at no time did

1  you raise anything about Officer Dorough and his prior

2  lawsuits or complaints or disciplinary action or

3  anything like that?

4       A    I did not.

5       Q    And you're not aware of Officer Dorough

6  having ever been accused or claim to have improperly

7  released the dog on somebody, are you?

8       A    I don't believe so.  As I sit here and try

9  and recall his record I don't believe that's the case.

10      Q    And you're aware of the fact that he had

11 been a canine handler for several years before this

12 incident?

13      A    Yes, sir.

14      Q    So I mean, not withstanding what you said

15 a while ago, would you agree with me that he was an

16 experienced canine handler?

17      A    He certainly had served --

18      Q    Five years or something -- four or

19 five years, ball park.

20      A    I was going to say four I think.

21      Q    That's fair.  He wasn't green?

22      A    No, he was not green.

23      Q    Wasn't the first time around the block for

24 him?

25      A    No, sir.

1    Q    Do you believe it was a good policy for my

2    client to always conduct a departmental incident

3    review after a use of force incident?

4         A    I believe that is a very -- I do.  I

5    believe that's a good policy.

6         Q    Particularly with regard to canine

7    handling it's a good policy?

8         A    With regard to any use of force I believe

9    that there should be a post incident department review

10   for a well operated police department.

11        Q    And you agree that Yacco had no history at

12   least that you have been able to see of apprehending

13   and biting the wrong person?

14        A    I don't recall any history of that.

15        Q    You've already identified -- I think there

16   were a couple of aspects of the actual written policy.

17   One had to do with the reference to felony as a

18   prerequisite for release and then the other had to do

19   with -- and we talked at length about the announcement

20   issue.  Are there any other aspects of the actual

21   written policy that you believe are insufficient or

22   inappropriate?

23        A    The policy should also state -- the

24   written policy, not just the oral --

25        Q    We're talking about the written policy.

1          A     The written policy should also state that

2     an officer should give a minimum of two announcements.

3     And some circumstances, sir, it makes sense to give

4     more announcements.  I don't know whether we need to

5     put that -- if we're searching the warehouse at

6     Wal-Mart -- we've got a distribution center that's in

7     Utah it's the size of like eight football fields.  One

8     announcement isn't going to do it, or one set.  We

9     need to move to other discreet areas.  So we need to

10    talk about the need for multiple announcements with

11    the exception that they don't need to be given when

12    that's tactically inappropriate.  We should also see

13    in the policy something that discusses waiting a

14    reasonable time considering the nature and character

15    of the building enclosure or other place to be

16    searched for the suspects to make themselves known, as

17    well as any circumstances, any peculiarities about

18    these particular suspects.  For example, they may be

19    less able to respond.  Maybe -- or less inclined.

20    Maybe juveniles, maybe an intoxicated person.  It may

21    be that we're searching an area known to be frequented

22    by homeless elderly people.  We've got such a place a

23    few blocks west here by the river.  Those kind of

24    factors would cause us I think not only to repeat our

25    warnings but also to give a greater amount of time --

if it were tactically feasible a greater amount of

time for potential suspects or potential innocent

persons in the area to respond.

Q    But you're telling me you think that needs

to be specified in writing in the policy?

A    I think that needs to be in the written

policy.

Q    Despite how the warnings are practiced or

the testimony as to how they were put into practice

and the custom of the agency, you believe in addition

to that they should be put in writing?

A    I think that if that's indeed the custom

of the agency it ought to be put in writing.  As we

saw and as I believe that I saw in Sergeant Young's

testimony that the officer's conduct's going to be

evaluated according to the written policy.  So if

that's a standard that's applied to the officer -- you

need to be fair to the officer.  The officer should

know what's expected of her or him in the performance

of his or her duties.

Q    Any other aspects of what you think -- and

we also talked about the reference to felony.  Any

other aspects that the written policy should be

better?

A    Just to be clear, when we talk about the

severity of the crime as opposed to felony versus
misdemeanor, there should be discussion of whether the
crime involved some threat to personal safety.  Again,
you point out that there was an oral tradition here
that augmented that.  But if that's the standard to
which the officer's going to be held and the officer's
going to be expected to comply with that standard, I
believe it should be reduced to writing and be part of
the official policy of the City.

        Q     Okay.  Even though you acknowledge that
all particular circumstances cannot be enumerated?

        A     They cannot.  You try and do that the next
day someone will give you an exception.

        Q     Just so we're clear, this issue of using a
bite and hold or -- versus bite and guard -- I guess
there are different competing terminology here?

        A     Bite and hold, guard and bark, find and
bark, find and bite.  There are two major
philosophies.  Whether the dog is intended to bite the
suspect at the end of an apprehension trail, or
whether the dog is expected then to guard the
compliant suspect and not bite the suspect.

        Q     And I believe in our Judicial Circuit, the
11th Circuit, the phrase bite and hold is used.

        A     It is used.

Q    And you understand that in the 11th
Circuit the bite and hold method is constitutionally
valid?

A    It's constitutionally valid in all
Circuits.

Q    So that's an acceptable policy on behalf
of my client to use that technique?

A    Absolutely.  It is in fact, according to
the research of your own expert -- which I might add
I'm trying to facilitate additional research -- many
believe -- and I'm one of those -- and I've preached
for many years that a dog that's trained in bark and
hold is actually more likely to bite than a dog
trained in bite and hold.

Q    I've read that you've said that.

A    I have said that and I have a thesis that
Charlie wrote and I have all these notes from years
back that there's good research behind that.

Q    I can't remember if I asked you this
before but just to make sure we're clear, not
withstanding your opinions as to what ought to be
added to the written policy that my client has, do you
agree with me that it's an acceptable custom or
practice for the Jax Beach Police Officers to not
release dogs on suspects unless there's a threat to

the officer and a noncompliance or resistance of some

sort?

A    Some sort of resistance, some sort of

noncompliance, yes, sir.

Q    And again, excuse me for the moments of

quiet here, I'm skipping through the areas I've

already asked you just trying to get to the end.  It

has been described by a couple of my officers that --

and let me ask you whether you agree with this -- the

proposition is that the -- when a dog is engaged in a

bite and hold technique, the dog's got the guy, that

the more the suspect resists and fights the more the

dog is going to work to win the fight to get in

control.  Do you agree that that's typical in the

industry?

A    I believe that's typical in the industry

and that's my experience.

Q    And that -- and for a dog to do that is

not a failure to -- does not reflect failure to train

or inadequate training, does it?

A    Depending on whether the dog comes off the

bite and tries to re-bite.  If the dog shows

hesitancy -- one of your client's representatives used

the term corn cobbing.  In the west it's more common

to call that a typewriter bite.

Q     Okay.

      A     When the dog comes off and then
re-inquires it shows hesitancy.  That's more likely to
injure the suspect, it's also more likely to prolong
the fight and it's not desirable behavior.  It should
be trained out of the dog.

      Q     Absolutely.  As long as they're not doing
that.  If the suspect's increasing the resistance in
the fight and the dog maintains the hold and is biting
harder almost, that's accepted behavior from a dog?

      A     Accepted and expected.

      Q     Okay.  Officer Dorough testified he was
using a six-foot leash.  Is that appropriate under
these circumstances?

      A     Yes, sir.

      Q     There have been some questions by
Mr. Shakib of some of the witnesses as to whether
Officer Dorough should have -- and I think the term
used short leashed or wrapped the leash even more --

      A     Choked up.

      Q     Choked up on it, yeah.  Are you going to
be expressing opinion that Officer Dorough should have
done that under these circumstances?

      A     Well, I haven't been asked that at this
point.

1      Q     I didn't see it in your report anywhere.
2   I'm trying to cover all the bases.
3      A     I understand that.  I haven't been asked
4   that.  I think best practice would have been to have
5   choked up on the leash when you can't see where the
6   dog's going as it goes through.  But I believe that
7   many reasonable officers would not choke up on the
8   six-foot lead as they're right there because they're
9   not expecting the dog to bolt.
10      Q     Okay.  And that was going to be my
11   question.  If you didn't need them, if you didn't
12   expect it to bolt is that a factor.  I appreciate that
13   answer.
14      A     To be fair to Dorough I think that's what
15   most people would tell you.
16      Q     Do you think that Dorough or Yacco did
17   anything wrong or contrary to accepted industry
18   standards, for lack of a better term, up to the point
19   where Yacco alerted on Mr. Cooper's back fence?
20      A     No.  I don't have any information that he
21   did.
22      Q     If Officer Dorough's version and
23   description of this entire incident is in fact what
24   happened.  Okay?  If it were to be determined that
25   what Officer Dorough says is the way everything

happened here, would you agree that he and Yacco acted

appropriately at all times?

A     No.

Q     In what regard would you say he did not?

A     Again, I would go back to the issue of

using the flashlight.  I understand that he and I

differ on looking over the fence.  I believe that

could have been accomplished safely and I believe that

that would have been a reasonable thing to do, and I

believe that had he done that there's a pretty good

chance that this situation would have turned out

differently.  The other -- the same can be said as

when he's down on his knees looking through the

opening in the fence before he rips open or as he rips

open the fence panel to get in.  Again, if he had used

proper illumination techniques as he said he tried to,

I think that even if we take his version, which I

think he's mistaken on where Mr. Trammell was at, he

should have seen Mr. Trammell and should have be able

to call that dog back before it goes through and

engages Mr. Trammell.  I still have in my mind

questions based on the flury of -- or the testimony

given about the flury of taking that dog off the bite.

I still have in my mind substantial questions about

whether the dog was removed as quickly as a well

1   performing well trained dog should have been.

2        Q    Okay.  Of course again my question was

3   just taking Officer Dorough's version not --

4        A    Okay.  Then let's just talk about the two

5   points of where I think he should have seen -- he

6   should have seen Mr. Trammell.

7        Q    You said something about you think Officer

8   Dorough was wrong about where Mr. Trammell was.  I'm

9   sorry, I didn't follow you.  What are you referring to

10  there?

11       A    I believe Mr. Trammell was standing up and

12  was knocked down by the dog as opposed to laying down

13  when Yacco came through the fence.

14       Q    Okay.  Standing up holding the cell phone

15  as he described, Mr. Trammell described?

16       A    Yes, sir.

17       Q    If that indeed had been -- you believe

18  that's how it happened, that Mr. Trammell was standing

19  up.  If indeed that's what happened would you have

20  expected that the cell phone -- or for Mr. Trammell to

21  have dropped the cell phone upon being engaged by an

22  85-pound dog?

23       A    Certainly could have.  On the flip side,

24  he might have engaged in a clench.  He might have

25  clenched up and held that cell phone as he fell down

on his hind end.  I don't know.

    Q    If -- let me ask you to assume this
hypothetical for just a moment.  If indeed
Mr. Trammell had not been in the backyard and instead
Mr. Dillard was crouched over right close to the fence
on the side crouched down low and it had been
Mr. Dillard in that yard, do you -- not standing up,
not wearing a white shirt, but crouched low trying
to -- intentionally hiding from Officer Dorough and
not responding to his canine warning or warnings,
whatever the case may be.  Do you believe it was
appropriate under that hypothetical, would it be
appropriate for Officer Dorough and Yacco to have
entered the backyard as they did?

    A    Limited to that hypothetical, no.

    Q    Why not?

    A    I would still hold Officer Dorough to the
standard of using his light at some point to
illuminate the backyard.  Now, I understand that --
and I don't know what Mr. Dillard was wearing that
night, but I will -- I believe that it's more
difficult to see a black man in the dark crouched in a
corner.

    Q    So it would have been more difficult --

    A    It would have been more difficult to see.

And if he hears and intentionally ignores the warnings
then it becomes a different situation.  And then based
on what Dorough knew it becomes a different situation.
But if he's crouched there and not making any threats
toward the officers at that point and resisting in any
way, I still believe that Dorough should have looked
and seen him and given him specific commands to show
his hands and to come out, and if at that point he
didn't comply then Dorough should have reevaluated and
likely made a decision to send the dog.  But at that
point -- and I understand, sir, I've changed your
hypothetical.

     Q    And all I was trying to ask is basically
you've got the same situation, except instead of
Mr. Trammell what you have is Mr. Dillard who's
purposely trying to hide from Officer Dorough.

     A    Right.

     Q    Officer Dorough doesn't know he's there,
can't see him, he's not responding to Officer
Dorough's canine announcement, and I was only trying
to ask in that hypothetical with a few changed facts
is it okay for Officer Dorough and Yacco to enter the
yard as they did?

     A    Can't be seen?

     Q    Can't be seen.

1        A    Yes, I believe it is.

2              (Whereupon, a recess was taken.)

3              MR. SARBER:  I have no other questions.  I

4   appreciate you're answering the ones you have.  Your

5   lawyer may have some questions for you so we may not

6   be done.

7

8                      **EXAMINATION**

9

10  BY MR. SHAKIB:

11       Q    I do have questions and so I would like to

12  ask some questions to clarify things.  Let me start

13  with this, and it's something that I want to hit

14  head-on.  Actually, let me qualify things.  You are

15  here testifying as an expert for the plaintiffs in

16  this case.  Your job is not necessarily to be the

17  finder of fact.  Would you agree with that?

18       A    Yes, sir.  Sure.

19       Q    And you -- all you can do is look at what

20  the testimony of the various witnesses is and come up

21  with some reasonable conclusions, but ultimately it's

22  the jury that decides what the facts are.  All you can

23  do is just with what you have make some reasonable

24  conclusions?

25       A    That's true.

1      Q    And I want to do that as it pertains to

2  the canine warnings.  In this case you've reviewed the

3  deposition testimony of Officer Howell, Officer

4  Golleher and former Officer Keith Dorough, and that's

5  three deposition transcripts of police officers who

6  were out there at the scene and perceived what

7  happened that night.  And they all testified in one

8  way or the other about what canine warnings were

9  given.  Are they consistent with each other?

10           MR. SARBER:  Objection to form.

11           THE WITNESS:  No, they're not.

12      Q    (BY MR. SHAKIB)   What's different?

13      A    Dorough says that he gave two warnings and

14  that there was some period of time between when he

15  gave the warnings and when he had Yacco go into the

16  backyard.  The other two officers were not perfectly

17  consistent, but those officers talked about the

18  warnings being given as the dog -- contemporaneously

19  with the dog going into the yard or as the dog has

20  bolted into the yard.

21      Q    Now I think in your testimony before you

22  recalled the situation when you were shot -- and gee,

23  I didn't know that it happened.  Good gosh.  That must

24  have been --

25      A    It's been 20 years, I'm over it.  The guy

went to prison.

Q    But you said that you never heard the shot.  And which scenario would be more analogous to your situation as far as ability to -- or inability to hear the shot?  The simultaneous canine warning that you get from Officer Howell and Golleher, or the two canine warnings with a reasonable waiting period before doing anything else?

A    I'm not sure that that -- I'm not sure that I can apply that principle fairly.  I think that it would be fair to say that I relied on -- and I don't recall as we sit here whether it was Howell or Golleher that was more detailed, and I acknowledge at the time I prepared this report I didn't have the benefit of Officer Dorough's deposition, but I did have the benefit of written statements by him -- I relied more heavily on those two Officer's statements because they had -- they were more detached, less I believe -- and this is a conclusion, but less emotionally aroused and less charged by adrenaline because they weren't the one that was in direct contact with the dog that's bolting forward.

Q    Right.  I think I wasn't -- I was confusing some things here.  One of the other things that had been discussed is that Mr. Trammell testified

he never heard a canine warning.

      A     That's true.

      Q     And so I guess the first thing I'm asking is would it not be consistent with not hearing a canine warning if the canine warning is right at the same time you're seeing a dog in your face?

      A     Based on my own experience, as well as based on substantial research that I've conducted in connection with some classes that I've taught, and based on personal conversations with a good friend of mine Alexis -- Dr. Alexis Artwall, who wrote a book called Deadly Force Encounters and talks about sensory distortion, it would be -- if Mr. Trammell testified that he did not hear a warning, that would be more consistent with the dog coming at him at the time the warning is given because he would be responding to the most substantial stimulus. The stimulus that's overarching, overwhelming his other senses, and that is seeing the dog -- as a gesture was made earlier today and is consistent with I believe what he told me -- seeing the dog when the dog was first inches away from his face.

      Q     And getting back to the issue of these three -- or at least two current officers, one former officer testifying about the canine warning, Howell

and Golleher say something that's inconsistent with
what Dorough says.

        A       That's true.

        Q       Would it be fair to say they can't be
both -- Golleher and Howell and Dorough -- put
Golleher and Howell together and Dorough in another
place, they probably can't both be telling the truth?

                MR. SARBER:  Objection to form of the
question.

                THE WITNESS:  They both can't be accurate.

        Q       (BY MR. SHAKIB)  And I understand.  No one
wants to say someone is intentionally lying.  But at
the very least, if Golleher and Howell are correct in
what they say as to what happened, then by necessity
Dorough is incorrect?

        A       That's accurate.  They can't both be
telling the truth as it is.  They may both -- they may
all three be telling the truth as they perceived it.

        Q       And certainly everyone can have different
perceptions.  But what we're actually worried about is
what actually happened versus what was perceived.  And
if what Howell and Golleher testified to happening as
far as the canine warning is concerned, what would --
what is your opinion as to -- let me strike that.
Looking at those three witnesses and their testimony,

1    what is your conclusion as to which one is more

2    accurate?  And I think you've already said this but I

3    want to make sure it's clear.

4         A    I cannot remember as I sit here today

5    whether it was Howell or Golleher that was more

6    specific.

7         Q    But when I say which one is more accurate,

8    there's one version of the facts that it was a

9    simultaneous warning and then there's --

10        A    I believe that the version of the facts

11   that it was a simultaneous warning is more accurate.

12        Q    And if that is the conclusion that you

13   reach, does that necessarily mean -- does that in your

14   opinion implicate the problems with the written

15   policies of the Jax Beach Police Department regarding

16   canine warnings?

17        A    Well, that's the crux of what I've talked

18   about in the report and here today in terms of the

19   policy needs to provide a reasonable waiting period

20   between the second -- the end of the second warning

21   and actually sending the dog.

22        Q    And obviously when you're evaluating which

23   version of the facts is more reasonable to believe, is

24   it not true that you look at things like well, who is

25   a party in the litigation, who has an interest in the

litigation?  And in this case Howell and Golleher are

not parties to this litigation.  Does that affect how

you evaluated that?

          A     In general terms.  I mean, I look at

whether someone's self-interested or not.  Here there

were two people that were fairly consistent and one

person who was inconsistent.  Those two people I felt

were in a better position and in part because of their

lesser stake, if you will, in the matter, to give the

more accurate rendition of the truth.

          Q     Now the next -- maybe I'll get to this

next.  The other thing that was discussed, we talked

about -- you testified at different times about your

opinion that the dog Yacco not coming off the bite on

verbal command is one of the things that you have a

problem with as far as what happened that night, one

of the reasons that Dorough's conduct was

inappropriate or that Jax Beach Police Department as a

whole is responsible for this incident.  What I'd like

to you do if you could is -- because there was some

discussion with you and Mr. Sarber about what led you

to believe that there was a call to come off the bite

that was not responded to that required Officer

Dorough to then have to pull Yacco off.  And you were

looking in your report trying to find where it talked

about that.  And I think if you were to go to Page 17

sub part Q, and then I think it goes off into 18 that

might refresh your recollection as to what you had put

in your report.

A    I've looked at paragraph Q and that's

consistent with actually what I remember.  And we had

a discussion with Mr. Sarber about the 8 out of

12 months, that the other two officers -- and again, I

realize that this is a factual issue, but I have to

resolve the facts in -- the disputed facts in some way

in order to be able to make -- reach a reasonable

conclusion or a conclusion with reasonable certainty.

Here I had two officers, both who were using terms

like trying to pull off and whose reports tell me that

there was a struggle to get this dog off of

Mr. Trammell's neck.  And this is a dog who had had

some -- I believe I used the term D grades in

releasing from a bite on command.  And that's a

critical performance area.

Q    Now going into the facts of what happened

that night, Dorough is there at the fence, Yacco goes

through the gap and at some point Dorough follows him

in and suddenly realizes that Yacco is engaged with a

person and, you know, suddenly he has an opportunity

to see who that person is or how that person looks.

How soon in your opinion as an expert in these issues,
how soon should Dorough when he goes into the fence
and perceives who Yacco has, how soon should Dorough
give the command to come off the bite?

A     Instantly.  Instantly.  The testimony was
that Dorough made a comment let go of my dog or stop
fighting my dog.  Well, he had to have seen Trammell's
hands and seen that this is a white man and he should
have instantly before saying anything else given that
dog the stand still or the release, the out command.

Q     And is Howell's testimony from his
deposition that Dorough was trying to yank the dog
off, trying to pull or yank the dog off, is that
consistent with Dorough instantly giving the command
to Yacco to come off the bite and Yacco immediately
complying?

A     No.

Q     So did that -- did that information -- is
that how you reached your conclusion that this is one
of the things that you found fault with as far as the
Jacksonville Beach Police Department with that
incident?

A     With respect to the training of the dog
and the dog's prior compliance and the dog's
performance to that issue, yes.

1     Q     Then we go into the whole issue of
2  actually -- Dorough called it deployment, and when I
3  was talking with him in his deposition we talked about
4  deployment on leash and deployment off leash.  I think
5  in the context of your deposition we don't want to use
6  the word deployment but there's sending the dog in on
7  leash, sending the dog in off leash.  Would that be a
8  way to describe?
9     A     Sure.  And I can use the term deployment
10 in the same context he did if that would be easier, or
11 we can just say sending the dog.
12    Q     Well, I'll stick with the sending.
13 Officer Dorough obviously is -- has the dog and is
14 going into the backyard for a reason.  The reason is
15 he thinks he's about to apprehend a suspect.  And
16 knowing that should he expect as Yacco is going into
17 the backyard that Yacco could bite someone?
18    A     Based on Yacco's behavior I think he
19 should expect that Yacco was primed to bite somebody,
20 yes.
21    Q     And at that point should an officer under
22 those circumstances say all right, you know, this is a
23 situation where the dog may bite someone.  Does that
24 also create a duty on the part of the handler, the
25 officer, to make sure that it's an appropriate

situation for a dog to bite someone?

        A     To make sure that it is an appropriate
target, yes.

        Q     And, you know, in this situation the --
you've got a helicopter that's overhead.  The
testimony from the different officers is that the
helicopter was reasonably close, and nobody has
testified that the helicopter couldn't have been
called in to make another sweep over the backyard.  In
fact, that's what Officer Golleher was there for,
because he had a radio that went directly to the
helicopter.

        A     Right.  What I saw from -- and I
understand the helicopter's still generally in the
area -- what I saw from the depositions and reports
didn't suggest to me why or why not they didn't call
the helicopter back.  But that certainty would have
been a reasonable alternative if they thought somebody
was in the backyard.

        Q     I want to make sure -- what I think is --
particularly from the defense's expert in this case --
I think the position that is being taken is that this
was not a deployment or a sending in, therefore there
were no requirements to take any actions that you
might otherwise be required to follow for sending a

dog in.  Is that a valid, you know -- is it valid in the facts of this case to say, you know, the balancing requirements of the law that normally applies to deploying a dog or sending a dog in don't apply to this case because really we have a situation where they didn't really intend for the dog to go in?

MR. SARBER:  Objection.  Form.

THE WITNESS:  That's too fine a point to put on here.  And I guess I had some sense of that as I read one of the depositions, I don't recall whose now.  That dog is being used to track a suspect.  That dog is being allowed to lunge through and bolt into the backyard where there is every indication that the officers believe a suspect is being located.  To say that a particular word wasn't used now renders this not a deployment just doesn't -- that's just not a fair statement of what happened.

Q    (BY MR. SARBER)  And do you know of any reason to give a canine warning if you don't have any expectation as the officer that there could be some potential contact between the canine and someone else?

A    I suppose there's not in this context. There may be in some other contexts.

Q    Is it not reasonable to assume that the reason Dorough gave a canine warning, whether it's the

two or the simultaneous one that the two other
officers testified to, that he did that because he in
fact was in one form or another sending Yacco in to
apprehend a suspect?

A     Yes.

Q     There was -- one of the things you
testified about or talked about in testimony with
Mr. Sarber is the helicopter and you weren't -- one of
the things you didn't understand was why Mr. Trammell
who would have been -- would not have when he heard
the helicopter flying over come outside or looked
outside to wonder, hey, what's going on, what are the
police doing?

A     Or at least looked up.  I mean, I --

Q     Right.  And I think -- and I apologize for
you not having had the opportunity of reading
Mr. Trammell's deposition, but -- and I'll give you an
opportunity to do that.  But the deposition if you
read it says that -- and I think Mr. Cooper said the
same thing -- in that area they live --

A     Mayfield.

Q     They live near Mayport Naval Base.
Atlantic Beach is right next to Mayport and they had
naval helicopters flying over pretty frequently.  And
Mr. Trammell's testimony is he didn't think anything

of it because they hear helicopters all the time.
With that extra fact, which would be in the deposition
of Mr. Dorough and I think Mr. Cooper, would that give
you a little bit more understanding as to why someone
may or may not have come outside and looked up?

     A     Sure.  We have a helicopter, a military
helicopter base in the town next to me and I'm sure
the people that live next to it don't look up in the
sky anymore.

     Q     All right.  Getting back to the standard,
the gold standard for when there can be a use of a
canine or any kind of force, which is in the Graham v.
Connor case, Mr. Sarber was asking you questions and
he said well Dorough -- the first thing you have to
evaluate in light of that standard as well as in light
of the Jacksonville Beach Police Department Canine
deployment standards or sending in standards is that
the first -- what's the crime?  And the Jax Beach
standards says it has to be a felony.  But under
Connor it's a little more -- there's more to it than
that.  It's not just a felony.  It has to be -- the
question is what kind of felony.  What kind of danger
is involved in the felony?

     A     The Connor standard is more qualitative
than quantitative.  It talks about the quality of

threat to public safety, the quality of the threat
inherent in the crime that's committed, the quality of
the threat committed by the suspect's behavior, and
the quality of the threat committed by whether the
suspect continues to resist arrest or attempt to evade
from the officers.

Q    And Mr. Sarber said in talking about that
the first element is there because of the threat to
the public that would be posed by a burglary to a
residence.  I was at Officer Dorough's depo and he
didn't testify that in fact he knew it was a burglary
to a residence.  What he testified to in his
deposition was the only thing he knew was that it was
a burglary.

A    Well, that's why I made the distinction in
my answer to Mr. Sarber.  You have different grades of
burglary.  You have a very low grade felony.  In this
state, for example, burglary of a vehicle is not even
a felony.  Burglary of a non dwelling is our lowest
level of burglary, as opposed to burglary of a
dwelling, which is the second highest level, unless
you're armed and then it's the highest level of felony
we have.

Q    And I went through that with Officer
Dorough about, what did you know?  What did they tell

you when the radio call came up that you're going to

track a suspect?  And the only thing he knew was that

it was a burglary.  And that's why I went through with

him ad nauseam, well, there's burglary to a dwelling,

there's burglary to an unoccupied dwelling actually,

which is a different charge in Florida than burglary

to an occupied dwelling, burglary to a vehicle.

They're all different felonies.  They are all felonies

in Florida but they're all different levels of danger.

So I guess I ask you this, just knowing that it's a

burglary without any other kind of qualification, does

that information actually meet the first prong of

Connor?

        A     Again, I want more information.  That's

why I went into the issue with Mr. Sarber.  I want to

know if it's a burglary of a dwelling or a shed, a

garden shed, that was the example I used, or vehicle,

all of which are lower grade crimes, which then become

factors.  You can't -- Graham v. Connor isn't a

mechanical formula.  You don't satisfy one and go to

two and three.  You've got to look at it

wholistically.  And a low grade burglary is much less

significant than a residential burglary, which is

clearly a high grade burglary.  So if that's all I

know as the officer then I guess it's incumbent on me

to ask more questions of the officers who know.  Was

it a shed?  Was it a car?  Was it a home?

        Q     And if the officer in question does not

ask those questions ever and never knows that, does it

not make the other two elements that much more

important in evaluating what they can do with the dog?

        A     Yes.

        Q     So going to the next two elements, I asked

Officer Dorough when they told you this man Dillard

is -- we're going to track him, I asked him did they

tell you anything about him being armed?  His answer

was no.  I asked him did they tell you anything about

him being a known dangerous suspect, a history of

violence or being a danger to people in any way?  He

said no, I didn't know anything about that.  Not

armed, not anything?  So evaluating the second element

under Connor based on the knowledge that Mr. -- or

that Officer Dorough had about Dillard, does that

element mitigate for or against employing a canine?

                MR. SARBER:  Objection.  Form of the

question.

                THE WITNESS:  Well, just knowing that

mitigates against.  But he did know however that

Dillard had fled, and so I can't fairly evaluate that

without throwing into the mix that he knew he was

seeking someone who fled.  Now, he didn't know and
apparently based on what he was told didn't have any
reason to know that Dillard had, if indeed Dillard
does have, a history of violence, that Dillard was
armed, that Dillard had breathed threats or anything
else.  Based on what he knew, all he knew was that
Dillard had run away, which is -- my gosh, not many
criminals stay when they think they're about to go to
jail.

     Q    (BY MR. SHAKIB)  Right.  Basically the
only thing he knows is that Dillard has committed some
type of burglary and that he fled.  And the issue of
whether or not it's a felony or not under Connor is
not important versus the quality of the crime?

     A    Right.

     Q    For instance, under Connor if it's a
battery, even though that's a misdemeanor, that
mitigates more favorably in -- toward using a canine
as opposed to a burglary to a car?

     A    Yes.

     Q    And so would -- the little amount of
information that he had, someone has fled who
committed some kind of burglary, does that then not
place a greater burden on the canine officer to be
even more cautious in the way he sends the dog in if

and when he ever decides to do that?

     A     Sure.  I mean, it's a little bit like
Sergeant Young said.  At the end of the day the
deployment decision belongs to the handler.  I think
Sergeant Young even said I may order my handler to
deploy the dog, but the handler still has to make the
decision whether it is an appropriate deployment.

     Q     Talking about the flashlight -- I'm
switching subjects now -- is one of the reasons that
officers say that they don't want to use the
flashlight a lot is because they don't want to lose
the element of surprise?

     A     Yeah, that's true.  But, you know, if you
read the literature and if you talk to tacticians, as
great as not losing the element of surprise.  And it's
not so much the element of surprise, the suspect
usually knows you're there.  It's not giving away your
location and not presenting a target.  As great as
that issue you'll hear tacticians talk about the
underuse of a flashlight being an equally serious
tactical error.

     Q     And the decision to send a dog in or to
use the dog to apprehend a suspect, does the
environment that you're in affect how you do that?
For instance, in this case we're talking about a

neighborhood where people live.  We're literally going

through people's backyards as opposed to running

through abandoned buildings in an old warehouse

district.  Does that make a difference?

     A     Of course.  That was part of the --

Mr. Sarber and I talked earlier today about a case

from Phoenix, Frank v. the City of the Phoenix where

that was part of the decision process.  The suspect

was running into an elementary school yard that's

bounded by homes with young children.  That says a

couple things to us.  It says catch the guy before he

gets to those homes.  It also says if he gets into

those homes we've got to be very, very careful because

in the evening in Phoenix, Arizona kids are out

playing in their backyards sometimes until 9:00 or

10:00 night.  And one, we don't want our suspect to

get the kids, and two, we don't want our dog going

into a yard where there are kids who may respond

unpredictably and get bitten.

     Q     And in this case we don't know if some

homeowner in his backyard has an iPod on and is doing

a little evening gardening.  We don't know anything

about that?

     A     That's true.

          MR. SARBER:  Objection to the concept of

gardening by light of iPod.

Q    (BY MR. SHAKIB)  And the -- then there's
the added situation in this case that we're not
talking about bark and hold or bark and however you
describe it.  We're talking about bite and hold dogs.
Mr. Sarber said that that bite and hold is found
constitutional in our particular circuit and you said
that it's in every circuit.  And I'm not taking issue
with bite and hold.  But is it not true that if you
know that your dogs when they are sent in or deployed
are going to bite someone, does that not create a
greater responsibility on the part of the canine
handler to be more careful about when it's deployed in
a neighborhood where people are around?

A    It does.  But I want to stress that my
answer doesn't depend whether the dog's trained in a
bark and hold or bite and hold philosophy.  My
answer's based on what I heard in your question, and
that is if you believe that the dog has a reasonable
likelihood of biting someone, as you send the dog into
the enclosed area of the building does that heighten
your sense of responsibility to be sure that you're
sending that dog under proper circumstances, and
that's a clear yes.  But I don't think it makes a whit
of difference whether it's a fight and bark or fight

1  and bite dog.

2       Q    The other thing is we talked choking up on

3  the leash -- those were my words because that reminded

4  me of T-ball.

5       A    Sure.  And it's a -- and that's a term

6  that's used in relation to the leash.

7       Q    But talking about that, does your opinion

8  as to whether it would have been more reasonable or

9  more appropriate in this case to do that, is that

10  affected by where it is that he is at the time?

11  Again --

12       A    Sure.

13       Q    -- a neighborhood with people there versus

14  abandoned warehouses?

15       A    You know, distractions and other -- if you

16  get the dog in an area where there are probable

17  unintended targets, then yeah.  Choking up on the

18  leash is just one way of increasing your control over

19  the dog.

20       Q    Does the fact that Yacco was certified by

21  the Florida Department of Law Enforcement six to seven

22  months before this incident and then five months after

23  the incident mean that Yacco was appropriately trained

24  on July 12, 2003?

25       A    It's one indicator, but it's a pretty mild

indicator, or pretty inconsequential indicator.

        Q       Is constant training important to canines?

        A       Constant training is essential for canines.

        Q       Can canines lose their training in short periods of time?

        A       You can have a dog that doesn't get worked for a month, doesn't get trained for a month, that -- to which you do serious damage to the dog's ability to perform.  For example, you can certify the dog on January 1, and you put that dog up or you go on vacation or you take -- your handler breaks a leg and doesn't work for six to eight weeks, you're going to have a period of having to bring -- the dog will come back up to speed pretty quickly, but you're still going to have a period where that dog is not going to perform very well.  It's more true frankly with narcotics than it is patrol work, but it's still a very true principle with patrol work.

        Q       And the question in this case is not whether on the night of the incident July 12, 2003, Yacco or Officer Dorough were certified by the Florida Department of Law Enforcement.  One of the questions in this case, or the issue in this case is whether at the time of this incident they were reasonably

trained.  And I guess my follow-up question is, is the

fact that they were certified six or seven months

before and five months after dispositive of the

question whether on that particular night they were

reasonably trained?

        A    No.

        Q    Which brings me to the next question.

Mr. Sarber talked to you about the fact that -- it

doesn't appear that Sergeant Young or Officer Dorough

had any meaningful knowledge or involvement of the

different national work dog associations that other

law enforcement agency canine handlers tend to be

involved in.  They testified they really don't know

the standards of those associations, they don't

participate in them.  I think even Young said that

it -- they don't say that the canine handlers have to

do it.  Does that -- when you're evaluating the

reasonableness of the training, does that fact that

they're not involved in this and it doesn't appear

that the department is even encouraging this

involvement, does that factor play into your

evaluation of the reasonableness of the training of

the canine officer?

        A    It does.  As I said, it's a best practice

to be involved with these groups because these groups

promote professionalism, they have high standards,

they teach how to achieve those standards, they

promote communication between handlers, they provide a

marvelous service called problem solving in terms of

being the linkup with people who may -- give you an

example.  A dog in Phoenix when I was doing some

training down there for Phoenix Police Department had

a dog that didn't want to go into elevators.  I wasn't

sure why the dog didn't want to go into elevators.  It

didn't register with me.  So I get talking to some

other people that I know through these various work

groups and boom, I get three people right away giving

me the same answer that helped me resolve the issue

with the dog going in elevators.  So again, there's no

requirements.  They're not mandatory, none of them

are.  Although there are some states that use their

standards.  But it's the best practice.  It's really a

good indicator of what -- it is one good indicator

that professionalism of a police service dog unit.

     Q    Would it be fair to say that when you're

evaluating the overall reasonableness of a canine

handler's training at the time of an incident, that's

one other factor that you're using as you're ticking

off the ultimate decision as to --

     A    Sure.  It's like Jax Beach PD goes out and

1   gets CALEA, C-A-L-E-A, accreditation.  It's very

 2   common in the east, very uncommon in the west.  They

 3   do that to say, look, we belong and the Chief there --

 4   I haven't looked, but I would be willing to wager

 5   dinner that the Chief belongs to the International

 6   Association of Chiefs of Police, as I do.  It's just

 7   something that a good Chief does.  A good department

 8   or really good department goes out and gets

 9   accredited.  Really good canine units participate in

10   these national organizations.  But are they required?

11   No.  No Chief has to belong to a Chief's association,

12   no department has to be accredited, and no handler has

13   to belong to a national or regional organization.

14        Q    I want to follow-up with CALEA.  I'm going

15   to ask you something about that but I want to finish a

16   couple other things first.  Mr. Sarber asked you about

17   the standards that these different groups have versus

18   the Florida Department of Law Enforcement.  Let me ask

19   you this, would it be fair to say that the standards

20   that these different work dog associations have tend

21   to be more detailed and more strict than the

22   Jacksonville Beach Police Department Canine standards?

23        A    Than the PD standards?  I'm not sure that

24   I can say what the police department standards are

25   because I believe that they're trying to adhere to the

State FDLE standards.  If the question is are they more detailed and more strict than the FDLE standards? I'm sure that some are.  But I would have to get them here and lay them out before I could tell you truthfully.

      Q      Well, for instance, the National Chief of Police Association has a model canine unit standard?

      A      The model policy, yes.

      Q      Model policy.  And I think it even specifically addresses canine warnings?

      A      Yes.  There are many things in the International Association of Chiefs of Police policy that are not addressed -- model policy that are not addressed in the Jax Beach Police Department Canine policy.  And that -- we've talked about those specifics.  Again, it's not mandatory.  It is in my experience many, many agencies and most of the better agencies in the country either follow or exceed the International Association Chiefs of Police Canine policy.

      Q      You talked some about the fact that Yacco is a KNPV dog.  Mr. Sarber asked you does the fact that it's a KNPV dog, does that make you think -- that they were using a KNPV dog, does that affect your ultimate opinions that that's -- is the fact that they

had that or they were using KNPV dogs why you would

think that the Jax Beach Police Department did

something wrong?  And I think your testimony was no,

not that in and of itself.  Does the issue of KNPV

have more to do with what the reasonable training or

at least understanding that the officers involved,

Young and Dorough, should have had and should have

applied to Yacco, does that really have more to do

with training of the dog and training of Dorough, the

fact that it's a KNPV dog, and how they need to train

the dog appropriately because of the fact that it's a

KNPV dog?

