UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT TRAMMELL,

      Plaintiff,

v.                                    **Case No.: 3:06-cv-984-J-16TEM**

BRUCE A. THOMASON, in his official
capacity as Chief of Police of the Jacksonville
Beach Police Department, Jacksonville Beach;
RICHARD KEITH DOROUGH, individually;
and, the CITY OF JACKSONVILLE BEACH,
FLORIDA,

      Defendants.

_____/

**O R D E R**

Plaintiff Mr. Robert Trammell ("Trammell") filed this action pursuant 42 U.S.C. § 1983, asserting that his constitutional rights under the Fourth and Fourteenth Amendments were violated when he was seized with excessive force and bitten by a "K-9" police dog.  Trammell also asserts several state law causes of action over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Trammell names as Defendants Bruce A. Thomason ("Chief Thomason"), in his official capacity as the Chief of Police of the Jacksonville Beach Police Department in Jacksonville Beach, Duval County, Florida (the "Department"); Officer Richard Keith Dorough ("Officer Dorough"), individually; and the City of Jacksonville Beach Florida (the "City").

Before the Court are:

1.     Trammell's Motion for Summary Judgment on Counts I and II against the City - Fla. Stat. § 767.01 (Strict Liability) and § 767.04 (Strict Liability)(Dkt. 46) ("Trammell's Motion");

2.     Officer Dorough's Motion for Final Summary Judgment on Count VI based on Qualified Immunity (Dkt. 52) (Officer Dorough's Motion"); and

3.     Chief Thomason and the City's Motion for Partial Summary Judgment on Counts IV and V (Dkt. 53)(the "Joint Motion for Partial Summary Judgment").

The parties filed responses in opposition with supporting documentation (Dkts. 58, 62 and 63).

The motions are addressed below.

## I.     BACKGROUND

The few facts that follow are not in dispute.

### The Evening of July 11, 2003

On July 11, 2003, Trammell was spending the evening with his friend Mr. Henry Cooper ("Cooper") at Cooper's residence located at 642 Aquatic Drive, Atlantic Beach, Duval County, Florida.  Cooper resided in a townhouse with a small back yard enclosed by an old six-foot wooden privacy fence.  (Howell Depo., p. 23).  Trammell, who was then unemployed, was a long time friend of Cooper's and spent the night at Cooper's residence several times a month. Trammell and Cooper spent the late afternoon hours of July 11, 2003, eating little and drinking several beers each, while intermittently watching TV and talking.  (Trammell Depo., pp. 21-22). Trammell is a Caucasian male who was then fifty-seven (57) years old. (Trammell Depo., pp. 17-25).

That same evening, at approximately 9:17 p.m., a woman called the Atlantic Beach Police Department to report that her sister's ex-boyfriend, Mr. Robert Dillard ("Dillard"),  was attempting to "kick-in" the sliding glass door at her home so he could get to her sister.  Dillard is an African-American male, who was then twenty-three (23) years old. (Howell Depo., pp. 9-26; Golleher Depo., pp. 7-30; Dorough Depo., pp. 23-36, 70-92).  Officers Douglas Paul Howell, Jr.

("Officer Howell") and Shannon R. Hartley, both from the Atlantic Beach Police Department, responded to the call and upon arrival at the scene were informed that Dillard had fled on foot. Officers Howell and Hartley called for assistance tracking Dillard.  (Howell Depo., pp. 15-17).

Because the Atlantic Beach Police Department does not own any helicopters or have a K-9 unit of its own, the Jacksonville Sheriff's office provided a helicopter and the  Department provided  one of its two K-9 units ( a handler and dog).  (Howell Depo., pp. 15-17).  The Department sent Officer Dorough, the K-9 handler on duty, and his police dog named Yacco ("Yacco") to assist in tracking Dillard, who was reported to be in the vicinity of Cooper's neighborhood.

On the evening in question, Officer Hartley remained near the scene of the attempted burglary while Officer Howell began the search for Dillard with Officer Dorough.  They were joined by Officer Theron Golleher ("Officer Golleher"), who was then assigned to the Jacksonville Sheriff's office.   (Howell Depo., pp. 16-17; Golleher Depo., p. 17). Officer Dorough was informed about Dillard's physical characteristics, his two outstanding misdemeanor warrants and that he was suspected of committing a residential burglary. (Dorough Depo., pp. 24, 27-31, 170-71).

When he began the search for Dillard, Officer Dorough had Yacco on a six-foot lead (leash), which he held looped over his right hand and he held a flashlight in his left hand. (Dorough Depo., pp. 68-70).  Assisted from the air by the helicopter, Officers Howell and Golleher followed behind Officer Dorough and Yacco as they began their ground search for Dillard at his last known location.  This air and ground search continued until Yacco appeared to indicate that he "found" something when he reached the outside back wall of the wooden fence enclosing the small backyard of Cooper's residence.  (Howell Depo., pp. 25, 37; Golleher Depo.,

3

pp. 25-27; Dorough Depo. pp. 75-84). Cooper's yard was very dark and Officer Dorough could not see through the six-foot wooden privacy fence. (Dorough Depo., 82, 169). Upon Yacco's alert, Officer Dorough removed part of the wooden fence, quickly shined his flashlight through the opening and saw no one.  (Dorough Depo., pp.85-88).