     A    I think I followed that.  The issue really

with the KNPV dog and the training is that -- let me

give you an example.  Maybe you've heard the term in

these depositions of a green dog.  If I have a green

dog -- and usually what that means is I go to somebody

like Ken Mathias or Kenny Lichtlider or Dave Reaver at

Adlerhorst, one of these major national reputation

kennels and I say I want to buy a green dog.

Typically what that means is they have checked that

dog out for breeding, the dog's been bread from

suitable blood line, they've checked the dog's health,

they've done the tests for hip dysplasia and other

common ailments, and they've also done some basic

evaluations.  Some people would call them drives,
other scientists would tell you drives don't exist.
But they do some evaluations of the dog's work ethic
as a puppy, its interest in play, its basic tendency
to obedience training as a suitable dog for training.
If you get a highly rated green dog from one of
these -- I bought dogs from Dave Reaver at Adlerhorst
Kennels in Riverside, California, in the west one of
the top flight people, charges a lot of money for his
dogs -- you get a green dog there and you have a good
trainer, that green dog is much easier to train than
you buy at a kennel.

             Emphasize I have never trained a KNPV dog
and I have never seen one other than videos.  But you
buy a dog that comes to you with a whole set of
training -- Schutzhünd may be a good example, German
sport dog.  Or we saw -- in the early '90s we saw a
lot of dogs come out of Europe that came from the
Czech Republic when it was Czechoslovakia, we even saw
dogs that were being sold as surplus dogs from East
Germany.  Those dogs you had to be careful to train
out of them some aggression and some free thinking in
terms of who they could bite and when before they were
suitable to use as service dogs.  It's a lot easier to
take a tabula rasa and write your masterpiece than it

is to take and erase the writing of someone else and
write your masterpiece.  And that's the difference
between -- that's the factor that the KNPV dog kicks
in here, and that's the reason that the trainer needs
to be alert to the fact that it's a KNPV dog.  It's
the reason the trainer needs to know that there seems
to be a tendency of KNPV dogs to jump up and engage in
high bites.  So you can train those issues -- and if
you want to train for high bites and if you think
they're defensible then fine.  But that's why you need
to be alert to those issues and know what the KNPV
training consists of, where the Schutzhünd or the
other -- there's actually an American sport dog
society that does a KNPV type of training, and they
may sell to law enforcement from time to time.  You've
just got to know what you're buying so you know what
to train out of it.

     Q    And is there anything that you've seen
from the deposition of Officer Dorough that he or the
Jacksonville Beach Police Department or Officer Young
or whoever was involved in getting Yacco did anything
to take into account the fact that there was a KNPV
dog that has to have special training to get past that
early training to make it appropriate for working on
the street in Jax Beach?

A     Well, I would say special consideration --
it may be that the dog distinguishes those behaviors
on its own through the retraining done in the
400 hours, I don't know.  But I didn't see anything in
the evidence that suggested that there was that
awareness and that need and that that was done.

Q     Is there anything in the evidence that
would suggest that they did anything other than apply
the one size fits all certification training that they
do to every other dog when they acquired Yacco, the
same training they do whether it's a completely green
dog or not?

A     No.

Q     And so is that something that you take
into account in evaluating the reasonableness of the
training that Jax Beach Police Department is doing
with the canine officers and the canines?

A     It's certainly a factor.

Q     One of the other things that you talked
about was the -- I think you testified -- actually let
me backtrack.  You said you talked to -- you mentioned
the name Ken Mathias.  Have you talked to him?

A     You know, I have.  Yes.

Q     He's the guy who owns the kennel from
which --

A     Orchard Knoll.

         Q     Right.  He owns the kennel from which
Jacksonville Beach Police Department acquired Yacco?

         A     Right.

         Q     Did he -- in your conversation with him
did he indicate that he did any special training to
try to bring Yacco from where he was as a KNPV dog to
where anything such as a tendency for high bites could
be trained out?

         A     No.  Let me tell you how it played out.
Jim Kunz who's in Florida -- I think he's in
St. Augustine -- I know I've told you about Jim Kunz
before -- anyway, he told me that that's where the dog
came from and that it was sold as a green dog.  That
is, it was sold as an untrained dog, but that it
really was a KNPV titled dog and so it had these
training protocols that at least needed to be
considered in the training.  And so I called Ken
Mathias whom I had known from other contacts and said,
hey, how are you doing, did you sell this dog?  Yeah,
the lawyers have already asked me, the lawyers have
already talked to me.  And I said, well, did you sell
the dog as a green dog?  He said yeah, it was a titled
dog, but I did no training whatsoever to that dog and
I sold it as a green dog.  I sold it with no

representations of training.

Q    So --

A    Now to be fair, you know, Ken's in business to make money and he's saying this is a KNPV dog, titled, he's a 370 range points -- the points go as high as 400.  If I'm the buyer it says to me at least Mathias thinks the dog is teachable.  That's what it tells me is this dog is teachable and I can train it to do what I want it to do.

Q    But would it be fair to say that what you also get from Ken Mathias is that a one size fits all training approach for this particular dog is not appropriate?

A    Ken didn't say that to me.  But certainly a discussion that Jim Kunz and I had, and it certainly fits with what I know about KNPV dogs, is that you need to be alert.  And the biggest issue is their tendency to knock down before they bite, or at least some of their dogs knock down before they bite because the judges like to see high bites.

Q    And Mr. Sarber said, well, is there anything in Yacco's history that suggests he does high bites.  And I think you said you don't recall that.

A    He'd had a head bite that I recall.  But I don't think it's fair to call that a high bite simply

because that suspect as I recall was hiding under
something, didn't extend his hands to surrender and,
you know, the dog -- although a head is not a
desirable target of engagement granted, that's what
was presented to the dog and that seemed to be in that
case the dog's only alternative.

     Q    In Dorough's depo he testified that there
was another incident where Yacco is going after a
suspect who is trying to get away where he actually
jumps at the suspect.

     A    He did.

     Q    Would that be an incident of a prior high
bite?

     A    That could be considered an incident of
prior high bite.

     Q    And if you know that the dog is a KNPV dog
where they tend to train for that, does a reasonable
police agency that is training a dog take that into
consideration when they're determining what kind of
training to give the dog?

     A    They should.  But I need to qualify that
and say that the reasonableness comes in by -- that
the police department should do the homework and say
these -- should call around and should talk to
trainers in the area, should talk to people who've

converted KNPV dogs to service dogs, and should find

out what issues.  And then a reasonable police

department should say, look, we've heard -- just as I

have.  I haven't -- I have never trained or seen a

KNPV dog work, but I've heard of these things.  So

when I get the responsibility in this case to look at

that issue I reach out to my people who I know and

they tell me -- Jim Kunz and Kenny Lichtlider tell me,

yeah, it's an issue, you need to be aware of it and

you need to be on top of it because that way you can

train the dog to engage in more appropriate or at

least as American police service dogs are trained a

more appropriate target area.

        Q    Is there anything that you've seen from

any of the materials or testimony from this case to

suggest that the people with Jax Beach Police

Department even appreciated the necessity to do what

you just described, let alone do what you just

described?

        A    I don't think that that was -- I didn't

see any indication of that.

        Q    Would it be fair to say in this case not

only did they not do it but they didn't even

understand the issue?

        A    That's the fair statement, that the issue

1   wasn't seen.

2        Q    I want to get to the things I was talking

3   about.  Mr. Sarber was asking you about whether in the

4   history or the file of Keith Dorough whether there was

5   anything that affected your opinion as to whether he

6   was appropriate as a canine officer at least at the

7   time he was hired or later on.  And I think your

8   testimony was that you had an opinion that you thought

9   the evidence in his file would suggest that it was

10  inappropriate potentially or there would be a question

11  at least about his retention as a canine officer?

12       A    I would want to have that discussion.

13       Q    And would that opinion that you have be

14  based on the fact that he's got an excessive force

15  complaint before our incident where the state

16  attorney's office literally dropped a criminal case

17  because of a concern that Dorough had used excessive

18  force?

19            MR. SARBER:  Objection to the form of the

20  question.

21            THE WITNESS:  Well, I knew that there had

22  been this prior -- and it wasn't a dog thing, it was a

23  lateral vascular control hold or bar arm hold.  I knew

24  that there was a case like that.  That kind of a

25  case -- that kind of case says to me, boy, there's

some real -- there are hard questions that we need to
ask.  We've got to have some good answers before we
continue to let this person work on the streets.  Now
I don't know what they did there.  Maybe they did
that.  Maybe the Chief did that.

Q     (BY MR. SHAKIB)  Well, would the prior
history that's in his file of having been drunk and
being specifically ordered not to drive his vehicle
home after an incident that he helped out in and he
was under the influence of alcohol -- I say drunk, I
don't know that he was drunk, but he was certainly
under the influence of alcohol --

A     I don't know that that's supported.

Q     Does that play into your decision as to
whether this is an appropriate -- this is an officer
who employs the appropriate discretion?

A     Yeah.  Again, it's a factor.  You take a
person and put them in a canine unit.  You don't want
a person who in the middle of the night you call and
they say I'm too tired, I don't want to come out.  You
want a person with a high motivation.  You don't want
a person who's going to use force in questionable
situations unreasonably because you're giving this
person an additional force tool.  You don't want a
person who has driving issues, because what kind of

calls are you giving this canine handler?  This canine

handler's going to go on all the hot calls.  You want

a person who's got great judgment, great driving

skills, low -- a low tendency to whine and complain, a

high tendency to work hard and to respond to calls, a

good ability to work with people, to be supervised.

So what I'm trying to -- what I tried to suggest was

there were a number of factors that I looked at that

caused me to question whether or not he should be a

canine handler.

Now again, I don't know what, if anything,

the agency did to examine those questions and resolve

them internally.  I don't know if the Chief and the

Lieutenant sat down one day with the Sergeant and had

a discussion about, hey, are we okay here to keep

Dorough in as a canine handler?  Are we okay to keep

him as a police officer, period?  I don't know.

Q     Would -- does the incident where he was I

believe called or paged and didn't respond and wasn't

available, does that play into that?

A     Again, it fits those same factors.  It

fits -- I want a canine handler -- if I'm a police

Chief and I've got a canine I'm investing a lot more

money than I do normally, okay?  It's not just an

$8,000 or $9,000 and the dog and all the equipment.

I'm buying a special vehicle that's going home with
this officer, I'm giving this officer special
privileges in terms of additional training, I'm paying
this officer to take care of that dog at home, I'm
paying the supervisor that's got to have some special
skills to supervise this.  This is a high cost item, I
want my money back.  I want my community to get the
value for the dollar.  So yeah, all of those things
factor.  But again, they are just indicators.  They
are things that make me as a Chief -- and I guess
maybe I'm stepping out of the role as a canine expert
here and I'm just thinking from the perspective of a
Chief who has a -- who has to account at the end of
the year for seven some odd million dollars of tax
payer's money.  I feel that's an obligation that I
personally feel that's a big deal and so I feel if
I've got an officer who's not working that that's a
big deal to me and that's a big deal about
accountability.  Now do I know from one incident where
he apparently should have responded and doesn't that
he has a poor work ethic?  I don't know that.  It
raises a question.

    Q    What about the incident where another
officer was bitten by Yacco when they're out --

    A    Okay.  Well, that one -- the other officer

1     I think took the hit on that one unfairly so.  The

2     other officer -- there's was a couple things that play

3     into the thought process here.  First off the patrol

4     division of this department ought to be doing training

5     with canine and patrol officers.  Patrol officers need

6     to know what the canines can do.  Canines can save

7     patrol officer's lives, they can save thousands of

8     hours of time in searching.  I've seen -- I've never

9     personally done this, but I've seen $10,000 dogs sent

10    into the situation where it's likely the dog will even

11    get killed.  But the alternative was an officer

12    getting killed.  You should flush a $10,000 dog's life

13    no question if it's a possibility of saving an

14    officer's life.  Patrol officers need to know all of

15    those things.  They need to know how to search.  So

16    there should have been training.  Maybe there was.

17    Maybe this officer was out of line.  But ultimately --

18    Young says it the best -- ultimately where the muzzle

19    of that dog is directed and pointing and about to

20    engage is the ultimate responsibility of the canine

21    handler who's able to command the dog, who's able to

22    tell that dog what to do and when to do it and how to

23    do it.  So as I looked at that my first reaction was

24    poor patrol guy, he got bitten and he got blamed for

25    it.  Common sense tells me -- but I work with dogs --

I'm not going to walk in front of someone else's dog
in a building search.  If I'm going to do that I'm
going to get bitten.  But I would hope the handler
would say, hey, you're an idiot, get back here.
Again, same answer.  It's a factor, it's an issue, it
raises a flag, it causes me to ask a question.

     Q     So we have all these things, the excessive
force complaint that ended up in the state attorney's
office dropping a case, the under the influence of the
alcohol and disobeying an order, not being available
when he was supposed to have been somewhere, the other
officer being bitten, put all that together does that
raise questions about the reasonableness of retaining
Officer Dorough as a canine officer?

     A     Or as a police officer, yes.

     Q     And does -- you know, does the cumulative
effect of these things have greater weight than they
do individually?

     A     Clearly.  Clearly they do.

     Q     Getting back to the accreditation
through -- what was the name?

     A     CALEA, Commission on Accreditation of Law
Enforcement Agencies.

     Q     You read the deposition transcript of
Commander Corbitt --

A     Yes, sir.

          Q     -- and his testimony about the CALEA
accreditation.  And I believe one of the things that's
required for CALEA accreditation is that Jacksonville
Beach Police Department had an early warning system.
Could you explain what that means?

          A     Sure.  In fact, I just finished a
termination hearing where that was an issue.  An early
warning system is -- and CALEA by the way doesn't
mandate how that system is to work.  It is a system to
where either software or a supervisor says okay, this
is the second sustained Category I complaint, that is
a sustained use of force, or this is the fourth
sustained Category III, that is -- and I'm just using
examples from my agency -- that's being rude to
somebody.  And so we're going to hold a supervisory
review of this officer's performance.  So you get the
people in the direct chain of command, the Sergeant,
the Lieutenant, maybe even the Captain, depending on
the size of the agency, together and say here are the
issues and you have a discussion, you bring the
officer and say look, we've had this review, it's non
disciplinary, this is counseling, we just see there
may be a pattern here and we want you to be aware that
there may be a pattern.  Is there anything you feel

the department can do for you -- and different

departments may take this approach.  But it's a system

designed to preserve the safety and integrity of

the -- the safety of the public, the integrity of the

agency and to preserve the employment and good

performance of an officer.  It's designed to come in

and say, hey, there may be a problem, if there is

let's try and find a fix before we have to charge you,

terminate you, sue you, do whatever with you.

Q     Are you familiar with -- or at least to

some degree what Jacksonville Beach Police Department

has for their early warning system?

A     I believe somebody testified that they had

an early warning system of acting after there were

five substantiated consecutive -- five consecutive

substantiated use of force complaints.

Q     In your opinion is that consistent with an

early warning system?

A     No.

Q     Why not?

A     Most agencies, including ours, would find

improper use of force to be a high level complaint.

It's -- and certainly there would be others, but it's

the sort of thing that should cause the administration

to stand up, take notice, and frankly depending on the

standards depending on where you're at -- here in this

state one substantiated excessive force complaint,

depending on the level of force, might buy termination

for you.  But to say that we're going to give you five

passes, five bites at the apple, that's just too much

in the context of use of force.  That's too much.

     Q     Finally, and this really is finally for

me, the hypothetical that Mr. Sarber gave you

about let's assume everything is done -- let's assume

it's Mr. Dillard that's there in the backyard instead

of Mr. Trammell, do you have a problem with what

happened if that's the way it works instead of

Mr. Trammell being there.  I want to make sure we're

clear though with that hypothetical.  Let's apply that

hypothetical but with your conclusion as to what

happened as far as the canine warning, which was from

the testimony of Officer Howell and Officer Golleher

that the canine warning was given once simultaneously

with Yacco going over into the backyard.  If that's

the scenario where Yacco goes over into the backyard

as the canine warning is given once with no reasonable

waiting period, do you have a problem with that even

if it is Mr. Dillard?

     A     That would not be reasonable but I don't

believe that was the hypothetical given me.

1    Q    And would it make a difference -- is there

2    a difference -- if someone's lying down on the ground

3    would it be fair to say that person is not -- if he

4    doesn't have a gun or a knife or anything like that

5    he's obviously what would be called a passive person?

6    A    If he's lying down on the ground he's not

7    making threatening gestures, he's not armed, then I

8    would consider him to be passive.

9    Q    And so if using the same hypothetical

10   instead of Mr. Dillard standing as Mr. Trammell said

11   he was, but instead he's lying on the ground, does

12   that change anything as far as one canine warning

13   simultaneous without a waiting period?

14   A    That still wouldn't be reasonable.

15   MR. SHAKIB:  I have no further questions.

16

17                  **FURTHER EXAMINATION**

18

19   BY MR. SARBER:

20   Q    I've got to clean some of that up.  Before

21   I forget, this last thing about CALEA and the early

22   warning system.  I believe you've just testified a

23   minute ago that you thought the early warning system

24   that the city -- that my client had in place was that

25   you got five substantiated excessive force claims?

1      A     Consecutive.  I believe that's what I

2  read.

3      Q     If I suggested to you that you misread

4  that and what the early warning system is is at five

5  unsubstantiated use of force or excessive force claims

6  is when --

7      A     Can I ask in what period of time?  Five

8  unsubstantiated still causes me some measure of

9  concerns.

10      Q     But certainly a lot less concern than if

11  it's going to be five substantiated?

12      A     Much less.

13      Q     In fact, you understand the City's policy

14  to be you can't be a police officer -- I mean, you

15  can't be a canine handler if you've got one

16  substantiated claim in the past two years?

17      A     That's right.

18      Q     So it don't make any sense to have an

19  early warning system that gives you five after that?

20      A     It didn't.  If I misread that shame on me.

21      Q     First of all, you're not holding yourself

22  out to be an expert on sensory distortion, are you?

23      A     I'm not sure you want to go down that

24  road.

25      Q     You haven't included that in any of your

1    reports or anything.

2         A    I haven't included in any of my reports.

3    It is an area in which I have done a fair bit of

4    research, have some personal experience, have

5    participated in research of others, have created

6    curriculum that is widely in use in police academies

7    here in this state and continues to be an area that I

8    study.  However, I do not -- for purposes of this case

9    I wasn't hired to evaluate whether there was any

10   perceptual distortion or other psychosensory issues

11   going on here.

12        Q    So not in this case?

13        A    Not in this case.

14        Q    All right.  There was a discussion about

15   Golleher's account and Howell's account and whether

16   that was consistent or inconsistent with Officer

17   Dorough's account.

18        A    Right.

19        Q    Let me get specific just on a couple of

20   brief instances.  I'm going to read you a couple of

21   things from Officer Golleher's deposition.  On pages

22   27 and 28 of his deposition he's asked, so the dog

23   could get through, you recall the dog goes through and

24   the dog is still on a leash when he goes through?

25             He answered, to my knowledge and my

recollection the dog was still on a leash.  Now, prior

to the dog starting through the fence is when I began

to hear Officer Dorough identifying himself as a

police officer, police canine.

          And then let me read you what's on

Page 60.  Question -- and this is the latter part of a

question -- but I'm talking about before the dog was

allowed to go into the backyard.  You said you heard

him say, let me see your hands, let me see your hands.

          Initially he was saying Jacksonville Beach

Police canine, police canine, police canine.  The dog

went in and then as I was right at the opening I

recall hearing let me see your hands.

          Officer Golleher may have said a lot of

other things, and he did.  But at the very least those

two parts of his testimony that I just read you are in

large part consistent with Officer Dorough's

explanation, are they not?

          A    Taking those in the abstract they are.

          Q    Yes, taking those out, pulling those out

and reading them to you --

          A    They are substantially consistent.

          Q    Okay.  On the issue of what Dorough knew

or didn't know about Dillard, so the question is

whether he knew anything more than just a burglary.

1    You also recall Officer Dorough testifying that he was

2    called by another agency, right?

3         A    Right.

4         Q    He was called by the Atlantic Beach

5    Department because they don't have a dog unit?

6         A    Right.

7         Q    And that he testified that he's relying on

8    what the officers on the scene tell him?

9         A    That's true.

10        Q    And they're the ones that set up the

11   perimeter and they're calling him in to do a search;

12   correct?

13        A    That's true.

14        Q    And Officer Golleher testified that what

15   he knew -- Officer Golleher being with the

16   Jacksonville Sheriff's Office, another agency out

17   there, because he had been called to help manage the

18   air unit; correct?

19        A    That's right.

20        Q    Officer Golleher had testified that he

21   knew of Robert Dillard, there were two warrants for

22   his arrest, it was for battery, domestic violence and

23   theft.  Domestic violence can certainly be a felony of

24   violence; correct?

25        A    It can be.

1        Q    And on Page 10 Officer Golleher says

2    that -- about what he knew about what had happened in

3    the burglary and he says, I don't recall any specifics

4    other than, you know, he had attempted to kick the

5    door in or did kick the door in or something.  He was

6    trying to get to his ex-girlfriend and she was inside

7    the residence.  So at least would you agree with me

8    that Officer Golleher had information that this was a

9    burglary to a residence while the girlfriend was in

10   there?

11        A    Golleher knew that.

12        Q    Golleher knew that.

13        A    Yeah.  Either he or Howell had known this

14   guy.

15        Q    Right.  Now KNPV, you and Mr. Shakib got

16   to talking and you all kind of got back to believing

17   back into this suggestion or hint that KNPV is a bad

18   thing, that it's necessarily an inappropriate

19   foundation of training, a foundation that's not

20   conducive to proper or appropriate police dog work.

21   Is that what you intended to convey?

22        A    I don't intend to convey that it's a bad

23   thing.  In fact, I think that it's a beautiful sport

24   to watch.  And I think the people who engage in that

25   sport perform some masterful work with dogs.  There

are elements in the most -- the only one that I've

cited here in KNPV is that the judges appear to

appreciate an athletic jump just before a bite, which

results in a higher bite.  And that is not consistent

with what we really like to see in American police

working dogs and so it becomes -- you've got a

positive side and a negative side to this coin.

You've got a dog over here that can score really well

and is amenable to training and is amenable to

discipline, yet this discipline at least in this one

area is not a discipline that we're really pleased to

see in American police working dog environments.

          Q     Again, you've been quite clear on what you

do and don't know about KNPV, but is it true that KNPV

training and trials involve many of the same

techniques and skills that a police canine needs to

have?

          A     Yeah, they do.  They have article search.

I mean, there's some things they do that we don't do.

There are many things if you have got a good KNPV dog

you could put that -- article search for example.  You

can take a good KNPV dog to a field where you had a

suspect drop a wallet, it can be a football field, and

it's just a joy to watch because that dog will go find

that wallet at a remarkably hundredth of the time it

1   would take a bunch of cops out there to find it.

2       Q    So there are a variety of aspects in which

3   prior KNPV training can be a good positive foundation?

4       A    Absolutely.

5       Q    As one of the officers says, I can't

6   remember which, it can put that dog ahead of others as

7   they begin to be trained for police work?

8       A    It can be.

9       Q    But we need to be careful of that one

10  thing you identified, and that is whether that dog

11  jumps and wants to knock down and bite high?

12      A    There may be more but that's the one thing

13  I'm talking about in this case.

14      Q    That's the thing you're familiar with.

15  That's great.  Now you testified that you don't

16  believe that the police department even saw the need

17  or the importance of watching out for the differences

18  in the KNPV training, something along those lines?

19      A    That's true.

20      Q    Wouldn't you agree with me though that if

21  Yacco had that problem of jumping up, doing that thing

22  you've talked about is not great for the police work,

23  wouldn't those types of problems be seen in the

24  initial selection tests prior to purchase, or in the

25  initial 400 hours of that initial FDLE certified

1  training, or in the monthly training, or in the daily

2  training and all the different types of

3  recertifications they do?  Wouldn't you expect that

4  would eventually be seen, that Yacco has that tendency

5  that needed to be trained out?

6       A    One would expect.  Maybe not in the early

7  selection training.

8       Q    Maybe not that early?

9       A    Maybe not that early.  But at some point

10  in the initial service dog training, that 400 hours,

11  one would hope.  Because they're going to be doing a

12  number of tasks that involve apprehending suspects

13  moving away.

14       Q    And the testimony of this case is that

15  Yacco in fact did not have that tendency to jump and

16  bite high, did he?

17       A    I have not seen Yacco was a consistent

18  high jumping biter.

19       Q    And if that's the case, if he was not,

20  then wouldn't that tell you that at least that one

21  thing that we ought to be looking for on a KNPV

22  trained dog may not be a big problem with Yacco?

23       A    It may not be.  I don't think that I have

24  the ability to say that here.

25       Q    And just this one other thing, Officer

1   Dorough's prior excessive force claim and the issue of

2   the state attorney dropping -- do you know why the

3   state attorney dropped that claim?

4          A     I do not.

5          Q     Are you familiar with the fact that that

6   claim actually became a civil lawsuit?

7          A     I guess -- I don't think I knew that.

8          Q     So you probably didn't know I represented

9   him in that case?

10         A     I believe that I'd heard you'd represented

11  the -- was this a choking case or something like that?

12         Q     This was a straight on bar take down case.

13         A     Yes, I believe I may have heard that you

14  represented him.

15         Q     And do you recall the fact that he was

16  exonerated by a jury of his peers in a civil lawsuit

17  of having committed any kind of excessive force in

18  that case?

19         A     I don't think that I knew that.

20         Q     But those facts would be the types of

21  thing you're talking about in the Chief and the

22  department taking a look at hey, what's this really

23  all about, why did this happen?

24         A     They would certainly be some of them.  You

25  want to look beyond that, but if he is exonerated at a

civil standard at a civil trial --

     Q     That's pretty important?

     A     That would be pretty important to me as a
Chief.

     Q     If a canine handler is off duty is it your
position that he should not drink anything at all
alcoholic?

     A     Depends on the department policy.  It
wouldn't be my department's policy.

     Q     But it would be acceptable to you if a
department said that was acceptable?

     A     Mr. Sarber, I doubt this happens in the
State of Florida, but we do have in the State of Utah
a few police departments that require the condition of
employment that an officer not drink off duty.  This
is Utah, sir.

     Q     All right.  That's fine.  Do you know
whether that's the case in Florida?

     A     I really doubt it.  I am told there are
some places in Texas where that's the case but -- and
it has to do -- it has to do with size of the
department.  If you have a seven officer department
and you've got to have one of those fellows at night
and you call them up and they're impaired, then they
are less available to you.

1    Q    But if there's a second canine officer

2 who's available and you're off shift and you know

3 you're not going to be called --

4    A    I'm just going to tell you it wouldn't be

5 my policy.

6         MR. SARBER:  All right.  That's all I've

7 got.  Thank you.

8

9                 **FURTHER EXAMINATION**

10

11 BY MR. SHAKIB:

12    Q    Well, we'll go into that.  In reviewing

13 Dorough's file is it your understanding that the

14 reason that the Jacksonville Beach Police Department

15 had a problem with what he did in relation to that

16 night where he was drinking, is the fact that he was

17 drinking or the fact that he drove his car home after

18 he was drinking?

19    A    It was the driving issue.

20    Q    And talking about the KNPV dogs and how

21 the judges score higher for athletic jumps.  An

22 athletic jump, when you say that, the dog running

23 jumps at the suspect to bite them?

24    A    Right.  I mean, I've shown you tapes,

25 videos or we watched videos of a dog that comes up and

1   as the decoy is walking away jumps not at all and

2   bites the knee or lower.  And then you've seen other

3   dogs that will leap and you see this graceful -- and I

4   understand you people may not appreciate it the way I

5   do -- but you see this graceful leap through the air

6   and the dog place the paws and bite high at the same

7   moment.  The judges tend to evaluate those dogs

8   better.  It's more athletic.  Some people say it's a

9   more aggressive dog, I don't know that I buy that.

10          Q     Well, I saw those tapes, or at least one

11  of those tapes, with you and I saw I think the first

12  one -- the first jump in particular.  That dog really

13  kind of put a thumping --

14          A     When it sailed through the air and the guy

15  started to fall?

16          Q     Yeah.

17          A     Yeah.  And that's -- I am told that that's

18  what the Dutch judges like to see is that flying

19  through the air with the greatest of ease, and

20  smacking and either knocking down or causing a

21  disruption in the gait of the decoy walking away.

22          Q     Now knowing that, would Mr. Trammell's

23  testimony that he's standing up and all the sudden the

24  dog comes and knocks him down to the ground, is that

25  consistent with what a KNPV dog does in those KNPV

1    trials?

2         A    That's consistent with what many of those

3    dogs do.  Not all.

4              MR. SHAKIB:  I don't have any other

5    questions.

6              (Deposition concluded at 8:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    C E R T I F I C A T E

STATE OF UTAH          )

COUNTY OF SALT LAKE )


          I HEREBY CERTIFY that I have read the
foregoing testimony and the same is a true and correct
transcription of said testimony with the exception of
the following corrections listed below giving my
reasons therefor.

Page   Line   Change/Correction        Reason

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____


                 _____
                      KENNETH WALLENTINE

          Subscribed and sworn to at _____,

this _____ day of _____, 2008.