Officer Dorough entered Cooper's yard with Yacco on his leash. (Dkt. 90-92).  Officers Golleher and Howell entered Cooper's yard shortly after Officer Dorough and Yacco.  Upon gaining entry to Cooper's backyard, Yacco immediately bit Trammell and caused severe injury to Trammell's throat, which had been damaged previously by cancer.  (Dkt. 63 at p. 7, App. 2). Yacco was trained in the "bite and hold" technique - that is to bite the first body part he came to when he engaged with Trammell.  (Dorough Depo., pp. 90-92).  Officer Dorough shouted to Trammell to show him his hands.  (Dorough Depo., pp. 90-92).  Upon seeing that Trammell was not Dillard, Officer Dorough began ordering Yacco to release his bite.  Dorough Depo., pp. 94, 98, 100; Golleher Depo., pp. 29-31).

Once Yacco released Trammell and was removed from Cooper's backyard by Officer Dorough, one of the officers remaining in Cooper's yard called 911 and Trammell was transported to the Trauma One Center at Shand's Hospital ("Shands"). (Dkt. 63 at pg. 7, App. 2). Trammell was discharged from the hospital eighteen days (18) later after incurring $147,514.82 in medical bills. (Dkt. 63, pp. 17-18).   Once Trammell was bitten, the search for Dillard was called off. Dillard was captured on July 12, 2003.

**The K-9 Unit and its Governing Policies**

Officer Dorough became a police officer in 1989 and a K-9 handler in 1996. (Dorough Depo., pp. 11, 18).  In order to be a K-9 handler, Officer Dorough had to complete a four-hundred (400) hour canine patrol training course and become certified as a K-9 handler by the

Florida Department of Law Enforcement ("FDLE").  (Dorough Depo., 36-37, 39).  In order to train other K-9 handlers, Officer Dorough completed another four-hundred (400) hour course. (Dorough Depo., pp. 40-41).  Police Officers are not allowed to join the K-9 unit if they have been charged with the unjustified excessive use of force or violated the Department's other policies.  (Dorough Depo., pp. 127, 135).

Yacco, was a breed of dog known as a Belgian Malinois.  (Dorough Depo., pp. 24-26, 50). The City purchased Yacco in 1998 from a very reputable kennel after he met stringent standards including review of his personality (confident, eager and playful) and prey instincts. When not on duty with Officer Dorough, Yacco resided with Officer Dorough's family (which at the time consisted of his wife and two young daughters) in their home.  Prior to being purchased, Yacco had completed police dog training (known as "KNPV" training) in Holland.

Yacco was trained in the "bite and hold" technique of suspect apprehension. (Dorough Depo., pp. 162-63), which meant that he would bite the first body part that he came to when apprehending a suspect, but he typically bit in the leg. (Dorough Depo. at p. 154). Until the evening of July 11, 2003, Yacco had approximately 45 apprehensions that included biting the suspect (Dorough Depo., pp. 151-52).  Until July 11, 2003, Yacco had never bitten anyone in the head or neck or bitten the wrong suspect, other than one occasion (which was  the result of a training officer's own error during a training exercise).  (Dorough Depo., pp. 1345-36, 153, 155). Yacco's police dog certifications never lapsed while he worked with Officer Dorough. While in service for the City, Yacco was trained in some capacity pursuant to Department and FDLE policies on a daily basis.  (Dorough Depo., 45-47).

Sergeant C. David Young ("Sergeant Young") became the direct supervisor or the "K-9 sergeant" of the Department's two K-9 officers approximately seven months prior to July 11,

2003, and served in that capacity until February of 2004.  (Young Depo., p. 14).  Prior to serving

as the Department's K-9 Sergeant, Sergeant Young was trained as a K-9 handler in the United

States Navy and worked in that capacity from 1993-1996, although not as a K-9 supervisor or

trainer.  Sergeant Young was never certified by the FDLE as either a K-9 handler or trainer and

did not participate in any national K-9 professional handler organizations.  (Young Depo., pp.

23-25; 26-27). Part of Sergeant Young's job was to ensure that the Department's K-9 handlers

were properly trained and aware of the Department's policies for K-9s.   After Yacco bit

Trammell, Sergeant Young conducted the Department's "Incident Review" and concluded that

Officer Dorough's actions complied with the City's policies and procedures. (Young Depo., pp.

195-196).

The City has a written K-9 policy (the "K-9 Policy").  The K-9 Policy was developed

after reviewing similar policies from other agencies and approved only after it was submitted to

and approved by an accreditation manager from an outside governing agency.  (Dorough Depo.,

pp.140-142).  Some pertinent sections of the K-9 Policy provide as follows:

- Section 1.3 provides that a canine, while on a leash and accompanied by a K-9 officer, may be used to assist in the apprehension of a subject who has committed a crime.

- Section 1.4 provides that a canine may be released from the leash to pursue and capture a suspect when an officer reasonably believes that the suspect has committed a felony, the suspect is  in the act of committing a crime of violence, or apprehension of the subject by another means will expose the officer or another to the risk of serious bodily injury or death.

- Section L.1 covers the procedure for area searches within a boundaried geographical location, and directs the officer to keep the dog leashed unless the officer can be assured that no persons are inside the area except the suspect.