                 _____
                      NOTARY PUBLIC
My commission expires:

_____
```

          C E R T I F I C A T E

STATE OF UTAH       )

COUNTY OF SALT LAKE )

   THIS IS TO CERTIFY that the deposition of KENNETH

WALLENTINE, the witness in the foregoing deposition

named, was taken before me, AMBER PARK, a Certified

Shorthand Reporter and NOTARY PUBLIC in and for the

State of Utah, residing at South Jordan, Utah.  That

the said witness, was by me, before examination, duly

sworn to testify the truth, the whole truth and

nothing but the truth in said cause.

   That the testimony of said witness was reported by

me in Stenotype and thereafter caused by me to be

transcribed into typewriting, and that a full, true

and correct transcription of said testimony so taken

and transcribed, is set forth in the foregoing pages.

   I further certify that I am not of kin or otherwise

associated with any of the parties to said cause of

action, and that I am not interested in the event

thereof.

   WITNESS MY HAND and official seal at South Jordan,

Utah, this 27th day of March, 2008.

            _____

## $

**$1,000** [1] - 106:4
**$10,000** [2] - 193:9, 193:12
**$150** [1] - 105:19
**$2,500** [1] - 46:7
**$8,000** [1] - 191:25
**$9,000** [1] - 191:25

## '

**'02** [1] - 31:15
**'03** [2] - 20:10, 31:15
**'04** [1] - 20:10
**'90s** [1] - 182:17
**'96** [1] - 20:10
**'97** [2] - 18:8, 18:13
**'98** [2] - 18:8, 18:13

## 1

**1** [4] - 123:6, 123:9, 136:17, 176:11
**10** [4] - 10:21, 72:16, 94:20, 203:1
**100** [1] - 111:22
**101** [1] - 14:16
**10:00** [1] - 173:16
**10th** [2] - 7:3, 25:11
**11** [4] - 37:21, 66:3, 72:16, 139:11
**11th** [2] - 145:24, 146:1
**12** [6] - 41:2, 41:3, 122:18, 161:8, 175:24, 176:21
**12-foot** [1] - 72:17
**1200** [1] - 2:7
**12th** [1] - 40:4
**13th** [1] - 40:4
**14** [1] - 138:10
**152** [2] - 58:7, 58:13
**153** [1] - 58:19
**154** [2] - 2:14, 59:9
**156** [1] - 59:18
**16** [1] - 59:18
**17** [3] - 59:6, 117:25, 161:1
**18** [3] - 28:11, 122:17, 161:2
**198** [1] - 2:14
**1982** [2] - 15:11, 17:17
**1984** [1] - 17:23
**1987** [2] - 15:17, 15:21
**1994** [1] - 16:4
**1998** [1] - 11:1

**1999** [1] - 16:17
**1:50** [1] - 3:1

## 2

**2** [2] - 123:7, 123:9
**20** [5] - 43:1, 43:4, 112:3, 136:13, 155:25
**20/20** [1] - 94:15, 113:23
**2000** [2] - 16:17, 32:9
**2001** [3] - 18:10, 18:17, 18:21
**2002** [3] - 20:12, 31:8, 119:24
**2003** [8] - 22:22, 37:21, 47:17, 66:3, 120:1, 139:11, 175:24, 176:21
**2004** [2] - 22:22, 26:8
**2005** [3] - 5:11, 8:13, 25:23
**2007** [2] - 10:3, 78:12
**2008** [8] - 1:18, 3:1, 4:11, 37:19, 48:5, 90:10, 212:21, 213:22
**209** [1] - 2:15
**22** [1] - 58:13
**221** [1] - 60:18
**222** [3] - 60:18, 60:22, 61:23
**233** [2] - 2:4, 60:16
**24** [2] - 1:18, 3:1
**25-year** [1] - 30:9
**27** [1] - 200:22
**27th** [1] - 213:22
**28** [1] - 200:22
**29** [1] - 14:2

## 3

**3** [4] - 2:13, 91:22, 123:6, 123:7
**3,000** [1] - 46:7
**30** [2] - 43:1, 43:4
**32201** [1] - 2:8
**32202** [1] - 2:5
**333** [1] - 1:17
**35** [1] - 13:13
**370** [2] - 137:10, 186:5
**38** [1] - 13:14
**39** [1] - 13:14
**3:06-CV-984-J-16 TEM** [1] - 1:6

## 4

**4** [4] - 4:10, 41:2, 90:10, 123:7
**40** [2] - 13:15, 17:2
**400** [4] - 184:4, 186:6, 205:25, 206:10
**400-hour** [2] - 55:8, 126:21
**4th** [1] - 56:2

## 5

**5** [3] - 41:2, 123:6
**50** [3] - 43:3, 88:14, 99:23
**5th** [1] - 7:3

## 6

**6** [3] - 25:3, 60:22
**60** [1] - 201:6

## 7

**7** [1] - 25:3
**70** [1] - 42:23
**72** [1] - 49:11

## 8

**8** [3] - 91:21, 122:18, 161:7
**80-pound** [1] - 42:23
**800** [2] - 2:8, 14:18
**84101** [1] - 1:17
**85-pound** [2] - 99:7, 151:22
**8:00** [1] - 211:6
**8th** [1] - 2:4

## 9

**9** [3] - 10:20, 72:16, 94:19
**9:00** [1] - 173:15

## A

**abandoned** [2] - 173:3, 175:14
**abilities** [1] - 119:17
**ability** [11] - 30:8, 115:15, 115:18, 121:2, 139:20,
140:2, 140:3, 156:4, 176:9, 191:6, 206:24
**able** [21] - 30:24, 84:21, 84:22, 92:13, 95:20, 95:21, 95:22, 99:2, 99:16, 100:14, 106:9, 114:6, 121:9, 125:11, 125:12, 142:12, 143:19, 150:19, 161:11, 193:21
**Absolutely** [11] - 9:15, 63:24, 64:24, 89:11, 96:25, 97:7, 108:2, 128:2, 146:8, 148:7, 205:4
**absolutely** [3] - 37:18, 63:14, 97:6
**abstract** [1] - 201:19
**academies** [1] - 200:6
**academy** [1] - 119:6
**acceptable** [5] - 60:10, 146:6, 146:23, 208:10, 208:11
**accepted** [2] - 148:10, 149:17
**Accepted** [1] - 148:11
**accomplished** [1] - 150:8
**according** [6] - 52:6, 52:7, 52:24, 71:13, 144:16, 146:8
**account** [7] - 74:18, 183:22, 184:15, 192:13, 200:15, 200:17
**accountability** [1] - 192:19
**accountant** [1] - 13:11
**accountants** [1] - 13:10
**Accreditation** [1] - 194:22
**accreditation** [4] - 179:1, 194:20, 195:3, 195:4
**accredited** [3] - 120:10, 179:9, 179:12
**accurate** [9] - 10:23, 120:24, 134:12, 158:10, 158:16, 159:2, 159:7, 159:11, 160:10
**accused** [1] - 141:6
**achieve** [1] - 178:2
**achilles** [1] - 30:7
**acknowledge** [4] - 112:7, 113:9,
145:10, 156:13
**acquainted** [1] - 39:13
**acquire** [3] - 18:7, 44:12, 44:13
**acquired** [6] - 18:8, 90:24, 135:8, 135:22, 184:10, 185:3
**acquiring** [1] - 51:4
**acronym** [1] - 40:13
**act** [5] - 50:15, 67:16, 67:21, 125:25, 140:3
**acted** [1] - 150:1
**acting** [3] - 17:20, 73:22, 196:14
**action** [4] - 27:9, 83:10, 141:2, 213:19
**actions** [3] - 25:18, 80:12, 164:24
**activated** [1] - 77:3
**active** [2] - 31:5, 52:16
**actively** [2] - 109:21, 110:11
**activities** [1] - 129:12
**activity** [1] - 70:3
**actual** [7] - 13:14, 56:1, 61:3, 91:9, 91:10, 142:16, 142:20
**ad** [2] - 13:24, 169:4
**Ada** [3] - 24:8, 31:4, 31:12
**add** [5] - 42:6, 42:9, 97:23, 113:1, 146:9
**added** [2] - 146:22, 174:3
**adding** [1] - 65:25
**addition** [4] - 7:21, 56:6, 107:6, 144:10
**additional** [9] - 34:23, 47:11, 64:25, 74:17, 118:17, 140:20, 146:10, 190:24, 192:3
**addressed** [4] - 8:10, 8:24, 180:13, 180:14
**addresses** [1] - 180:10
**adequately** [1] - 114:8
**adhere** [1] - 179:25
**adjunct** [1] - 134:23
**Adlerhorst** [2] - 181:19, 182:7
**administration** [1] - 196:24
**Administrative** [2] - 5:22, 12:3
**admire** [1] - 136:19
**admit** [1] - 134:7
**admittedly** [1] - 91:7

**adoption** [1] - 6:14
**Adoption** [1] - 6:16
**adrenaline** [1] - 156:20
**adult** [2] - 74:1, 134:6
**advantage** [1] - 117:16
**advertise** [1] - 30:22
**affect** [3] - 160:2, 172:24, 180:24
**affected** [2] - 175:10, 189:5
**affixed** [1] - 72:8
**Afghanistan** [1] - 15:1
**afternoon** [2] - 3:12, 3:20
**afterwards** [3] - 79:24, 97:4, 133:10
**again...** [1] - 19:2
**age** [1] - 84:14
**Agencies** [1] - 194:23
**agencies** [5] - 14:9, 23:2, 180:17, 180:18, 196:21
**agency** [18] - 13:7, 17:15, 22:11, 30:15, 86:11, 135:11, 135:17, 138:8, 144:10, 144:13, 177:12, 187:18, 191:12, 195:15, 195:20, 196:5, 202:2, 202:16
**aggression** [1] - 182:22
**aggressive** [2] - 127:16, 210:9
**ago** [14] - 11:1, 25:12, 27:2, 31:4, 59:23, 68:19, 94:9, 125:5, 128:11, 129:15, 129:25, 138:8, 141:15, 198:23
**agree** [31] - 53:19, 62:13, 62:14, 62:23, 63:7, 64:12, 74:20, 74:22, 75:3, 77:1, 79:5, 81:11, 89:1, 97:13, 101:7, 101:22, 102:6, 102:13, 107:12, 111:17, 112:22, 134:24, 141:15, 142:11, 146:23, 147:9, 147:14, 150:1, 154:17, 203:7, 205:20
**agreed** [2] - 7:11, 60:10
**ahead** [2] - 36:12,

205:6
**ailments** [1] - 181:25
**air** [9] - 42:24, 43:17, 103:4, 103:8, 103:22, 202:18, 210:5, 210:14, 210:19
**Albany** [1] - 14:22
**alcohol** [3] - 190:10, 190:12, 194:10
**alcoholic** [1] - 208:7
**alert** [4] - 134:4, 183:5, 183:11, 186:17
**alerted** [2] - 109:4, 149:19
**alerting** [1] - 95:3
**Alexis** [2] - 157:11
**alike** [1] - 20:25
**ALJ** [1] - 12:2
**allegation** [1] - 26:5
**allege** [1] - 28:4
**allegedly** [2] - 25:19, 30:7
**Allegedly** [1] - 25:21
**allow** [3] - 65:4, 106:17, 106:18
**allowed** [2] - 165:12, 201:8
**almost** [8] - 5:17, 12:5, 44:10, 88:24, 106:22, 117:16, 117:18, 148:10
**Almost** [1] - 6:13
**alone** [6] - 106:25, 107:16, 123:13, 129:4, 140:11, 188:18
**altered** [1] - 47:12
**alternative** [3] - 164:18, 187:6, 193:11
**alternatives** [1] - 89:15
**amateur** [1] - 46:3
**AMBER** [2] - 1:19, 213:6
**ambient** [3] - 93:15, 95:5, 114:13
**amenable** [2] - 204:9
**Amendment** [1] - 56:2
**American** [13] - 7:25, 40:23, 46:5, 120:13, 121:23, 123:14, 124:2, 125:14, 134:23, 183:13, 188:12, 204:5, 204:12
**amount** [7] - 55:19, 55:20, 58:14, 58:15,

143:25, 144:1, 171:21
**analogous** [1] - 156:3
**analysis** [4] - 48:6, 48:7, 109:16, 111:7
**anniversary** [1] - 20:15
**announcement** [31] - 54:21, 55:2, 59:15, 61:3, 61:5, 62:16, 63:19, 64:15, 66:1, 66:17, 67:1, 67:11, 92:2, 92:4, 92:6, 92:8, 92:9, 92:15, 92:21, 92:23, 92:25, 93:5, 94:22, 94:25, 101:19, 101:20, 110:2, 142:19, 143:8, 153:20
**announcements** [19] - 54:18, 55:9, 57:4, 58:20, 58:21, 59:8, 59:17, 60:2, 60:6, 64:4, 66:12, 66:18, 70:8, 92:12, 143:2, 143:4, 143:10
**announcing** [1] - 55:25
**annual** [2] - 56:10, 56:17
**annually** [2] - 118:11, 119:13
**Answer** [2] - 58:19, 58:25
**answer** [16] - 10:23, 23:19, 29:18, 34:4, 36:10, 54:23, 55:11, 59:3, 59:14, 63:12, 149:13, 168:16, 170:11, 174:16, 178:13, 194:5
**answer's** [1] - 174:18
**answered** [2] - 29:20, 200:25
**answering** [1] - 154:4
**Answering** [1] - 8:15
**answers** [2] - 13:1, 190:2
**anticipated** [2] - 20:8, 101:3
**anytime** [1] - 69:11
**anyway** [2] - 66:17, 185:13
**apart** [2] - 94:10
**aperture** [1] - 73:11
**apologize** [4] - 33:24, 38:7, 46:17, 166:15
**Appeals** [1] - 25:11
**appear** [4] - 48:25, 177:9, 177:19, 204:2

**appeared** [4] - 73:10, 74:7, 74:10, 90:22
**applaud** [1] - 107:24
**apple** [1] - 197:5
**applicable** [1] - 118:15
**application** [1] - 9:24
**applied** [2] - 10:14, 144:17, 181:8
**applies** [1] - 165:3
**apply** [6] - 10:15, 104:22, 156:10, 165:4, 184:8, 197:14
**appoint** [1] - 139:13
**appointing** [1] - 140:7
**appreciate** [13] - 3:19, 3:22, 3:24, 30:13, 37:17, 63:12, 90:3, 94:22, 130:6, 149:12, 154:4, 204:3, 210:4
**appreciated** [1] - 188:17
**apprehend** [18] - 43:8, 50:15, 65:21, 68:4, 69:15, 69:21, 70:13, 71:1, 100:23, 101:14, 101:19, 105:8, 107:8, 111:13, 163:15, 166:4, 172:23
**apprehended** [1] - 105:4
**apprehending** [3] - 65:18, 142:12, 206:12
**apprehension** [1] - 145:20
**approach** [2] - 186:12, 196:2
**appropriate** [27] - 55:24, 69:3, 105:9, 107:1, 107:13, 107:25, 108:1, 112:24, 113:4, 115:18, 116:2, 134:25, 148:13, 152:12, 152:13, 163:25, 164:2, 172:7, 175:9, 183:24, 186:13, 188:11, 188:13, 189:6, 190:15, 190:16, 203:20
**appropriately** [3] - 150:2, 175:23, 181:11
**approval** [1] - 22:10
**approximate** [1] - 40:3
**area** [27] - 10:18,

61:16, 64:17, 64:18, 65:5, 66:14, 67:9, 81:1, 121:7, 125:2, 125:16, 126:7, 126:12, 127:5, 131:23, 143:21, 144:3, 161:19, 164:15, 166:20, 174:21, 175:16, 187:25, 188:13, 200:3, 200:7, 204:11
**areas** [11] - 6:24, 47:24, 48:14, 66:1, 121:19, 121:20, 127:23, 132:3, 132:5, 143:9, 147:6
**argue** [1] - 58:22
**arise** [1] - 53:13
**arises** [2] - 67:12, 67:13
**Arizona** [3] - 24:7, 28:5, 173:14
**arm** [8] - 72:7, 74:16, 95:21, 100:5, 100:9, 125:23, 126:2, 189:23
**arm's** [2] - 99:4, 99:17
**armed** [8] - 30:1, 109:8, 109:10, 168:22, 170:11, 170:16, 171:5, 198:7
**arms** [1] - 99:3, 125:21
**aroused** [1] - 156:20
**arrest** [3] - 109:22, 168:5, 202:22
**arrival** [1] - 81:15
**arrived** [1] - 104:8
**arsenal** [1] - 89:25
**artery** [1] - 124:17
**article** [2] - 204:18, 204:21
**articles** [1] - 37:2, 134:10
**Artwall** [1] - 157:11
**ashamed** [1] - 37:5
**aspects** [8] - 51:9, 51:15, 54:5, 142:16, 142:20, 144:21, 144:23, 205:2
**Aspen** [1] - 8:12
**assignment** [1] - 13:24
**assignments** [1] - 15:19
**assistant** [2] - 34:25, 133:25
**associate** [1] - 20:14
**associated** [3] - 35:10, 125:8, 213:18
**association** [3] - 7:19,

8:23, 179:11

**Association** [9] - 8:1, 8:22, 13:25, 121:23, 121:24, 179:6, 180:7, 180:12, 180:19

**associations** [4] - 120:8, 177:11, 177:14, 179:20

**assume** [12] - 5:18, 25:7, 37:24, 63:16, 63:17, 82:16, 120:23, 130:24, 152:2, 165:24, 197:9

**assumes** [1] - 54:23

**assuming** [4] - 10:24, 36:22, 130:23, 131:4

**assumption** [2] - 84:9, 84:14

**Aswin** [2] - 38:10, 131:10

**AT** [1] - 1:17

**athletic** [7] - 42:12, 43:17, 45:2, 204:3, 209:21, 209:22, 210:8

**Atlantic** [2] - 166:23, 202:4

**attached** [4] - 39:2, 47:19, 71:14, 71:25

**attempt** [1] - 168:5

**attempted** [1] - 203:4

**attempting** [4] - 28:18, 109:22, 110:12

**attended** [1] - 36:16

**attention** [2] - 67:4, 118:14

**Attorney** [10] - 4:22, 4:24, 5:3, 5:4, 11:2, 13:18, 13:20, 13:23, 14:7, 33:3

**attorney** [6] - 3:13, 11:18, 32:14, 32:20, 207:2, 207:3

**attorney's** [2] - 189:16, 194:8

**attorneys** [1] - 30:24

**attribute** [1] - 81:5

**attributing** [1] - 60:4

**audience** [2] - 8:12, 9:18

**auditory** [1] - 95:24

**augment** [1] - 134:17

**augmented** [1] - 145:5

**Augustine** [1] - 185:12

**author** [2] - 7:15, 7:17

**authored** [2] - 4:9, 134:10

**authority** [2] - 20:5, 70:21

**authorized** [2] - 7:2, 135:3

**available** [5] - 36:8, 191:20, 194:10, 208:25, 209:2

**aware** [10] - 82:14, 82:18, 96:2, 97:20, 104:6, 133:8, 141:5, 141:10, 188:9, 195:24

**awareness** [1] - 184:6

## B

**B-E-R-G** [1] - 35:21

**backtrack** [1] - 184:21

**backyard** [31] - 28:1, 28:14, 61:17, 66:23, 73:16, 79:17, 91:25, 94:12, 101:11, 102:7, 102:15, 103:23, 109:6, 111:2, 111:23, 112:2, 113:12, 152:4, 152:14, 152:19, 155:16, 163:14, 163:17, 164:9, 164:19, 165:13, 173:21, 197:10, 197:19, 197:20, 201:8

**backyards** [3] - 90:21, 173:2, 173:15

**bad** [11] - 63:15, 64:2, 105:17, 105:21, 128:7, 129:20, 137:10, 203:17, 203:22

**bailed** [2] - 29:6, 30:2

**bailiwick** [1] - 93:10

**balance** [1] - 65:19

**balancing** [1] - 165:2

**ball** [3] - 99:24, 141:19, 175:4

**bar** [2] - 189:23, 207:12

**Bar** [1] - 7:25

**barely** [1] - 7:10

**bark** [7] - 145:17, 145:18, 146:12, 174:4, 174:17, 174:25

**Base** [1] - 166:22

**base** [1] - 167:7

**baseball** [2] - 86:6, 86:7

**Based** [5] - 84:9, 102:5, 157:7, 163:18, 171:6

**based** [32] - 48:12, 50:16, 54:2, 71:17, 75:12, 78:23, 79:1, 79:15, 80:6, 81:13, 83:5, 85:2, 85:5, 85:7, 88:3, 93:2, 101:7, 101:10, 101:12, 111:6, 112:4, 134:9, 140:15, 150:22, 153:2, 157:8, 157:10, 170:17, 171:2, 174:18, 189:14

**bases** [1] - 149:2

**basic** [4] - 15:12, 16:15, 181:25, 182:4

**basing** [1] - 82:24

**basis** [11] - 4:25, 13:24, 15:25, 16:19, 28:23, 28:25, 56:25, 77:17, 77:18, 80:11, 91:2

**batted** [1] - 136:10

**batteries** [1] - 86:14

**battery** [2] - 171:17, 202:22

**Bay** [1] - 2:4

**Beach** [45] - 1:7, 1:8, 3:15, 21:9, 38:12, 47:16, 49:6, 49:21, 49:22, 49:24, 50:17, 52:1, 52:19, 55:6, 56:10, 56:22, 62:5, 64:14, 85:18, 106:8, 107:6, 130:11, 138:4, 140:6, 146:24, 159:15, 160:18, 162:21, 166:23, 167:16, 167:18, 178:25, 179:22, 180:14, 181:2, 183:20, 183:25, 184:16, 185:3, 188:16, 195:5, 196:11, 201:10, 202:4, 209:14

**BEACH** [1] - 1:9

**Beach's** [1] - 54:16

**bearing** [7] - 40:17, 93:11, 103:9, 123:17, 137:4, 137:19, 139:9

**beautiful** [2] - 45:2, 128:21, 203:23

**became** [5] - 15:10, 17:22, 17:25, 18:12, 207:6

**become** [3] - 15:8,

97:17, 169:18

**becomes** [5] - 66:23, 72:16, 153:2, 153:3, 204:6

**becoming** [1] - 18:5

**beer** [1] - 93:13

**beers** [1] - 93:9

**began** [2] - 85:9, 201:2

**begin** [2] - 90:20, 205:7

**beginning** [1] - 16:4

**begs** [1] - 63:4

**begun** [1] - 7:22

**behalf** [7] - 25:6, 25:24, 26:9, 27:4, 27:6, 34:9, 146:6

**behave** [1] - 76:8

**behavior** [10] - 9:11, 63:8, 92:20, 101:10, 101:12, 112:5, 148:5, 148:10, 163:18, 168:3

**behaviors** [1] - 184:2

**behind** [6] - 28:3, 79:24, 80:1, 81:14, 98:25, 146:18

**Belgian** [2] - 99:7, 134:24

**belief** [5] - 53:7, 64:14, 70:10, 77:12, 109:5

**believer** [3] - 134:12, 134:16, 134:19

**belong** [4] - 121:6, 179:3, 179:11, 179:13

**belongs** [2] - 172:4, 179:5

**below** [1] - 212:6

**bend** [1] - 74:3

**bending** [1] - 74:15

**benefit** [3] - 49:21, 156:15, 156:16

**best** [12] - 8:18, 23:22, 85:1, 85:5, 91:12, 92:25, 121:6, 122:11, 149:4, 177:24, 178:17, 193:18

**better** [10] - 15:13, 18:6, 72:22, 124:3, 125:14, 144:24, 149:18, 160:8, 180:17, 210:8

**between** [22] - 10:9, 12:22, 20:10, 26:20, 28:11, 50:12, 50:13, 52:4, 52:5, 55:25, 58:17, 59:13, 60:18, 61:4, 72:17, 123:25,

127:6, 155:14, 159:20, 165:21, 178:3, 183:3

**beyond** [3] - 32:3, 45:8, 207:25

**Beyond** [2] - 22:23, 27:20

**bias** [1] - 8:19

**bicep** [1] - 44:4

**big** [10] - 74:1, 84:13, 99:23, 103:25, 117:2, 136:17, 192:16, 192:18, 206:22

**biggest** [1] - 186:17

**Biko** [1] - 38:10

**bilingual** [1] - 138:2

**Bill** [4] - 19:17, 20:21, 20:22, 20:23

**binders** [1] - 33:19

**bit** [12] - 3:21, 3:25, 20:10, 30:6, 55:22, 71:8, 99:22, 99:25, 102:16, 167:4, 172:2, 200:3

**Bite** [1] - 145:17

**bite** [107] - 19:1, 23:25, 24:2, 27:3, 28:23, 29:22, 31:2, 40:20, 41:15, 42:13, 42:20, 43:21, 44:12, 44:13, 47:21, 47:22, 50:5, 68:5, 69:15, 70:16, 70:19, 70:20, 70:23, 71:1, 72:1, 73:9, 74:22, 75:21, 76:3, 76:10, 77:11, 77:23, 80:5, 80:13, 81:19, 83:6, 86:18, 88:17, 99:3, 99:16, 100:3, 102:22, 102:25, 111:13, 124:13, 124:14, 125:5, 125:22, 126:5, 126:10, 126:15, 126:16, 127:12, 127:14, 127:15, 127:18, 127:23, 129:16, 130:2, 130:3, 131:6, 139:2, 139:6, 145:15, 145:18, 145:19, 145:22, 145:24, 146:2, 146:13, 146:14, 147:11, 147:22, 147:25, 150:23, 160:14, 160:22, 161:18, 162:4, 162:15, 163:17, 163:19,

163:23, 164:1,
174:5, 174:6, 174:9,
174:11, 174:17,
175:1, 182:23,
186:18, 186:19,
186:24, 186:25,
187:13, 187:15,
204:3, 204:4,
205:11, 206:16,
209:23, 210:6
**biter** [1] - 206:18
**bites** [27] - 17:21,
28:22, 44:3, 44:4,
44:6, 44:7, 122:23,
123:1, 124:9,
125:15, 126:6,
127:13, 127:15,
129:15, 129:24,
130:11, 130:13,
130:14, 183:8,
183:9, 185:8,
186:20, 186:23,
197:5, 210:2
**biting** [11] - 27:15,
61:4, 100:23, 101:3,
102:21, 126:10,
126:11, 127:4,
142:13, 148:9,
174:20
**bitten** [10] - 88:11,
125:19, 127:8,
129:5, 129:23,
173:19, 192:24,
193:24, 194:3,
194:12
**black** [3] - 27:24,
84:13, 152:22
**blamed** [1] - 193:24
**blitzes** [1] - 16:22
**block** [1] - 141:23
**blocks** [1] - 143:23
**blood** [2] - 96:9,
181:23
**body** [14] - 40:21,
43:18, 43:21, 43:23,
43:25, 44:9, 44:25,
45:1, 72:6, 72:18,
115:24, 116:13,
126:6
**Boise** [1] - 24:9
**bolstered** [1] - 47:12
**bolsters** [1] - 76:7
**bolt** [3] - 149:9,
149:12, 165:12
**bolted** [1] - 155:20
**bolting** [1] - 156:22
**bone** [1] - 126:8
**book** [19] - 5:24, 5:25,
7:5, 7:8, 7:12, 7:17,
7:19, 7:25, 8:1, 8:4,

8:9, 8:10, 8:14, 8:16,
9:4, 9:8, 9:13, 9:17,
157:11
**books** [6] - 7:13, 7:16,
7:21, 10:12, 36:21,
134:11
**boom** [1] - 178:12
**border** [1] - 67:23
**bottle** [1] - 33:17
**bottom** [2] - 58:7,
58:12
**Bottom** [1] - 58:13
**bought** [4] - 41:8,
46:1, 133:2, 182:7
**Boulevard** [1] - 2:7
**bounded** [1] - 173:10
**boy** [1] - 189:25
**branchs** [1] - 13:1
**breaching** [1] - 56:1
**bread** [1] - 181:22
**break** [4] - 46:14,
69:6, 93:19, 108:8
**breaks** [2] - 108:9,
176:12
**breathed** [1] - 171:5
**breed** [3] - 134:25,
135:2, 135:3
**breeding** [1] - 181:22
**brief** [2] - 9:8, 200:20
**briefed** [1] - 20:9
**briefly** [1] - 112:18
**bring** [7] - 33:15,
33:20, 33:22, 34:8,
176:14, 185:7,
195:21
**brings** [1] - 177:7
**broad** [3] - 14:16,
19:9, 19:10
**broader** [2] - 11:25,
23:16
**broke** [2] - 12:25,
100:5
**broken** [1] - 100:8
**brother** [1] - 93:19
**brother's** [1] - 37:16
**brought** [5] - 19:19,
33:17, 45:13, 68:14,
118:16
**BRUCE** [1] - 1:6
**Buchanan** [1] - 133:25
**building** [16] - 50:7,
50:10, 50:22, 54:22,
59:20, 61:15, 61:18,
64:13, 64:16, 64:23,
65:5, 66:3, 66:6,
143:15, 174:21,
194:2
**buildings** [1] - 173:3
**bulky** [1] - 84:13
**bunch** [3] - 34:3,

119:10, 205:1
**burden** [1] - 171:24
**bureau** [1] - 13:4
**bureaus** [1] - 5:2
**Burglary** [1] - 168:19
**burglary** [30] - 104:24,
105:3, 108:4, 108:7,
108:13, 108:15,
109:3, 168:9,
168:11, 168:14,
168:17, 168:18,
168:20, 169:3,
169:4, 169:5, 169:6,
169:7, 169:11,
169:16, 169:22,
169:23, 169:24,
171:12, 171:19,
171:23, 201:25,
203:3, 203:9
**business** [1] - 186:4
**button** [1] - 89:7
**buy** [8] - 36:4, 133:4,
135:19, 181:20,
182:12, 182:15,
197:3, 210:9
**buyer** [1] - 186:6
**buying** [2] - 183:16,
192:1
**buys** [1] - 46:11
**BY** [20] - 1:19, 3:7,
35:14, 46:22, 58:12,
69:5, 78:22, 82:22,
90:16, 100:20,
106:13, 154:10,
155:12, 158:11,
165:18, 171:10,
174:2, 190:6,
198:19, 209:11

# C

**cadet** [1] - 17:17
**cage** [2] - 44:7
**CALEA** [8] - 179:1,
179:14, 194:22,
195:2, 195:4, 195:9,
198:21
**calendar** [1] - 39:25
**calf** [1] - 126:5
**California** [3] - 24:10,
68:18, 182:8
**Canine** [6] - 121:24,
130:12, 167:16,
179:22, 180:14,
180:19
**canine** [9] - 9:5,
10:18, 11:7, 12:16,
14:14, 17:5, 18:20,
18:25, 21:4, 24:7,

25:24, 26:10, 26:17,
31:21, 31:22, 32:1,
32:2, 32:3, 49:3,
49:4, 49:6, 51:22,
53:10, 53:14, 53:20,
53:23, 55:6, 55:9,
56:8, 56:10, 57:1,
57:4, 58:17, 59:7,
59:10, 59:11, 59:13,
60:2, 60:8, 63:18,
64:15, 66:25, 68:2,
68:19, 69:2, 70:6,
70:7, 70:24, 94:2,
99:11, 123:14,
129:12, 134:20,
139:14, 139:19,
141:11, 141:16,
142:6, 152:10,
153:20, 155:2,
155:8, 156:5, 156:7,
157:1, 157:5,
157:25, 158:23,
159:16, 165:19,
165:21, 165:25,
167:12, 170:19,
171:18, 171:24,
174:12, 177:12,
177:16, 177:23,
178:21, 179:9,
180:7, 180:10,
184:17, 189:6,
189:11, 190:18,
191:1, 191:10,
191:16, 191:22,
191:23, 192:11,
193:5, 193:20,
194:14, 197:16,
197:18, 197:21,
198:12, 199:15,
201:4, 201:11,
204:16, 208:5, 209:1
**Canines** [1] - 193:6
**canines** [10] - 9:14,
10:4, 11:9, 17:6,
107:19, 176:2,
176:4, 176:5,
184:17, 193:6
**cannot** [3] - 145:11,
145:12, 159:4
**capacities** [1] - 14:3
**capacity** [10] - 1:7,
12:2, 17:17, 18:1,
18:19, 19:7, 19:12,
19:20, 21:25, 23:13
**capitol** [1] - 24:9
**Captain** [1] - 195:19
**car** [15] - 28:10, 28:11,
28:16, 29:6, 29:25,
30:2, 67:16, 67:21,
68:9, 69:11, 86:4,

124:24, 170:2,
171:19, 209:17
**cards** [1] - 65:19
**care** [7] - 26:17, 26:22,
27:14, 88:14, 88:16,
137:3, 192:4
**careful** [4] - 173:13,
174:13, 182:21,
205:9
**Carolina** [1] - 132:25
**Carolinas** [1] - 68:23
**carotid** [1] - 124:17
**carport** [1] - 28:10
**cars** [1] - 30:3
**cartilage** [1] - 125:4
**Case** [1] - 1:6
**case** [131] - 3:18, 4:12,
10:10, 23:3, 23:5,
23:14, 23:25, 24:2,
24:7, 24:8, 24:10,
24:19, 24:21, 24:24,
25:10, 25:14, 25:16,
25:21, 25:24, 26:2,
26:10, 26:11, 27:3,
27:5, 27:13, 27:14,
29:8, 29:15, 29:17,
29:22, 29:24, 30:16,
31:6, 31:9, 31:11,
31:14, 31:20, 31:21,
31:22, 32:1, 32:2,
32:16, 32:25, 33:1,
33:7, 33:8, 33:12,
33:16, 34:12, 34:18,
39:13, 40:7, 40:18,
41:3, 41:11, 49:15,
55:6, 63:3, 63:8,
63:17, 67:2, 89:23,
95:6, 97:13, 97:15,
103:9, 103:12,
104:16, 106:23,
112:13, 117:17,
117:18, 119:4,
124:5, 124:6,
124:11, 124:22,
125:5, 127:15,
132:11, 133:14,
136:5, 137:5,
137:15, 137:20,
137:22, 139:10,
141:9, 152:11,
154:16, 155:2,
160:1, 164:21,
165:2, 165:5,
167:13, 172:25,
173:6, 173:20,
174:3, 175:9,
176:20, 176:24,
187:6, 188:6,
188:15, 188:22,
189:16, 189:24,

189:25, 194:9, 200:8, 200:12, 200:13, 205:13, 206:14, 206:19, 207:9, 207:11, 207:12, 207:18, 208:18, 208:20

**cases** [17] - 6:14, 10:19, 11:17, 12:3, 24:3, 24:11, 24:16, 25:4, 30:13, 30:19, 30:23, 31:5, 31:16, 31:17, 32:3, 105:17, 105:22

**catch** [1] - 173:11

**Category** [2] - 195:12, 195:14

**caused** [5] - 26:6, 51:19, 139:23, 191:9, 213:13

**causes** [4] - 51:25, 121:1, 194:6, 199:8

**causing** [1] - 210:20

**caution** [3] - 117:21, 117:23, 117:24

**cautious** [1] - 171:25

**cede** [1] - 99:24

**cell** [4] - 151:14, 151:20, 151:21, 151:25

**center** [1] - 143:6

**Central** [1] - 26:8

**ceremonies** [1] - 18:24

**certain** [13] - 72:5, 73:5, 74:18, 74:19, 85:1, 101:5, 102:10, 106:18, 111:14, 111:16, 111:21, 136:20

**certainly** [20] - 16:6, 44:19, 51:17, 63:7, 86:25, 87:7, 87:14, 89:14, 93:12, 135:18, 141:17, 158:19, 184:18, 186:14, 186:15, 190:11, 196:23, 199:10, 202:23, 207:24

**Certainly** [3] - 108:4, 117:9, 151:23

**certainty** [6] - 49:5, 52:21, 84:23, 111:23, 161:12, 164:17

**certification** [15] - 17:1, 18:23, 36:15, 55:7, 55:8, 56:8, 56:19, 118:5, 119:1,

121:15, 122:11, 126:21, 136:9, 136:14, 184:9

**certifications** [2] - 118:12, 120:16

**certified** [14] - 15:10, 16:13, 118:3, 118:11, 118:20, 118:23, 119:13, 119:24, 120:1, 120:10, 175:20, 176:22, 177:2, 205:25

**Certified** [1] - 213:6

**certify** [2] - 176:10, 213:17

**CERTIFY** [2] - 212:4, 213:4

**cetera** [1] - 135:24

**chain** [3] - 49:1, 66:5, 195:18

**championship** [1] - 129:17

**chance** [2] - 150:11

**change** [4] - 48:7, 64:19, 119:9, 198:12

**Change/Correction** [1] - 212:7

**changed** [7] - 4:14, 47:5, 47:19, 48:5, 48:14, 153:11, 153:21

**chapter** [3] - 9:23, 10:5, 10:7

**chapters** [2] - 8:5, 9:20

**character** [2] - 65:5, 143:14

**characterization** [1] - 112:20

**charge** [6] - 6:14, 86:14, 105:3, 105:9, 169:6, 196:8

**charged** [5] - 6:19, 32:15, 33:3, 53:23, 156:20

**charges** [2] - 33:5, 182:9

**charging** [2] - 127:16, 127:19

**charity** [2] - 6:7, 6:10

**Charlie** [4] - 38:5, 39:21, 70:22, 146:17

**chart** [1] - 136:24

**chase** [1] - 103:13

**chasing** [2] - 109:2, 109:23

**check** [5] - 39:25, 44:25, 105:17, 105:19, 105:21

**checked** [2] - 181:21, 181:23

**checks** [1] - 107:21

**Chief** [21] - 1:7, 3:15, 4:21, 4:23, 11:2, 12:14, 12:18, 119:7, 179:3, 179:5, 179:7, 179:11, 180:6, 190:5, 191:13, 191:23, 192:10, 192:13, 207:21, 208:4

**Chief's** [1] - 179:11

**chiefs** [1] - 13:4

**Chiefs** [5] - 13:25, 14:1, 179:6, 180:12, 180:19

**children** [2] - 134:7, 173:10

**choice** [2] - 113:8, 115:15

**choke** [1] - 149:7

**Choked** [2] - 148:20, 148:21

**choked** [1] - 149:5

**choking** [2] - 175:2, 207:11

**Choking** [1] - 175:17

**choose** [1] - 76:23

**chose** [1] - 131:5

**Chris** [1] - 78:18

**Christmas** [1] - 78:12

**CHRISTOPHER** [1] - 2:3

**chronological** [1] - 7:24

**Circuit** [5] - 7:3, 25:11, 145:23, 145:24, 146:2

**circuit** [3] - 7:3, 174:7, 174:8

**Circuits** [2] - 7:1, 146:5

**circumstances** [17] - 53:13, 64:21, 66:1, 70:6, 86:16, 106:8, 114:10, 124:20, 130:15, 131:9, 143:3, 143:17, 145:11, 148:14, 148:23, 163:22, 174:23

**citations** [1] - 78:7

**cite** [1] - 60:17

**cited** [1] - 204:2

**cities** [2] - 5:23, 14:2

**citing** [1] - 50:23

**city** [7] - 26:21, 27:6, 32:12, 139:1, 198:24

**CITY** [1] - 1:9

**City** [19] - 1:17, 3:14, 23:25, 24:2, 24:19, 25:22, 26:13, 27:2, 27:4, 29:22, 31:2, 31:3, 31:8, 32:13, 32:17, 32:25, 33:2, 145:9, 173:7

**city's** [1] - 105:7

**City's** [1] - 199:13

**civil** [13] - 10:19, 11:18, 23:15, 27:8, 31:21, 31:25, 32:20, 33:8, 207:6, 207:16, 208:1

**claim** [7] - 27:19, 29:1, 141:6, 199:16, 207:1, 207:3, 207:6

**claims** [4] - 11:7, 28:24, 198:25, 199:5

**clarify** [2] - 81:16, 154:12

**clarity** [1] - 113:22

**class** [1] - 14:17

**classes** [1] - 157:9

**clean** [2] - 68:13, 198:20

**clear** [14] - 50:17, 50:18, 52:2, 77:7, 82:23, 109:14, 133:7, 144:25, 145:14, 146:20, 159:3, 174:24, 197:14, 204:13

**clearly** [7] - 43:15, 70:21, 82:2, 96:4, 113:7, 169:24

**Clearly** [1] - 194:19

**clench** [1] - 151:24

**clenched** [1] - 151:25

**client** [12] - 21:9, 21:14, 21:17, 22:1, 22:5, 135:7, 139:1, 139:4, 142:2, 146:7, 146:22, 198:24

**client's** [1] - 147:23

**clients** [1] - 135:7

**clinics** [1] - 6:17

**close** [8] - 83:23, 93:25, 96:21, 99:6, 100:13, 101:11, 109:5, 152:5, 164:7

**closer** [2] - 13:14, 110:6

**co** [1] - 8:16

**co-written** [1] - 8:16

**coasters** [1] - 42:5

**cobbing** [1] - 147:24

**cognizant** [1] - 117:13

**coin** [1] - 204:7

**collar** [27] - 47:24,

75:22, 75:24, 76:1, 76:18, 76:19, 76:22, 77:4, 77:6, 77:8, 77:22, 78:9, 80:7, 80:18, 80:21, 80:24, 83:2, 85:11, 85:15, 85:17, 86:3, 86:9, 86:12, 87:15, 89:2