- Section L.2 addresses building searches and provides that the officer's duty is to verify that no person other than the suspect is in the building by conferring with officers at the scene and giving a verbal announcement.

- Section M covers the procedure for using a K-9 team to track persons.

The facts that follow are the parties' versions of what occurred on the evening on July 11, 2003.

**Trammell and Cooper's Account**

Trammell claims that the entire incident is an "absolute blur" and he does not recall many of the details. (Trammell Depo., pp. 60, 62).  Trammell acknowledged that the darkness of the back yard and his mild hearing loss in his left ear may have contributed to this.  (Trammell Depo., 37-39).

Trammell claims that shortly after he stepped outside into Cooper's dark backyard to make a phone call, Yacco entered the yard. (Trammell Depo., pp. 25, 26).  Trammell claims that he neither heard the police helicopter flying overhead, Officer Dorough opening the fence nor Officer Dorough and Yacco entering Cooper's backyard.

What Trammell claims is that he was using his cell phone to make a call when Yacco knocked him to the ground. (Trammell Depo., pp. 33, 35, 54, 61).  Trammell claims that he was able to remove Yacco from his neck and hold him at bay until Yacco was taken away. (Trammell Depo., pp. 54, 61).  Trammel claims that several officers watched him struggle with Yacco until Cooper came out of his house and made them remove Yacco.  (Trammell Depo., pp. 62, 65-66).

Cooper claims that when he entered his back yard, he saw Trammell seated on the ground, holding Yacco at arm's length. (Cooper Depo., 23,26).  Cooper claims that when he saw this, he screamed and he then saw one of the Officers pick up Yacco's leash and pull him away from Trammell.  (Cooper Depo., 23-24).

**Officer Dorough, Golleher and Howell's Account**

Following Yacco's alert behind Cooper's backyard, Officer Dorough chose for tactical reasons to remove part of the fence rather than look over it.  With Yacco in the down "heel" position, Officer Dorough looked through the fence opening, shined his flashlight and saw no one.  (Dorough Depo., pp. 84, 88).  Before entering the yard, Officer Dorough shouted two announcements or warnings of his presence and intention to enter the backyard with Yacco, each warning followed by a five to fifteen second interval. (Dorough Depo., pp. 84-85, 87).  Both Officers Golleher and Howell who were  following Officer Dorough and Yacco heard Officer Dorough make at least one announcement.  (Golleher Depo., pp. 27-28, 60; Howell Depo., p. 38).  Officer Dorough signaled to Yacco to enter Cooper's backyard and he followed behind. Officer Dorough felt Yacco's leash tighten when Yacco entered cooper's backyard.  Officer Dorough saw someone lying face down on the ground inside the fence to his right.  (Dorough Depo., pp. 92-93).   Officer Dorough turned on his flashlight and yelled "Let me see your hands!" (Dorough Depo., pp. 92-93).   The individual turned and rolled onto his side and wrapped his arms around Yacco who was engaged in a "bite and hold" technique on the individual's neck. (Dorough Depo., pp. 92-93).  When the individual rolled, Officer Dorough claimed that he saw for the first time that the person was not Dillard, but was instead a Caucasian male, Trammell. (Dorough Depo., p. 94).  Officer Dorough immediately yelled to Trammel to let go of Yacco while simultaneously giving Yacco the verbal command "stand still" to release his bite. (Dorough Depo., pp. 94, 98, 100; Golleher Depo., 100, 102, 106).  Yacco immediately responded to the release command and when Officers Golleher and Howell entered Cooper's backyard, Officer Dorough lifted the dog away from Trammell.  (Dorough Depo., pp. 100, 102, 106).  Yacco remained on the leash the entire time. (Dorough Depo., pp. 110, 146).

8

## II.     STANDARD OF REVIEW

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. V. Catrett, 477 U.S. 317, 322 (1986); Fed,.R.Civ.P.56.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 323-24. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 60 (11th Cir. 2004) (*internal citations omitted*).  "An issue of fact is genuine 'if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. at 1260.

## III.     THE PENDING MOTIONS

Following his release from Shands, Trammell filed suit in this Court.  His Amended Complaint (Dkt. 42) contains six-counts: Counts I and II against the City for alleged violations of Fla. Stat. Sections 767.01 and 767.04 (Strict Liability; Count III against the City for Negligence; Count IV against the City pursuant to § 1983 for violations of Trammell's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and from excessive use

9

of force; Count V against Chief Thomason pursuant to § 1983 for violations of Trammell's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and from excessive use of force; and Count VI against Officer Dorough pursuant to § 1983 for violations of Trammell's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and from excessive use of force.

Counts I thru III are state law claims governed by Florida Statutes and Florida common law (the "State Law Claims"). Count IV-VI are federal claims governed by 42 U.S.C. § 1983 (the "Section 1983 Claims").

### Trammell's Motion (Dkt. 46)

Trammell's Motion asks the Court to grant summary judgment on Counts I and II of the Amended Complaint because the City is "strictly liable for [Trammell's] damages" pursuant to Fla. Stat. Sections 767.01 and 767.04. (Dkt. 46 at p. 1). The City responds that Trammell's Motion should be denied because "the statutes in question do not apply to situations in which an injury from a dog bite occurs during the course of a police work dog tracking a suspect in the normal course of the dog's duties, and on the grounds that the City's liability in tort is governed exclusively by the sovereign immunity statute, Florida Statute Section 768.28." (Dkt. 58 at p. 1).