**collars** [1] - 86:22

**College** [1] - 14:22

**collegiality** [1] - 121:7

**Colorado** [2] - 25:22, 25:23

**comfort** [1] - 89:13

**comfortable** [2] - 92:17, 108:17

**comfortably** [1] - 70:17

**coming** [9] - 63:20, 76:3, 95:2, 96:23, 97:19, 127:18, 127:19, 157:15, 160:14

**comitting** [1] - 107:20

**command** [34] - 5:1, 13:12, 49:1, 50:15, 76:4, 76:10, 77:5, 77:8, 77:10, 77:14, 77:15, 79:3, 79:7, 79:14, 80:5, 80:15, 81:6, 81:9, 83:10, 83:12, 83:17, 84:5, 84:8, 84:16, 138:5, 138:14, 160:15, 161:18, 162:4, 162:10, 162:14, 193:21, 195:18

**Commander** [9] - 35:9, 48:23, 49:12, 50:24, 51:25, 52:15, 62:24, 194:25

**commands** [6] - 59:21, 59:22, 77:24, 137:18, 138:11, 153:7

**comment** [2] - 90:20, 162:6

**comments** [2] - 122:22, 123:3

**commercially** [1] - 35:12, 45:5, 45:15

**Commission** [1] - 194:22

**commission** [2] - 32:21, 212:23

**committed** [7] - 27:20, 168:2, 168:3, 168:4, 171:11, 171:23, 207:17

**Committee** [1] - 39:22

**committee** [1] - 132:20

**common** [12] - 67:19, 68:6, 68:8, 69:10, 85:20, 89:22, 96:10, 96:17, 125:22, 147:24, 179:2, 181:25

**Common** [1] - 193:25

**commonly** [4] - 18:22, 67:20, 69:24, 89:24

**communication** [1] - 178:3

**communities** [1] - 134:18

**community** [2] - 33:14, 192:7

**companion** [1] - 81:5

**company** [1] - 37:16

**compensation** [1] - 26:16

**competence** [1] - 119:22

**competing** [1] - 145:16

**competition** [1] - 18:25

**complain** [1] - 191:4

**Complaint** [1] - 38:11

**complaint** [5] - 189:15, 194:8, 195:12, 196:22, 197:2

**complaints** [5] - 135:6, 140:5, 140:8, 141:2, 196:16

**complete** [1] - 38:24

**completely** [1] - 184:11

**completion** [1] - 7:9

**compliance** [7] - 52:5, 52:6, 76:25, 77:10, 107:10, 125:9, 162:24

**compliant** [1] - 145:22

**complied** [1] - 60:23

**comply** [11] - 52:12, 77:5, 77:13, 79:2, 79:7, 79:13, 80:5, 81:5, 83:11, 145:7, 153:9

**complying** [1] - 162:16

**components** [1] - 85:16

**comported** [1] - 63:9

**compromise** [1] - 11:7

**computer** [1] - 136:12

**concept** [1] - 173:25

**concern** [10] - 51:20,

62:25, 112:10, 115:11, 115:12, 115:14, 132:4, 139:23, 189:17, 199:10

**concerned** [4] - 7:9, 30:5, 88:14, 158:23

**concerning** [1] - 60:19

**concerns** [5] - 62:24, 122:22, 122:25, 124:4, 199:9

**conclude** [6] - 65:23, 78:25, 83:5, 97:2, 101:23, 102:4

**concluded** [1] - 211:6

**concluding** [2] - 80:6, 80:11

**conclusion** [14] - 49:9, 63:5, 66:10, 84:7, 85:2, 85:5, 92:25, 156:19, 159:1, 159:12, 161:12, 162:19, 197:15

**conclusions** [6] - 47:5, 47:9, 48:4, 93:4, 154:21, 154:24

**condition** [6] - 43:21, 99:15, 99:18, 99:21, 208:14

**conditioned** [1] - 138:22

**conducive** [1] - 203:20

**conduct** [3] - 61:12, 142:2, 160:17

**conduct's** [1] - 144:15

**conducted** [2] - 139:11, 157:8

**conference** [2] - 19:21, 21:13

**confidently** [1] - 101:23

**confined** [1] - 64:17

**confirm** [3] - 109:7, 109:10, 122:6

**confirmed** [3] - 22:25, 42:9, 43:14

**confusing** [2] - 22:5, 156:24

**connected** [6] - 26:1, 73:8, 74:21, 75:6, 75:7, 75:8

**connecting** [1] - 85:14

**connection** [5] - 12:21, 20:19, 23:3, 127:5, 157:9

**Connor** [14] - 104:12, 106:21, 108:3, 109:13, 109:21,

110:5, 167:13, 167:20, 167:24, 169:13, 169:19, 170:17, 171:13, 171:16

**consecutive** [2] - 196:15

**Consecutive** [1] - 199:1

**consider** [3] - 19:24, 129:11, 198:8

**consideration** [2] - 184:1, 187:19

**considerations** [1] - 71:2

**considered** [3] - 123:10, 185:18, 187:14

**considering** [1] - 143:14

**consistent** [23] - 50:1, 55:12, 56:15, 62:11, 77:20, 137:25, 138:23, 155:9, 155:17, 157:4, 157:15, 157:20, 160:6, 161:6, 162:14, 196:17, 200:16, 201:17, 201:22, 204:4, 206:17, 210:25, 211:2

**consistently** [4] - 52:15, 59:16, 59:19, 60:8

**consists** [1] - 183:12

**constant** [1] - 176:2

**Constant** [1] - 176:3

**constitutional** [2] - 13:21, 174:7

**constitutionally** [2] - 146:2, 146:4

**consultation** [1] - 38:14

**consulted** [3] - 24:9, 30:20, 30:23

**consumer** [1] - 6:17

**contact** [5] - 12:22, 21:7, 23:6, 156:22, 165:21

**contacts** [1] - 185:19

**contain** [1] - 122:21

**contained** [1] - 5:3

**contemporaneous** [2] - 81:15, 86:18

**contemporaneously** [1] - 61:6, 96:20, 155:18

**content** [1] - 37:7

**contention** [1] - 28:17

**contest** [1] - 56:15

**context** [8] - 57:2, 60:3, 67:12, 69:1, 163:5, 163:10, 165:22, 197:6

**contexts** [2] - 67:13, 165:23

**contingency** [1] - 53:9

**continue** [2] - 128:10, 190:3

**continued** [2] - 100:9, 100:10

**continues** [3] - 32:11, 168:5, 200:7

**Continuing** [1] - 52:13

**continuously** [1] - 16:13

**contract** [1] - 7:11

**contrary** [2] - 8:19, 149:17

**contributed** [1] - 9:11

**contributing** [1] - 7:17

**control** [6] - 102:8, 125:11, 127:17, 147:14, 175:18, 189:23

**convenient** [1] - 3:25

**conversation** [10] - 39:5, 39:6, 39:16, 39:23, 40:25, 61:23, 75:12, 104:22, 131:14, 185:5

**conversations** [2] - 36:14, 157:10

**converted** [1] - 188:1

**convey** [2] - 203:21, 203:22

**convinces** [1] - 118:19

**convoluted** [1] - 32:10

**Conway** [1] - 20:25

**Cooper** [8] - 74:25, 75:13, 79:6, 79:9, 97:22, 104:7, 166:19, 167:3

**Cooper's** [5] - 38:14, 75:6, 82:17, 134:1, 149:19

**copies** [3] - 36:1, 36:2, 36:6

**cops** [1] - 205:1

**copy** [1] - 46:25

**copyright** [4] - 36:4, 37:12, 37:14, 37:18

**Corbitt** [7] - 35:9, 39:3, 48:24, 50:25, 51:25, 62:24, 194:25

**Corbitt's** [1] - 49:12

**corn** [1] - 147:24

**corner** [1] - 152:23

**corpulent** [1] - 117:3

**Correct** [11] - 15:22, 48:18, 97:11, 98:7, 101:16, 101:21, 106:15, 109:25, 110:3, 110:23, 140:10

**correct** [24] - 36:11, 36:23, 46:17, 53:14, 53:15, 62:9, 63:22, 66:3, 70:15, 99:8, 99:11, 104:25, 109:24, 110:2, 110:19, 110:22, 111:24, 122:8, 158:13, 202:12, 202:18, 202:24, 212:5, 213:15

**corrections** [1] - 212:6

**cost** [1] - 192:6

**counsel** [2] - 11:14, 104:20

**counseling** [1] - 195:23

**count** [1] - 6:8

**counties** [2] - 5:23, 14:2

**countless** [1] - 53:12

**countries'** [1] - 46:6

**country** [6] - 20:9, 69:18, 70:1, 124:14, 129:13, 180:18

**County** [20] - 11:2, 11:3, 11:8, 16:3, 17:18, 17:24, 18:10, 18:14, 19:14, 19:17, 19:19, 20:14, 20:20, 21:3, 21:4, 22:6, 24:8, 31:4, 31:12

**COUNTY** [2] - 212:3, 213:3

**county** [8] - 11:4, 11:5, 11:13, 11:15, 12:11, 14:9, 24:9, 32:14

**county's** [1] - 11:7

**couple** [21] - 24:23, 30:23, 33:2, 44:17, 46:14, 67:13, 87:6, 91:1, 114:15, 114:21, 125:18, 127:1, 127:11, 136:10, 142:16, 147:8, 173:11, 179:16, 193:2, 200:19, 200:20

**coupled** [2] - 50:5, 61:2

**course** [6] - 55:7, 55:8, 126:21, 126:22, 151:2, 173:5

**court** [2] - 6:22, 9:3
**COURT** [1] - 1:1
**Court** [3] - 7:4, 24:23, 55:23
**courts** [2] - 6:23, 106:19
**Courts** [1] - 6:24
**cover** [2] - 53:9, 149:2
**covered** [2] - 83:16, 90:5
**create** [2] - 163:24, 174:11
**created** [2] - 115:10, 200:5
**creating** [1] - 113:10
**credible** [2] - 97:17, 97:20
**crime** [8] - 27:20, 104:24, 108:4, 145:1, 145:3, 167:18, 168:2, 171:14
**crimes** [2] - 8:6, 169:18
**Criminal** [3] - 8:2, 8:10, 14:16
**criminal** [9] - 8:4, 8:11, 9:17, 10:19, 11:18, 32:16, 33:1, 33:7, 189:16
**criminally** [1] - 32:15
**criminals** [1] - 171:8
**criteria** [3] - 54:23, 135:10, 140:12
**critical** [2] - 139:18, 161:19
**criticism** [1] - 135:7
**criticizing** [1] - 12:24
**cross** [1] - 74:13
**crossbar** [1] - 74:8
**crossbeam** [1] - 74:8
**crossover** [1] - 10:9
**crouched** [5] - 152:5, 152:6, 152:8, 152:22, 153:4
**cruise** [1] - 20:15
**crux** [1] - 159:17
**CSR** [1] - 1:19
**cumulative** [1] - 194:16
**cup** [1] - 86:4
**curious** [3] - 103:10, 103:13, 103:18
**current** [1] - 157:24
**curriculum** [1] - 200:6
**custom** [4] - 107:5, 144:10, 144:12, 146:23
**customs** [1] - 54:6
**cut** [3] - 10:21, 109:14, 113:2
**Czech** [2] - 41:9, 182:19
**Czechoslovakia** [1] - 182:19

# D

**daily** [6] - 4:24, 5:6, 12:22, 13:4, 56:23, 206:1
**Dallas** [3] - 40:5, 40:6, 40:9
**damage** [5] - 125:6, 125:7, 125:8, 139:21, 176:9
**danger** [3] - 167:22, 169:9, 170:14
**dangerous** [1] - 170:13
**dark** [4] - 27:23, 28:20, 109:3, 152:22
**darn** [1] - 21:1
**darts** [1] - 77:2
**DATE** [1] - 1:18
**date** [4] - 4:10, 10:22, 50:23, 51:19
**dated** [2] - 4:10, 90:10
**dates** [1] - 140:5
**Dave** [2] - 181:18, 182:7
**days** [5] - 17:1, 25:12, 41:1, 41:2
**Deadly** [1] - 157:12
**deal** [4] - 132:7, 192:16, 192:18
**dealing** [1] - 17:6
**dealings** [2] - 21:8, 23:2
**dealt** [1] - 9:21
**dear** [1] - 129:12
**death** [2] - 26:1, 26:6
**decade** [1] - 130:13
**decades** [1] - 124:13
**decided** [1] - 138:4
**decides** [2] - 154:22, 172:1
**decision** [14] - 33:5, 91:9, 115:9, 115:18, 138:10, 139:13, 140:14, 153:10, 172:4, 172:7, 172:22, 173:8, 178:24, 190:14
**decoy** [17] - 17:20, 17:25, 18:6, 42:20, 42:24, 43:2, 43:3, 43:8, 43:12, 43:18, 44:5, 44:12, 44:13,
100:1, 210:1, 210:21
**decoy's** [1] - 43:12
**defendant** [4] - 25:7, 27:10, 33:9, 55:5
**defendant's** [2] - 25:9, 37:25
**defendants** [5] - 3:17, 25:10, 25:24, 26:9, 27:8
**Defendants** [2] - 1:10, 2:6
**Defenders** [1] - 8:3
**defending** [2] - 3:14, 12:23
**Defense** [1] - 90:9
**defense** [3] - 27:7, 32:20, 33:1
**defense's** [1] - 164:21
**defensible** [1] - 183:10
**defensive** [2] - 127:17, 127:18
**deficiency** [1] - 129:7
**define** [2] - 55:24, 67:10
**defined** [2] - 64:17, 110:18
**defining** [1] - 59:2
**definitions** [1] - 67:5
**defrauded** [1] - 106:3
**degree** [3] - 49:5, 63:2, 196:11
**delivered** [1] - 65:9
**demeanor** [1] - 135:21
**demonstration** [1] - 67:18
**Department** [41] - 1:8, 17:16, 17:18, 17:23, 21:10, 22:16, 25:5, 25:8, 26:7, 32:13, 38:12, 47:16, 49:6, 49:16, 50:18, 52:2, 107:6, 118:3, 119:1, 121:17, 130:12, 138:9, 159:15, 160:18, 162:21, 167:16, 175:21, 176:23, 178:7, 179:18, 179:22, 180:14, 181:2, 183:20, 184:16, 185:3, 188:17, 195:5, 196:11, 202:5, 209:14
**department** [26] - 15:17, 32:12, 48:17, 49:7, 53:6, 53:8, 57:2, 107:19, 119:20, 142:9, 142:10, 177:20,
179:7, 179:8, 179:12, 179:24, 187:23, 188:3, 193:4, 196:1, 205:16, 207:22, 208:8, 208:11, 208:22
**department's** [2] - 54:5, 208:9
**departmental** [2] - 61:25, 142:2
**departments** [2] - 196:2, 208:14
**deploy** [4] - 67:15, 106:25, 110:10, 172:6
**deployed** [4] - 27:16, 67:18, 174:10, 174:13
**deploying** [11] - 50:3, 50:7, 50:9, 54:24, 55:10, 56:9, 56:13, 57:5, 60:11, 64:16, 165:4
**Deploying** [1] - 70:2
**deployment** [32] - 26:18, 38:9, 49:4, 50:21, 57:22, 58:1, 58:2, 58:18, 59:13, 61:3, 65:2, 67:1, 67:5, 67:10, 67:12, 67:13, 67:19, 68:24, 69:10, 109:18, 110:14, 163:2, 163:4, 163:6, 163:9, 164:23, 165:16, 167:17, 172:4, 172:7
**Deployment** [2] - 69:8, 69:9
**depo** [3] - 134:6, 168:10, 187:7
**deponent** [1] - 3:11
**depos** [1] - 24:24
**deposed** [4] - 4:1, 4:2, 82:15, 82:18
**DEPOSITION** [1] - 1:13
**deposition** [58] - 3:19, 24:4, 24:11, 24:21, 29:12, 33:6, 35:1, 35:4, 35:5, 35:7, 35:11, 37:22, 39:1, 39:3, 42:22, 46:20, 49:12, 49:13, 50:17, 55:13, 56:6, 58:4, 59:25, 60:7, 71:21, 71:22, 72:4, 73:3, 76:20, 81:25, 82:12, 82:17, 85:3, 88:19, 90:9, 91:7, 98:23,
112:17, 118:8, 131:17, 134:4, 134:8, 155:3, 155:5, 156:15, 162:12, 163:3, 163:5, 166:17, 166:18, 167:2, 168:13, 183:19, 194:24, 200:21, 200:22, 213:4, 213:5
**Deposition** [4] - 25:6, 25:23, 26:8, 211:6
**depositions** [14] - 35:9, 39:3, 50:24, 67:3, 78:6, 80:9, 103:3, 105:16, 118:18, 128:4, 134:1, 164:15, 165:10, 181:16
**Deputy** [1] - 11:2
**describe** [5] - 12:24, 42:15, 114:9, 163:8, 174:5
**described** [15] - 29:14, 62:25, 76:20, 76:23, 88:1, 91:25, 112:20, 114:8, 116:12, 138:16, 147:8, 151:15, 188:18, 188:19
**describes** [2] - 89:19, 112:16
**describing** [3] - 38:16, 78:3, 85:10
**description** [15] - 74:24, 77:1, 80:6, 80:15, 82:25, 83:5, 83:25, 86:20, 87:18, 87:19, 91:16, 101:8, 110:17, 135:21, 149:23
**designed** [2] - 196:3, 196:6
**desirable** [4] - 124:9, 125:17, 148:5, 187:4
**despite** [1] - 64:1
**Despite** [1] - 144:8
**detached** [1] - 156:18
**detail** [1] - 8:6
**detailed** [3] - 156:13, 179:21, 180:2
**details** [5] - 27:13, 47:2, 49:8, 51:8, 71:10
**determine** [1] - 58:17
**determined** [1] - 149:24
**determining** [1] - 187:19
**develop** [1] - 133:22

**developed** [1] - 100:21

**device** [2] - 76:25, 86:7

**dichotomy** [1] - 52:4

**differ** [1] - 150:7

**difference** [5] - 173:4, 174:25, 183:2, 198:1, 198:2

**differences** [1] - 205:17

**different** [39] - 5:2, 29:15, 44:21, 47:9, 51:8, 53:6, 60:12, 62:7, 65:25, 68:15, 68:25, 78:25, 92:21, 93:24, 101:2, 113:19, 119:10, 120:7, 121:19, 127:12, 130:19, 136:25, 145:16, 153:2, 153:3, 155:12, 158:19, 160:13, 164:6, 168:16, 169:6, 169:8, 169:9, 177:11, 179:17, 179:20, 196:1, 206:2

**differently** [1] - 150:12

**difficult** [4] - 100:6, 152:22, 152:24, 152:25

**difficulty** [1] - 100:2

**Dillard** [28] - 101:14, 101:15, 102:16, 102:22, 102:25, 104:24, 105:4, 108:14, 108:18, 108:19, 152:5, 152:7, 152:20, 153:15, 170:9, 170:18, 170:24, 171:3, 171:4, 171:5, 171:7, 171:11, 197:10, 197:23, 198:10, 201:24, 202:21

**dinner** [2] - 39:19, 179:5

**direct** [6] - 5:1, 13:15, 18:20, 21:7, 156:21, 195:18

**directed** [1] - 193:19

**direction** [1] - 92:3

**directly** [6] - 6:11, 13:5, 14:13, 23:1, 51:21, 164:11

**disadvantage** [1] - 63:5

**disagree** [1] - 54:8

**disc** [1] - 37:15

**discernable** [1] - 118:2

**disciplinary** [3] - 139:9, 141:2, 195:23

**discipline** [4] - 12:8, 204:10, 204:11

**disciplined** [1] - 32:13

**disciplines** [2] - 40:23, 41:16

**discount** [1] - 100:3

**discreet** [1] - 143:9

**discretion** [5] - 53:21, 53:24, 64:22, 65:1, 190:16

**discuss** [6] - 30:10, 30:11, 40:7, 104:9, 106:17, 109:16

**discussed** [3] - 40:19, 156:25, 160:12

**discusses** [1] - 143:13

**discussion** [25] - 10:7, 44:1, 58:10, 60:18, 61:2, 77:20, 80:10, 82:2, 85:11, 90:14, 103:2, 103:7, 104:11, 105:24, 124:6, 138:7, 140:4, 145:2, 160:21, 161:7, 186:15, 189:12, 191:15, 195:21, 200:14

**discussions** [3] - 79:12, 81:22, 93:13

**dismissed** [3] - 25:11, 29:8, 33:5

**Disneyworld** [1] - 19:15

**disobeying** [1] - 194:10

**dispositive** [1] - 177:3

**dispute** [3] - 120:2, 135:20, 135:25

**disputed** [1] - 161:10

**disputes** [1] - 92:5

**disruption** [1] - 210:21

**distance** [8] - 42:25, 43:2, 72:17, 72:25, 74:17, 81:14, 89:16, 114:3

**distances** [1] - 43:6

**distinction** [2] - 108:16, 168:15

**distinguishable** [1] - 41:25

**distinguished** [1] - 41:25

**distinguishes** [1] - 184:2

**distortion** [3] - 157:13, 199:22, 200:10

**distractions** [1] - 175:15

**distribution** [2] - 37:16, 143:6

**DISTRICT** [2] - 1:1

**district** [1] - 173:4

**District** [1] - 33:3

**DIVISION** [1] - 1:2

**Division** [1] - 26:8

**division** [1] - 193:4

**document** [1] - 46:19

**documentation** [1] - 132:2

**documented** [1] - 97:6

**documents** [8] - 21:24, 22:8, 34:21, 118:2, 118:8, 118:18, 124:16, 133:11

**dog** [398] - 9:10, 10:19, 18:5, 18:7, 18:8, 18:9, 18:10, 18:12, 18:18, 23:25, 24:1, 24:13, 26:18, 26:19, 26:22, 27:3, 27:10, 27:16, 27:17, 28:2, 28:14, 28:18, 28:21, 29:1, 29:22, 30:6, 31:2, 38:13, 40:23, 42:2, 43:1, 43:4, 43:11, 43:13, 43:20, 43:21, 44:5, 44:6, 44:21, 45:2, 46:1, 46:2, 46:7, 47:18, 49:20, 50:3, 50:4, 50:7, 50:9, 50:14, 51:2, 53:14, 53:22, 54:1, 54:22, 54:24, 55:10, 55:16, 56:9, 56:13, 57:5, 59:1, 59:5, 60:11, 61:3, 61:6, 64:16, 65:2, 67:6, 67:7, 67:8, 67:15, 67:16, 67:18, 67:20, 68:3, 68:4, 68:9, 68:21, 69:11, 69:14, 69:19, 70:1, 70:2, 70:4, 70:9, 70:12, 70:14, 70:16, 70:17, 70:23, 70:25, 72:14, 72:18, 72:21, 73:4, 76:2, 76:8, 76:17, 77:4, 77:6, 77:23, 78:9, 80:7, 80:17, 81:1, 81:6, 81:9, 82:9, 82:11, 83:2, 83:10, 83:11, 84:6, 84:20, 85:17, 86:3, 86:9, 86:13, 87:9, 87:11, 87:12, 88:3, 88:6, 88:7, 88:11, 88:16, 88:23, 89:2, 89:4, 89:5, 89:8, 89:12, 91:16, 91:17, 94:2, 94:5, 94:11, 95:2, 95:22, 95:23, 96:21, 97:9, 97:10, 98:12, 98:14, 98:16, 98:17, 98:19, 98:25, 99:1, 99:4, 99:17, 100:2, 100:3, 100:23, 100:24, 101:3, 101:24, 102:8, 102:16, 102:24, 103:13, 104:5, 105:8, 106:7, 106:10, 106:18, 106:19, 106:21, 107:7, 108:1, 109:4, 109:19, 110:10, 110:11, 110:19, 110:21, 111:3, 111:13, 112:5, 119:5, 120:8, 121:9, 123:13, 123:14, 123:17, 124:13, 124:18, 125:11, 125:12, 125:15, 126:1, 126:6, 126:9, 126:11, 126:14, 126:18, 126:22, 126:23, 127:13, 127:18, 127:22, 128:6, 128:10, 128:16, 129:16, 129:20, 129:22, 129:24, 130:19, 131:8, 132:23, 133:2, 135:19, 136:2, 136:17, 136:18, 137:9, 137:11, 138:14, 138:19, 138:21, 138:23, 138:24, 141:7, 145:19, 145:21, 146:12, 146:13, 147:10, 147:13, 147:18, 147:21, 147:22, 148:2, 148:6, 148:9, 148:10, 149:9, 150:20, 150:23, 150:25, 151:1, 151:12, 151:22, 153:10, 155:18, 155:19, 156:22, 157:6, 157:15, 157:19, 157:21, 159:21, 160:14, 161:15, 161:16, 162:6, 162:7, 162:10, 162:12, 162:13, 162:23, 163:6, 163:7, 163:11, 163:13, 163:23, 164:1, 165:1, 165:4, 165:6, 165:11, 165:12, 170:6, 171:25, 172:6, 172:22, 172:23, 173:17, 174:19, 174:20, 174:23, 175:1, 175:16, 175:19, 176:7, 176:10, 176:11, 176:14, 176:16, 177:11, 178:6, 178:8, 178:9, 178:14, 178:19, 179:20, 180:22, 180:23, 180:24, 181:9, 181:10, 181:11, 181:12, 181:14, 181:16, 181:17, 181:20, 181:22, 182:5, 182:6, 182:10, 182:11, 182:13, 182:15, 182:17, 183:3, 183:5, 183:13, 183:23, 184:2, 184:10, 184:12, 185:7, 185:13, 185:14, 185:15, 185:16, 185:20, 185:23, 185:24, 185:25, 186:5, 186:7, 186:8, 186:12, 187:3, 187:5, 187:16, 187:18, 187:20, 188:5, 188:11, 189:22, 191:25, 192:4, 193:10, 193:19, 193:21, 193:22, 194:1, 200:22, 200:23, 200:24, 201:1, 201:2, 201:7, 201:11, 202:5, 203:20, 204:8, 204:12, 204:20, 204:22, 204:24, 205:6, 205:10, 206:10, 206:22, 209:22, 209:25, 210:6, 210:9, 210:12, 210:24,

210:25

**Dog** [4] - 40:14, 120:12, 120:13, 121:23

**dog's** [24] - 9:11, 25:17, 43:8, 64:22, 68:7, 75:17, 95:20, 99:3, 99:16, 101:10, 101:12, 127:19, 136:20, 147:11, 149:6, 162:24, 174:16, 176:9, 181:22, 181:23, 182:3, 187:6, 193:12

**dogs** [107] - 6:2, 7:6, 9:6, 9:8, 9:19, 9:21, 9:23, 9:25, 10:6, 10:8, 10:13, 11:12, 11:19, 12:4, 12:16, 14:14, 14:20, 17:5, 17:19, 17:22, 19:22, 20:3, 23:12, 25:16, 25:17, 26:2, 38:10, 40:20, 40:21, 41:1, 41:8, 41:15, 41:22, 42:1, 42:5, 43:6, 43:16, 43:18, 44:3, 44:8, 44:17, 44:20, 44:22, 44:24, 46:8, 46:10, 52:22, 67:23, 68:16, 77:2, 85:19, 85:25, 100:1, 122:1, 124:1, 124:8, 125:15, 125:19, 125:21, 125:22, 128:9, 128:10, 128:12, 128:13, 128:21, 132:8, 133:4, 134:13, 134:16, 134:22, 137:23, 137:25, 138:2, 138:10, 138:11, 139:1, 139:5, 146:25, 174:5, 174:10, 181:1, 182:7, 182:10, 182:18, 182:20, 182:21, 182:24, 183:7, 186:16, 186:19, 188:1, 188:12, 193:9, 193:25, 203:25, 204:6, 209:20, 210:3, 210:7, 211:3

**dollar** [1] - 192:8

**dollars** [1] - 192:14

**domestic** [1] - 202:22

**Domestic** [1] - 202:23

**donated** [1] - 134:21

**done** [32] - 10:24, 16:9, 19:6, 21:14, 30:22, 31:17, 36:25, 37:4, 37:11, 42:11, 52:22, 64:10, 66:20, 66:21, 113:16, 113:19, 114:20, 115:13, 115:21, 131:24, 133:23, 148:23, 150:10, 154:6, 181:24, 181:25, 184:3, 184:6, 193:9, 197:9, 200:3

**door** [4] - 25:20, 108:14, 203:5

**DOROUGH** [1] - 1:9

**Dorough** [164] - 3:16, 35:4, 38:9, 38:11, 46:20, 47:19, 49:2, 49:20, 57:25, 60:1, 60:23, 62:5, 62:22, 63:16, 64:2, 64:9, 66:2, 66:11, 66:16, 71:15, 72:1, 72:6, 72:8, 72:10, 72:20, 72:23, 73:9, 73:18, 73:23, 74:21, 75:6, 76:14, 76:16, 77:8, 77:14, 77:21, 78:3, 79:14, 79:17, 80:7, 80:16, 81:6, 81:8, 81:18, 81:24, 82:3, 82:6, 82:10, 82:11, 83:1, 83:15, 84:2, 84:10, 84:20, 85:7, 87:13, 87:20, 88:12, 88:23, 89:3, 89:19, 90:17, 90:19, 91:13, 91:19, 92:2, 92:4, 92:16, 92:18, 94:10, 94:16, 94:17, 94:21, 97:16, 97:18, 97:25, 98:3, 99:7, 100:23, 101:3, 101:13, 101:23, 102:14, 102:20, 102:24, 105:2, 109:4, 109:6, 110:16, 111:2, 111:11, 111:18, 111:20, 112:9, 112:16, 115:1, 116:19, 117:21, 118:10, 118:20, 119:12, 120:9, 120:24, 123:21, 127:2, 127:25, 130:2, 131:9, 138:16, 139:8, 140:21, 141:1, 141:5, 148:12,

148:18, 148:22, 149:14, 149:16, 149:25, 151:8, 152:9, 152:13, 152:17, 153:3, 153:6, 153:9, 153:16, 153:18, 153:22, 155:4, 155:13, 158:2, 158:5, 158:6, 158:15, 160:24, 161:21, 161:22, 162:2, 162:3, 162:6, 162:12, 162:14, 163:2, 163:13, 165:25, 167:3, 167:14, 168:25, 170:9, 170:18, 176:22, 177:9, 181:7, 181:9, 183:19, 189:4, 189:17, 191:16, 194:14, 201:3, 201:23, 202:1

**Dorough's** [33] - 39:1, 71:20, 71:24, 72:3, 78:19, 78:24, 79:1, 80:12, 80:14, 83:25, 85:3, 86:19, 87:2, 87:18, 88:6, 95:21, 101:7, 109:2, 109:23, 113:9, 126:19, 135:21, 149:22, 151:3, 153:20, 156:15, 160:17, 168:10, 187:7, 200:17, 201:7, 207:1, 209:13

**doubt** [2] - 208:12, 208:19

**down** [33] - 20:15, 25:23, 26:14, 29:11, 54:6, 54:14, 54:17, 59:6, 74:3, 74:15, 89:5, 95:2, 95:14, 106:23, 117:4, 117:7, 130:21, 150:13, 151:12, 151:25, 152:6, 178:7, 186:18, 186:19, 191:14, 198:2, 198:6, 199:23, 205:11, 207:12, 210:20, 210:24

**downtown** [1] - 3:21

**dozen** [6] - 44:19, 44:22, 44:24, 45:6, 45:8

**Dr** [1] - 157:11

**Drafting** [1] - 8:23

**draw** [1] - 127:5

**drawing** [1] - 100:15

**drink** [3] - 86:4, 208:6, 208:15

**drinking** [3] - 209:16, 209:17, 209:18

**drive** [1] - 190:8

**drives** [2] - 182:1, 182:2

**driving** [3] - 190:25, 191:3, 209:19

**drop** [2] - 31:9, 204:23

**dropped** [6] - 71:24, 73:4, 125:25, 151:21, 189:16, 207:3

**dropping** [2] - 194:9, 207:2

**drops** [2] - 28:14, 43:10

**drove** [1] - 209:17

**drug** [1] - 69:12

**drunk** [3] - 190:7, 190:10, 190:11

**dual** [1] - 138:13

**duces** [1] - 34:1

**due** [1] - 48:5

**DUI** [1] - 16:21

**duly** [2] - 3:4, 213:9

**during** [3] - 43:4, 57:22, 94:7

**Dutch** [6] - 43:16, 136:25, 137:18, 138:19, 138:20, 210:18

**duties** [1] - 5:4, 144:20

**duty** [4] - 26:23, 163:24, 208:5, 208:15

**DVD** [2] - 35:22, 36:4

**DVDs** [5] - 35:12, 39:4, 45:4, 45:11, 45:20

**dwelling** [6] - 168:19, 168:21, 169:4, 169:5, 169:7, 169:16

**dysplasia** [1] - 181:24

# E

**e-mail** [3] - 33:23, 46:24, 136:11

**e-mails** [1] - 39:18

**ear** [1] - 93:10

**early** [15] - 18:8, 182:17, 183:24,

195:5, 195:8, 196:12, 196:14, 196:18, 198:21, 198:23, 199:4, 199:19, 206:6, 206:8, 206:9

**ease** [1] - 210:19

**easier** [5] - 4:4, 125:18, 163:10, 182:11, 182:24

**east** [2] - 42:5, 179:2

**East** [2] - 2:4, 182:20

**Easter** [1] - 134:6

**easy** [2] - 112:13, 135:23

**ecclesiastical** [1] - 8:17

**echoed** [1] - 130:1

**economists** [1] - 13:10

**Ed** [4] - 35:17, 35:23, 45:21, 46:6

**educated** [2] - 17:20, 18:6

**educating** [1] - 120:6

**effect** [5] - 54:20, 64:9, 97:1, 97:3, 194:17

**effective** [2] - 126:2, 126:3

**efforts** [1] - 134:19

**eight** [4] - 16:5, 129:15, 143:7, 176:13

**Either** [2] - 117:7, 203:13

**either** [15] - 13:8, 13:23, 18:13, 24:3, 32:23, 40:21, 46:1, 47:12, 48:25, 81:24, 126:9, 136:16, 180:18, 195:11, 210:20

**elderly** [1] - 143:22

**electric** [1] - 86:12

**electronic** [7] - 47:24, 75:22, 76:18, 76:22, 77:4, 77:6, 86:9

**element** [6] - 168:8, 170:16, 170:19, 172:12, 172:15, 172:16

**elementary** [1] - 173:9

**elements** [3] - 170:5, 170:8, 204:1

**elevators** [2] - 178:8, 178:9, 178:14

**ELLIS** [1] - 2:3

**elsewhere** [1] - 54:24

**emotionally** [1] -

156:20
**Emphasize** [1] - 182:13
**emphasize** [1] - 44:18
**employ** [1] - 111:12
**employed** [5] - 4:19, 5:9, 5:12, 5:18, 13:17
**employee** [7] - 12:9, 12:10, 21:13, 21:14, 21:18, 22:12, 135:14
**employees** [5] - 12:10, 12:11, 13:7, 115:13, 119:7
**employer** [1] - 19:13
**employing** [1] - 170:19
**employment** [9] - 4:20, 6:4, 12:7, 22:10, 33:8, 69:7, 139:8, 196:5, 208:15
**employs** [1] - 190:16
**empowered** [1] - 53:24
**encircled** [1] - 72:12
**enclosed** [5] - 28:9, 50:22, 61:16, 64:17, 174:21
**enclosure** [1] - 143:15
**encounter** [1] - 53:10
**Encounters** [1] - 157:12
**encouraging** [1] - 177:20
**end** [11] - 72:11, 75:8, 98:15, 119:24, 120:1, 145:20, 147:7, 152:1, 159:20, 172:3, 192:13
**ended** [5] - 24:11, 33:9, 101:2, 111:19, 194:8
**enforce** [1] - 15:24
**Enforcement** [11] - 4:21, 4:23, 12:15, 12:18, 118:4, 119:2, 121:17, 175:21, 176:23, 179:18, 194:23
**enforcement** [29] - 9:25, 13:5, 13:7, 13:12, 13:16, 13:17, 13:22, 14:6, 14:8, 15:6, 15:9, 15:11, 16:14, 17:15, 19:6, 19:12, 19:25, 20:2, 20:5, 26:3, 30:15, 33:14, 119:21, 124:2, 134:13,

134:23, 177:12, 183:15
**engage** [7] - 43:12, 125:16, 126:2, 183:7, 188:11, 193:20, 203:24
**engaged** [5] - 100:2, 147:10, 151:21, 151:24, 161:23
**engagement** [2] - 83:21, 187:4
**engages** [1] - 150:21
**engaging** [2] - 61:8, 73:12
**English** [4] - 137:18, 138:12, 138:20
**entails** [1] - 13:19
**enter** [2] - 29:4, 153:22
**entered** [1] - 152:14
**entering** [1] - 111:11
**enters** [1] - 27:22
**enthusiasts** [1] - 43:20
**entire** [4] - 28:23, 28:25, 73:17, 149:23
**entities** [1] - 14:6
**enumerated** [1] - 145:11
**environment** [1] - 172:24
**environments** [1] - 204:12
**epithets** [1] - 28:25
**equal** [1] - 91:15
**equally** [2] - 121:16, 172:20
**equate** [1] - 108:13
**equipment** [2] - 89:13, 191:25
**equipped** [1] - 76:17
**equivalent** [1] - 123:10
**erase** [1] - 183:1
**error** [1] - 172:21
**escape** [3] - 109:22, 109:24, 110:12
**essential** [1] - 176:3
**established** [1] - 9:9
**et** [1] - 135:24
**ethic** [2] - 182:3, 192:21
**ethnic** [1] - 8:19
**Europe** [1] - 182:18
**European** [1] - 136:8
**Europeans** [1] - 136:16
**Euros** [1] - 46:7
**evade** [1] - 168:5
**evaluate** [4] - 167:15,

170:24, 200:9, 210:7