### Officer Dorough's Motion (Dkt. 52)

Officer Dorough's Motion asks the Court to grant summary judgment on Count VI because there are "no genuine issues of material fact" and "he is entitled to judgment as a matter of law on the grounds that he is entitled to qualified immunity." (Dkt. 52 at p. 1).  Trammell responds that summary judgment on qualified immunity grounds is inappropriate because genuine issues of material fact exist which preclude summary judgment. (Dkt. 63 at p. 1).

**The Joint Motion for Partial Summary Judgment (Dkt. 53)**

In the Joint Motion for Partial Summary Judgment, the City and Chief Thomason ask the Court to grant summary judgment on Counts IV and V of the Amended Complaint because Officer Dorough committed no constitutional violations, there was no custom or policy of unconstitutional deprivation of rights by the City and the City properly trained Officer Dorough. (Dkt.53). Trammell responds that summary judgment is inappropriate because "the City misapprehends certain applicable issues of law, and genuine issues of material fact exist, which preclude entry of summary judgment." (Dkt. 62 at p. 1). Specifically, Trammell claims that "the Department's policy in regard to K-9 warning was the 'moving force' behind Yacco's attack on" him. (Dkt. 62 at p. 9).

## IV.    DISCUSSION

### A.    The State Law Claims

### Counts I and II of the State Law Claims

Chapter 767, Florida Statutes, governs damages caused by dogs.  In particular, Section 767.01 reads as follows, "Owners of dogs shall be liable for any damage done by their dogs to a person or to any animal included in the definitions of "domestic animal" and "livestock" as provided s. 585.01."  Section 767.04, reads in pertinent part:

> The owner of any dog that bites any person while such person is on or in a public place,  or lawfully on or in a private place, including the property of the owner of the dog, is liable for damages suffered by persons bitten, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness.

Trammell claims that when interpreting these statutes, courts have held that Fla. Stat. Section 767.04 makes dog owners strictly liable to any person bitten by their dog and Section 767.01 makes dog owners strictly liable to any person whom their dogs damage.  (Dkt. 46 at p.

11

3, *internal citations omitted*)).  Essentially, Trammell claims that the plain meaning of Fla. Stat. Sections 767.01 and 767.04 makes every law enforcement agency strictly liable to every suspect apprehended by use of a police dog.[1]

The City responds that "the statutes in question do not apply to situations in which an injury from a dog bite occurs during the coarse of a police work dog tracking a suspect in the normal course of the dog's duties, and on the grounds that the City's liability in tort is governed exclusively by the sovereign immunity statute, Florida Statute Section 768.28." (Dkt. 58 at p. 1).

The City claims in support of its argument that if Trammell's interpretation were accepted, law enforcement would be "hamstrung by legal liability in their efforts to apprehend potentially dangerous subjects."(Dkt. 58 at p. 2). The City adds that the legislative intent in passing these statutes supports its interpretation.  The City notes that Chapter 767 was expressly intended by the Florida Legislature to address the problem of "dangerous dogs" as that term in defined in Fla. Stat. § 767.11(1) and not to address police work dogs performing their duty in apprehending a suspect. (Dkt. 58 at p. 2-3, "The legislature finds that dangerous dogs are an increasingly serious and widespread threat to the safety and welfare of the people of this State because of unprovoked attacks which cause injury to persons and domestic animals; that such attacks are in part attributable to the failure of owners to confine and properly train and control their dog . . . ").

The City's final argument is that the sovereign immunity statute waives sovereign immunity for liability for torts only to the extent specified in Section 768.28 and because

---

[1]  Trammell claims that because the pleadings, discovery and disclosure material establish that there is no genuine issue of fact that he was lawfully in Cooper's back yard; Yacco was owned by the City ; Yacco bit him; and as a result of that bite, Trammell sustained damages, Sections 767.01 and 767.04 would seem to make the City strictly liable for Plaintiff's damages..  (Dkt. 46 at p. 2).

immunity is not waived it would be a violation of Section 768.28 for the Court to hold the City liable in tort as Trammell urges it to do.

The Court finds the City's arguments persuasive.  Except as otherwise provided, Section 768.28 grants immunity to the City from all tort liability regardless of how the legal responsibility is determined.  The plain language of Section 768.28 requires the Court to deny Trammell's Motion the ground that it is barred by the City's sovereign immunity.  The legislative intent behind Sections 767.01 and 767.04 makes clear that the strict liability statutes Trammell references are not meant to ensnare working police dogs.  A working police dog trained to apprehend suspects is not by definition a "dangerous dog" that cannot be controlled by its owner - and all the verbal legal acrobatics attempted by Trammell in his motion will not make it so.  See Audette v. Commonwealth, 829 N.E. 2d. 248 (Mass. App. Ct. 2005). Based on the above, the Court finds that Trammell's Motion (Dkt. 46) should be denied and Counts I and II should be dismissed from the Amended Complaint.

### B.      The Section 1983 Claims

Violations of § 1983 occur when a person is deprived of rights secured by the United States Constitution and federal laws by one acting "under color of any state statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia."  42 U.S.C. § 1983.  Because  § 1983 "confers no substantive rights, a plaintiff seeking relief under the statute must bring a § 1983 claim in conjunction with some other statute or constitutional provision that provides substantive rights." See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979).  Here, the underlying bases for Trammell's  § 1983 claim is that Defendants violated his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure or arrest, and from the excessive use of force.