**evaluated** [3] - 60:23, 144:16, 160:3
**evaluating** [1] - 61:25, 159:22, 170:6, 170:16, 177:17, 178:21, 184:15
**evaluation** [3] - 61:12, 139:25, 177:22
**evaluations** [2] - 182:1, 182:3
**evening** [3] - 76:18, 173:14, 173:22
**event** [4] - 87:19, 98:6, 123:9, 213:19
**events** [6] - 18:23, 38:16, 66:6, 95:11, 98:5, 101:8
**eventually** [1] - 206:4
**evidence** [12] - 48:21, 50:22, 51:18, 53:2, 95:15, 114:4, 114:24, 118:1, 136:6, 184:5, 184:7, 189:9
**evidentiary** [1] - 93:3
**ex** [1] - 203:6
**ex-girlfriend** [1] - 203:6
**exact** [7] - 55:19, 55:20, 58:14, 58:15, 78:6, 80:9, 81:17
**EXAMINATION** [6] - 1:13, 2:12, 3:5, 154:8, 198:17, 209:9
**examination** [1] - 213:9
**Examination** [4] - 2:13, 2:14, 2:14, 2:15
**examine** [1] - 191:12
**examined** [1] - 3:4
**example** [14] - 49:10, 58:3, 68:17, 93:19, 95:24, 106:2, 125:3, 138:2, 143:18, 168:18, 169:17, 176:10, 178:6, 181:15, 182:16, 204:21
**examples** [1] - 195:15
**exceed** [1] - 180:18
**exceeded** [1] - 16:6
**Excelsior** [1] - 14:22
**except** [2] - 138:12, 153:14
**excepting** [1] - 24:17
**exception** [3] - 143:11, 145:13, 212:5

**excerpts** [2] - 60:7, 134:10
**excessive** [12] - 27:17, 27:20, 104:14, 140:5, 189:14, 189:17, 194:7, 197:2, 198:25, 199:5, 207:1, 207:17
**exchange** [1] - 121:8
**exchanged** [1] - 39:18
**exclusive** [1] - 42:11
**exclusively** [3] - 6:13, 12:6, 42:11
**excuse** [6] - 48:16, 55:19, 69:9, 81:18, 123:8, 147:5
**execute** [1] - 9:2
**executing** [1] - 51:5
**Executing** [1] - 8:24
**execution** [1] - 25:14
**exercise** [1] - 42:14
**exercised** [2] - 117:23, 117:24
**exercising** [1] - 117:21
**Exhibit** [1] - 90:9
**exhibit** [2] - 118:9, 118:17
**exhibits** [3] - 35:6, 35:10, 39:2
**exist** [1] - 182:2
**existence** [1] - 103:7
**exonerated** [2] - 207:16, 207:25
**expect** [15] - 29:12, 49:19, 52:14, 55:18, 55:20, 56:3, 56:4, 72:7, 74:13, 99:14, 149:12, 163:16, 163:19, 206:3, 206:6
**expectation** [2] - 52:11, 165:20
**expected** [13] - 52:5, 52:6, 52:7, 77:9, 86:10, 88:2, 100:16, 116:15, 144:19, 145:7, 145:21, 148:11, 151:20
**expecting** [1] - 149:9
**experience** [17] - 17:4, 17:6, 17:11, 17:13, 17:20, 18:21, 23:11, 42:1, 89:9, 89:12, 96:24, 99:13, 107:18, 147:17, 157:7, 180:17, 200:4
**experienced** [2] - 130:12, 141:16
**expert** [22] - 5:13, 6:4, 22:4, 23:11, 23:13,

23:24, 24:1, 24:6, 24:8, 32:20, 37:24, 37:25, 43:15, 69:17, 97:23, 119:16, 146:9, 154:15, 162:1, 164:21, 192:11, 199:22
**expertise** [7] - 41:11, 41:13, 47:14, 48:16, 94:24, 104:16, 128:18
**experts** [1] - 43:15
**expires** [1] - 212:23
**explain** [3] - 5:16, 32:6, 195:6
**explainable** [1] - 130:22
**explanation** [2] - 85:9, 201:18
**explosives** [1] - 67:22
**exposition** [1] - 9:8
**expressing** [1] - 148:22
**extend** [1] - 131:4, 187:2
**extended** [1] - 114:18
**extending** [2] - 72:6, 74:16
**extent** [4] - 66:15, 90:5, 104:15, 120:6
**exterior** [1] - 64:18
**extra** [1] - 167:2
**extreme** [1] - 63:17
**extremities** [1] - 127:21

## F

**F-R-A-W-L-E-Y** [1] - 35:18
**face** [6] - 28:21, 94:5, 95:23, 126:12, 157:6, 157:22
**facilitate** [1] - 146:10
**facilitates** [1] - 121:7
**facility** [1] - 132:17
**fact** [59] - 7:11, 20:18, 23:8, 24:21, 29:5, 42:3, 44:10, 50:16, 54:4, 57:3, 59:11, 63:1, 66:16, 76:23, 81:23, 84:3, 86:21, 94:10, 94:23, 101:17, 104:6, 107:17, 116:25, 119:12, 123:12, 123:16, 126:13, 127:7, 129:4, 135:10, 141:10,

146:8, 149:23, 154:17, 164:10, 166:3, 167:2, 168:11, 175:20, 177:2, 177:8, 177:18, 180:21, 180:22, 180:25, 181:10, 181:11, 183:5, 183:22, 189:14, 195:7, 199:13, 203:23, 206:15, 207:5, 207:15, 209:16, 209:17

**factor** [13] - 93:11, 104:3, 109:18, 109:21, 128:1, 149:12, 177:21, 178:23, 183:3, 184:18, 190:17, 192:9, 194:5

**factors** [11] - 32:18, 65:12, 104:12, 104:23, 106:24, 108:3, 127:11, 143:24, 169:19, 191:8, 191:21

**facts** [24] - 47:12, 53:13, 63:8, 77:7, 85:6, 90:19, 91:22, 97:24, 101:5, 104:22, 109:11, 109:16, 110:4, 111:7, 153:21, 154:22, 159:8, 159:10, 159:23, 161:10, 161:20, 165:2, 207:20

**factual** [5] - 77:17, 84:21, 93:3, 111:10, 161:9

**factually** [1] - 91:3

**failed** [9] - 79:2, 79:7, 79:19, 80:4, 81:9, 83:11, 84:3, 84:6, 84:7

**failure** [5] - 81:5, 84:4, 129:6, 147:19

**fair** [30] - 15:2, 53:1, 63:12, 64:13, 64:18, 75:4, 83:22, 87:1, 89:6, 98:8, 99:25, 101:6, 102:11, 111:5, 112:19, 141:21, 144:18, 149:14, 156:11, 158:4, 165:17, 178:20, 179:19, 186:3, 186:10, 186:25, 188:22,

188:25, 198:3, 200:3

**Fair** [1] - 112:3

**fairly** [4] - 37:11, 156:10, 160:6, 170:24

**fairness** [1] - 106:16

**fall** [2] - 121:2, 210:15

**familiar** [9] - 36:15, 76:22, 80:14, 89:20, 118:25, 132:13, 196:10, 205:14, 207:5

**familiarity** [2] - 123:20, 123:23

**far** [23] - 7:8, 9:10, 10:12, 26:20, 32:8, 63:3, 63:11, 93:3, 96:6, 97:24, 105:13, 106:11, 113:7, 114:14, 130:21, 137:7, 156:4, 158:23, 160:16, 162:20, 197:16, 198:12

**fashion** [2] - 16:2, 49:7

**fast** [1] - 43:11

**fatality** [1] - 124:12

**fault** [4] - 113:14, 115:8, 117:21, 162:20

**favor** [1] - 109:18

**favorably** [1] - 171:18

**FDLE** [4] - 119:11, 180:1, 180:2, 205:25

**feasible** [1] - 144:1

**Federal** [3] - 6:24, 7:1, 24:23

**fee** [1] - 6:14

**fees** [3] - 6:7, 6:9, 6:18

**feet** [12] - 73:1, 74:9, 74:14, 92:1, 94:3, 94:15, 94:20, 112:3, 114:19, 116:13, 116:15

**fell** [3] - 10:25, 63:16, 151:25

**fella** [2] - 17:21, 99:24

**fellow** [5] - 19:19, 33:10, 117:3, 123:21, 132:18

**fellows** [1] - 208:23

**felonies** [3] - 107:21, 169:8

**felony** [22] - 105:9, 105:20, 106:6, 106:12, 106:14, 106:17, 106:25, 107:7, 108:11, 142:17, 144:22,

145:1, 167:19, 167:21, 167:22, 167:23, 168:17, 168:19, 168:22, 171:13, 202:23

**felt** [6] - 57:14, 77:3, 96:1, 96:9, 132:4, 160:7

**fence** [51] - 28:3, 28:13, 38:13, 61:7, 66:13, 73:12, 73:16, 74:2, 74:3, 74:4, 74:7, 74:8, 74:10, 74:11, 75:18, 90:25, 92:2, 92:4, 94:2, 94:11, 94:17, 95:2, 95:13, 95:15, 95:16, 96:14, 97:19, 97:25, 98:5, 111:12, 111:20, 113:11, 114:5, 114:11, 114:12, 114:21, 114:22, 115:4, 115:9, 115:23, 149:19, 150:7, 150:14, 150:15, 151:13, 152:5, 161:21, 162:2, 201:2

**fenced** [4] - 28:1, 29:3, 29:4, 66:14

**fencing** [1] - 73:17

**few** [16] - 5:22, 19:23, 46:19, 68:19, 79:25, 85:13, 94:3, 94:15, 116:12, 116:15, 117:20, 122:13, 128:11, 143:23, 204:22, 204:23

**fields** [1] - 143:7

**fight** [7] - 98:11, 125:12, 147:13, 148:5, 148:9, 174:25

**fighting** [1] - 162:7

**fights** [1] - 147:12

**figure** [2] - 47:4, 47:7

**figured** [5] - 4:17, 38:4, 110:15, 133:10, 133:12

**file** [13] - 33:15, 33:18, 33:20, 33:22, 34:5, 139:9, 139:12, 139:16, 140:4, 189:4, 189:9, 190:7, 209:13

**files** [1] - 133:16

**film** [1] - 44:22

**filmed** [1] - 44:20

**films** [3] - 44:20, 45:14

**finalized** [1] - 7:12

**Finally** [1] - 197:7

**finally** [1] - 197:7

**finder** [1] - 154:17

**Fine** [1] - 80:22

**fine** [6] - 23:23, 45:18, 135:3, 165:8, 183:10, 208:17

**finish** [3] - 36:13, 75:19, 179:15

**finished** [1] - 195:7

**finishing** [1] - 61:5

**fire** [1] - 42:24

**firearm** [1] - 30:1

**fired** [1] - 77:3

**fires** [1] - 43:9

**first** [34] - 13:3, 15:8, 17:6, 17:15, 18:12, 19:10, 31:25, 34:21, 47:3, 48:14, 51:7, 71:8, 76:10, 77:7, 79:18, 86:20, 88:15, 104:23, 109:15, 125:2, 125:16, 129:24, 130:2, 141:23, 157:3, 157:21, 167:14, 167:18, 168:8, 169:12, 179:16, 193:23, 210:11, 210:12

**First** [5] - 82:24, 108:3, 127:12, 193:3, 199:21

**fits** [5] - 184:9, 186:11, 186:16, 191:21, 191:22

**five** [15] - 14:19, 19:2, 41:1, 120:1, 141:19, 175:22, 177:3, 196:15, 197:4, 197:5, 198:25, 199:4, 199:11, 199:19

**Five** [2] - 141:18, 199:7

**fix** [1] - 196:8

**flag** [1] - 194:6

**flash** [3] - 113:6, 114:7, 116:9

**flashed** [1] - 117:5

**flashlight** [14] - 112:7, 112:8, 112:12, 112:17, 112:23, 113:20, 114:17, 114:18, 117:11, 117:22, 150:6,

172:8, 172:11, 172:20

**flashlight's** [1] - 117:5

**fled** [5] - 29:6, 170:24, 171:1, 171:12, 171:22

**fleshy** [1] - 126:7

**flew** [1] - 20:15

**flight** [2] - 104:2, 182:9

**flip** [1] - 151:23

**Floor** [1] - 2:4

**FLORIDA** [2] - 1:2, 1:9

**Florida** [28] - 1:8, 2:5, 2:8, 19:7, 19:11, 20:5, 20:12, 22:21, 28:6, 69:25, 105:19, 108:9, 118:3, 119:1, 119:20, 120:15, 120:19, 121:17, 122:2, 122:13, 169:6, 169:9, 175:21, 176:22, 179:18, 185:11, 208:13, 208:18

**FLSA** [2] - 26:16

**flury** [2] - 150:22, 150:23

**flush** [1] - 193:12

**flying** [3] - 166:11, 166:24, 210:18

**focus** [1] - 114:17

**focused** [1] - 93:21

**focussing** [1] - 55:1

**folks** [1] - 133:18

**follow** [10] - 49:20, 65:22, 95:9, 120:16, 136:19, 151:9, 164:25, 177:1, 179:14, 180:18

**follow-up** [5] - 95:9, 177:1, 179:14

**followed** [15] - 55:10, 56:8, 57:4, 61:12, 62:1, 62:6, 62:8, 62:22, 65:8, 66:19, 66:21, 70:8, 181:13

**following** [6] - 30:3, 34:24, 41:6, 61:22, 103:13, 212:6

**follows** [2] - 3:4, 161:22

**fool** [1] - 16:23

**foot** [7] - 72:16, 74:10, 74:11, 115:4, 115:5, 148:13, 149:8

**football** [2] - 143:7, 204:23

**footnote** [1] - 68:12

**Force** [1] - 157:12

**force** [31] - 6:1, 9:24, 10:7, 26:25, 27:19, 29:1, 104:14, 111:12, 140:5, 140:19, 140:20, 142:3, 142:8, 167:12, 189:14, 189:18, 190:22, 190:24, 194:8, 195:13, 196:16, 196:22, 197:2, 197:3, 197:6, 198:25, 199:5, 207:1, 207:17

**foregoing** [3] - 212:5, 213:5, 213:16

**forensic** [2] - 13:9, 13:10

**forget** [1] - 198:21

**forgetting** [1] - 129:3

**forgive** [1] - 90:11

**forgotten** [1] - 130:19

**form** [6] - 4:11, 79:1, 155:10, 158:8, 166:3, 189:19

**Form** [2] - 165:7, 170:20

**formed** [1] - 101:4

**former** [5] - 3:16, 21:13, 22:12, 155:4, 157:24

**forms** [3] - 6:4, 28:23, 28:25

**formula** [2] - 106:23, 169:20

**forth** [5] - 16:23, 30:5, 61:17, 138:23, 213:16

**forward** [3] - 72:15, 90:4, 156:22

**forwarded** [1] - 4:9

**fought** [1] - 99:25

**foundation** [3] - 203:19, 205:3

**four** [16] - 5:2, 7:21, 13:4, 14:19, 19:2, 23:16, 23:20, 24:14, 24:16, 25:5, 30:17, 31:10, 31:17, 55:24, 141:18, 141:20

**fourth** [1] - 195:13

**frame** [1] - 40:3

**Frank** [1] - 173:7

**frankly** [7] - 52:14, 69:24, 70:22, 86:8, 127:20, 176:17, 196:25

**fraud** [1] - 107:21

**Frawley** [2] - 35:17, 46:6

**Frawley's** [1] - 45:21

**free** [2] - 4:6, 182:22

**frequented** [1] - 143:21

**frequently** [1] - 166:24

**Friday** [1] - 35:8

**friend** [4] - 36:14, 74:24, 124:7, 157:10

**friend's** [1] - 39:6

**friends** [3] - 23:5, 33:13, 129:12

**fright** [2] - 96:25, 97:3

**front** [3] - 94:5, 136:21, 194:1

**frontal** [4] - 127:12, 127:13, 127:14, 127:22

**Frontal** [2] - 127:15

**frontally** [1] - 127:20

**fronts** [1] - 103:10

**full** [5] - 5:7, 15:25, 42:20, 72:7, 74:1, 213:14

**full-time** [2] - 5:7, 15:25

**fully** [1] - 138:22

**fundamental** [1] - 8:20

**FURTHER** [2] - 198:17, 209:9

# G

**gain** [2] - 77:9, 125:9

**gained** [1] - 41:20

**gainful** [1] - 6:4

**gainfully** [1] - 5:12

**gaining** [1] - 127:19

**gait** [1] - 210:21

**game** [2] - 86:6, 86:9

**gap** [2] - 95:15, 161:22

**garden** [2] - 108:10, 169:17

**gardening** [2] - 173:22, 174:1

**gate** [3] - 28:13, 73:13, 73:14

**gating** [1] - 95:24

**gear** [1] - 104:21

**geared** [1] - 9:18

**gee** [1] - 155:22

**general** [12] - 47:24, 48:13, 53:4, 54:4, 54:7, 54:8, 54:9, 68:8, 70:11, 103:4, 124:5, 160:4

**General** [4] - 4:22, 4:24, 13:20, 13:23

**General's** [4] - 5:3, 5:4, 13:18, 14:7

**generally** [14] - 6:9, 8:10, 27:3, 41:7, 41:23, 47:13, 54:10, 77:4, 94:6, 124:9, 126:11, 135:23, 139:17, 164:14

**Generally** [4] - 75:9, 75:11, 134:9, 135:6

**generated** [5] - 34:13, 34:18, 71:5, 71:11, 140:24

**generating** [2] - 37:19, 71:6

**gentleman** [1] - 99:14

**gentlemen** [2] - 51:3, 105:16

**German** [7] - 96:23, 136:16, 136:25, 138:12, 138:20, 182:16

**Germany** [2] - 41:10, 182:21

**gesture** [1] - 157:19

**gestures** [1] - 198:7

**gesturing** [1] - 125:23

**Gilligan's** [1] - 20:24

**girlfriend** [2] - 203:6, 203:9

**given** [40] - 6:7, 6:10, 24:21, 25:23, 26:9, 30:19, 30:24, 50:3, 50:6, 50:14, 53:21, 57:16, 57:19, 57:22, 60:20, 61:5, 64:15, 65:24, 66:2, 69:2, 74:24, 76:4, 83:10, 96:20, 109:4, 110:1, 114:3, 119:12, 124:19, 143:11, 150:23, 153:7, 155:9, 155:18, 157:16, 162:9, 197:18, 197:21, 197:25

**glimpse** [1] - 112:19

**goal** [1] - 125:8

**God** [1] - 106:2

**God's** [1] - 8:15

**gold** [1] - 167:11

**Golleher** [40] - 37:23, 71:18, 73:3, 73:7, 78:1, 79:20, 79:22, 80:4, 81:7, 81:12, 81:17, 82:25, 83:8, 84:5, 84:16, 85:7, 91:7, 92:1, 97:16, 98:3, 155:4, 156:6, 156:13, 158:1, 158:5, 158:6, 158:13, 158:22,

159:5, 160:1, 164:10, 197:17, 201:14, 202:14, 202:15, 202:20, 203:1, 203:8, 203:11, 203:12

**Golleher's** [3] - 85:5, 200:15, 200:21

**Gonzales** [1] - 24:19

**gosh** [3] - 136:13, 155:23, 171:7

**grab** [3] - 28:18, 89:5, 126:9

**grabbed** [2] - 80:23, 98:16

**grabs** [1] - 80:17

**graceful** [2] - 210:3, 210:5

**grade** [6] - 108:15, 123:10, 168:17, 169:18, 169:22, 169:24

**grades** [2] - 161:17, 168:16

**Graham** [8] - 104:12, 106:21, 108:3, 109:13, 109:20, 110:5, 167:12, 169:19

**grammatically** [1] - 70:15

**Grande** [1] - 1:17

**grandma** [1] - 106:7

**grandmother** [1] - 106:2

**grant** [1] - 61:19

**granted** [2] - 9:3, 187:4

**grave** [1] - 73:15

**gravitated** [1] - 18:5

**GRAY** [1] - 2:7

**great** [13] - 68:16, 72:15, 129:13, 132:7, 133:6, 134:22, 139:20, 172:15, 172:18, 191:3, 205:15, 205:22

**greater** [6] - 73:1, 143:25, 144:1, 171:24, 174:12, 194:17

**greatest** [1] - 210:19

**green** [13] - 133:4, 141:21, 141:22, 181:16, 181:20, 182:6, 182:10, 182:11, 184:11, 185:14, 185:23, 185:25

**greeting** [1] - 28:20

**grip** [1] - 72:12

**gripe** [1] - 62:20

**gripping** [1] - 72:10

**ground** [12] - 44:12, 44:14, 74:9, 100:10, 116:14, 116:21, 124:25, 125:1, 198:2, 198:6, 198:11, 210:24

**Group** [1] - 40:14

**group** [2] - 5:5, 119:11

**groups** [8] - 13:25, 68:12, 121:25, 126:5, 177:25, 178:12, 179:17

**guard** [3] - 145:15, 145:17, 145:21

**guess** [13] - 60:2, 82:23, 93:6, 97:14, 122:6, 145:15, 157:3, 165:9, 169:10, 169:25, 177:1, 192:10, 207:7

**guidance** [1] - 30:24

**Guide** [1] - 8:2

**Guidelines** [1] - 40:15

**gun** [5] - 86:5, 96:5, 100:14, 112:14, 198:4

**gunshot** [4] - 42:15, 42:20, 42:24, 96:7

**gut** [1] - 88:8

**guy** [15] - 35:17, 45:22, 74:1, 83:20, 84:11, 84:12, 87:25, 96:6, 147:11, 155:25, 173:11, 184:24, 193:24, 203:14, 210:14

**guys** [2] - 63:18, 70:18

# H

**Habit** [1] - 38:2

**half** [2] - 74:9, 84:13

**HAND** [1] - 213:21

**hand** [9] - 28:15, 28:17, 28:21, 71:24, 72:9, 94:5, 109:5, 114:13, 125:25

**handgun** [1] - 43:10

**handler** [47] - 17:7, 17:12, 17:14, 17:23, 18:11, 18:13, 18:16, 27:10, 29:2, 49:25, 53:10, 53:14, 53:20, 55:14, 58:23, 59:4, 70:7, 72:18, 75:8,

86:13, 88:6, 88:7, 88:8, 121:9, 129:21, 139:14, 139:19, 140:7, 141:11, 141:16, 163:24, 172:4, 172:5, 172:6, 174:13, 176:12, 179:12, 191:1, 191:10, 191:16, 191:22, 193:21, 194:3, 199:15, 208:5

**handler's** [3] - 138:22, 178:22, 191:2

**Handlers** [1] - 89:23

**handlers** [12] - 41:24, 51:4, 52:12, 55:6, 56:11, 62:5, 68:18, 86:2, 106:22, 177:12, 177:16, 178:3

**handling** [4] - 18:20, 53:22, 142:7

**hands** [10] - 73:24, 81:2, 99:3, 131:5, 153:8, 162:8, 187:2, 201:9, 201:13

**handwritten** [1] - 78:15

**hanging** [1] - 100:9

**happy** [3] - 4:7, 30:10, 136:11

**hard** [6] - 46:25, 79:8, 79:9, 91:11, 190:1, 191:5

**harder** [1] - 148:10

**Harmon** [2] - 25:5, 29:8

**Hartley** [1] - 37:22

**hate** [1] - 70:14

**head** [16] - 28:14, 38:19, 43:3, 114:14, 114:15, 114:19, 115:6, 125:4, 126:12, 127:4, 129:23, 131:6, 139:2, 154:14, 186:24, 187:3

**head-on** [1] - 154:14

**health** [1] - 181:23

**healthy** [1] - 133:4

**hear** [20] - 68:23, 69:23, 72:24, 86:8, 92:24, 93:5, 93:21, 94:25, 95:2, 95:3, 96:10, 96:14, 96:15, 125:22, 156:5, 157:14, 167:1, 172:19, 201:3

**heard** [37] - 41:23, 48:12, 57:15, 57:21,

57:24, 57:25, 64:3, 66:19, 67:3, 67:17, 72:3, 72:23, 78:19, 80:10, 89:20, 89:21, 92:21, 95:5, 96:6, 96:7, 96:13, 96:16, 109:9, 125:16, 133:2, 133:3, 137:16, 156:2, 157:1, 166:10, 174:18, 181:15, 188:3, 188:5, 201:8, 207:10, 207:13

**hearing** [10] - 32:21, 71:20, 72:20, 82:6, 92:5, 93:9, 93:14, 157:4, 195:8, 201:13

**hears** [1] - 153:1

**heat** [1] - 28:7

**heater** [2] - 28:9, 28:12

**heaters** [1] - 28:6

**heavily** [1] - 156:17

**heck** [1] - 138:24

**heel** [1] - 30:6

**hefty** [1] - 42:23

**heighten** [1] - 174:21

**held** [9] - 15:19, 58:11, 71:25, 84:24, 90:15, 105:25, 114:14, 145:6, 151:25

**helicopter** [20] - 19:23, 93:15, 103:4, 103:11, 103:13, 103:14, 103:15, 103:20, 103:22, 104:2, 113:25, 164:5, 164:7, 164:8, 164:12, 164:17, 166:8, 166:11, 167:6, 167:7

**helicopter's** [1] - 164:14

**helicopters** [4] - 30:3, 103:21, 166:24, 167:1

**help** [2] - 93:7, 202:17

**helped** [2] - 178:13, 190:9

**helpful** [1] - 12:25

**Henry** [1] - 38:14

**HEREBY** [1] - 212:4

**Herring** [2] - 25:22, 26:6

**HERRING** [1] - 25:22

**hesitancy** [1] - 147:23, 148:3

**hide** [1] - 153:16

**hiding** [4] - 117:15, 124:23, 152:9, 187:1

**high** [27] - 44:4, 44:7, 45:15, 84:23, 114:14, 115:4, 115:5, 169:24, 178:1, 183:8, 183:9, 185:8, 186:6, 186:20, 186:22, 186:25, 187:12, 187:15, 190:21, 191:5, 192:6, 196:22, 205:11, 206:16, 206:18, 210:6

**higher** [11] - 40:20, 41:15, 43:19, 108:15, 124:8, 125:7, 126:15, 126:16, 136:18, 204:4, 209:21

**highest** [2] - 168:21, 168:22

**highly** [2] - 132:24, 182:6

**Highly** [1] - 129:16

**hill** [1] - 19:5

**himself** [6] - 60:24, 94:11, 98:19, 112:9, 139:11, 201:3

**hind** [1] - 152:1

**hindsight** [2] - 94:14, 113:23

**hint** [1] - 203:17

**hip** [1] - 181:24

**hired** [2] - 104:19, 189:7, 200:9

**history** [11] - 16:10, 32:10, 38:11, 127:4, 142:11, 142:14, 170:13, 171:4, 186:22, 189:4, 190:7

**hit** [3] - 51:13, 154:13, 193:1

**hitting** [1] - 89:7

**hobbyist** [1] - 46:3

**hoc** [1] - 13:24

**HOGAN** [1] - 2:3

**hold** [23] - 43:5, 70:19, 99:4, 99:17, 145:15, 145:17, 145:24, 146:2, 146:13, 146:14, 147:11, 148:9, 152:17, 174:4, 174:5, 174:6, 174:9, 174:17, 189:23, 195:16

**holder** [1] - 86:4

**holding** [2] - 151:14, 210:6

**Holland** [6] - 35:13, 41:9, 42:11, 43:6,

44:21, 46:2

**home** [9] - 26:23, 28:7, 45:18, 56:2, 170:2, 190:9, 192:1, 192:4, 209:17

**Homeland** [1] - 39:22

**homeless** [1] - 143:22

**homemade** [1] - 74:11

**homeowner** [1] - 173:21

**homes** [3] - 173:10, 173:12, 173:13

**homework** [1] - 187:23

**honest** [2] - 132:23, 133:5

**hope** [2] - 58:22, 194:3, 206:11

**hoping** [1] - 89:8

**Hospital** [1] - 37:22

**hot** [1] - 191:2

**hours** [11] - 16:6, 17:2, 26:23, 41:2, 41:3, 49:11, 134:21, 184:4, 193:8, 205:25, 206:10

**house** [2] - 28:1, 28:2

**housewives** [1] - 46:4

**Howell** [33] - 37:23, 71:19, 71:20, 73:3, 73:7, 78:1, 78:2, 79:20, 80:2, 80:4, 81:7, 81:12, 82:25, 83:8, 84:5, 84:16, 85:4, 85:7, 91:7, 97:16, 98:4, 155:3, 156:6, 156:12, 157:25, 158:5, 158:6, 158:13, 158:22, 159:5, 160:1, 197:17, 203:13

**Howell's** [2] - 162:11, 200:15

**human** [1] - 103:20

**humanity** [1] - 88:10

**hundreds** [1] - 134:21

**hundredth** [1] - 204:25

**hunting** [1] - 128:13

**hurt** [1] - 16:24

**hypothetical** [11] - 117:1, 152:3, 152:12, 152:15, 153:12, 153:21, 197:8, 197:14, 197:15, 197:25, 198:9

**I**

**Idaho** [2] - 24:8, 31:4

**idea** [4] - 63:19, 94:1, 94:4, 97:9

**Ideally** [1] - 113:22

**ideally** [1] - 113:24

**identical** [1] - 21:1

**identified** [6] - 51:21, 103:14, 103:15, 132:5, 142:15, 205:10

**identify** [2] - 122:24, 130:14

**identifying** [2] - 84:5, 201:3

**idiot** [1] - 194:4

**ignores** [1] - 153:1

**Ill** [2] - 2:6, 195:14

**illegally** [2] - 67:24, 67:25

**illuminate** [4] - 114:13, 116:19, 117:12, 152:19

**illuminated** [2] - 103:15, 116:16

**illumination** [3] - 113:6, 115:19, 150:16

**imagine** [4] - 17:7, 97:2, 117:14, 128:22

**immediate** [5] - 77:9, 107:9, 108:23, 108:24, 109:12

**immediately** [8] - 42:12, 66:5, 77:13, 83:6, 84:4, 84:8, 88:2, 162:15

**impact** [4] - 5:6, 45:1, 72:1, 75:22

**impacted** [3] - 30:7, 47:22, 47:25

**impaired** [1] - 208:24

**implicate** [1] - 159:14

**importance** [1] - 205:17

**important** [8] - 53:20, 134:15, 134:16, 170:6, 171:14, 176:2, 208:2, 208:3

**imported** [2] - 67:24, 67:25

**impression** [5] - 41:14, 41:18, 41:21, 73:7, 100:22

**impressions** [1] - 42:7

**improper** [2] - 53:5, 196:22

**improperly** [3] -

113:16, 139:21, 141:6

**IN** [1] - 1:1

**in-service** [1] - 17:2

**inability** [1] - 156:4

**inadequate** [3] - 63:21, 64:6, 147:20

**inappropriate** [9] - 53:5, 121:1, 121:5, 123:14, 142:22, 143:12, 160:18, 189:10, 203:18

**inartfully** [1] - 102:19

**inches** [3] - 28:11, 28:21, 157:21

**incident** [34] - 54:20, 61:25, 62:21, 86:20, 118:13, 119:15, 119:25, 120:2, 127:7, 130:13, 130:24, 130:25, 131:3, 135:23, 141:12, 142:2, 142:3, 142:9, 149:23, 160:19, 162:22, 175:22, 175:23, 176:21, 176:25, 178:22, 187:8, 187:12, 187:14, 189:15, 190:9, 191:18, 192:19, 192:23

**inclined** [1] - 143:19

**include** [3] - 10:4, 104:16, 106:14

**included** [8] - 10:7, 11:4, 11:6, 55:14, 104:10, 119:11, 199:25, 200:2

**includes** [1] - 68:5

**including** [3] - 8:5, 53:25, 196:21

**income** [2] - 5:18, 6:8

**inconsequential** [1] - 176:1

**inconsistencies** [1] - 123:24

**inconsistency** [2] - 50:12, 60:5

**inconsistent** [6] - 61:9, 74:23, 134:4, 158:1, 160:7, 200:16

**Inconsistent** [1] - 75:1

**incorporated** [1] - 63:10

**incorrect** [1] - 158:15

**increase** [1] - 134:20

**increasing** [2] - 148:8, 175:18

**incumbent** [3] - 70:6,

70:23, 169:25

**indeed** [11] - 51:25, 61:8, 62:20, 88:22, 96:17, 116:11, 144:12, 151:17, 151:19, 152:3, 171:3

**independent** [2] - 136:21, 139:18

**independently** [3] - 18:2, 73:22, 140:3

**Indiana** [1] - 39:11

**indicate** [1] - 185:6

**indicated** [1] - 95:22

**indicates** [2] - 65:11, 74:2

**indication** [7] - 28:3, 95:4, 101:9, 122:19, 165:13, 188:21

**indicator** [6] - 52:3, 175:25, 176:1, 178:18

**indicators** [2] - 51:17, 192:9

**individual** [3] - 14:1, 27:10, 125:12

**individually** [2] - 1:9, 194:18

**individuals** [1] - 48:25

**industry** [5] - 63:22, 67:14, 147:15, 147:16, 149:17

**infancy** [1] - 7:10

**inflict** [1] - 139:20

**influence** [3] - 190:10, 190:12, 194:9

**information** [17] - 23:1, 47:6, 48:1, 48:6, 48:13, 71:6, 97:17, 121:8, 138:25, 139:3, 139:4, 149:20, 162:18, 169:12, 169:14, 171:22, 203:8

**informing** [1] - 60:24

**infrequent** [1] - 6:6

**Ingle** [2] - 38:9, 49:2

**inherent** [1] - 168:2

**initial** [11] - 55:7, 56:7, 71:7, 103:3, 123:22, 126:21, 205:24, 205:25, 206:10

**injure** [1] - 148:4

**injuries** [1] - 125:6

**injury** [1] - 65:21

**innocent** [1] - 144:2

**inquire** [1] - 129:9

**inquires** [1] - 148:3

**inside** [2] - 113:11, 203:6

**instance** [3] - 171:16, 172:25, 180:6

**instances** [1] - 200:20

**instant** [1] - 86:17

**Instantly** [2] - 162:5

**instantly** [4] - 76:3, 77:5, 162:9, 162:14

**instead** [8] - 69:16, 115:9, 152:4, 153:14, 197:10, 197:12, 198:10, 198:11

**Instead** [1] - 89:7

**insufficient** [1] - 142:21

**insure** [2] - 49:5, 52:20

**insuring** [1] - 52:17

**integrity** [2] - 196:3, 196:4

**intend** [6] - 29:4, 41:15, 70:25, 104:18, 165:6, 203:22

**intended** [9] - 29:18, 33:21, 100:23, 102:7, 102:12, 102:24, 145:19, 203:21

**intending** [3] - 67:16, 110:18, 111:12

**intends** [3] - 28:13, 70:11

**intent** [1] - 68:3

**intention** [1] - 102:9

**intentionally** [7] - 83:16, 102:4, 110:25, 139:5, 152:9, 153:1, 158:12

**Intentionally** [1] - 102:2

**interaction** [2] - 12:19, 13:4

**interchangeably** [1] - 137:21

**interest** [8] - 16:22, 17:22, 37:18, 56:2, 65:18, 106:16, 159:25, 182:4

**interested** [3] - 128:9, 160:5, 213:19

**interesting** [1] - 25:1

**intermittent** [3] - 112:21, 113:6, 113:7

**intermittently** [1] - 112:17

**internal** [1] - 50:18

**internally** [1] - 191:13

**international** [2] - 120:7, 120:11

**International** [4] - 120:13, 179:5, 180:12, 180:19

**internet** [1] - 35:3

**interpretation** [3] - 59:3, 102:11, 104:20

**interpretations** [1] - 104:17

**interpreted** [1] - 52:9

**Interrogatories** [1] - 8:15

**interrupt** [1] - 4:7

**interrupted** [1] - 6:3

**interstitial** [1] - 50:13

**interview** [5] - 78:11, 78:13, 82:5, 94:7, 104:5

**interviewed** [1] - 78:10

**intimidating** [1] - 96:24

**intoxicated** [1] - 143:20

**intriguing** [1] - 114:24

**introduce** [1] - 3:8

**invariably** [2] - 18:4, 44:6

**investigation** [1] - 25:15

**investigative** [3] - 5:2, 8:5, 15:19

**investigators** [1] - 13:9

**investing** [1] - 191:23

**involve** [5] - 12:3, 12:15, 27:15, 204:15, 206:12

**involved** [10] - 11:11, 17:25, 124:4, 145:3, 167:23, 177:13, 177:19, 177:25, 181:6, 183:21

**involvement** [6] - 10:18, 10:19, 14:8, 32:18, 177:10, 177:21

**involves** [2] - 42:13, 69:15

**involving** [7] - 9:19, 11:8, 11:12, 11:19, 12:4, 31:21, 53:25

**iPod** [2] - 173:21, 174:1

**Iraq** [1] - 15:1

**irrelevant** [1] - 63:2

**Irrelevant** [1] - 63:4

**IS** [1] - 213:4

**Island** [1] - 20:24

**issue** [40] - 27:16, 42:8, 46:17, 49:24,

51:13, 61:19, 64:14, 70:21, 75:17, 84:21, 86:25, 106:20, 110:6, 123:12, 130:11, 142:20, 145:14, 150:5, 157:23, 161:9, 162:25, 163:1, 169:15, 171:12, 172:19, 174:8, 176:24, 178:13, 181:4, 181:13, 186:17, 188:7, 188:9, 188:24, 188:25, 194:5, 195:8, 201:23, 207:1, 209:19

**issues** [14] - 14:13, 26:4, 47:1, 47:2, 51:1, 135:17, 135:18, 162:1, 183:8, 183:11, 188:2, 190:25, 195:21, 200:10

**itching** [1] - 113:1

**item** [1] - 192:6

**itself** [5] - 75:18, 76:1, 129:20, 130:3, 181:4

## J

**Jack** [1] - 123:5

**JACKSONVILLE** [2] - 1:2, 1:9

**Jacksonville** [28] - 1:7, 1:8, 2:5, 2:8, 3:14, 21:8, 21:9, 22:5, 23:2, 38:11, 47:16, 49:6, 49:16, 49:21, 50:17, 57:1, 130:11, 162:21, 167:16, 179:22, 183:20, 185:3, 195:4, 196:11, 201:10, 202:16, 209:14

**jail** [1] - 171:9

**James** [2] - 38:14, 131:11

**January** [7] - 4:10, 37:19, 47:10, 48:2, 48:5, 90:10, 176:11

**Japan** [1] - 15:1

**Jax** [26] - 49:22, 49:24, 52:1, 52:18, 54:16, 55:6, 56:10, 56:22, 62:5, 64:14, 85:18, 106:8, 107:5, 123:21, 138:4, 140:6, 146:24,

159:15, 160:18,
167:18, 178:25,
180:14, 181:2,
183:25, 184:16,
188:16

**jerked** [1] - 71:24

**jerking** [1] - 73:1

**Jim** [4] - 185:11,
185:12, 186:15,
188:8

**job** [5] - 4:20, 5:7,
12:22, 121:3, 154:16

**jogged** [1] - 22:9

**Johnny** [1] - 3:13

**JOHNSON** [1] - 2:6

**Jordan** [2] - 213:8,
213:21

**joy** [1] - 204:24

**judge** [1] - 9:1

**Judge** [2] - 5:22, 12:3

**judged** [1] - 43:2

**judges** [9] - 42:10,
42:12, 43:16,
136:22, 186:20,
204:2, 209:21,
210:7, 210:18