13

The Fourth Amendment guarantees that all individuals will "be secure in their person . . . against unreasonable seizures."   U.S. Const. Amend. IV.   The Fourth Amendment's right to freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest.   Graham v. Connor, 490 U.S. 386 (1989).   To assert a violation of the Fourth Amendment for the use of excessive force, a plaintiff must demonstrate that (1) a seizure occurred and (2) the force used to effect the seizure was objectively unreasonable.   Troupe v. Sarasota County, Florida, 419 F.3d 1160 (11th Cir. 2005), cert. denied, 547 U.S. 1112 (2006). Such  a test does not look to the motivation of the particular officer, rather it requires an analysis of whether a reasonable officer would have taken the same action given the facts and circumstances confronting him. Graham, 473 U.S. at 397; Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.").   The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."   Graham, 490 U.S. at 396.   Thus, in determining whether an officer's use of force was objectively reasonable, thereby entitling the officer to qualified immunity, the court must consider several factors including: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and (4) whether the force was applied in good faith or maliciously or sadistically."   Slicker v. Jackson, 215 F.3d 1225, 1232-33 (11th Cir. 2000).

A court should also consider the Graham factors: (1) the underlying crime's severity, (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists arrest or attempts to flee." Lafavors v. Jenne, 2006 WL 249544, at *1 (11th Cir. Feb 2, 2006) (citing to Graham, 490 U.S. at 396). When determining the

reasonableness of an officer's actions, a court must consider that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 394. In light of all of these considerations, the assessment of a police officer's use of force is a highly factual one.

In the context of a police dog bite, the Eleventh Circuit has held that a police dog bite after a defendant has been subdued, surrendered, or has ceased resisting or fleeing would violate the suspect's constitutional rights." See Reese v. Coxwell, 2006 WL 680811 at * 1 (March 13, 2006 N.D. Fla.) (citing Priester v. City of Riviera Beach, 208 F.3d 919, 924-25) (11th Cir.2000).

As a City employee, Officer Dorough contends he is entitled to qualified immunity as to the Section 1983 claims. He argues that the defense of qualified immunity protects "government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Eleventh Circuit provides that the defense of qualified immunity protecting government officials is the "usual rule. . . [and] only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." Lassiter v. Alabama A&M University, 28 F.3d 1146 (11th Cir. 1994); See Hope v. Pelzer, 536 U.S. 730 (2002); Gonzalez, 325 F.3d at 1233 (noting the purpose of the immunity is to protect "'from suit all but the plainly incompetent or one who is knowingly violating the federal law.'") (internal citation omitted).

**§ 1983 Claims and Officer Dorough's Claim of Qualified Immunity**

In order to receive qualified immunity, the government official "must first prove he was acting within his discretionary authority." Gonzalez, 325 F.3d at 1234 (internal citations omitted). If the public official establishes this requirement, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(internal citation and quotation marks omitted). To determine if the plaintiff met this burden, the Supreme Court has provided a two-part test for qualified immunity analysis: (1) "'[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right'" and (2) "if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then consider 'whether the right was clearly established.'" Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003) (internal citation omitted). If no constitutional violation is established, then the officer prevails and no further inquiry is required. Id. "On the other hand, if the facts establish a constitutional violation, we must determine whether, at the time of the violation, the right was clearly established, an inquiry that 'must be undertaken in light of the specific context of the case [and] not as a broad general proposition. . . .'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001). In this Circuit, the law can be "clearly established" for qualified immunity purposes only by decisions from the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Wilson v. Strong, 156 F.3d 1131, 1135 (11th Cir. 1998) (*quoting* Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821 826, n.4 (11th Cir. 1997)). The very action in question need not have been held unlawful for an official to lose the protection of qualified immunity . . . .Instead, the law merely must give defendants fair warning that their actions are unconstitutional." Reese, 2006 WL 680611 at *6.

The Court initially finds that it is undisputed that Officer Dorough was acting within the scope of his discretionary authority during the evening of July 11, 2003.  Next the Court determines whether, under the facts as alleged by Trammell, show Officer Dorough's conduct violated a constitutional right.  As noted above, Trammell's (with some support from Cooper) account of the events that led to Yacco biting him on the evening of July 11, 2003, differs markedly from Officer Dorough's account (with some support from Officers Golleher and Howell). The Court resolves the differences in favor of Trammell, with the *caveat* described below.

**Was Trammell Seized?**

In order to prove that his Fourth Amendment rights were violated, Officer Dorough must have "seized" Trammell on the evening of July 11, 2003.  A "seizure" occurs  when a government actor restrains the freedom of a citizen "by means of physical force or show of authority . . . ."  Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[w]henever an officer restrains the freedom of a person to walk away, he has seized that person.).  In Brower v.County of Inyo, 489 U.S. 593, 596-97 (1989), the Supreme Court explained that the Fourth Amendment would not be implicated in the case of an accidental termination of freedom of movement but "only where there is a government termination of freedom of movement through means intentionally applied."