**judging** [1] - 22:3

**judgment** [3] - 12:7,
139:18, 191:3

**Judicial** [1] - 145:23

**July** [6] - 37:21, 47:17,
66:3, 139:11,
175:24, 176:21

**jump** [8] - 42:12, 44:9,
139:5, 183:7, 204:3,
206:15, 209:22,
210:12

**jumped** [1] - 72:21

**jumping** [2] - 205:21,
206:18

**jumps** [6] - 27:22,
187:10, 205:11,
209:21, 209:23,
210:1

**June** [1] - 5:11

**jury** [2] - 154:22,
207:16

**Justice** [1] - 14:16

**juveniles** [1] - 143:20

## K

**keep** [7] - 85:19, 90:3,
108:10, 115:24,
128:24, 191:15,
191:16

**keeping** [1] - 67:8

**Keith** [3] - 3:16, 155:4,
189:4

**KEITH** [1] - 1:8

**Ken** [7] - 3:10, 132:18,
181:18, 184:22,
185:18, 186:11,
186:14

**Ken's** [1] - 186:3

**kennel** [3] - 182:12,
184:24, 185:2

**Kennels** [7] - 35:24,
39:10, 132:9,
132:10, 132:14,
132:19, 182:8

**kennels** [1] - 181:20

**KENNETH** [4] - 1:14,
3:3, 212:19, 213:4

**Kenny** [7] - 39:7,
39:21, 40:19, 43:13,
124:7, 181:18, 188:8

**kept** [1] - 69:20

**key** [1] - 51:1

**kick** [2] - 203:4, 203:5

**kicked** [2] - 25:19

**kicking** [1] - 108:14

**kicks** [1] - 183:3

**kids** [5] - 134:8,
135:24, 173:14,
173:17, 173:18

**killed** [3] - 34:20,
193:11, 193:12

**Kimbo** [1] - 38:10

**kin** [1] - 213:17

**kind** [33] - 5:19, 12:9,
12:13, 12:21, 12:22,
47:3, 47:7, 56:23,
62:23, 68:11, 69:12,
89:9, 104:17, 115:3,
132:1, 135:16,
135:17, 135:18,
137:20, 143:23,
167:12, 167:22,
169:11, 171:23,
187:19, 189:24,
189:25, 190:25,
203:16, 207:17,
210:13

**Kind** [1] - 12:24

**kinds** [1] - 88:9

**knee** [1] - 210:2

**kneeling** [3] - 115:24,
116:5, 117:10

**knees** [1] - 150:13

**knife** [1] - 198:4

**knock** [3] - 186:18,
186:19, 205:11

**knocked** [3] - 98:14,
98:25, 151:12

**Knocked** [1] - 98:15

**knocking** [1] - 44:11,
55:25, 210:20

**knocks** [1] - 210:24

**Knoll** [5] - 132:9,
132:10, 132:13,
132:19, 185:1

**knowing** [5] - 76:14,
163:16, 169:10,
170:22, 210:22

**knowingly** [1] -
102:24

**knowledge** [8] - 21:7,
42:7, 49:3, 121:13,
128:16, 170:17,
177:10, 200:25

**known** [4] - 7:6,
85:6, 90:18, 124:12,
143:16, 143:21,
170:13, 185:19,
203:13

**knows** [4] - 91:17,
170:4, 171:11,
172:17

**KNPV** [77] - 35:12,
36:15, 36:16, 39:4,
40:20, 41:8, 41:14,
41:22, 42:1, 42:2,
42:10, 42:13, 43:7,
43:19, 43:20, 44:8,
44:21, 45:4, 47:1,
68:16, 68:21,
123:12, 123:13,
123:16, 123:24,
123:25, 124:1,
124:8, 124:18,
126:14, 126:18,
127:6, 127:23,
128:5, 128:6, 128:9,
128:14, 128:15,
132:8, 136:7,
136:17, 136:18,
180:22, 180:23,
180:24, 181:1,
181:4, 181:10,
181:12, 181:14,
182:13, 183:3,
183:5, 183:7,
183:11, 183:14,
183:22, 185:7,
185:16, 186:4,
186:16, 187:16,
188:1, 188:5,
203:15, 203:17,
204:2, 204:14,
204:20, 204:22,
205:3, 205:18,
206:21, 209:20,
210:25

**Koliboski** [3] - 26:12,
31:6, 31:8

**KOLIBOSKI** [1] -
26:13

**Kunz** [9] - 38:15,

41:23, 131:11,
131:25, 132:1,
185:11, 185:12,
186:15, 188:8

**KUNZ** [1] - 38:15

## L

**L-I-C-H-T-L-I-D-E-R**
[1] - 39:7

**lack** [5] - 15:13, 87:2,
107:10, 134:12,
149:18

**Lake** [7] - 1:17, 3:22,
19:14, 19:19, 20:13,
32:13, 32:17

**LAKE** [2] - 212:3,
213:3

**landlord** [1] - 6:18

**language** [4] - 34:8,
138:1, 138:21,
138:22

**languages** [1] -
138:18

**large** [2] - 66:15,
201:17

**largely** [1] - 80:11

**last** [30] - 6:13, 8:21,
9:4, 10:17, 11:12,
11:20, 11:21, 16:15,
20:12, 23:16, 23:18,
23:19, 24:14, 24:16,
25:4, 30:17, 31:14,
31:20, 32:4, 35:8,
49:11, 54:3, 55:23,
55:24, 82:23, 85:13,
100:11, 117:20,
124:13, 198:21

**latches** [1] - 126:6

**late** [1] - 86:8

**lateral** [1] - 189:23

**latitude** [1] - 53:21

**latter** [2] - 76:5, 201:6

**law** [49] - 6:9, 6:12,
6:17, 6:21, 6:23,
8:20, 9:25, 10:17,
10:18, 13:5, 13:7,
13:12, 13:16, 13:17,
13:21, 14:6, 14:8,
15:5, 15:9, 15:11,
15:17, 15:21, 15:23,
15:24, 16:14, 17:15,
19:6, 19:12, 19:24,
19:25, 20:2, 20:5,
26:3, 30:15, 33:13,
37:12, 37:14, 37:18,
65:7, 104:20,
119:20, 120:15,
124:2, 134:13,

134:23, 165:3,
177:12, 183:15

**Law** [15] - 4:21, 4:23,
5:22, 8:15, 9:13,
12:3, 12:14, 12:18,
118:4, 119:2,
121:17, 175:21,
176:23, 179:18,
194:22

**lawsuit** [3] - 23:15,
207:6, 207:16

**lawsuits** [1] - 141:2

**lawyer** [2] - 63:6,
154:5

**lawyers** [1] - 25:9,
185:21

**lay** [2] - 122:2, 180:4

**laying** [1] - 151:18

**lead** [1] - 149:8

**leaders** [1] - 8:17

**leading** [1] - 70:21,
101:8, 129:11

**leads** [1] - 125:9

**leap** [4] - 43:17, 210:3,
210:5

**leapt** [1] - 72:14

**learn** [1] - 40:16

**learned** [4] - 48:1,
48:6, 49:11

**learning** [1] - 47:23

**leash** [38] - 47:18,
67:6, 67:8, 69:14,
69:20, 69:22, 71:14,
71:23, 71:25, 72:8,
72:10, 72:11, 72:16,
73:2, 73:4, 73:8,
74:21, 75:5, 75:7,
78:4, 84:23, 101:24,
102:8, 110:22,
111:3, 148:13,
148:19, 149:5,
163:4, 163:7, 175:3,
175:6, 175:18,
200:24, 201:1

**leashed** [1] - 148:19

**least** [27] - 20:17,
67:4, 76:21, 88:10,
101:17, 102:9,
108:5, 109:22,
110:25, 130:12,
142:12, 157:24,
158:13, 166:14,
181:6, 185:17,
186:7, 186:18,
188:12, 189:6,
189:11, 196:10,
201:15, 203:7,
204:10, 206:20,
210:10

**leave** [3] - 86:3, 91:20,

95:9

**lecturing** [3] - 6:6, 14:12, 14:13

**led** [1] - 160:21

**LEERB** [1] - 35:20

**Leerberg** [4] - 35:17, 35:19, 35:20, 35:23

**left** [3] - 18:9, 93:10, 133:14

**leg** [1] - 176:12

**Legal** [2] - 8:2, 10:2

**legal** [5] - 63:4, 104:17, 104:20, 106:20, 111:7

**length** [4] - 72:7, 99:4, 99:17, 142:19

**lengthy** [1] - 30:3

**less** [21] - 44:19, 62:6, 63:11, 64:7, 64:8, 66:24, 72:4, 92:1, 121:9, 121:15, 125:11, 125:12, 143:19, 156:18, 156:19, 156:20, 169:22, 199:10, 199:12, 208:25

**lesser** [1] - 160:9

**letters** [2] - 39:17, 136:13

**letting** [1] - 67:7

**level** [15] - 47:14, 48:15, 51:20, 51:21, 52:15, 66:18, 89:13, 125:24, 136:18, 168:20, 168:21, 168:22, 196:22, 197:3

**levels** [1] - 169:9

**licensed** [3] - 6:20, 6:23, 6:24

**Liche** [1] - 39:10

**LICHE** [1] - 39:10

**Lichtlider** [12] - 39:7, 39:8, 39:12, 40:7, 40:17, 41:20, 42:6, 43:13, 43:24, 124:7, 181:18, 188:8

**Lieutenant** [4] - 48:23, 52:15, 191:14, 195:19

**life** [6] - 44:19, 53:14, 100:12, 128:12, 193:12, 193:14

**Life** [2] - 8:14, 9:13

**Lift** [1] - 89:22

**lift** [8] - 80:17, 82:11, 83:17, 84:2, 89:16, 89:19, 89:21, 99:25

**lifts** [1] - 80:18

**light** [18] - 47:5, 65:24,

75:16, 83:25, 87:13, 113:11, 114:13, 114:16, 114:17, 114:20, 115:6, 115:17, 115:19, 116:6, 152:18, 167:15, 174:1

**lighting** [1] - 103:23

**lights** [1] - 27:21

**likelihood** [1] - 174:20

**likely** [10] - 71:1, 71:22, 97:3, 117:11, 146:13, 148:3, 148:4, 153:10, 193:10

**likewise** [1] - 56:21

**limit** [1] - 115:14

**Limited** [1] - 152:15

**limp** [1] - 100:9

**line** [8] - 16:21, 59:6, 83:15, 85:9, 90:25, 114:21, 181:23, 193:17

**Line** [4] - 58:13, 59:18, 60:22, 212:7

**lines** [11] - 56:16, 57:11, 71:15, 93:25, 120:5, 122:4, 129:3, 130:10, 136:4, 137:12, 205:18

**linkup** [1] - 178:5

**list** [6] - 8:21, 25:21, 31:9, 31:13, 38:24, 82:13

**listed** [5] - 7:21, 27:1, 45:10, 48:15, 212:6

**listened** [2] - 35:2, 38:25

**lists** [1] - 34:21

**lit** [1] - 113:25

**literally** [3] - 116:12, 173:1, 189:16

**literature** [1] - 172:14

**litigation** [8] - 11:6, 11:11, 25:18, 26:20, 32:10, 159:25, 160:1, 160:2

**live** [4] - 166:20, 166:22, 167:8, 173:1

**lives** [1] - 193:7

**local** [1] - 122:12

**locally** [1] - 118:5

**located** [1] - 165:14

**location** [1] - 172:18

**logic** [1] - 117:1

**logical** [3] - 66:9, 97:2, 116:24

**look** [37] - 20:25, 25:2, 28:14, 45:17, 68:21, 78:5, 88:22, 90:4,

93:18, 95:16, 103:24, 106:19, 108:3, 114:11, 115:10, 124:16, 125:24, 129:14, 129:19, 130:9, 130:20, 135:18, 135:19, 137:1, 139:16, 140:14, 154:19, 159:24, 160:4, 167:8, 169:21, 179:3, 188:3, 188:6, 195:22, 207:22, 207:25

**Look** [1] - 58:12

**looked** [17] - 33:12, 42:12, 45:13, 73:15, 74:3, 74:7, 93:2, 115:3, 119:6, 153:6, 161:5, 166:11, 166:14, 167:5, 179:4, 191:8, 193:23

**looking** [17] - 49:11, 59:9, 60:24, 73:15, 87:18, 93:16, 97:24, 103:19, 108:2, 109:1, 111:7, 115:9, 150:7, 150:13, 160:25, 206:21

**Looking** [1] - 158:25

**looks** [2] - 117:3, 161:25

**loop** [2] - 72:9, 72:11

**looped** [1] - 72:10

**loose** [1] - 73:18

**lose** [2] - 27:24, 172:11, 176:5

**losing** [1] - 172:15

**loss** [2] - 93:9, 93:14

**lost** [6] - 90:23, 91:3, 91:5, 91:9, 91:10, 91:16

**loud** [1] - 96:13

**loudly** [1] - 65:9

**love** [1] - 106:7

**low** [9] - 115:19, 115:25, 117:4, 152:6, 152:8, 168:17, 169:22, 191:4

**lower** [4] - 125:23, 127:21, 169:18, 210:2

**lowest** [1] - 168:19

**lunge** [1] - 165:12

**luxury** [1] - 113:22

**Lying** [1] - 178:4

**lying** [7] - 116:21, 117:7, 125:1,

158:12, 198:2, 198:6, 198:11

---

## M

---

**magic** [1] - 34:15

**mail** [3] - 33:23, 46:24, 136:11

**mailmen** [1] - 46:4

**mails** [1] - 39:18

**maintain** [4] - 16:25, 19:4, 23:6, 117:14

**maintains** [1] - 148:9

**maintenance** [2] - 52:22, 122:20

**Major** [2] - 132:21

**major** [7] - 7:18, 70:14, 121:6, 121:25, 126:5, 145:18, 181:19

**majority** [5] - 13:6, 15:3, 18:4, 72:17, 123:22

**Malimois** [3] - 96:22, 99:7, 134:24

**Man** [1] - 34:19

**man** [18] - 27:20, 28:19, 29:5, 29:6, 29:25, 30:6, 32:11, 42:22, 84:13, 88:15, 88:16, 100:6, 100:10, 100:13, 113:25, 152:22, 162:8, 170:9

**man's** [3] - 20:20, 30:7, 100:5

**manage** [1] - 202:17

**management** [3] - 5:5, 11:4, 11:5

**mandate** [1] - 195:10

**mandated** [2] - 17:3, 89:13

**mandatory** [5] - 120:16, 120:18, 120:22, 178:15, 180:16

**maneuver** [3] - 80:17, 89:4, 114:7

**manner** [1] - 51:6

**Manther** [3] - 19:18, 20:22, 20:23

**March** [4] - 1:18, 3:1, 40:5, 213:22

**MARKS** [1] - 2:7

**Mart** [2] - 65:7, 143:6

**marvelous** [1] - 178:4

**master** [1] - 18:24

**masterful** [1] - 203:25

**masterpiece** [2] -

182:25, 183:2

**material** [2] - 36:19, 36:23

**materials** [1] - 188:15

**Mathias** [7] - 132:18, 132:22, 181:18, 184:22, 185:19, 186:7, 186:11

**matter** [10] - 3:16, 8:4, 25:14, 26:16, 34:16, 51:12, 51:14, 137:22, 137:24, 160:9

**mattered** [1] - 124:21

**matters** [2] - 7:20, 7:23

**maxillofacial** [1] - 125:6

**Mayfield** [1] - 166:21

**Mayport** [2] - 166:22, 166:23

**McKale's** [1] - 20:25

**mean** [30] - 5:18, 16:19, 19:11, 19:22, 20:10, 27:15, 31:16, 44:20, 52:10, 68:15, 87:1, 87:8, 94:21, 115:10, 121:8, 126:16, 129:5, 136:2, 136:8, 137:23, 138:21, 141:14, 159:13, 160:4, 166:14, 172:2, 175:23, 199:14, 204:19, 209:24

**Meaning** [1] - 97:22

**meaning** [2] - 36:22, 138:13

**meaningful** [1] - 177:10

**meanings** [1] - 68:25

**means** [12] - 68:2, 68:5, 119:19, 128:7, 136:20, 136:23, 137:2, 137:17, 181:17, 181:21, 195:6

**meant** [6] - 16:10, 19:10, 37:24, 41:5, 102:17

**measure** [3] - 53:24, 84:23, 199:8

**mechanical** [1] - 169:20

**Medicaid** [1] - 107:21

**medical** [1] - 37:21

**meet** [3] - 108:5, 109:12, 169:12

**meeting** [3] - 39:20,

40:7, 40:11
**members** [2] - 120:10, 120:25
**membership** [1] - 121:14
**memory** [4] - 22:9, 22:23, 23:19, 24:12
**memory's** [1] - 62:9
**mention** [3] - 86:22, 87:3, 87:14
**mentioned** [10] - 9:4, 14:11, 20:19, 24:18, 25:4, 59:23, 86:11, 87:24, 96:2, 184:21
**mentioning** [2] - 26:14, 87:14
**mere** [4] - 87:20, 123:12, 127:7, 129:4
**Mesa** [8] - 24:7, 26:13, 26:14, 31:4, 31:6, 31:7, 31:8, 31:9
**Meslow** [1] - 70:22
**message** [1] - 93:20
**messages** [1] - 93:18
**met** [3] - 119:19, 132:21, 140:21
**methamphetamine** - 30:2
**method** [1] - 146:2
**METLOF** [3] - 137:13, 137:14
**Michelin** [1] - 42:22
**MIDDLE** [1] - 1:1
**middle** [1] - 190:19
**might** [15] - 20:18, 22:5, 42:18, 47:5, 53:10, 75:23, 97:4, 104:22, 146:9, 151:24, 161:3, 164:25, 197:3
**mild** [2] - 93:9, 175:25
**military** [1] - 167:6
**million** [1] - 192:14
**mind** [11] - 39:25, 48:8, 70:3, 84:22, 86:25, 88:9, 95:20, 122:25, 123:12, 150:21, 150:25
**mine** [2] - 36:14, 157:11
**minimum** [3] - 49:25, 70:7, 143:2
**minor** [2] - 17:19, 28:23
**minute** [3] - 61:19, 84:10, 198:23
**minutes** [5] - 46:14, 56:4, 68:19, 85:13, 117:20
**misdemeanor** [3] -

106:17, 145:2, 171:17
**misdemeanors** [1] - 106:18
**misread** [2] - 199:3, 199:20
**missed** [2] - 30:14, 33:24
**mission** [1] - 134:17
**mistake** [2] - 36:10, 36:25
**mistaken** [1] - 150:18
**mitigate** [1] - 71:2, 170:19
**mitigates** [2] - 170:23, 171:18
**mix** [2] - 138:2, 170:25
**model** [3] - 180:7, 180:8, 180:13
**Model** [1] - 180:9
**moment** [15] - 5:14, 54:3, 55:3, 61:21, 72:1, 73:12, 83:19, 87:24, 88:8, 90:13, 110:10, 111:11, 120:23, 152:3, 210:7
**momentarily** [1] - 114:12
**moments** [3] - 81:8, 81:12, 147:5
**Monday** [1] - 3:1
**money** [5] - 182:9, 186:4, 191:24, 192:7, 192:15
**month** [4] - 16:6, 57:12, 176:8
**monthly** [1] - 56:23, 206:1
**months** [11] - 16:7, 85:4, 119:24, 120:1, 122:18, 128:11, 161:8, 175:22, 177:2, 177:3
**moral** [1] - 8:20
**Morton** [1] - 24:19
**most** [18] - 6:6, 7:24, 10:1, 10:12, 13:6, 15:18, 86:17, 86:18, 96:21, 120:18, 124:7, 129:10, 137:23, 149:15, 157:17, 180:17, 204:1
**Most** [2] - 127:13, 196:21
**moths** [1] - 114:16
**motion** [1] - 74:15
**motivation** [1] - 190:21
**move** [5] - 45:7, 71:11,

114:7, 116:9, 143:9
**movement** [1] - 126:1
**movies** [1] - 44:21
**moving** [7] - 44:5, 61:7, 67:9, 75:17, 111:2, 206:13
**MR** [40] - 3:7, 34:1, 34:6, 35:14, 35:25, 36:5, 36:7, 36:12, 46:12, 46:22, 58:8, 58:12, 69:5, 78:17, 78:22, 82:20, 82:22, 90:16, 100:20, 105:23, 106:13, 154:3, 154:10, 155:10, 155:12, 158:8, 158:11, 165:7, 165:18, 170:20, 171:10, 173:25, 174:2, 189:19, 190:6, 198:15, 198:19, 209:6, 209:11, 211:4
**multiple** [6] - 57:16, 58:1, 60:20, 65:3, 70:24, 143:10
**municipal** [4] - 12:12, 14:9, 15:16, 17:15
**muscle** [2] - 126:5, 126:8
**must** [2] - 98:3, 155:23
**muzzle** [1] - 193:18
**MY** [1] - 213:21

# N

**N-O-P-E** [1] - 21:21
**nailed** [1] - 73:18
**name** [11] - 3:10, 3:13, 20:20, 21:23, 22:8, 35:17, 39:6, 39:11, 133:9, 184:22, 194:21
**named** [2] - 31:16, 176:18
**NAPWADA** [2] - 121:22
**narcotics** [2] - 67:22, 176:18
**narrow** [1] - 28:8, 28:10
**National** [2] - 120:12, 120:6
**national** [11] - 50:2, 63:9, 120:7, 120:11, 120:12, 129:17, 132:20, 177:11, 179:10, 179:13,

181:19
**nationally** [1] - 118:4
**nationwide** [1] - 138:7
**natural** [2] - 8:20, 126:1
**Naturally** [1] - 14:5
**nature** [4] - 103:20, 134:11, 137:8, 143:14
**nauseam** [1] - 169:4
**Naval** [1] - 166:22
**naval** [1] - 166:24
**Navy** [1] - 20:25
**near** [4] - 3:23, 92:2, 92:4, 166:22
**nearby** [1] - 66:6
**necessarily** [9] - 121:11, 126:16, 127:5, 127:8, 127:10, 129:6, 154:16, 159:13, 203:18
**necessary** [3] - 119:21, 120:9, 120:14
**Necessary** [1] - 120:15
**necessity** [2] - 158:14, 188:17
**neck** [16] - 78:9, 99:2, 99:4, 99:16, 124:14, 127:5, 127:8, 129:5, 129:15, 129:23, 130:3, 130:11, 130:13, 130:14, 139:2, 161:16
**need** [30] - 30:11, 40:2, 67:11, 86:17, 89:24, 91:24, 133:23, 143:4, 143:9, 143:10, 143:11, 144:18, 149:11, 181:10, 183:10, 184:6, 186:17, 187:21, 188:9, 188:10, 190:1, 193:5, 193:14, 193:15, 205:9, 205:16
**needed** [4] - 54:21, 123:4, 185:17, 206:5
**needing** [1] - 107:7
**needs** [7] - 69:2, 144:4, 144:6, 159:19, 183:4, 183:6, 204:16
**negative** [2] - 92:22, 204:7
**negligent** [1] - 25:15
**neighborhood** [7] -

27:22, 30:5, 90:21, 103:25, 173:1, 174:14, 175:13
**neutral** [1] - 136:21
**never** [21] - 29:4, 31:24, 43:7, 44:2, 46:24, 96:5, 96:6, 96:12, 96:13, 107:19, 128:15, 129:23, 133:2, 136:3, 156:2, 157:1, 170:4, 182:13, 182:14, 188:4, 193:8
**Never** [1] - 17:22
**New** [1] - 14:22
**new** [4] - 48:5, 48:6, 138:22
**next** [11] - 8:8, 8:9, 8:14, 145:12, 160:11, 160:12, 166:23, 167:7, 167:8, 170:8, 177:7
**night** [16] - 47:23, 66:3, 87:8, 99:15, 99:19, 112:9, 152:21, 155:7, 160:16, 161:21, 173:16, 176:21, 177:4, 190:19, 208:23, 209:16
**nobody** [1] - 164:7
**noise** [2] - 93:15, 95:5
**non** [2] - 168:19, 195:22
**noncompliance** [2] - 147:1, 147:4
**none** [1] - 178:15
**nonviolent** [2] - 106:14, 107:20
**normally** [2] - 165:3, 191:24
**North** [1] - 121:23, 132:24
**Northern** [1] - 68:17
**not...** [1] - 37:1
**notable** [1] - 122:21
**NOTARY** [2] - 212:23, 213:7
**notes** [7] - 39:17, 71:13, 78:15, 78:17, 132:13, 133:17, 146:17
**nothing** [6] - 25:18, 25:25, 26:1, 28:19, 104:7, 213:11
**notice** [1] - 196:25
**nullified** [1] - 66:16
**number** [20] - 8:16, 13:14, 14:8, 15:3, 32:18, 50:2, 51:1,

56:3, 56:4, 59:14,
59:16, 60:10, 62:15,
62:18, 65:12, 91:22,
136:20, 191:8,
206:12
**numbers** [1] - 53:12
**numerical** [1] - 123:5
**nurses** - 13:10

## O

**oath** [1] - 55:5
**obedience** [1] - 182:5
**obey** [2] - 81:9, 84:6
**object** [1] - 54:4
**Objection** [6] -
155:10, 158:8,
165:7, 170:20,
173:25, 189:19
**obligation** [1] - 192:15
**obtained** [1] - 31:20
**Obviously** [1] - 128:3
**obviously** [9] - 31:18,
34:12, 36:18, 58:14,
101:2, 111:8,
159:22, 163:13,
198:5
**occasion** [5] - 23:9,
44:8, 57:7, 57:18,
119:4
**occasional** [1] - 10:16
**occasionally** [3] -
5:14, 57:14, 60:6
**occasions** [4] - 6:8,
20:7, 57:15, 57:23
**occupied** [1] - 169:7
**occurred** [1] - 32:8
**occurrence** [1] - 53:9
**ocular** [1] - 125:5
**odd** [2] - 88:14,
192:14
**OF** [7] - 1:2, 1:9, 1:13,
212:2, 212:3, 213:2,
213:3
**off's** [1] - 89:22
**off-duty** [1] - 26:23
**off-the-record** [3] -
58:10, 90:14, 105:24
**offer** [4] - 37:17,
121:18, 121:19,
122:10
**Office** [11] - 5:3, 11:8,
13:18, 14:7, 16:3,
17:25, 18:14, 21:3,
21:5, 21:9, 202:16
**office** [10] - 5:5, 16:22,
22:7, 65:7, 87:10,
121:22, 123:22,
137:1, 189:16, 194:9

**Officer** [140] - 38:11,
46:20, 47:19, 49:2,
49:19, 57:25, 60:1,
60:23, 62:5, 62:21,
64:2, 66:2, 66:11,
66:16, 72:1, 72:3,
72:6, 72:23, 73:9,
73:18, 74:21, 75:6,
77:8, 77:14, 77:21,
78:1, 78:3, 78:19,
78:24, 79:1, 79:14,
79:17, 79:22, 80:4,
80:7, 80:14, 80:16,
81:6, 81:7, 81:8,
82:3, 82:6, 82:10,
82:11, 83:1, 83:8,
83:15, 83:25, 84:2,
86:19, 87:2, 89:18,
92:1, 94:21, 97:15,
97:16, 99:6, 100:22,
101:7, 101:13,
101:23, 102:14,
102:20, 102:23,
105:2, 109:2, 109:4,
109:6, 109:23,
110:16, 111:1,
111:11, 111:18,
111:20, 112:8,
112:16, 113:9,
115:1, 116:18,
117:21, 119:12,
120:9, 123:21,
126:19, 127:2,
130:1, 135:20,
138:16, 139:8,
140:21, 141:1,
141:5, 148:12,
148:18, 148:22,
149:22, 149:25,
151:3, 151:7, 152:9,
152:13, 152:17,
153:16, 153:18,
153:19, 153:22,
155:3, 155:4, 156:6,
156:15, 160:23,
163:13, 164:10,
168:10, 168:24,
170:9, 170:18,
176:22, 177:9,
183:19, 183:20,
194:14, 197:17,
200:16, 200:21,
201:3, 201:14,
201:17, 202:1,
202:14, 202:15,
202:20, 203:1,
203:8, 206:25
**officer** [78] - 13:16,
15:6, 15:9, 15:11,
15:18, 15:20, 15:24,
16:5, 16:14, 16:24,

18:1, 20:5, 26:20,
26:22, 28:7, 28:12,
28:19, 30:4, 32:11,
32:14, 32:15, 53:10,
53:23, 59:10, 63:6,
64:21, 65:14, 65:15,
65:16, 68:20, 70:11,
71:18, 94:1, 95:4,
97:9, 107:9, 112:10,
114:18, 114:20,
117:17, 117:24,
132:24, 143:2,
144:17, 144:18,
147:1, 157:25,
163:21, 163:25,
165:20, 169:25,
170:3, 171:24,
177:23, 189:6,
189:11, 190:15,
191:17, 192:2,
192:4, 192:17,
192:24, 192:25,
193:2, 193:11,
193:17, 194:12,
194:14, 194:15,
195:22, 196:6,
199:14, 201:4,
208:15, 208:22,
209:1
**Officer's** [2] - 8:22,
156:17
**officer's** [8] - 32:19,
140:12, 144:15,
145:6, 193:7,
193:14, 195:17
**officers** [52] - 3:16,
12:19, 12:21, 13:6,
13:7, 13:8, 13:12,
13:17, 25:19, 26:6,
27:6, 27:23, 27:25,
28:24, 30:1, 30:15,
33:2, 37:20, 57:1,
57:24, 59:10, 67:17,
77:19, 79:16, 92:19,
104:6, 105:6,
108:25, 110:9,
114:9, 147:8, 149:7,
153:5, 155:5,
155:16, 155:17,
157:24, 161:8,
161:13, 164:6,
165:14, 166:2,
168:6, 170:1,
172:10, 181:6,
184:17, 193:5,
193:14, 202:8, 205:5
**Officers** [6] - 37:22,
38:9, 79:20, 84:4,
84:16, 146:24
**official** [4] - 1:7,

13:22, 145:9, 213:21
**often** [7] - 13:22,
23:13, 46:5, 69:15,
125:20, 126:2,
127:22
**old** [5] - 19:3, 34:14,
73:15, 88:15, 173:3
**Old** [1] - 9:15
**older** [1] - 84:12
**once** [15] - 4:4, 9:2,
16:20, 19:13, 19:17,
30:8, 44:11, 44:15,
45:1, 57:11, 96:4,
100:5, 119:11,
197:18, 197:21
**one** [143] - 3:15, 7:17,
7:19, 7:22, 8:8, 8:9,
9:17, 10:1, 11:9,
17:7, 22:9, 23:2,
23:14, 26:13, 26:24,
27:2, 28:4, 29:7,
29:11, 29:12, 29:14,
29:21, 30:16, 31:1,
36:13, 41:14, 42:16,
43:15, 44:24, 45:3,
45:24, 46:12, 46:18,
48:14, 49:10, 49:19,
49:25, 55:12, 58:8,
59:14, 61:14, 65:19,
67:14, 68:15, 69:23,
71:8, 71:9, 72:7,
74:13, 75:20, 76:21,
84:19, 85:8, 86:22,
87:5, 87:7, 87:8,
87:9, 87:11, 87:15,
90:22, 92:11, 92:15,
97:1, 100:22,
103:21, 103:22,
105:22, 107:20,
109:8, 109:9,
114:11, 115:13,
118:18, 119:7,
119:22, 125:23,
129:12, 129:13,
129:14, 130:16,
130:18, 131:8,
133:16, 136:17,
137:12, 137:25,
138:12, 138:17,
143:8, 146:11,
147:23, 155:7,
156:21, 157:24,
158:11, 159:1,
159:7, 159:8, 160:6,
160:15, 160:16,
162:19, 165:10,
166:1, 166:3, 166:6,
166:8, 169:20,
172:9, 173:16,
175:18, 175:25,

178:18, 178:23,
181:19, 182:6,
182:8, 182:14,
184:9, 186:11,
191:14, 192:19,
192:25, 193:1,
195:3, 197:2,
198:12, 199:15,
204:1, 204:10,
205:5, 205:9,
205:12, 206:11,
206:20, 206:25,
208:23, 210:10,
210:12
**One** [14] - 9:21, 44:22,
47:13, 67:5, 82:22,
104:10, 112:6,
125:18, 142:17,
143:7, 156:24,
176:23, 184:19,
206:6
**one's** [2] - 18:7, 86:19
**ones** [5] - 27:1, 31:3,
45:6, 154:4, 202:10
**ongoing** [1] - 29:11
**online** [1] - 14:25
**oOo** [1] - 2:11
**open** [4] - 61:16,
73:25, 150:14,
150:15
**opening** [5] - 73:25,
113:10, 115:10,
150:14, 201:12
**operated** [2] - 49:7,
142:10
**operates** [1] - 39:9
**operation** [1] - 51:2
**operations** [5] - 49:3,
50:19, 51:5, 53:25
**opinion** [46] - 47:17,
47:20, 52:1, 65:24,
69:2, 70:5, 71:16,
75:24, 76:1, 76:2,
76:6, 76:7, 76:8,
76:13, 77:17, 79:1,
81:9, 82:23, 82:25,
85:10, 85:12, 90:7,
94:24, 100:21,
101:4, 105:15,
109:11, 111:6,
111:10, 120:8,
121:18, 121:19,
122:10, 128:6,
132:9, 137:19,
148:22, 158:24,
159:14, 160:14,
162:1, 175:7, 189:5,
189:8, 189:13,
196:17
**opinions** [30] - 4:14,

10:10, 40:17, 47:3, 47:5, 47:13, 47:25, 48:3, 48:14, 48:20, 51:8, 71:5, 71:11, 71:12, 75:20, 93:8, 103:9, 104:3, 104:10, 122:4, 122:7, 123:17, 131:14, 132:16, 133:22, 137:4, 139:10, 140:25, 146:21, 180:25

**opportunity** [7] - 18:1, 35:11, 45:17, 131:4, 161:24, 166:16, 166:18

**opposed** [7] - 61:13, 84:12, 145:1, 151:12, 168:20, 171:19, 173:2

**option** [1] - 89:17

**oral** [2] - 142:24, 145:4

**ORAL** [1] - 1:13

**Orange** [5] - 19:14, 19:17, 20:20, 21:3, 21:4

**Orchard** [5] - 132:8, 132:10, 132:13, 132:19, 185:1

**order** [7] - 7:24, 47:4, 83:18, 94:11, 161:11, 172:5, 194:10

**ordered** [1] - 190:8

**Orem** [1] - 26:7

**organization** [2] - 121:6, 179:13

**organizations** [6] - 118:6, 120:11, 120:25, 121:15, 122:14, 179:10

**original** [1] - 37:20

**originally** [1] - 71:11

**Orthogonal** [1] - 40:15

**ORTHOGONAL** [1] - 40:15

**otherwise** [2] - 164:25, 213:17

**ought** [2] - 66:1, 90:8, 144:13, 146:21, 193:4, 206:21

**ourself** [1] - 38:6

**outcry** [1] - 33:4

**outing** [4] - 47:22, 75:21, 76:3, 77:7

**outline** [2] - 7:12, 46:19

**outside** [8] - 22:10, 28:6, 28:9, 66:13,

---

93:10, 166:11, 166:12, 167:5

**outstanding** [1] - 132:22

**overall** [1] - 178:21

**overarching** [1] - 157:18

**overcome** [1] - 100:14

**overhead** [1] - 164:5

**oversaw** [1] - 21:4

**overseas** [2] - 15:2, 15:3

**overseeing** [1] - 51:22

**oversight** [6] - 5:1, 11:4, 11:6, 11:10, 12:15, 13:15

**Overton** [2] - 25:5, 29:8

**overusing** [1] - 112:8

**overview** [1] - 14:17

**overwhelming** [2] - 65:19, 157:18

**owed** [2] - 26:21

**own** [9] - 18:7, 18:8, 56:22, 99:16, 124:16, 126:21, 146:9, 157:7, 184:3

**owned** [1] - 87:9

**owns** [4] - 37:16, 39:9, 184:24, 185:2

---

# P

**P-1** [1] - 136:18

**P.A** [1] - 2:7

**p.m** [2] - 3:1, 211:6

**Page** [14] - 25:3, 58:7, 59:18, 60:16, 60:18, 60:22, 61:23, 91:21, 117:25, 122:17, 161:1, 201:6, 203:1, 212:7

**page** [2] - 14:18, 133:17

**PAGE** [1] - 2:12

**paged** [1] - 191:19

**pages** [4] - 14:19, 14:20, 200:21, 213:16

**paid** [3] - 5:24, 6:10, 19:12

**pain** [1] - 76:25

**panel** [2] - 73:17, 74:2, 161:5

**paper** [1] - 34:20

**Paragraph** [1] - 25:3

**paragraph** [3] - 34:21, 91:22, 161:5

**paraphrasing** [2] -

---

83:18, 115:8

**park** [1] - 141:19

**PARK** [2] - 1:19, 213:6

**parked** [1] - 28:10

**parrots** [1] - 67:24

**Part** [2] - 42:13, 42:19

**part** [28] - 5:5, 5:19, 13:6, 16:18, 17:24, 19:21, 45:6, 56:18, 64:13, 65:23, 68:2, 68:11, 68:12, 69:25, 75:12, 106:10, 115:23, 122:5, 122:7, 145:8, 160:8, 161:2, 163:24, 173:5, 173:8, 174:12, 201:6, 201:17

**part-time** [3] - 5:19, 16:18, 17:24

**participant** [1] - 134:19

**participate** [6] - 6:16, 52:20, 56:11, 129:10, 177:15, 179:9

**participated** [1] - 200:5

**participation** [1] - 52:16

**particular** [13] - 12:9, 65:23, 121:7, 121:20, 122:24, 139:20, 143:18, 145:11, 165:15, 174:7, 177:4, 186:12, 210:12

**Particularly** [1] - 142:6

**particularly** [6] - 29:2, 49:4, 50:23, 70:13, 96:22, 164:21

**parties** [3] - 11:11, 160:2, 213:18

**partner** [1] - 18:3

**parts** [2] - 91:23, 201:16

**party** [2] - 23:15, 159:25

**passageway** [1] - 28:8

**passed** [3] - 106:3, 118:11, 128:10

**passes** [1] - 197:5

**passive** [2] - 198:5, 198:8

**past** [5] - 4:1, 10:20, 106:2, 183:23, 199:16

**path** [1] - 18:7

**patrol** [21] - 13:8, 14:14, 15:12, 15:18,

---

15:20, 15:24, 16:16, 16:24, 17:5, 18:2, 23:12, 26:18, 38:10, 121:25, 176:18, 176:19, 193:3, 193:5, 193:7, 193:24

**Patrol** [2] - 193:5, 193:14

**patrolled** [1] - 18:3

**pattern** [2] - 195:24, 195:25

**patterns** [1] - 140:13

**pauses** [1] - 90:11

**paws** [1] - 210:6

**pay** [1] - 118:14

**payer's** [1] - 192:15

**paying** [3] - 27:7, 192:3, 192:5

**PD** [7] - 49:22, 49:24, 52:19, 106:8, 138:4, 178:25, 179:23

**Peace** [1] - 8:22

**peak** [4] - 14:7, 116:8, 116:16, 116:20

**peculiarities** [1] - 143:17

**peers** [1] - 207:16

**people** [48] - 13:16, 42:4, 46:4, 68:2, 68:25, 76:24, 91:8, 96:11, 96:12, 96:21, 96:22, 96:23, 103:19, 103:23, 114:19, 116:8, 125:10, 125:12, 125:21, 126:3, 126:4, 126:7, 129:11, 131:22, 133:3, 136:19, 143:22, 149:15, 160:6, 160:7, 167:8, 170:14, 173:1, 174:14, 175:13, 178:5, 178:11, 178:12, 182:1, 182:9, 187:25, 188:7, 188:16, 191:6, 195:18, 203:24, 210:4, 210:8

**People** [1] - 114:15

**people's** [1] - 173:2

**per** [1] - 17:2

**perceived** [4] - 73:10, 155:6, 158:18, 158:21

**perceives** [1] - 162:3

**percent** [1] - 111:22

**perceptions** [1] - 158:20

---