Officer Dorough argues that Trammell was never "seized."  Officer Dorough supports his argument by citing to Andrade v. Burlingame, 847 F.Supp. 760 (N.D. Cal. 1994). In Andrade a K-9 unit stopped a car because it matched the description of a car occupied by persons suspected of committing an assault.  The officer approached the car, ordered the suspects out of the car and demanded that they lie down.  Once out of the car, one of the suspects, Andrade, the driver of the

car, did not immediately lie down as instructed.  While the officer was attempting to subdue Andrade, the officer's police dog exited his police cruiser on his own volition and bit two of the passengers before he was able to be called off.   It was later determined that no one in Andrade's car committed the assault.

In Andrade, the Court noted that when he stopped the car, the K-9 officer had no intention of using his police dog to subdue Andrade and his passengers.  The Andrade court determined that no Fourth Amendment violation occurred because such a violation occurs only when there is a governmental termination of freedom of movement through means intentionally applied.  Thus, because the officer never intended to seize anyone in the Andrade party by using his police dog, no Fourth Amendment violation occurred.  Andrade, 847 F.Supp at 767.

Trammell responds that under the logic of Smith v. City of Auburn, 2006 WL 1419376 (May 19, 2006 W.D. Wash.), he was seized.  In Smith two police officers were attempting to track a burglary suspect through a wooded park with a police dog on a leash.  While still attached to the leash, the police dog jumped over a shrub and landed on Smith, who was sleeping on a park bench.  The police dog bit Smith several times in the neck.  Smith was arrested and charged.  He maintained that he was innocent.

The officers in Smith cited Andrade's "no intentional physical control" argument when seeking qualified immunity.  The Smith court denied the officer's request for qualified immunity and rejected the officer's assertion that Smith was not "seized" within the meaning of the Fourth Amendment.  In its decision, the Smith court found that the Andrade case was totally inapposite because "[h]ere, the police dog was acting under direction to find and apprehend a burglary suspect.  As a result of that direction, plaintiff was apprehended, arrested and charged with a

crime. The fact that he now maintains that he did not commit the crime is irrelevant to his basis for asserting a Fourth Amendment claim." Smith, 2006 WL 1419376 at *2.

The Court finds Trammell's arguments persuasive.  On the evening of July 11, 2003, Officer Dorough was using Yacco to track a suspect.  Yacco "alerted" that he had found "Dillard" in Cooper's backyard.  Yacco's alert gave Officer Dorough reason to believe that Dillard was in Cooper's backyard or had very recently been in Cooper's backyard.  Once Officer Dorough entered Cooper's backyard with Yacco, his intent was to apprehend "Dillard" using Yacco.  Yacco is trained in the "bite and hold method" when apprehending a suspect, thus it is clear that once Officer Dorough and Yacco entered the backyard, Officer Dorough expected Yacco to perform as he was trained to do – that is, to "bite and hold" the suspect in Cooper's backyard.

Ironically, it is Trammell who summarizes the Court's conclusion best when he stated that:

> [W]hen Dorough finally gives a K-9 warning, we know that he is not merely following through with a search, but instead is announcing (or warning) that he is about to deploy force (namely, a police dog) to seize someone, in this case, what he thinks is the suspect he has been tracking. And according to all three police officers present, [Officer Dorough] gave a K-9 warning at Cooper's backyard . . . Hence, [Officer Dorough] was clearly attempting to *seize* someone when Yakko [sic] entered the backyard . . ."

(Dkt. 63 at p. 11).  Unfortunately for all concerned, it was Trammell and not Dillard that Yacco came upon and bit in Cooper's backyard.

Having determined that the Fourth Amendment is properly implicated, the Court now turns to Trammell's substantive arguments regarding excessive force.  It does so with one *caveat*.  In order to make his point about his seizure, Trammell acknowledged that Officer

Dorough gave a K-9 warning of some kind - whether it was two warnings separated by five to twenty seconds given before entering Cooper's backyard (Dorough Depo., 84-90) or one warning given while simultaneously entering Cooper's backyard (Golleher Depo., pp. 25-29; Howell Depo., pp. 25-26, 38-39) – is not necessary for the Court to resolve.  Based on the facts presented, the Court finds that Officer Dorough gave a warning.  The Court's conclusion is supported by Trammell's own pleadings, as well as precedent from the Middle District of Florida in Pace v. City of Palmetto, 489 F.Supp.2d 1325 (M.D. Fla. 2007).  In Pace, the court determined that while the plaintiff had not heard any verbal warning from an officer, the record provided ample evidence that the plaintiff was warned.  Pace, 489 F.Supp.2d at 1334.

**Excessive Force**

In Reese, another "excessive force police dog bite case," the court noted that it had "already set forth the facts which, based on the summary judgment record, are not in dispute.  These facts establish the events leading up to Defendants' discovery of Plaintiff.  The parties sharply dispute the circumstances surrounding Plaintiff's capture. These disputed facts are critical to Plaintiff's excessive force claim." Reese, 2006 WL 680811 *7.  The Reese court then listed some of the disputed facts in a footnote and concluded based on taking the summary judgment evidence in the light most favorable to the plaintiff that the plaintiff had stated a constitutional violation.  Id. at

The situation in Reese is analogous to this case.  Assuming that Trammell's recitation of the facts is true, a police helicopter, several police officers, including Officers Golleher, Howell and Dorough, with Yacco, were tracking a suspect who had allegedly committed a felony (residential burglary).  When tracking the suspect, Yacco "alerted" that the suspect might be in a small enclosed residential backyard.  Instead of asking for additional police helicopter search