**perceptual** [1] - 200:10

**perfect** [1] - 58:23

**perfectly** [2] - 45:18, 155:16

**perform** [5] - 67:16, 121:9, 176:10, 176:17, 203:25

**performance** [7] - 122:22, 124:1, 144:19, 161:19, 162:25, 195:17, 196:6

**performing** [2] - 80:16, 151:1

**perhaps** [17] - 3:20, 4:6, 28:11, 30:23, 44:18, 52:1, 61:8, 65:25, 67:4, 73:8, 79:24, 87:1, 87:4, 90:7, 90:8, 95:5, 101:9

**perimeter** [1] - 202:11

**period** [32] - 10:25, 11:25, 43:16, 50:12, 50:13, 50:20, 55:10, 55:16, 55:17, 55:18, 55:25, 56:9, 56:13, 57:4, 60:9, 61:4, 62:8, 62:22, 65:3, 66:12, 66:22, 70:8, 140:9, 155:14, 156:7, 159:19, 176:14, 176:16, 191:17, 197:22, 198:13, 199:7

**Period** [1] - 11:20

**periods** [2] - 15:19, 176:6

**permanent** [1] - 13:24

**permission** [1] - 21:16

**permitted** [1] - 119:18

**person** [38] - 27:15, 39:5, 43:7, 44:3, 59:3, 65:21, 68:4, 69:13, 71:1, 87:21, 91:12, 92:19, 102:15, 106:5, 111:18, 111:23, 112:1, 112:2, 124:3, 125:9, 127:17, 142:13, 143:20, 160:7, 161:24, 161:25, 190:3, 190:18, 190:19, 190:21, 190:22, 190:24, 190:25, 191:3, 198:3, 198:5

**personal** [5] - 39:20, 42:1, 145:3, 157:10,

200:4

**personally** [2] - 192:16, 193:9

**personnel** [1] - 139:25

**persons** [1] - 144:3

**perspective** [8] - 33:13, 102:6, 109:23, 110:1, 110:17, 111:1, 111:4, 192:12

**pertain** [4] - 7:6, 9:5, 9:14, 24:14

**pertained** [1] - 9:15

**pertaining** [2] - 24:12, 33:15

**pertains** [1] - 155:1

**PH-1** [3] - 136:8, 136:10, 136:23

**phenomenon** [1] - 96:18

**philosophies** [2] - 70:14, 145:19

**philosophy** [1] - 174:17

**Phoenix** [15] - 23:25, 24:2, 24:19, 27:3, 27:4, 29:11, 29:15, 29:22, 31:2, 31:3, 173:7, 173:14, 178:6, 178:7

**phone** [5] - 93:17, 151:14, 151:20, 151:21, 151:25

**photographs** [1] - 38:13

**phrase** [1] - 145:24

**physical** [1] - 40:20

**physically** [9] - 47:19, 71:14, 73:8, 73:19, 77:22, 77:23, 80:13, 81:2, 100:15

**physiological** [1] - 126:1

**picked** [3] - 75:9, 81:1, 83:2

**picking** [2] - 80:7, 83:10

**pictures** [6] - 72:2, 73:15, 74:4, 74:5, 95:17, 117:4

**piece** [1] - 64:25

**pitch** [1] - 27:24

**place** [13] - 35:23, 39:24, 69:21, 70:12, 98:23, 134:15, 134:17, 143:15, 143:22, 158:7, 171:24, 198:24, 210:6

**places** [2] - 60:17,

208:20

**placing** [1] - 50:4

**plains** [1] - 56:1

**Plaintiff** [2] - 1:4, 2:2

**plaintiff** [11] - 31:19, 31:21, 31:24, 32:4, 32:22, 33:11, 34:10, 34:11, 38:1, 81:4

**plaintiff's** [5] - 27:19, 33:12, 37:24, 37:25, 38:7

**plaintiffs** [2] - 38:2, 154:15

**planning** [1] - 133:13

**plants** [1] - 67:25

**play** [7] - 47:3, 103:8, 177:21, 182:4, 190:14, 191:20, 193:2

**played** [3] - 99:24, 135:24, 185:10

**playground** [1] - 30:4

**playing** [2] - 111:9, 173:15

**plays** [1] - 47:8

**pleased** [1] - 204:11

**pocket** [1] - 95:25

**point** [49] - 15:4, 15:6, 17:7, 22:9, 34:22, 42:17, 43:11, 55:12, 59:24, 60:11, 62:3, 62:14, 66:8, 67:25, 87:19, 90:12, 90:16, 91:21, 91:24, 92:1, 92:3, 93:1, 94:20, 95:23, 97:18, 97:21, 98:23, 109:2, 119:22, 121:12, 124:11, 125:10, 133:11, 133:15, 137:12, 138:4, 145:4, 148:25, 149:18, 152:18, 153:5, 153:8, 153:11, 161:22, 163:21, 165:8, 206:9

**pointed** [1] - 132:3

**pointing** [1] - 193:19

**points** [4] - 136:21, 151:5, 186:5

**police** [93] - 6:2, 7:6, 8:12, 9:5, 9:10, 9:18, 9:19, 9:21, 9:23, 9:24, 10:6, 10:8, 10:13, 10:18, 11:12, 11:19, 12:4, 12:16, 12:19, 12:20, 14:20, 15:16, 17:22, 18:5, 19:22, 20:3, 24:12, 25:16, 26:20, 26:22,

29:1, 32:12, 38:12, 40:23, 49:20, 51:2, 53:5, 53:8, 53:10, 53:24, 53:25, 54:1, 54:5, 59:10, 63:6, 65:1, 68:9, 68:19, 69:12, 94:1, 94:2, 95:4, 99:11, 103:24, 109:18, 119:5, 119:6, 120:7, 123:14, 124:3, 124:12, 125:14, 131:3, 132:24, 134:20, 134:22, 136:2, 142:10, 155:5, 166:13, 178:19, 179:24, 187:18, 187:23, 188:2, 188:12, 191:17, 191:22, 194:15, 199:14, 200:6, 201:4, 201:11, 203:20, 204:5, 204:12, 204:16, 205:7, 205:16, 205:22, 208:14

**Police** [44] - 1:7, 1:8, 3:15, 8:3, 13:25, 14:1, 17:16, 17:18, 17:23, 21:10, 22:6, 32:13, 38:12, 47:16, 49:6, 49:16, 50:18, 52:1, 107:6, 120:13, 121:23, 121:24, 130:11, 146:24, 159:15, 160:18, 162:21, 167:16, 178:7, 179:6, 179:22, 180:7, 180:12, 180:14, 180:19, 181:2, 183:20, 184:16, 185:3, 188:16, 195:5, 196:11, 201:11, 209:14

**policies** [8] - 38:12, 49:4, 49:5, 52:24, 53:8, 54:11, 106:16, 159:15

**policy** [83] - 12:23, 14:5, 14:7, 49:15, 49:18, 50:8, 50:12, 50:19, 51:1, 52:2, 52:4, 52:5, 52:6, 52:9, 54:5, 54:17, 54:19, 54:25, 55:2, 59:15, 60:24, 60:25, 61:1, 61:13, 62:1, 62:14, 62:19, 63:1, 63:10, 63:11, 63:15,

63:18, 63:20, 64:1, 64:6, 64:14, 65:2, 65:24, 66:15, 66:23, 85:18, 85:20, 85:23, 105:8, 105:10, 106:8, 106:11, 107:1, 107:15, 107:16, 140:6, 140:17, 140:18, 142:1, 142:5, 142:7, 142:16, 142:21, 142:23, 142:24, 142:25, 143:1, 143:13, 144:5, 144:7, 144:16, 144:23, 145:9, 146:6, 146:22, 159:19, 180:8, 180:9, 180:12, 180:13, 180:15, 180:20, 199:13, 208:8, 208:9, 209:5

**policy's** [1] - 61:21

**political** [1] - 33:4

**poor** [2] - 192:21, 193:24

**pop** [1] - 71:9

**posed** [1] - 168:9

**position** [23] - 5:10, 12:14, 13:19, 50:4, 68:3, 70:12, 91:8, 91:12, 92:24, 94:23, 98:15, 99:1, 115:24, 116:5, 116:20, 117:14, 118:22, 135:19, 136:1, 139:13, 160:8, 164:22, 208:6

**positive** [2] - 204:7, 205:3

**possessed** [1] - 49:3

**possession** [1] - 38:20

**possibility** [1] - 193:13

**possible** [13] - 21:12, 53:9, 53:12, 65:9, 72:15, 74:14, 74:16, 88:3, 88:24, 96:14, 96:19, 100:16

**possibly** [1] - 72:19

**post** [2] - 73:19, 142:9

**potential** [2] - 144:2, 165:21

**potentially** [1] - 189:10

**potting** [1] - 108:10

**poverty** [1] - 6:17

**power** [1] - 72:15

**practice** [17] - 6:9,

6:12, 6:21, 6:23, 7:2, 10:16, 61:11, 62:12, 107:5, 107:13, 107:14, 121:6, 144:9, 146:24, 149:4, 177:24, 178:17

**practiced** [2] - 10:17, 62:10, 144:8

**practices** [1] - 54:6

**preached** [1] - 146:11

**Precisely** [1] - 86:16

**predetermined** [1] - 42:25

**prefer** [3] - 43:16, 108:7, 126:11

**preferable** [1] - 115:21

**premise** [1] - 70:11

**prepare** [2] - 9:1, 46:18

**prepared** [7] - 23:19, 24:20, 34:13, 46:19, 118:6, 121:12, 156:14

**preparing** [2] - 45:11, 70:2

**prerequisite** [1] - 142:18

**presence** [1] - 103:4

**present** [10] - 12:14, 25:17, 47:16, 57:8, 57:11, 60:1, 106:9, 108:23, 109:11, 128:6

**presentation** [1] - 37:9

**presented** [8] - 28:21, 108:24, 109:17, 125:2, 125:17, 127:22, 187:5

**presenting** [5] - 19:21, 127:1, 172:11

**presently** [4] - 4:19, 5:24, 23:24

**preserve** [2] - 196:3, 196:5

**Press** [1] - 8:12

**pressure** [1] - 33:4

**presume** [4] - 3:25, 9:13, 40:12, 104:17

**Pretrial** [1] - 8:2

**pretrial** [2] - 8:4, 8:11

**pretty** [16] - 19:9, 31:10, 77:7, 83:23, 91:11, 117:3, 132:9, 139:18, 140:12, 150:10, 166:24, 175:25, 176:1, 176:15, 208:2, 208:3

**previous** [2] - 29:21,

122:18
**previously** [4] - 24:1, 24:6, 24:7, 31:3
**primarily** [1] - 15:2
**primary** [3] - 4:20, 19:13, 40:24
**primed** [1] - 163:19
**principle** [3] - 122:9, 156:10, 176:19
**principles** [2] - 10:13, 10:15
**printed** [1] - 36:22
**prison** [2] - 30:9, 156:1
**privileges** [1] - 192:3
**probable** [2] - 9:11, 175:16
**problem** [14] - 83:21, 128:7, 130:4, 130:8, 133:5, 138:18, 160:16, 178:4, 196:7, 197:11, 197:22, 205:21, 206:22, 209:15
**problems** [2] - 159:14, 205:23
**Procedure** [2] - 8:2, 8:10
**procedure** [4] - 8:4, 8:11, 9:17, 89:18
**process** [4] - 56:10, 56:12, 173:8, 193:3
**produce** [1] - 34:2
**produced** [6] - 35:12, 35:16, 35:22, 45:5, 45:15, 45:24
**produces** [1] - 45:25
**profess** [1] - 128:18
**professionalism** [3] - 134:20, 178:1, 178:19
**profile** [1] - 115:25
**program** [4] - 11:8, 11:10, 21:4, 119:5
**progress** [1] - 122:16
**project** [1] - 88:5
**prolong** [1] - 148:4
**promote** [2] - 178:1, 178:3
**prong** [6] - 108:5, 108:20, 108:22, 109:13, 110:5, 169:12
**prongs** [1] - 77:3
**pronounce** [1] - 136:12
**proper** [7] - 51:2, 52:21, 52:24, 114:6, 150:16, 174:23, 203:20

**properly** [10] - 8:25, 9:2, 52:23, 66:20, 66:21, 118:23, 122:23, 123:1, 139:11, 139:21
**proposition** [1] - 147:10
**Prosecutors** [1] - 8:3
**protocols** [2] - 36:16, 49:19, 52:24, 185:17
**prove** [1] - 92:22
**provide** [7] - 5:1, 5:21, 22:3, 70:23, 104:19, 159:19, 178:3
**provided** [12] - 22:4, 24:3, 24:17, 34:9, 34:10, 34:24, 34:25, 46:21, 51:19, 118:1, 118:18, 123:22
**providing** [5] - 5:13, 47:14, 55:14, 55:15, 65:3
**Provo** [3] - 17:16, 17:18, 17:23
**psychological** [1] - 96:17
**psychologist** [1] - 97:1
**psychosensory** [1] - 200:10
**public** [8] - 33:4, 65:17, 65:18, 108:25, 134:17, 168:1, 168:9, 196:4
**PUBLIC** [2] - 212:23, 213:7
**Public** [6] - 12:11, 22:16, 25:6, 25:8, 26:7, 138:9
**publications** [1] - 37:1
**published** [7] - 7:16, 7:18, 7:19, 7:25, 8:12, 8:22, 10:2
**publisher** [1] - 7:18
**publishers** [1] - 7:16
**pull** [10] - 68:20, 73:24, 77:22, 84:20, 89:22, 121:22, 122:1, 160:24, 161:14, 162:13
**pulled** [2] - 94:10, 100:14
**pulling** [5] - 78:3, 78:8, 82:10, 100:3, 201:20
**pumping** [1] - 125:21
**punch** [1] - 99:25
**punctured** [1] - 124:17
**puppy** [1] - 182:4

**purchase** [2] - 133:12, 205:24
**purchased** [1] - 46:8
**purchases** [1] - 135:4
**purport** [1] - 20:4
**purpose** [3] - 40:6, 40:9, 134:21
**purposely** [1] - 153:16
**purposes** [2] - 58:5, 200:8
**pursued** [1] - 27:21
**pursuit** [2] - 27:21, 30:3
**put** [23] - 13:13, 68:2, 76:25, 94:4, 103:21, 103:22, 115:6, 126:20, 136:3, 136:16, 143:5, 144:9, 144:11, 144:13, 158:5, 161:3, 165:9, 176:11, 190:18, 194:12, 204:21, 205:6, 210:13
**Put** [1] - 19:3
**Putting** [1] - 86:19
**putting** [1] - 87:17

## Q

**qualification** [4] - 64:20, 121:14, 140:22, 169:11
**qualifier** [1] - 12:6
**qualifies** [3] - 108:4, 108:20, 109:12
**qualify** [3] - 110:4, 154:14, 187:21
**qualitative** [1] - 167:24
**quality** [6] - 45:15, 167:25, 168:1, 168:2, 168:4, 171:14
**quantified** [1] - 79:23
**quantitative** [1] - 167:25
**questionable** [1] - 190:22
**questions** [19] - 46:19, 88:9, 128:4, 148:16, 150:22, 150:24, 154:3, 154:5, 154:11, 154:12, 167:13, 170:1, 170:4, 176:23, 190:1, 191:12, 194:13, 198:15, 211:5
**quibble** [5] - 51:10,

80:23, 85:23, 106:10, 121:5
**quick** [3] - 88:2, 112:19, 113:11
**quicker** [1] - 89:3
**quickly** [8] - 28:22, 31:10, 88:15, 88:24, 116:6, 150:25, 176:15
**quiet** [1] - 147:6
**quite** [5] - 20:9, 38:8, 72:4, 128:23, 204:13

## R

**racial** [2] - 8:19, 28:25
**radio** [2] - 164:11, 169:1
**raise** [2] - 141:1, 194:13
**raised** [1] - 86:25
**raises** [2] - 192:22, 194:6
**range** [4] - 100:13, 137:10, 137:11, 186:5
**rank** [1] - 15:20
**rare** [2] - 6:8, 85:21
**rasa** [1] - 182:25
**rated** [1] - 182:6
**rather** [2] - 6:10, 72:8
**rating** [1] - 137:14
**re** [4] - 48:6, 83:21, 147:22, 148:3
**re-analysis** [1] - 48:6
**re-bite** [1] - 147:22
**re-engagement** [1] - 83:21
**re-inquires** [1] - 148:3
**reach** [7] - 84:7, 89:4, 100:7, 106:20, 159:13, 161:11, 188:7
**reached** [5] - 10:10, 49:9, 93:4, 98:16, 162:19
**reacted** [1] - 90:25
**reaction** [1] - 193:23
**read** [31] - 15:5, 17:7, 47:9, 50:24, 55:3, 60:7, 67:2, 75:23, 78:19, 82:12, 85:2, 90:11, 105:17, 107:4, 107:17, 107:22, 115:1, 115:5, 134:10, 146:15, 165:10, 166:19, 172:14, 194:24, 199:2,

200:20, 201:5, 201:16, 212:4
**reading** [9] - 49:13, 50:16, 71:21, 73:21, 87:18, 108:23, 130:23, 166:16, 201:21
**real** [6] - 10:21, 85:20, 95:16, 104:3, 138:1, 190:1
**realize** [4] - 85:3, 133:19, 133:20, 161:9
**realizes** [1] - 161:23
**really** [28] - 6:7, 19:11, 19:24, 30:22, 51:13, 63:2, 69:11, 91:12, 111:6, 128:23, 137:17, 137:23, 137:24, 165:5, 165:6, 177:13, 178:17, 179:8, 181:8, 181:13, 185:16, 197:7, 204:5, 204:8, 204:11, 207:22, 208:19, 210:12
**Really** [1] - 179:9
**rear** [3] - 44:7, 98:15, 130:16
**reason** [18] - 33:4, 40:19, 80:22, 101:23, 117:19, 118:22, 120:2, 122:9, 135:20, 135:25, 163:14, 165:19, 165:25, 171:3, 183:4, 183:6, 209:14
**Reason** [1] - 212:7
**reasonable** [35] - 49:5, 49:7, 51:2, 51:6, 52:21, 65:1, 65:13, 66:21, 84:15, 87:7, 89:15, 107:15, 109:5, 117:24, 135:17, 143:14, 149:7, 150:9, 154:21, 154:23, 156:7, 159:19, 159:23, 161:11, 161:12, 164:18, 165:24, 174:19, 175:8, 181:5, 187:17, 188:2, 197:21, 197:24, 198:14
**reasonableness** [9] - 47:20, 75:21, 76:2, 177:18, 177:22,

178:21, 184:15, 187:22, 194:13

**reasonably** [8] - 26:21, 50:5, 70:25, 76:9, 88:1, 164:7, 176:25, 177:5

**reasons** [5] - 114:15, 125:18, 160:17, 172:9, 212:6

**Reaver** [2] - 181:18, 182:7

**recalled** [4] - 60:1, 82:1, 82:2, 155:22

**received** [12] - 34:23, 35:4, 35:7, 35:8, 36:17, 36:19, 39:1, 47:6, 48:13, 62:6, 122:20, 123:9

**receiving** [1] - 71:6

**recent** [4] - 7:25, 10:1, 10:12, 71:6

**recently** [5] - 35:5, 35:6, 45:5, 48:13, 124:7

**recertification** [2] - 56:10, 56:17

**recertifications** [1] - 206:3

**recess** [4] - 46:15, 69:4, 100:19, 154:2

**recognize** [1] - 86:21

**recognized** [3] - 7:16, 84:11, 118:5

**recognizes** [1] - 88:7

**recollect** [1] - 84:4

**recollection** [5] - 51:23, 57:17, 83:9, 161:3, 201:1

**recommended** [1] - 131:25

**reconcile** [1] - 95:20

**record** [9] - 3:9, 11:15, 58:10, 78:16, 90:14, 105:23, 105:24, 139:9, 141:9

**record's** [1] - 133:7

**recorded** [1] - 78:14

**records** [8] - 34:23, 38:9, 118:16, 122:19, 122:21, 122:25, 123:3, 130:20

**recounted** [1] - 82:5

**reduced** [4] - 39:6, 63:10, 78:13, 145:8

**reevaluated** [1] - 153:9

**reexamination** [1] - 48:9

**refer** [5] - 25:2, 58:3,

78:8, 80:8, 80:9

**reference** [4] - 73:13, 94:9, 142:17, 144:22

**referenced** [1] - 52:10

**referring** [4] - 60:3, 61:10, 74:5, 151:9

**refers** [1] - 49:17

**reflect** [3] - 122:22, 122:25, 147:19

**reflecting** [1] - 87:3

**refresh** [1] - 161:3

**regard** [20] - 23:1, 41:19, 42:7, 48:20, 53:22, 54:18, 61:22, 63:21, 71:16, 75:25, 84:1, 98:9, 113:19, 117:22, 119:16, 129:7, 139:10, 142:6, 142:8, 150:4

**regarding** [1] - 159:15

**regardless** [1] - 126:19

**regional** [3] - 131:23, 131:24, 179:13

**regions** [4] - 43:22, 43:23, 43:25, 69:18

**register** [1] - 178:10

**regular** [3] - 16:19, 56:25, 57:9

**regularly** [1] - 44:16

**reinforced** [1] - 124:6

**relate** [1] - 85:12

**related** [7] - 12:7, 14:13, 19:25, 34:11, 41:12, 127:9, 127:10

**Related** [1] - 136:7

**relates** [1] - 67:10

**relating** [2] - 19:21, 38:12

**relation** [2] - 175:6, 209:15

**release** [29] - 59:1, 67:6, 69:16, 69:19, 69:21, 77:10, 77:24, 80:5, 81:10, 83:6, 83:9, 83:11, 83:17, 84:3, 84:8, 84:16, 86:18, 105:8, 106:6, 106:10, 106:18, 107:7, 122:23, 123:1, 132:6, 142:18, 146:25, 162:10

**released** [5] - 30:8, 50:14, 101:24, 107:19, 141:7

**releases** [2] - 28:22, 89:8

**releasing** [4] - 67:8, 110:21, 122:20,

161:18

**relevant** [2] - 66:24, 131:14

**reliability** [1] - 9:10

**relied** [5] - 34:22, 38:20, 43:14, 156:11, 156:17

**rely** [5] - 36:18, 91:15, 98:3, 122:14, 131:20

**relying** [4] - 77:25, 91:6, 202:7

**remain** [1] - 117:13

**remained** [2] - 18:16, 74:21

**remaining** [1] - 3:17

**remarkably** [2] - 100:6, 204:25

**remember** [15] - 19:18, 20:24, 44:5, 45:8, 81:22, 84:18, 88:20, 96:4, 96:5, 119:10, 138:17, 146:19, 159:4, 161:6, 205:6

**remembered** [3] - 81:17, 81:18, 81:23

**remembering** [1] - 79:10

**remind** [1] - 46:18

**reminded** [2] - 46:16, 175:3

**remove** [7] - 77:22, 77:23, 80:13, 83:2, 89:4, 99:3, 99:16

**removed** [2] - 98:12, 150:25

**Removing** [1] - 78:5

**render** [1] - 123:13

**renders** [1] - 165:15

**rendition** [1] - 160:10

**repeat** [2] - 4:7, 143:24

**repetitive** [1] - 126:10

**report** [43] - 4:8, 4:11, 13:5, 13:13, 24:17, 24:20, 25:3, 25:13, 34:13, 34:14, 34:20, 35:8, 36:18, 36:19, 36:20, 37:19, 37:23, 37:24, 38:22, 38:23, 45:11, 47:10, 48:4, 51:19, 71:7, 78:7, 81:24, 90:5, 90:10, 104:11, 108:24, 110:8, 112:6, 117:15, 117:25, 140:24, 149:1, 156:14, 159:18, 160:25, 161:4

**reported** [1] - 213:12

**REPORTED** [1] - 1:19

**Reporter** [1] - 213:7

**reports** [11] - 37:20, 37:21, 91:6, 103:3, 113:21, 130:24, 131:3, 161:14, 164:15, 200:1, 200:2

**represent** [2] - 98:22, 119:23

**representation** [2] - 122:12, 132:22

**representations** [1] - 186:1

**representative** [2] - 13:20, 46:10

**representatives** [1] - 147:23

**represented** [4] - 11:11, 207:8, 207:10, 207:14

**representing** [1] - 13:23

**Republic** [2] - 41:9, 182:19

**reputation** [2] - 133:6, 181:19

**require** [4] - 61:14, 65:13, 208:14

**required** [8] - 50:20, 50:21, 86:13, 119:14, 160:23, 164:25, 179:10, 195:4

**requirement** [2] - 16:5, 50:6

**requirements** [4] - 119:1, 164:24, 165:3, 178:15

**requires** [1] - 86:12

**research** [6] - 146:9, 146:10, 146:18, 157:8, 200:4, 200:5

**researched** [1] - 119:3

**resemblance** [1] - 29:24

**reserve** [2] - 16:4, 18:1

**residence** [9] - 38:14, 65:6, 104:25, 108:8, 108:15, 168:10, 168:12, 203:7, 203:9

**residential** [3] - 27:22, 27:25, 169:23

**residing** [1] - 213:8

**resist** [1] - 168:5

**resistance** [4] - 107:10, 147:1, 147:3, 148:8

**resisting** [3] - 109:21,

110:11, 153:5

**resists** [1] - 147:12

**resolve** [7] - 84:22, 92:13, 109:18, 161:10, 178:13, 191:12

**resolved** [2] - 31:15, 72:4

**respect** [7] - 5:13, 27:14, 28:4, 41:2, 41:3, 121:20, 162:23

**respected** [1] - 132:24

**respective** [1] - 52:12

**respond** [5] - 143:19, 144:3, 173:18, 191:5, 191:19

**responded** [2] - 160:23, 192:20

**responding** [3] - 152:10, 153:19, 157:16

**response** [2] - 110:2, 115:5

**responsibility** [7] - 11:3, 13:15, 14:6, 174:12, 174:22, 188:6, 193:20

**responsible** [5] - 13:11, 49:1, 52:17, 52:18, 160:19

**rest** [1] - 106:2

**restraint** [1] - 108:1

**results** [1] - 204:4

**retained** [12] - 25:10, 27:4, 27:5, 30:14, 30:19, 31:19, 31:24, 32:4, 32:16, 32:19, 32:25

**retaining** [1] - 194:13

**retention** [1] - 189:11

**retired** [1] - 21:2

**retraining** [1] - 184:3

**reverse** [1] - 7:24

**reversed** [1] - 33:5

**reverting** [1] - 127:23

**review** [6] - 35:12, 61:25, 142:3, 142:9, 195:17, 195:22

**reviewed** [4] - 35:6, 35:7, 107:3, 155:2

**reviewing** [2] - 56:5, 209:12

**revised** [3] - 4:11, 34:14, 47:8

**revisit** [1] - 134:5

**revolver** [1] - 100:7

**rib** [2] - 44:7

**RICHARD** [1] - 1:8

**rigid** [1] - 10:21

**Rio** [1] - 1:17

rip [1] - 73:19
ripped [2] - 94:10, 96:15
rips [2] - 150:14
risk [5] - 11:3, 11:5, 65:20, 107:9, 125:7
river [1] - 143:23
Riverplace [1] - 2:7
Riverside [1] - 182:8
road [1] - 199:24
ROBERT [1] - 1:4
Robert [2] - 38:15, 202:21
Robinette [2] - 124:22, 124:23
rock [1] - 95:16
rode [1] - 19:23
role [4] - 11:18, 103:8, 103:9, 192:11
rolling [1] - 90:4
rote [1] - 56:18
RPR [1] - 1:19
rude [1] - 195:15
rule [2] - 58:16, 59:8
rules [3] - 4:3, 9:22, 10:6
run [4] - 42:25, 43:4, 79:24, 171:7
running [8] - 27:23, 30:4, 43:9, 125:20, 126:4, 173:2, 173:9, 209:22
runs [2] - 35:23, 132:18

**S**

S-C-H-U-T-Z-H-Ü-N-D [1] - 40:22
safely [1] - 150:8
Safety [5] - 22:17, 25:6, 25:8, 26:7, 138:9
safety [11] - 65:15, 65:16, 65:17, 65:18, 108:25, 112:10, 134:18, 145:3, 168:1, 196:3, 196:4
sailed [1] - 210:14
sake [2] - 19:3, 35:25
sales [1] - 106:4
Salt [4] - 1:17, 3:22, 32:13, 32:17
SALT [2] - 212:3, 213:3
SARBER [26] - 2:6, 3:7, 34:6, 35:14, 36:7, 36:12, 46:12, 46:22, 58:12, 69:5,

78:17, 78:22, 82:22, 90:16, 100:20, 106:13, 154:3, 155:10, 158:8, 165:7, 165:18, 170:20, 173:25, 189:19, 198:19, 209:6
Sarber [22] - 2:13, 2:14, 3:13, 36:9, 65:10, 79:8, 160:21, 161:7, 166:8, 167:13, 168:7, 168:16, 169:15, 173:6, 174:6, 177:8, 179:16, 180:22, 186:21, 189:3, 197:8, 208:12
sat [1] - 191:14
satisfy [1] - 169:20
save [3] - 135:5, 193:6, 193:7
saving [1] - 193:13
saw [22] - 44:15, 44:16, 45:12, 45:15, 52:8, 52:10, 68:19, 77:14, 79:10, 96:9, 102:22, 118:8, 144:14, 164:13, 164:15, 182:17, 182:19, 205:16, 210:10, 210:11
scale [2] - 123:5, 123:6
scenario [2] - 156:3, 197:20
scene [6] - 37:21, 81:7, 90:17, 90:19, 155:6, 202:8
scent [3] - 90:25, 91:16
scheduled [1] - 24:22
scheme [1] - 13:21
school [6] - 15:17, 15:21, 15:23, 30:4, 67:18, 173:9
Schutzhünd [6] - 40:22, 41:8, 136:15, 137:11, 182:16, 183:12
Scientific [1] - 40:14
scientists [1] - 182:2
score [3] - 43:19, 204:8, 209:21
scored [1] - 136:20
scruff [1] - 80:18
seal [1] - 213:21
Search [1] - 8:24
search [19] - 6:1, 8:25, 9:1, 9:2, 9:12, 9:22,

10:6, 10:12, 25:15, 50:15, 54:22, 56:1, 69:12, 69:13, 193:15, 194:2, 202:11, 204:18, 204:21
searched [2] - 65:6, 143:16
searching [5] - 22:23, 117:17, 143:5, 143:21, 193:8
seated [2] - 98:15, 99:1
second [12] - 58:8, 71:12, 84:10, 108:22, 109:12, 125:10, 159:20, 168:21, 170:16, 195:12, 209:1
seconds [1] - 56:3
section [2] - 8:17, 8:19
Security [1] - 39:22
see [59] - 14:4, 34:2, 34:6, 34:17, 42:3, 43:16, 44:6, 46:1, 48:21, 52:14, 53:2, 56:3, 56:4, 74:16, 76:24, 85:15, 90:6, 97:4, 103:17, 103:19, 109:3, 109:7, 110:9, 113:12, 113:23, 114:19, 114:20, 116:10, 125:13, 125:21, 125:22, 125:24, 126:7, 126:9, 127:20, 128:9, 133:25, 142:12, 143:12, 149:1, 149:5, 152:22, 152:25, 153:19, 161:25, 184:4, 186:20, 188:21, 195:23, 201:9, 201:13, 204:5, 204:12, 210:3, 210:5, 210:18
seeing [4] - 96:5, 157:6, 157:19, 157:21
seek [2] - 124:8, 125:3
seeking [2] - 41:13, 171:1
seem [2] - 52:13, 52:16
sees [1] - 87:25
seizure [5] - 6:1, 8:25, 9:22, 10:6, 10:12
selection [3] - 135:10,

205:24, 206:7
self [2] - 86:19, 160:5
self-interested [1] - 160:5
sell [4] - 46:9, 183:15, 185:20, 185:22
seller [1] - 132:23
sells [1] - 45:23
semester [3] - 5:17, 5:21, 14:15
send [7] - 59:5, 69:11, 70:1, 110:10, 153:10, 172:22, 174:20
sending [18] - 54:22, 55:16, 59:20, 69:14, 70:1, 70:4, 110:19, 159:21, 163:6, 163:7, 163:11, 163:12, 164:23, 164:25, 165:4, 166:3, 167:17, 174:23
sends [1] - 171:25
sense [16] - 4:5, 52:18, 67:14, 73:21, 76:21, 89:1, 113:1, 116:18, 124:5, 134:11, 137:20, 143:3, 165:9, 174:22, 193:25, 199:18
senses [1] - 157:18
sensible [2] - 65:11, 113:8
sensory [2] - 157:12, 199:22
sent [7] - 30:5, 35:1, 38:21, 46:24, 93:20, 174:10, 193:9
sentences [1] - 91:1
sequence [1] - 95:10
Sergeant [48] - 21:1, 21:3, 35:9, 48:22, 49:12, 49:17, 50:16, 50:25, 51:24, 52:19, 55:4, 56:5, 56:21, 58:4, 59:25, 60:4, 60:12, 60:19, 60:21, 61:23, 61:24, 62:4, 62:24, 71:21, 72:3, 72:24, 75:23, 76:17, 76:19, 77:1, 85:11, 87:3, 107:3, 107:18, 118:16, 127:3, 130:1, 134:5, 135:13, 138:3, 138:17, 144:14, 172:3, 172:5, 177:9, 191:14, 195:18

serious [2] - 172:20, 176:9
serve [2] - 15:23, 134:18
served [7] - 15:12, 15:16, 24:1, 24:6, 24:7, 132:20, 141:17
service [53] - 6:2, 7:6, 9:5, 9:10, 9:19, 9:21, 9:24, 10:6, 10:8, 10:13, 10:18, 11:12, 11:19, 12:4, 12:16, 14:14, 14:20, 17:2, 17:5, 17:22, 18:5, 19:22, 20:3, 23:12, 24:13, 25:16, 26:18, 26:22, 29:1, 32:21, 38:10, 38:13, 49:20, 51:2, 54:1, 65:2, 67:16, 67:21, 70:12, 85:20, 109:19, 119:5, 124:3, 124:13, 125:15, 134:22, 178:4, 178:19, 182:24, 188:1, 188:12, 206:10
services [4] - 5:13, 5:22, 22:3, 22:4
serving [3] - 11:2, 23:14, 23:24
sessions [2] - 57:9, 57:12
set [6] - 35:3, 51:4, 143:8, 182:15, 202:10, 213:16
settings [1] - 57:3
settle [1] - 30:25
settlement [1] - 11:6
seven [2] - 119:24, 129:15, 175:21, 177:2, 192:14, 208:22
several [6] - 6:13, 52:8, 79:23, 119:14, 138:8, 141:11
severity [4] - 104:23, 108:3, 108:5, 145:1
SHAKIB [16] - 2:3, 34:1, 35:25, 36:5, 58:8, 82:20, 105:23, 154:10, 155:12, 158:11, 171:10, 174:2, 190:6, 198:15, 209:11, 211:4
Shakib [19] - 2:14, 2:15, 4:8, 34:25, 35:16, 45:13, 45:16, 46:17, 46:21, 58:6,

58:15, 60:19, 61:23, 76:20, 120:6, 131:24, 134:5, 148:17, 203:15

**Shakib's** [1] - 133:25

**shame** [1] - 199:20

**Shands** [1] - 37:21

**shed** [5] - 75:16, 108:10, 169:16, 169:17, 170:2

**Shepard** [1] - 96:23

**sheriff** [1] - 22:6

**Sheriff's** [13] - 11:8, 16:3, 17:18, 17:24, 18:14, 21:3, 21:5, 21:8, 22:7, 57:1, 87:10, 123:21, 202:16

**sheriff's** [1] - 11:9

**Sheriffs** [1] - 14:2

**shift** [1] - 209:2

**shine** [2] - 113:11, 115:6

**shined** [1] - 116:6

**shining** [1] - 112:18

**shirt** [6] - 84:12, 114:1, 116:16, 116:19, 117:5, 152:8

**shock** [8] - 75:24, 76:1, 76:19, 77:8, 85:11, 85:15, 86:12, 89:2

**shoes** [1] - 86:20

**shoot** [1] - 100:7

**shooting** [6] - 26:11, 32:8, 32:9, 32:14, 32:15, 32:17

**shootings** [1] - 33:3

**short** [4] - 63:16, 121:2, 148:19, 176:5

**shortcoming** [1] - 66:14

**shorter** [1] - 84:12

**shorthand** [1] - 47:21

**Shorthand** [1] - 213:7

**shortly** [2] - 29:13, 78:12

**Shortly** [1] - 90:24

**shot** [11] - 32:11, 43:9, 77:2, 96:3, 96:11, 100:11, 100:12, 115:7, 155:22, 156:3, 156:5

**shoulder** [2] - 44:4, 125:24

**shoulders** [1] - 126:12

**shouting** [2] - 82:2, 84:17

**show** [6] - 16:21, 16:22, 33:23, 73:24,

119:21, 153:7

**showed** [2] - 22:8, 133:11

**showing** [1] - 95:22

**shown** [3] - 21:12, 136:5, 209:24

**shows** [4] - 21:23, 136:25, 147:22, 148:3

**shut** [1] - 96:3

**side** [14] - 30:15, 31:18, 35:24, 38:7, 65:20, 94:2, 94:16, 98:5, 122:2, 151:23, 152:6, 204:7

**sight** [1] - 27:24

**signed** [1] - 22:9

**significance** [3] - 63:11, 64:5, 137:14

**significant** [1] - 169:23

**signing** [1] - 21:16

**silently** [1] - 28:20

**Simi** [1] - 24:10

**similar** [3] - 27:14, 28:4, 29:2

**similarity** [1] - 30:9

**similarly** [1] - 106:1

**simply** [5] - 19:13, 34:15, 51:3, 80:6, 186:25

**simultaneous** [5] - 156:5, 159:9, 159:11, 166:1, 198:13

**simultaneously** [5] - 80:16, 80:20, 83:17, 84:1, 197:18

**single** [5] - 50:9, 50:16, 54:21, 79:14, 133:17

**siren** [1] - 27:21

**sit** [6] - 27:12, 121:21, 123:2, 141:8, 156:12, 159:4

**Sitting** [1] - 12:7

**sitting** [2] - 46:13, 121:21

**situation** [20] - 68:14, 70:24, 88:25, 100:13, 107:15, 109:1, 112:8, 112:24, 150:11, 153:2, 153:3, 153:14, 155:22, 156:4, 163:23, 164:1, 164:4, 165:5, 174:3, 193:10

**situations** [5] - 53:13, 100:5, 116:3,

137:21, 190:23

**six** [13] - 20:17, 72:16, 73:1, 74:10, 74:11, 115:4, 115:5, 119:24, 148:13, 149:8, 175:21, 176:13, 177:2

**six-foot** [7] - 72:16, 74:10, 74:11, 115:4, 115:5, 148:13, 149:8

**size** [6] - 74:1, 143:7, 184:9, 186:11, 195:20, 208:21

**skill** [2] - 51:4, 51:20

**skills** [3] - 191:4, 196:2, 204:16

**skipping** [2] - 91:23, 147:6

**sky** [1] - 167:9

**slightly** [1] - 18:6

**slipped** [1] - 71:23

**slips** [1] - 21:17

**sloppy** [1] - 68:1

**slows** [1] - 43:10

**smacking** [1] - 210:20

**small** [2] - 5:22, 91:25

**smaller** [1] - 73:11

**sneak** [4] - 114:7, 116:8, 116:15, 116:20

**sniff** [1] - 28:2

**soap** [1] - 106:4

**society** [1] - 183:14

**soft** [1] - 100:2

**software** [1] - 195:11

**sold** [6] - 37:11, 182:20, 185:14, 185:15, 185:25

**sole** [1] - 7:15

**solely** [3] - 40:23, 78:24, 79:1

**solid** [1] - 95:16

**solving** [1] - 178:4

**Someone** [3] - 34:25, 100:25, 101:1

**someone** [23] - 28:3, 65:18, 75:9, 100:24, 102:21, 102:25, 107:20, 125:24, 127:19, 140:7, 145:13, 158:12, 163:17, 163:23, 164:1, 165:21, 167:4, 171:1, 171:22, 174:11, 174:20, 183:1, 194:1

**sometimes** [4] - 28:6, 76:18, 126:6, 173:15

**somewhat** [1] - 44:9

**somewhere** [2] -

132:12, 194:11