20

assistance or clearly confirming himself that the backyard was either clear of any persons or at least of those fitting the actual suspects' description, Officer Dorough entered the residential backyard while simultaneously giving a K-9 warning.   Upon entry Yacco immediately bit Trammell, an older Caucasian male, who Officer Dorough should have known immediately was not the young African-male suspect for whom he was searching.   Trammell who had been drinking that afternoon, but who was not drunk, did not hear anything pertinent (either the police helicopter circling overhead or Officer Dorough giving the K-9 warning) was taken by surprise when he looked up from dialing his cell phone to see a huge dog "in his face."   Even upon realizing that Yacco was not biting and holding the actual suspect and was off of his leash, Officer Dorough did not immediately command Yacco to release Trammell.   Officers Dorough, Golleher and Howell did not immediately aid Trammell until Trammel's friend Cooper rushed out of his house and demanded that they do so.   Yacco only released Trammell after Officer Dorough physically removed the dog from Trammell's person instead of by responding to Officer Dorough's commands as he was trained to do.

As the Reese court stated and as is the case here, "[g]iven these facts, a reasonable jury could conclude that . . . use of the canine in the manner prescribed constituted unreasonable and excessive use of force in violation of Plaintiff's constitutional rights under the Fourth Amendment."   Having reached the decision that if a jury were to credit Trammell's testimony it could find that Officer Dorough violated Trammell's Fourth Amendment right to be free from excessive force during arrest obviates any need for the court to engage in a detailed analysis of the Graham factors.   Thus, the Court turns to the next sequential step in a qualified immunity analysis, which is to determine whether the right was "clearly established."

**Was the right clearly established?**

A right is "clearly established" if the contours of the right are sufficiently clear that "a reasonable official would understand that what he is doing violates that right." Pace, 489 F.Supp. 2d at p. 1335 (*citing* to Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Id. (*citing* to Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)).  In an excessive force case, a plaintiff can demonstrate that the law "clearly established" that the officer's use of force was excessive in two ways:

> (1) "a controlling and materially similar case declares the official's conduct unconstitutional" or
>
> (2) "the official's conduct lies so obviously at the very core of what the fourth amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, not withstanding the lack of case law."

Id. (*citing* to Priester, 208 F.3d at 926).  Or stated differently, in order to come within the narrow exception to pointing toward particularized case law, a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point. Id. at 926-27.

The City contends that Trammell cannot prove that as of July 11, 2003, his constitutional right was clearly established.  In support of this argument, the City cites to Pace.  In Pace, Judge Whittemore of the Middle District of Florida found that as of January 2003, when the incident giving rise to that case occurred, the plaintiff could not demonstrate that using non-deadly K-9 force under the circumstances to apprehend a fleeing felon without a verbal warning was in violation of the Fourth Amendment. Pace, 489 F.Supp.2d at p. 1335.

Trammell responds that <u>Pace</u> is inapposite.  Trammell contends that <u>Pace</u> is limited to its facts, which are that a confirmed felon was bitten by a police dog after he ran through a mangrove swamp in an attempt to flee the police even when he knew that he was being pursued by the police dog.   Here, Plaintiff claims that when Officer Dorough released Yacco into Cooper's backyard, he knew that whoever was in the backyard was surrounded.  (Dkt. 63 at p. 17).  Thus, Trammell argues that the case of <u>Kerr v. City of West Palm Beach</u>, 875 F.2d 1546 (11th Cir. 1989) which "'clearly established' that the use of a police dog (with little warning) upon a suspect who is "surrounded" was a violation of the Fourth Amendment . . ." (Dkt. 63 at p. 17) means that the law was clearly established before July 11, 2003.  Trammell claims that disputed facts from this case bring it even "further under the ambit of <u>Kerr</u>."  (Dkt. 63 at p. 17).

First of all, <u>Kerr</u>, is not helpful to Trammell.  In <u>Kerr</u> the court found that ""[I]f  . . . there is probable cause to believe that [a suspect] has committed a crime involving the threatened infliction of serious physical harm, [even] deadly force may be used if necessary to prevent escape, and if, *where* feasible, some warning has been given."  <u>Kerr</u> thus allows the use of deadly force in certain situations and only requires a warning *when feasible*.  Thus, without Kerr's help, Trammell (and even assuming that Officer Dorough failed to give Trammell any warning that he was about to use Yacco to apprehend him), Trammell has failed to point to any persuasive factual situations in pre-existing case law that persuasively demonstrate that Officer Dorough's actions on July 11, 2003, were illegal. Based on this, Officer Dorough is entitled to qualified immunity.