**soon** [3] - 162:1, 162:2, 162:3

**sorry** [3] - 38:3, 140:16, 151:9

**sort** [7] - 6:18, 41:10, 107:10, 147:2, 147:3, 196:24

**sought** [2] - 22:25, 41:11

**soul** [1] - 106:3

**sounded** [1] - 20:21

**Sounds** [2] - 24:5, 104:21

**sounds** [1] - 37:10

**source** [4] - 5:18, 34:11, 41:18, 45:19

**sources** [2] - 97:17, 97:20

**South** [3] - 1:17, 213:8, 213:21

**space** [2] - 28:11, 39:10

**sparse** [1] - 122:22

**speaking** [4] - 47:13, 54:10, 134:9, 135:6

**special** [6] - 183:23, 184:1, 185:6, 192:1, 192:2, 192:5

**specialists** [1] - 13:9

**specific** [9] - 17:4, 41:10, 41:11, 44:1, 69:1, 84:5, 153:7, 159:6, 200:19

**specifically** [11] - 9:5, 9:21, 18:9, 45:1, 48:19, 59:25, 83:1, 139:1, 139:5, 180:10, 190:8

**Specifically** [1] - 49:24

**specificity** [1] - 57:21

**specifics** [4] - 49:8, 139:22, 180:16, 203:3

**Specifics** [1] - 139:22

**specified** [4] - 55:18, 55:21, 110:7, 144:5

**specify** [3] - 62:15, 62:17, 63:1

**speculate** [1] - 88:13

**Speech** [1] - 123:5

**speed** [2] - 65:20, 176:15

**Spell** [1] - 21:20

**spent** [2] - 16:2, 134:7

**spirit** [4] - 49:17, 52:9, 61:1, 61:11

**spoken** [2] - 23:4, 23:5

**spokesman** [1] - 55:5

**sport** [11] - 43:20, 46:4, 124:1, 124:2, 128:19, 128:23, 136:19, 182:17, 183:13, 203:23, 203:25

**sporting** [2] - 123:25, 128:13

**spot** [2] - 111:19, 112:13

**spotlight** [1] - 103:25

**sprang** [2] - 72:21, 72:22

**Springs** [1] - 25:22

**St** [1] - 185:12

**stage** [1] - 7:8

**stake** [2] - 73:16, 160:9

**stalky** [1] - 117:3

**stand** [6] - 40:12, 77:15, 80:15, 138:4, 162:10, 196:25

**Stand** [1] - 77:16

**standard** [17] - 34:8, 50:2, 59:6, 62:7, 74:11, 122:12, 136:9, 144:17, 145:5, 145:7, 152:18, 167:10, 167:11, 167:15, 167:24, 180:7, 208:1

**standards** [27] - 63:9, 63:21, 119:19, 121:15, 121:17, 121:24, 122:1, 122:2, 122:11, 124:1, 131:23, 149:18, 167:17, 167:19, 177:14, 178:2, 178:17, 178:22, 179:17, 179:19, 179:22, 179:23, 179:24, 180:1, 180:2, 197:1

**Standards** [1] - 121:25

**standing** [15] - 104:7, 107:16, 114:22, 116:11, 116:14, 116:20, 116:21, 117:8, 117:10, 140:11, 151:11, 151:18, 152:7, 198:10, 210:23

**Standing** [1] - 151:14

**standpoint** [2] - 93:3, 111:10

**start** [12] - 13:3, 17:10, 17:11, 17:12, 17:13, 17:14, 23:21, 43:3,

70:10, 90:8, 98:10, 154:12

**started** [4] - 61:7, 75:13, 128:8, 210:15

**starting** [2] - 58:13, 201:2

**startled** [1] - 28:22

**starts** [1] - 27:23

**STATE** [2] - 212:2, 213:2

**State** [13] - 5:23, 6:25, 12:10, 14:10, 15:10, 19:7, 25:7, 119:20, 132:24, 180:1, 208:13, 213:8

**state** [27] - 6:22, 12:11, 13:21, 13:22, 14:9, 18:22, 18:25, 79:6, 99:15, 106:6, 112:6, 117:13, 117:14, 117:25, 119:6, 119:13, 122:11, 122:13, 142:23, 143:1, 168:18, 189:15, 194:8, 197:2, 200:7, 207:2, 207:3

**statement** [10] - 64:13, 64:18, 78:10, 79:10, 79:12, 96:19, 113:2, 118:7, 165:17, 188:25

**statements** [3] - 38:15, 156:16, 156:17

**states** [7] - 6:20, 60:22, 119:8, 119:10, 120:18, 122:10, 178:16

**STATES** [1] - 1:1

**States** [3] - 7:4, 46:9, 121:24

**stature** [1] - 99:14

**stay** [3] - 111:8, 111:9, 171:8

**stealth** [1] - 65:20

**stems** [1] - 124:14

**Stenotype** [1] - 213:13

**step** [2] - 87:20, 88:25

**stepping** [1] - 192:11

**steps** [3] - 79:23, 79:25, 110:8

**stereotypical** [1] - 125:14

**stick** [1] - 163:12

**sticking** [1] - 51:7

**still** [37] - 15:7, 15:8, 16:20, 22:19, 23:5, 24:21, 49:14, 49:15, 50:17, 74:19, 77:12,

77:15, 77:16, 80:15, 81:8, 90:6, 90:7, 99:24, 99:25, 102:8, 117:1, 138:4, 150:21, 150:24, 152:17, 153:6, 162:10, 164:14, 172:6, 176:15, 176:18, 198:14, 199:8, 200:24, 201:1

**stimulus** [3] - 42:14, 157:17

**stole** [1] - 29:25

**stop** [3] - 32:12, 92:3, 162:6

**stopping** [2] - 126:3, 126:4

**straight** [1] - 207:12

**Strange** [1] - 24:24

**Street** [3] - 2:4, 8:1, 10:2

**street** [7] - 15:12, 53:16, 119:18, 119:22, 121:10, 136:3, 183:25

**streets** [1] - 190:3

**strength** [1] - 99:17

**strengthened** [1] - 76:13

**stress** [1] - 174:15

**stretch** [1] - 14:20

**strict** [2] - 179:21, 180:2

**strike** [2] - 12:6, 158:24

**stringent** [3] - 121:16

**strong** [5] - 51:17, 99:10, 101:9, 132:9, 134:18

**strongest** [1] - 52:3

**struggle** [3] - 55:23, 98:11, 161:15

**struggling** [1] - 104:5

**students** [3] - 14:25, 15:1, 15:3

**study** [1] - 200:8

**stuff** [6] - 34:3, 37:3, 37:18, 55:3, 90:12, 108:11

**sub** [1] - 161:2

**subcommittees** [1] - 68:13

**Subject** [1] - 26:16

**subject** [7] - 7:20, 7:22, 8:3, 25:13, 59:2, 108:24, 111:12

**subject's** [1] - 40:21

**subjects** [2] - 17:3, 172:9

**subpoena** [1] - 33:24

**Subscribed** [1] - 212:20

**substance** [3] - 39:16, 76:6, 131:13

**substantial** [3] - 150:24, 157:8, 157:17

**substantially** [2] - 81:15, 201:22

**substantiated** [7] - 140:8, 196:15, 196:16, 197:2, 198:25, 199:11, 199:16

**successful** [1] - 98:18

**sudden** [1] - 210:23

**suddenly** [7] - 28:14, 72:14, 72:21, 72:22, 161:23, 161:24

**sue** [1] - 196:9

**sufficient** [3] - 8:6, 65:4, 108:5

**suggest** [8] - 50:25, 80:4, 82:1, 164:16, 184:8, 188:16, 189:9, 191:7

**suggested** [5] - 73:3, 118:9, 131:24, 184:5, 199:3

**suggestion** [1] - 203:17

**suggestions** [1] - 87:7

**suggests** [7] - 60:21, 60:22, 87:6, 114:4, 114:24, 186:22

**suit** [4] - 19:3, 42:20, 42:22, 42:23

**suitability** [2] - 137:7, 139:17

**suitable** [3] - 181:23, 182:5, 182:24

**Suite** [1] - 2:8

**suited** [1] - 136:2

**sum** [1] - 8:18

**summarize** [1] - 98:24

**summarizing** [1] - 91:2

**summary** [4] - 83:22, 83:23, 90:18, 91:22

**supervise** [1] - 192:6

**supervised** [4] - 119:5, 139:17, 140:3, 191:6

**supervising** [1] - 49:2

**supervision** [3] - 47:15, 48:16, 51:20

**supervisor** [5] - 48:22, 52:17, 52:18, 192:5, 195:11

**supervisory** [1] -

195:16

**Supplemental** [1] - 51:15

**supplemental** [11] - 37:20, 51:11, 71:5, 71:12, 71:16, 75:20, 76:6, 76:7, 85:10, 122:6, 140:25

**supplementing** [1] - 107:14

**support** [2] - 13:17, 16:21

**supported** [1] - 190:13

**suppose** [2] - 20:8, 165:22

**supposed** [6] - 33:20, 64:3, 66:14, 82:21, 119:15, 194:11

**Supreme** [2] - 7:4, 55:23

**supreme** [1] - 13:21

**surplus** [1] - 182:20

**surprise** [3] - 172:12, 172:15, 172:16

**surprised** [4] - 38:6, 86:8, 88:21, 100:17

**surprising** [2] - 95:6, 95:8

**surrender** [2] - 65:4, 131:5, 187:2

**survey** [1] - 14:17

**suspect** [46] - 21:2, 50:5, 65:4, 87:20, 87:21, 101:1, 101:10, 101:15, 101:20, 105:8, 108:23, 109:3, 109:4, 109:5, 109:8, 109:21, 109:23, 110:11, 113:12, 114:8, 117:15, 130:21, 130:22, 130:23, 131:4, 145:20, 145:22, 147:12, 148:4, 163:15, 165:11, 165:14, 166:4, 168:5, 169:2, 170:13, 172:16, 172:23, 173:8, 173:16, 187:1, 187:9, 187:10, 204:23, 209:23

**suspect's** [2] - 148:8, 168:3

**suspected** [4] - 102:15, 104:24, 107:20, 112:1

**suspects** [8] - 125:19,

127:4, 138:14, 143:16, 143:18, 144:2, 146:25, 206:12

**suspicion** [1] - 112:4

**sustained** [3] - 195:12, 195:13, 195:14

**swearing** [1] - 9:1

**sweep** [1] - 164:9

**SWGDOG** [4] - 40:10, 40:12, 68:13

**switching** [1] - 172:9

**sworn** [4] - 3:4, 13:12, 212:20, 213:10

**system** [12] - 195:5, 195:9, 195:10, 196:2, 196:12, 196:14, 196:18, 198:22, 198:23, 199:4, 199:19

## T

**T-ball** [1] - 175:4

**tables** [1] - 23:8

**tabula** [1] - 182:25

**tactic** [1] - 116:2

**tactical** [3] - 71:2, 112:10, 172:21

**tactically** [5] - 65:10, 65:13, 113:7, 143:12, 144:1

**tacticians** [2] - 172:14, 172:19

**tactics** [1] - 115:20

**TAKEN** [1] - 1:17

**talismanic** [1] - 106:23

**talker** [1] - 131:18

**talks** [3] - 50:8, 157:12, 167:25

**tall** [1] - 84:13

**tangentially** [1] - 14:15

**tank** [1] - 129:11

**tapes** [3] - 209:24, 210:10, 210:11

**target** [6] - 70:3, 125:17, 164:3, 172:18, 187:4, 188:13

**targets** [1] - 175:17

**taser** [2] - 77:2

**task** [1] - 43:8

**tasks** [1] - 206:12

**taught** [8] - 55:6, 55:8, 56:12, 89:23, 89:24, 90:1, 106:22, 157:9

tax [1] - 192:14
teach [5] - 5:17, 5:21,
  14:23, 14:25, 178:2
teachable [2] - 186:7,
  186:8
teaching [4] - 14:11,
  14:12, 14:16, 14:21
team [1] - 118:20
tears [1] - 125:4
technicians [1] - 13:9
technique [5] - 89:23,
  89:24, 90:2, 146:7,
  147:11
techniques [2] -
  150:16, 204:16
tecum [1] - 34:1
teeth [1] - 72:18
telemarketer [1] -
  106:4
telephone [1] - 35:2
temperament [1] -
  140:13
ten [7] - 10:17, 10:22,
  11:12, 11:20, 11:21,
  23:18, 92:1
Ten [2] - 10:20, 11:1
tenant [1] - 6:18
tend [9] - 40:20,
  43:19, 124:8,
  126:15, 127:20,
  177:12, 179:20,
  187:17, 210:7
tendency [10] -
  126:16, 126:23,
  182:4, 183:7, 185:8,
  186:18, 191:4,
  191:5, 206:4, 206:15
tendon [1] - 30:7
term [35] - 15:13,
  15:14, 30:9, 52:8,
  57:20, 67:1, 67:10,
  67:13, 67:14, 67:19,
  68:9, 68:24, 69:6,
  69:9, 69:10, 69:16,
  69:23, 70:17,
  110:14, 116:7,
  121:14, 125:14,
  134:12, 136:9,
  136:11, 137:16,
  138:12, 147:24,
  148:18, 149:18,
  161:17, 163:9,
  175:5, 181:15
terminate [1] - 196:9
termination [2] - 12:8,
  195:8, 197:3
terminology [1] -
  145:16
terms [14] - 53:4, 54:4,
  54:8, 54:9, 55:24,

113:5, 138:2,
  140:12, 159:18,
  160:4, 161:13,
  178:4, 182:23, 192:3
TERRELL [1] - 2:3
terrible [2] - 37:10,
  63:20
test [2] - 56:19, 108:20
Testament [1] - 9:16
tested [1] - 118:3
testified [37] - 3:4,
  32:25, 51:25, 56:6,
  57:8, 57:25, 62:4,
  76:19, 81:14, 81:20,
  83:15, 84:17, 93:25,
  95:1, 99:2, 107:5,
  107:18, 126:19,
  148:12, 155:7,
  156:25, 157:13,
  158:22, 160:13,
  164:8, 166:2, 166:7,
  168:12, 177:13,
  184:20, 187:7,
  196:13, 198:22,
  202:7, 202:14,
  202:20, 205:15
testify [6] - 55:5, 67:3,
  83:9, 84:18, 168:11,
  213:10
testifying [4] - 56:22,
  154:15, 157:25,
  202:1
testimony [72] - 24:4,
  24:23, 25:6, 25:23,
  26:8, 29:12, 30:20,
  33:6, 33:7, 55:4,
  57:10, 57:18, 58:4,
  58:6, 60:4, 60:5,
  60:11, 61:10, 71:18,
  72:3, 73:2, 73:6,
  73:21, 75:7, 75:23,
  77:19, 77:25, 78:20,
  78:24, 79:2, 79:16,
  80:12, 80:19, 83:1,
  83:18, 91:20, 93:8,
  97:12, 98:23, 102:5,
  107:4, 113:10,
  113:21, 114:4,
  127:2, 133:20,
  138:3, 144:9,
  144:15, 150:22,
  154:20, 155:3,
  155:21, 158:25,
  162:5, 162:11,
  164:6, 166:7,
  166:25, 181:3,
  188:15, 189:8,
  195:2, 197:17,
  201:16, 206:14,
  210:23, 212:5,

212:5, 213:12,
  213:15
tests [2] - 181:24,
  205:24
Texas [1] - 208:20
text [1] - 93:20
textbook [1] - 14:18
THE [14] - 1:1, 34:4,
  34:19, 36:3, 36:9,
  36:13, 46:16, 78:21,
  106:1, 155:11,
  158:10, 165:8,
  170:22, 189:21
theft [1] - 202:23
themselves [4] -
  56:25, 59:4, 66:22,
  143:16
thereafter [3] - 74:22,
  90:24, 213:13
therefor [1] - 212:6
therefore [1] - 164:23
thereof [1] - 213:20
thesis [1] - 146:16
they've [5] - 59:11,
  115:23, 181:23,
  181:24, 181:25
thigh [2] - 126:4,
  127:21
thinking [4] - 38:5,
  101:19, 182:22,
  192:12
Thinking [1] - 101:1
thinks [2] - 163:15,
  186:7
third [6] - 75:20, 76:6,
  76:7, 85:9, 109:20,
  110:4
THIS [1] - 213:4
Thomason [1] - 3:15
THOMASON [1] - 1:6
thousands [1] - 193:7
threat [12] - 107:8,
  107:9, 108:23,
  108:24, 109:12,
  145:3, 146:25,
  168:1, 168:3, 168:4,
  168:8
threatened [1] - 30:1
threatening [1] -
  198:7
threats [2] - 153:4,
  171:5
three [19] - 14:20,
  19:1, 20:11, 48:13,
  55:24, 71:4, 74:9,
  74:14, 93:9, 104:23,
  106:24, 114:18,
  124:13, 155:5,
  157:24, 158:18,
  158:25, 169:21,

178:12
threshold [1] - 123:6
throat [1] - 94:6
throughout [1] - 14:9
throwing [1] - 170:25
thrown [1] - 67:1
thumb [1] - 58:17
thumping [1] - 210:13
Thursday [1] - 35:8
ticking [1] - 178:23
Tim [1] - 20:25
timing [2] - 103:11,
  104:2
tired [1] - 190:20
tissue [1] - 100:2
title [2] - 8:1, 132:21
titled [4] - 40:20,
  41:15, 129:16,
  185:16, 185:23,
  186:5
titles [1] - 136:25
TO [1] - 213:4
today [16] - 22:24,
  32:11, 33:15, 33:21,
  42:18, 45:7, 45:12,
  45:14, 113:23,
  118:7, 128:8,
  140:25, 157:20,
  159:4, 159:18, 173:6
together [6] - 45:13,
  132:20, 136:17,
  158:6, 194:12,
  195:20
tonight [1] - 64:5
took [4] - 20:13, 69:6,
  78:15, 193:1
tool [4] - 139:20,
  140:20, 190:24
tools [2] - 9:25,
  108:10
Top [1] - 58:19
top [7] - 38:18, 59:9,
  60:16, 88:25,
  136:14, 182:9,
  188:10
topic [1] - 5:25
topics [1] - 40:24
totality [2] - 79:16,
  85:6
toward [4] - 28:12,
  72:22, 153:5, 171:18
town [3] - 39:11,
  134:7, 167:7
track [10] - 28:2,
  90:20, 90:23, 91:3,
  91:4, 91:10, 165:11,
  169:2, 170:10
tracking [2] - 90:18,
  90:21
trade [2] - 7:19, 8:23

tradition [5] - 52:7,
  61:1, 61:11, 62:12,
  145:4
traffic [1] - 32:11
trail [1] - 145:20
train [12] - 43:20,
  125:18, 147:19,
  181:10, 182:11,
  182:21, 183:8,
  183:9, 183:17,
  186:9, 187:17,
  188:11
trained [38] - 40:21,
  40:22, 41:16, 52:23,
  56:7, 56:17, 57:3,
  60:1, 60:8, 61:1,
  61:11, 99:10,
  115:20, 123:17,
  125:15, 126:14,
  126:18, 126:22,
  129:16, 130:2,
  139:1, 139:5,
  146:12, 146:14,
  148:6, 151:1,
  174:16, 175:23,
  176:8, 177:1, 177:5,
  182:13, 185:9,
  188:4, 188:12,
  205:7, 206:5, 206:22
trainer [5] - 124:4,
  131:22, 182:11,
  183:4, 183:6
trainers [3] - 41:24,
  129:13, 187:25
Training [1] - 38:8
training [98] - 17:2,
  18:23, 19:21, 20:2,
  22:3, 34:23, 36:15,
  45:23, 47:15, 48:16,
  49:19, 51:5, 52:7,
  52:20, 52:21, 55:14,
  56:23, 56:24, 57:9,
  57:12, 57:15, 57:16,
  57:19, 57:22, 57:23,
  58:1, 58:2, 59:16,
  59:19, 62:4, 68:7,
  70:14, 115:15,
  115:17, 118:5,
  119:5, 122:19,
  122:20, 122:21,
  122:24, 123:3,
  123:13, 123:23,
  126:20, 126:22,
  127:6, 127:24,
  129:6, 129:7, 129:9,
  129:20, 130:20,
  131:23, 132:4,
  147:20, 162:23,
  176:2, 176:3, 176:5,
  177:18, 177:22,

178:7, 178:22, 181:5, 181:9, 181:14, 182:5, 182:16, 183:12, 183:14, 183:23, 183:24, 184:9, 184:11, 184:16, 185:6, 185:17, 185:18, 185:24, 186:1, 186:12, 187:18, 187:20, 192:3, 193:4, 193:16, 203:19, 204:9, 204:15, 205:3, 205:18, 206:1, 206:2, 206:7, 206:10

**training's** [2] - 131:24, 137:24

**TRAMMELL** [1] - 1:4

**Trammell** [72] - 38:15, 61:4, 61:8, 72:23, 73:24, 74:24, 75:5, 75:12, 77:21, 78:11, 79:6, 79:12, 81:16, 81:20, 81:25, 82:1, 82:5, 82:14, 83:3, 84:14, 84:20, 85:7, 87:22, 89:4, 92:5, 92:15, 92:22, 93:4, 93:23, 93:25, 94:15, 94:24, 95:1, 96:14, 97:8, 97:22, 98:9, 98:11, 99:23, 102:16, 103:14, 103:18, 104:4, 111:19, 114:5, 114:22, 116:11, 116:21, 117:2, 127:7, 129:5, 133:17, 134:1, 134:3, 150:18, 150:19, 150:21, 151:6, 151:8, 151:11, 151:15, 151:18, 151:20, 152:4, 153:15, 156:25, 157:13, 166:9, 197:11, 197:13, 198:10

**Trammell's** [9] - 78:10, 82:12, 92:20, 99:14, 161:16, 162:7, 166:17, 166:25, 210:22

**transcribed** [2] - 213:14, 213:16

**transcript** [5] - 35:5, 39:2, 82:13, 82:17, 194:24

**transcription** [2] - 212:5, 213:15

**transcripts** [2] - 37:22, 155:5

**transition** [3] - 137:25, 138:19, 138:21

**transmitter** [5] - 85:17, 86:4, 89:3, 89:7, 89:10

**traveled** [2] - 3:21, 20:9

**trees** [1] - 34:20

**trial** [12] - 24:3, 24:22, 24:24, 33:7, 42:13, 42:19, 43:7, 43:19, 44:8, 46:2, 136:21, 208:1

**trials** [11] - 18:23, 35:13, 36:16, 39:4, 42:10, 42:11, 44:21, 45:4, 123:25, 204:15, 211:1

**trick** [1] - 128:3

**tried** [6] - 11:17, 57:13, 98:16, 114:9, 150:16, 191:7

**tries** [1] - 147:22

**trigger** [1] - 86:6

**troops** [1] - 16:21

**True** [1] - 54:13

**true** [22] - 28:5, 63:14, 70:13, 79:11, 79:12, 97:15, 118:9, 154:25, 157:2, 158:3, 159:24, 172:13, 173:24, 174:9, 176:17, 176:19, 202:9, 202:13, 204:14, 205:19, 212:5, 213:14

**truly** [1] - 21:11

**trust** [2] - 45:16, 107:4

**truth** [7] - 158:7, 158:17, 158:18, 160:10, 213:10, 213:11

**truthfully** [1] - 180:5

**try** [8] - 57:11, 90:3, 114:12, 136:15, 141:8, 145:12, 185:7, 196:8

**trying** [14] - 46:9, 60:3, 65:21, 68:13, 73:24, 81:19, 97:14, 100:7, 106:20, 109:24, 111:6, 111:8, 111:9, 115:10, 115:24, 122:6, 146:10, 147:7, 149:2, 152:8,

153:13, 153:16, 153:20, 160:25, 161:14, 162:12, 162:13, 179:25, 187:9, 191:7, 203:6

**Tube** [1] - 76:24

**turn** [3] - 14:17, 114:16, 125:24

**turned** [3] - 23:8, 87:21, 150:11

**turning** [1] - 125:23

**Turns** [1] - 29:5

**twice** [1] - 57:12

**twist** [1] - 44:9

**two** [87] - 7:16, 9:20, 10:11, 13:1, 14:20, 19:12, 20:6, 20:11, 25:11, 44:19, 44:22, 45:25, 49:25, 50:23, 55:9, 55:14, 56:8, 56:12, 57:4, 57:18, 58:19, 58:20, 58:21, 59:4, 59:7, 59:11, 59:16, 59:17, 59:21, 60:2, 60:6, 60:8, 60:17, 62:7, 62:10, 62:22, 64:3, 64:4, 66:11, 66:18, 67:4, 67:5, 68:15, 70:7, 70:14, 74:9, 77:19, 80:19, 82:24, 84:1, 85:14, 85:16, 87:20, 88:25, 91:7, 92:11, 92:18, 100:5, 103:10, 112:2, 121:25, 125:19, 127:8, 130:12, 140:8, 143:2, 145:18, 151:4, 155:13, 155:16, 156:6, 156:17, 157:24, 160:6, 160:7, 161:8, 161:13, 166:1, 169:21, 170:5, 170:8, 173:17, 199:16, 201:16, 202:21

**two-year** [1] - 140:8

**type** [11] - 16:16, 56:24, 106:12, 106:14, 107:8, 109:11, 112:23, 136:8, 171:12, 183:14

**types** [3] - 205:23, 206:2, 207:20

**typewriter** [1] - 147:25

**typewriting** [1] - 213:14

**typical** [3] - 125:13, 147:14, 147:16

**Typically** [1] - 181:21

**typically** [7] - 47:21, 86:11, 114:10, 114:11, 114:16, 125:19, 125:21

## U

**uh-oh** [1] - 87:25

**Uintah** [5] - 11:2, 16:3, 17:24, 18:10, 18:14

**ultimate** [2] - 178:24, 180:25, 193:20

**ultimately** [5] - 13:11, 31:12, 154:21, 193:17, 193:18

**uncomfortable** [2] - 46:13, 129:1

**uncommon** [3] - 18:25, 72:13, 179:2

**unconstitutional** [2] - 63:23, 64:6

**undefined** [1] - 60:9

**Under** [1] - 106:7

**under** [21] - 13:20, 25:3, 55:5, 91:22, 102:8, 120:15, 124:24, 126:7, 148:13, 148:23, 152:12, 163:21, 167:19, 170:17, 171:13, 171:16, 174:23, 187:1, 190:10, 190:12, 194:9

**underarm** [1] - 44:4

**underneath** [1] - 28:15

**understood** [2] - 67:20, 76:5

**undertake** [1] - 122:10

**undertaking** [1] - 70:3

**underuse** [1] - 172:20

**undisputed** [1] - 124:12

**unfairly** [1] - 193:1

**unfold** [1] - 75:14

**unfortunately** [1] - 131:6

**unhappy** [1] - 33:10

**unheard** [1] - 85:21

**uniformed** [1] - 13:8

**unintended** [1] - 175:17

**unique** [1] - 9:22

**unit** [11] - 18:5, 51:3, 51:22, 68:19, 103:4,

103:8, 178:19, 180:7, 190:18, 202:5, 202:18

**Unit** [1] - 130:12

**UNITED** [1] - 1:1

**United** [3] - 7:4, 46:9, 121:24

**units** [1] - 179:9

**universe** [1] - 89:15

**unless** [5] - 71:2, 105:9, 137:4, 146:25, 168:21

**unoccupied** [1] - 169:5

**unofficially** [1] - 34:2

**unpredictably** [1] - 173:19

**unreasonable** [1] - 90:1

**unreasonably** [1] - 190:23

**unspecified** [1] - 55:15

**unsubstantiated** [2] - 199:5, 199:8

**untrained** [1] - 185:15

**unusual** [2] - 68:24, 94:25

**unwritten** [7] - 49:17, 49:18, 50:5, 52:4, 52:11, 59:8

**up** [75] - 3:21, 8:18, 19:23, 21:13, 21:23, 22:8, 24:11, 33:9, 33:23, 34:22, 35:3, 58:23, 68:14, 73:18, 75:9, 75:19, 80:7, 81:1, 83:2, 83:11, 86:14, 95:9, 95:22, 97:18, 97:21, 98:16, 101:2, 101:8, 103:19, 103:23, 108:8, 111:19, 113:25, 115:3, 115:6, 115:9, 116:11, 116:14, 116:22, 117:8, 117:10, 118:12, 133:9, 135:22, 148:20, 148:21, 149:5, 149:7, 149:18, 151:11, 151:14, 151:19, 151:25, 152:7, 154:20, 166:14, 167:5, 167:8, 169:1, 175:2, 175:17, 176:11, 176:15, 177:1, 179:14, 183:7, 194:8,

196:25, 198:20, 202:10, 205:21, 208:24, 209:25, 210:23
**upheld** [1] - 106:19
**UPON** [1] - 1:13
**upper** [4] - 43:21, 43:23, 43:25, 126:6
**urgent** [1] - 86:18
**usage** [3] - 67:17, 68:1, 68:8
**uses** [1] - 46:10
**UTAH** [2] - 212:2, 213:2
**Utah** [29] - 1:17, 4:21, 4:24, 5:3, 5:23, 6:23, 6:25, 8:22, 11:3, 12:15, 13:20, 13:25, 14:1, 14:10, 15:10, 17:1, 22:16, 25:5, 25:7, 26:8, 42:2, 122:13, 138:9, 143:7, 208:13, 208:16, 213:8, 213:22
**utilizing** [1] - 87:15

## V

**vacation** [1] - 176:12
**vaguely** [1] - 119:3
**valid** [11] - 112:9, 115:11, 115:12, 115:14, 140:12, 140:16, 140:18, 146:3, 146:4, 165:1
**Valley** [1] - 24:10
**value** [1] - 192:8
**variety** [5] - 6:17, 14:1, 14:2, 17:3, 205:2
**various** [3] - 8:5, 154:20, 178:11
**vascular** [1] - 189:23
**vehicle** [5] - 168:18, 169:7, 169:17, 190:8, 192:1
**vehicular** [1] - 27:21
**vendors** [1] - 46:6
**verbal** [8] - 77:10, 77:13, 79:2, 79:7, 79:14, 81:6, 96:19, 160:15
**verify** [1] - 110:9
**vernacular** [1] - 68:1
**version** [6] - 149:22, 150:17, 151:3, 159:8, 159:10, 159:23
**versus** [1] - 41:8,

67:7, 106:17, 113:6, 137:18, 145:1, 145:15, 158:21, 171:14, 175:13, 179:17
**vicinity** [1] - 103:5
**video** [5] - 37:4, 37:11, 37:13, 44:2, 44:3
**videos** [10] - 35:24, 41:22, 45:21, 45:22, 45:23, 45:24, 46:10, 182:14, 209:25
**view** [3] - 27:12, 87:19, 109:2
**violence** [5] - 170:14, 171:4, 202:22, 202:23, 202:24
**vision** [2] - 94:15, 114:12
**visit** [1] - 20:20
**visual** [1] - 117:16
**vividly** [1] - 129:14
**voice** [1] - 37:10
**volume** [1] - 66:18
**Vonne** [1] - 39:9
**VONNE** [1] - 39:9
**vs** [1] - 1:5

## W

**wager** [1] - 179:4
**waist** [1] - 125:23
**wait** [4] - 59:2, 59:5, 59:12
**waited** [1] - 58:21
**waiting** [21] - 50:12, 50:20, 55:10, 55:15, 55:17, 55:18, 55:25, 56:9, 56:13, 57:4, 60:9, 62:8, 62:22, 65:3, 66:12, 70:8, 143:13, 156:7, 159:19, 197:22, 198:13
**Wal** [2] - 65:7, 143:6
**Wal-Mart** [2] - 65:7, 143:6
**walk** [5] - 30:8, 43:11, 46:5, 90:6, 194:1
**Walker** [1] - 26:7
**walking** [3] - 28:7, 210:1, 210:21
**WALLENTINE** [4] - 1:14, 3:3, 212:19, 213:5
**Wallentine** [5] - 3:8, 3:10, 3:12, 53:7, 100:20
**wallet** [3] - 95:25,

204:23, 204:25
**wallet's** [1] - 96:2
**wants** [3] - 65:19, 158:12, 205:11
**warehouse** [3] - 65:7, 143:5, 173:3
**warehouses** [1] - 175:14
**warning** [47] - 50:8, 50:9, 50:14, 58:18, 59:1, 59:2, 59:13, 60:20, 60:24, 61:14, 61:15, 62:16, 64:22, 65:8, 69:2, 73:23, 96:16, 96:20, 152:10, 156:5, 157:1, 157:5, 157:14, 157:16, 157:25, 158:23, 159:9, 159:11, 159:20, 165:19, 165:25, 195:5, 195:9, 196:12, 196:14, 196:18, 197:16, 197:18, 197:21, 198:12, 198:22, 198:23, 199:4, 199:19
**warnings** [35] - 49:25, 50:3, 50:6, 50:21, 55:9, 55:15, 56:8, 56:12, 57:16, 57:18, 57:22, 58:1, 59:5, 59:12, 60:9, 60:20, 62:7, 62:11, 62:22, 65:3, 70:8, 70:24, 71:3, 143:25, 144:8, 152:10, 153:1, 155:2, 155:8, 155:13, 155:15, 155:18, 156:7, 159:16, 180:10
**warrant** [5] - 9:1, 9:2, 9:9, 25:15, 56:1
**warrantable** [1] - 8:25
**warrants** [1] - 202:21
**Warrants** [1] - 8:24
**watch** [4] - 37:8, 128:21, 203:24, 204:24
**watched** [2] - 45:9, 209:25
**watching** [1] - 205:17
**water** [4] - 28:6, 28:9, 28:12, 33:17
**wave** [1] - 28:18
**waving** [2] - 28:19, 29:5
**ways** [1] - 4:3
**weapon** [1] - 100:15

**wearing** [6] - 42:20, 47:23, 86:22, 117:4, 152:8, 152:20
**wedding** [1] - 20:14
**week** [2] - 7:11, 20:13
**weekend** [3] - 49:13, 50:24, 134:6
**weeks** [4] - 19:12, 20:11, 24:23, 176:13
**weight** [1] - 194:17
**Wendall** [2] - 21:19, 21:22
**west** [6] - 42:3, 128:9, 143:23, 147:24, 179:2, 182:8
**western** [1] - 69:25
**whatsoever** [1] - 185:24
**whine** [1] - 191:4
**whit** [1] - 174:24
**white** [9] - 84:12, 113:25, 114:1, 116:16, 116:19, 117:4, 152:8, 162:8
**who've** [1] - 187:25
**whole** [8] - 44:19, 100:12, 128:12, 137:3, 160:19, 163:1, 182:15, 213:10
**wholistically** [1] - 169:22
**widely** [1] - 200:6
**wife** [3] - 20:15, 20:18, 93:21
**willing** [2] - 88:12, 179:4
**win** [2] - 33:13, 147:13
**wish** [1] - 113:24
**withdraw** [1] - 118:6
**withstanding** [3] - 117:19, 141:14, 146:21
**WITNESS** [14] - 34:4, 34:19, 36:3, 36:9, 36:13, 46:16, 78:21, 106:1, 155:11, 158:10, 165:8, 170:22, 189:21, 213:21
**witness** [15] - 3:4, 5:13, 6:5, 22:4, 23:13, 23:14, 23:25, 24:1, 24:6, 24:8, 33:1, 70:15, 213:5, 213:9, 213:12
**witnesses** [4] - 67:3, 148:17, 154:20, 158:25
**woefully** [1] - 63:21,

63:23, 64:5
**woman** [1] - 43:10
**won** [2] - 58:22, 129:16
**wonder** [1] - 166:12
**wooden** [1] - 37:8
**word** [12] - 68:1, 68:15, 69:19, 72:22, 84:19, 112:18, 121:5, 126:15, 136:13, 136:17, 163:6, 165:15
**worded** [1] - 61:21, 65:25, 66:15
**words** [8] - 54:10, 63:15, 78:6, 81:17, 81:22, 85:22, 136:16, 175:3
**works** [2] - 22:19, 197:12
**workup** [1] - 133:22
**world** [4] - 106:20, 106:21, 132:22, 134:21
**world's** [3] - 43:15, 70:21, 129:11
**worried** [1] - 158:20
**worthless** [1] - 107:21
**Wow** [1] - 129:23
**wrapped** [1] - 148:19
**wrenching** [1] - 88:8
**wrist** [3] - 72:11, 72:12, 72:24
**write** [5] - 5:24, 9:9, 54:14, 182:25, 183:2
**writing** [12] - 7:5, 34:15, 39:17, 55:19, 55:21, 63:10, 78:13, 144:5, 144:11, 144:13, 145:8, 183:1
**written** [37] - 4:11, 7:14, 7:15, 7:18, 8:11, 8:16, 35:5, 48:4, 49:15, 50:8, 52:4, 53:8, 54:6, 54:11, 54:17, 54:24, 60:25, 61:13, 61:21, 62:14, 63:1, 66:23, 104:11, 122:5, 123:2, 142:16, 142:21, 142:24, 142:25, 143:1, 144:6, 144:16, 144:23, 146:22, 156:16, 159:14
**wrongful** [2] - 25:14, 26:1
**wrongfully** [1] - 26:6
**wrote** [5] - 8:17, 8:18, 48:1, 146:17, 157:11

## Y

**y'all's** [1] - 131:13
**Yacco** [98] - 38:10, 47:18, 47:20, 47:23, 61:6, 61:8, 71:14, 71:22, 72:21, 73:11, 73:22, 75:7, 77:13, 79:2, 79:6, 79:13, 80:4, 80:13, 81:18, 83:6, 84:7, 86:22, 87:5, 87:15, 90:22, 90:24, 91:3, 91:9, 94:16, 94:17, 97:18, 97:25, 99:7, 102:21, 102:22, 118:2, 118:11, 118:20, 119:13, 120:9, 120:24, 122:20, 122:23, 122:25, 123:4, 123:9, 123:16, 126:13, 126:16, 127:2, 127:3, 129:7, 130:17, 130:18, 130:21, 130:22, 131:10, 133:8, 135:8, 135:23, 136:2, 142:11, 149:16, 149:19, 150:1, 151:13, 152:13, 153:22, 155:15, 160:14, 160:24, 161:21, 161:23, 162:3, 162:15, 163:16, 163:17, 163:19, 166:3, 175:20, 175:23, 176:22, 180:21, 181:8, 183:21, 184:10, 185:3, 185:7, 187:8, 192:24, 197:19, 197:20, 205:21, 206:4, 206:15, 206:17, 206:22
**YACCO** [1] - 71:14
**Yacco's** [5] - 133:12, 135:21, 137:7, 163:18, 186:22
**yank** [2] - 162:12, 162:13
**yard** [11] - 29:3, 29:4, 38:13, 43:3, 43:4, 152:7, 153:23, 155:19, 155:20, 173:9, 173:18
**yards** [3] - 43:1, 90:22, 103:19
**year** [11] - 17:2, 20:11, 31:13, 40:5, 56:24, 88:14, 118:12, 118:15, 119:22, 140:8, 192:14
**years** [34] - 6:14, 10:17, 10:20, 10:21, 10:22, 11:1, 11:12, 11:20, 11:21, 20:6, 20:17, 23:16, 23:18, 23:20, 24:15, 24:16, 25:5, 30:17, 31:10, 31:17, 33:9, 119:14, 125:5, 127:6, 129:15, 131:2, 138:8, 141:11, 141:18, 141:19, 146:12, 146:17, 155:25, 199:16
**YEGELWEL** [1] - 2:3
**yell** [1] - 82:6
**yelling** [5] - 73:23, 81:18, 81:23, 81:25, 82:7
**York** [1] - 14:22
**Young** [33] - 35:9, 39:4, 48:22, 49:17, 50:25, 51:24, 52:19, 56:21, 59:25, 60:12, 60:19, 60:21, 61:24, 62:4, 62:24, 72:24, 76:17, 76:19, 85:11, 87:3, 107:18, 118:16, 127:3, 130:1, 138:17, 172:3, 172:5, 177:9, 177:15, 181:7, 183:20, 193:18
**young** [3] - 16:24, 84:13, 173:10
**Young's** [14] - 49:12, 50:16, 55:4, 56:6, 58:4, 60:4, 71:21, 72:3, 75:23, 77:1, 107:3, 134:5, 138:3, 144:14
**younger** [1] - 99:22
**yourself** [3] - 3:9, 17:8, 199:21

## Z

**zone** [1] - 125:17