Trammell makes one final attempt to overcome Officer Dorough's qualified immunity by attempting to demonstrate that Officer Dorough's conduct on July 11, 2003, lies within the exception from <u>Priester</u> detailed above - that is, that not withstanding particularized case law,

Officer Dorough's conduct lies at the very core of Fourth Amendment prohibitions, so that the unlawfulness of his conduct was readily apparent. Trammell claims that Officer Dorough's conduct met this requirement when he and Officers Golleher and Howell stood by and did nothing to stop Yacco from continuing his "merciless attack" in which he bit Trammell "repeatedly in the throat and back of the neck." (Dkt. 63, pp. 17,19). First of all, Trammell engages in hyperbole in his effort to make his point and second, there is nothing in the record indicating that Officer Dorough's conduct on July 11, 2003, was so beyond the hazy border between excessive and acceptable force that he should have known he was violating the Constitution. This is not a case in which Officer Dorough purposely "sicced" Yacco on a compliant and unsuspecting suspect or one where Officer Dorough let Yacco bite Plaintiff for an extended period of time. Therefore, based on the facts of the instant case, the Court finds that Officer Dorough is entitled to qualified immunity on Trammell's Section 1983 claim.

### Trammell's Fourteenth Amendment Claim

Because Trammell's Fourteenth Amendment claim is appropriately pleaded and identical to his Fourth Amendment claim, it must be dismissed for the same reasons set forth above.

### § 1983 Claims and the City's Claim of Qualified Immunity

Because the Court has found that Officer Dorough is entitled to qualified immunity on the substantive constitutional claims underlying the Section 1983 claim once pending against him, the City cannot be held liable on those related claims pending against it. See Turpin v. County of Rock, 262 F.3d 779, 784 (8th Cir. 2001) (concluding that because court granted officers summary judgment on qualified immunity grounds, county likewise was entitled to summary judgment); see also Thomas v. Dickel, 213 F.3d 1023, 1026 (8th Cir. 2000) (reasoning "[b]ecause we have found that the officers' stop of plaintiffs' car did not violate their fourth

24

amendment [ ] rights, it follows that the plaintiffs' claim against the city (inadequate training and municipal custom) must likewise fail").

A § 1983 claim filed against government officers in their official capacities is essentially a claim against the governmental entity of which the officer is an agent. See Graham, 473 U.S. at 165. A government entity is not responsible for the unauthorized actions of its lower level employees unless the entity's final decision makers participated in establishing a custom that directly or indirectly results in the constitutional violation. Stated differently, as a municipality, the City may not be held liable under § 1983 on the basis of *respondeat superior*. See City of St. Louis v. Praprotnik, 485 U.S. 112, 125, n.2 (1988). Rather, a plaintiff must establish that the alleged violation of his constitutional rights resulted from a policy or custom of the City. Monell v. Dept. of Social Servs., 436 U.S. 658, 691 (1978). A "policy" is a decision that is officially adopted by the municipality, or created by an official of such rank that he could be acting on behalf of the municipality, and a "custom" is a practice that is so settled and permanent that it takes on the force of law. Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). To impose liability on a municipality for constitutional violations inflicted by its employee through actions taken pursuant to the municipality's customs or policies, there must be a constitutional violation. Stated differently, a plaintiff must demonstrate that a policy or custom of the City was the "moving force" behind the alleged constitutional deprivation. Id.

The Supreme Court has found that under "limited circumstances" inadequate police training may serve as a basis for § 1983 liability. However, a municipality will not be liable for a failure to train unless that failure amounts to "deliberate indifference" to the constitutional rights of the persons with whom the police come into contact. City of Canton v. Harris, 489 U.S. 378, 388-89, n.7 (1989). In Canton, the Supreme Court emphasized that courts are not to

become mired in an "endless exercise of second-guessing municipal employee-training programs" and stated that a plaintiff must identify a particular deficiency in the training program and prove that the identified deficiency was the actual cause of the unconstitutional injury, which requires more than simply showing "but for" causation. Id. at 390. Establishing that a particular officer was inadequately trained or that the conduct resulting in injury could have been avoided is not sufficient. Id.

However, even if Trammell had demonstrated that Officer Dorough was liable under Section 1983, he has not demonstrated that the City is liable under Section 1983. The court finds that the City's arguments as contained in the Joint Motion for Partial Summary Judgment (Dkt. 53) would have been persuasive on the record evidence reviewed by the Court.

### C.     The Remaining State Claim

The parties did not brief Count III in any of the motions that were pending before the Court.  In Count III Trammell alleges that the City was negligent on various grounds and as a proximate result of the City's negligence, Trammell suffered bodily injury.  Because Trammell's federal and other state claims have been disposed of by summary judgment,  only Count III remains pending before the Court. When the federal claims that gave a plaintiff access to federal court have been disposed of on a motion for summary judgment under Fed. R. Civ. P. 56, a court should refrain from exercising pendent jurisdiction absent exceptional circumstances.  Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 (2d Cir. 1974).  Because Trammell's federal claims have been disposed of on a motion for summary judgment, his remaining state claim will be dismissed without prejudice.

## V.     CONCLUSION

For the reasons set forth above, the Court **ORDERS** that:

1.  Trammell's Motion (Dkt. 46) is **DENIED** and **COUNTS I** and **II** are **DISMISSED** from the Amended Complaint;

2.  Officer Dorough's Motion (Dkt. 52) is **GRANTED**; and,

3.  The Joint Motion for Partial Summary Judgment (Dkt. 53) is **DENIED as MOOT** in accordance with the Court's findings above.

Having dispensed with all claims from the Amended Complaint, the Court instructs the

Clerk of the Court to **CLOSE** this case.

**DONE** and **ORDERED** at Jacksonville, Florida this 3rd day of June 2008.

Copies to:  Counsel of Record

JOHN H. MOORE II
United States District Judge